UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

PHILLIP E.K. BRYANT,

                                        Plaintiff,

                                                        9:14-cv-1042
v.
                                                        (TJM/TWD)

LT. WHITMORE, et al.,

                                        Defendants.

_____

APPEARANCES:                                    OF COUNSEL:

PHILLIP E.K. BRYANT
Plaintiff, *pro se*
13-B-2470
Marcy Correctional Facility
P.O. Box 3600
Marcy, NY 13403

HON. ERIC T. SCHNEIDERMAN                        MICHAEL G. McCARTIN, ESQ.
Attorney General of the State of New York        Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>REPORT-RECOMMENDATION AND ORDER</u>

        This civil rights action, commenced by *pro se* Plaintiff Phillip E.K. Bryant pursuant to 42

U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable

Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and

Northern District of New York Local Rule ("L.R.") 72.3(c).  Plaintiff, an inmate in the custody

of the New York State Department of Corrections and Community Supervision ("DOCCS"),

claims he was subjected to excessive force on May 15, 2014, at the Marcy Correctional Facility. (*See generally* Dkt. No. 21.)  Plaintiff's second amended complaint, which is the operative pleading in this case, was filed on April 14, 2015, naming Superintendent Thomas ("Thomas"), Lieutenant Whitmore ("Whitmore"), and Corrections Officers Bauer ("Bauer"), Fischer ("Fischer"), and John Doe ("John Doe") as Defendants.  (Dkt. No. 21.)  As set forth more fully below, Whitmore is the only Defendant to have appeared in this action, as Bauer and Fisher were not served, and the claim against Thomas was *sua sponte* dismissed.

Presently before the Court is Whitmore's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  (Dkt. No. 54.)  Whitmore argues Plaintiff failed to exhaust his administrative remedies prior to filing this action, and therefore, the action must be dismissed.  (Dkt. No. 54-7 at 4-10.[1])  Plaintiff has opposed the motion.  (Dkt. No. 57.) Whitmore has not submitted a reply.  For the reasons that follow, the Court recommends granting Whitmore's motion for summary judgment.

## I.    BACKGROUND AND PROCEDURAL HISTORY

According to Plaintiff, on May 15, 2014, while Plaintiff was exiting the school building at Marcy Correctional Facility, Whitmore grabbed Plaintiff by the neck, and slammed Plaintiff's head against the wall three or four times.  (Dkt. No. 21 at 4; Dkt. No. 21-1 at 1-2.)  Next, Whitmore, Bauer, Fischer, and John Doe punched Plaintiff several times in the back and side. (Dkt. No. 21 at 4.)  Thereafter, while escorting Plaintiff to a van, Fischer slammed Plaintiff's head into a wall and threw him on the floor.  *Id*.  Fischer then placed his knee into Plaintiff's back, thereby pushing Plaintiff's head to the floor.  *Id*.  Plaintiff suffered injuries to his head and

---

[1] Page references to documents identified by docket number are to the page number assigned by the Court's CM/ECF electronic docketing system.

leg, and "coughed up blood." (Dkt. No. 21-1 at 3.) Plaintiff also experienced five seizures after the assault. *Id.*

Plaintiff's claim for excessive force in violation of the Eighth Amendment against Whitmore, Bauer, Fischer, and John Doe survived *sua sponte* review. (Dkt. No. 23.) However, Plaintiff's claim against Superintendent Thomas was dismissed without prejudice for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A. *Id.* at 4-5.

On May 21, 2015, the Clerk issued a summons for Whitmore, Bauer, and Fischer to the United States Marshal for service. (Dkt. No. 24.) Whitmore's acknowledgment of service and answer were filed on June 4, 2015, and August 7, 2015, respectively. (Dkt. Nos. 26 and 33.) However, the summons was returned as unexecuted as to Bauer and Fischer. (Dkt. No. 32.) The Clerk reissued a summons to Bauer and Fischer on August 19, 2015, which was again returned as unexecuted on October 5, 2015. (Dk. Nos. 36, 43, 44.) By Text Order entered on October 13, 2015, the Court advised Plaintiff the U.S. Marshals had been unable to effect service on Bauer and Fischer. (Text Entry 10/13/2015.) Plaintiff was mailed two blank USM-285 forms with instructions to complete the forms, adding any additional information pertaining to Bauer and Fischer. (Dkt. No. 47.) The Clerk re-issued a third summons to Bauer and Fischer on May 2, 2016. (Dkt. No. 58.) To date, service has not been effected on Bauer and Fischer, nor has John Doe's identity been ascertained.[2]

Whitmore has now moved for summary judgment based upon Plaintiff's failure to exhaust his administrative remedies, seeking dismissal of Plaintiff's second amended complaint

---

[2]  Plaintiff was deposed at the Great Meadow Correctional Facility on October 30, 2015. (Dkt. No. 54-3.) However, Plaintiff testified he was only assaulted by Whitmore, Bauer, and Fischer on May 15, 2014, and that no other corrections officer subjected him to excessive force on the date of the alleged incident. (Dkt. No. 54-3 at 83 ("Q: Is there anybody else that injured you in any way on that day?  A: No.  No.").)

in it entirety for failure to exhaust administrative remedies.  (Dkt. No. 54.)  Plaintiff has opposed the motion.  (Dkt. No. 57.)  Whitmore has not filed a reply.

## II.	APPLICABLE LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); Fed. R. Civ. P. 56(c).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at 273 (citations omitted).  The nonmoving party must do more than "rest upon the mere allegations . . . of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).  A party opposing summary judgment is required to submit admissible evidence.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005) (emphasis in original). To defeat summary judgment, nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Id*. (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted). Statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP)(JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999[3]) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

---

[3] The Court will provide Plaintiff with copies of unpublished decisions in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76, 76 (2d Cir. 2009) (per curium).

## III.    PLAINTIFF'S FAILURE TO COMPLY WITH L.R. 7.1(a)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003).  Plaintiff has failed to respond to Whitmore's Statement of Material Facts as required under L.R. 7.1(a)(3).[4]  (Dkt. No. 57.)  His response does not mirror Whitmore's Statement of Material Facts, nor does it specifically admit or deny the statements therein and cite references to evidence in the record supporting or refuting Whitmore's statements.  *Id*.  Where a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record,[5] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[6]  *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

---

[4]  L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts.  Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises."

[5]  L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *But see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts].  It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[6]  Whitmore has complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to the summary judgment motion.  (Dkt. Nos. 54-1.)

However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may, in its discretion, opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted).

In deference to Plaintiff's *pro se* status, the Court has opted to review the entire record in this case. Moreover, because the operative pleading is verified, the Court will treat it as an affidavit in opposition to Whitmore's motion for summary judgment. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). However, Plaintiff's opposition (Dkt. No. 57) is unsworn, and unsworn statements are generally inadmissible in opposition to a motion for summary judgment. *See, e.g.*, *Witzenburg v. Jurgens*, No. CV-05-4827 (SJF)(AKT), 2009 WL 1033395, at *11 (E.D.N.Y. Apr. 14, 2009) (unsworn declarations are inadmissible for purposes of Rule 56 and cannot be considered by the court in deciding the motion for summary judgment).

Even so, on summary judgment motions involving *pro se* plaintiffs, courts have been known to consider unsworn submissions in opposition. *See, e.g.*, *Hamm v. Hatcher*, No. 05 Civ. 503(ER), 2013 WL 71770, at *7 (S.D.N.Y. Jan. 7, 2013) (to afford *pro se* plaintiff special solicitude, the court considered unsworn statements in his opposition papers but only to the extent based on personal knowledge or supported by other admissible evidence in the record, on the assumption that if the allegations were sufficient to raise an issue of fact, plaintiff would be given the opportunity to submit an affidavit properly attesting to the allegations); *Robles v. Khahaifa*, No. 09CV718 (HBS), 2012 WL 2401574, at *7 (W.D.N.Y. June 25, 2012) (same).

However, the Court's review has revealed that Plaintiff's submissions contain very little in the way of admissible evidence.

## IV. ANALYSIS

### A. Legal Standard for Exhaustion

Under the Prison Litigation Reform Act of 1996 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)).

In New York State prisons, DOCCS has a well-established three-step Inmate Grievance Program ("IGP"). N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2013). Generally, the DOCCS IGP involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* § 701.5(a). A representative of the facility's Inmate Grievance Resolution Committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* § 701.5(b)(1). If there is no such informal resolution, the full IGRC

conducts a hearing within sixteen calendar days of receipt of the grievance and issues a written decision within two working days of the conclusion of the hearing. *Id.* §§ 701.5(b)(2), (3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the central office review committee ("CORC") for a decision under the process applicable to the third step. *Id.* § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* § 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.5(d)(3)(ii). If a prisoner has failed to properly follow each of the applicable steps, including receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative remedies and is barred from commencing a federal lawsuit. *Woodford*, 548 *U.S.* at 93.

Because failure to exhaust is an affirmative defense, the defendant bears the burden of showing by a preponderance of the evidence that the plaintiff has failed to exhaust administrative remedies.[7] *See Murray v. Palmer*, No. 9:03-CV-1010 (GTS/GHL), 2010 WL 1235591, at *4 (N.D.N.Y. Mar. 31, 2010); *Bailey v. Fortier*, No. 9:09-CV-0742 (GLS/DEP), 2012 WL 6935254, at *6 (N.D.N.Y. Oct. 4, 2012) (the party asserting failure to exhaust bears the burden of proving its elements by a preponderance of the evidence).

---

[7] Whitmore preserved the exhaustion defense by asserting it in his answer. (Dkt. No. 33 at 2.)

A prisoner's failure to exhaust may nonetheless be excused if administrative remedies were "unavailable" to him. As the Supreme Court recently clarified, "[a]n inmate . . . must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, ___ U.S. ___, 136 S. Ct. 1850, 1858 (2016). To guide courts in this analysis, the Supreme Court identified "three kinds of circumstances" in which an administrative remedy, "although officially on the books," is not "available." *Id*. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 1860. Whether a plaintiff has exhausted his administrative remedies is a question of law to be decided by the court as a matter of law. *See Snider v. Melindez*, 199 F.3d 108, 113-14 (2d Cir. 1999).

**B.     Exhaustion Analysis**

Here, Whitmore argues Plaintiff has failed to exhaust his administrative remedies. (Dkt. No. 54-7 at 4-9.) The Court agrees.

As alleged in Plaintiff's verified pleading, Plaintiff was subjected to excessive force on May 15, 2004. (Dkt. No. 21 at 2.) Thereafter, Plaintiff filed two grievances, which were "dismissed both times, contrary to lack of evidence." (Dkt. No. 21 at 2.) Further, although Plaintiff wrote a letter to Superintendent Thomas regarding the incident, he did not receive a response from Thomas. *Id*. at 3.

At his deposition, Plaintiff testified he took no other steps other than to file a grievance

with the IGRC and write a letter to Superintendent Thomas:

> Q:  All right.  So once you filed a grievance with the IGRC, did
> you take any other steps . . . [a]nything beyond that, any other
> steps?
> A:  No.
> ***
> Q:  It sounds like the only step that you took was to file with the
> IGRC, at Marcy?
> A:  Yes.
> Q:  And then there were no steps beyond that?
> A:  Yes.
> Q:  That's correct?
> A:  Yes.  I mean, after that, like I said, I wrote Mr. Thomas [at
> Marcy Correctional Facility].  He never responded back to me.  So,
> I mean, I ended up – I ended up filing – I believe I – yes, I'm
> positive.  I filed another grievance after he didn't respond to me.
> Because I'm thinking I did.  I filed another grievance.  Because
> I'm thinking, you supposed to be the boss of these people.  If
> something is going on, you're the boss, I'm coming to you.  So you
> can defecate [sic] these problems, you know."

(Dkt. No. 54-3 at 114-16.[8])

Plaintiff also testified that Defendants were not the cause of his grievances not being

processed at the facility level:

> Q:  Was Lieutenant Whitmore, Officer Bauer or Officer Fischer
> the cause of [the grievances] not getting processed?
> A:  I can't say precisely they are.
> Q:  Do you have any information that would suggest that?
> A:  No, I don't.  Other than just hearing, like, little rumors how
> other things have happened with other people concerning
> grievances and stuff like that.  Or how two of the people that

---

[8] Plaintiff also testified that he wrote letters to the Attorney General and the Inspector General. (Dkt. No. 54-3 at 97-98, 108-10.)  However, it is well settled that writing letters to prison officials, or other officials, is insufficient to properly exhaust administrative remedies.  *See Macias v. Zenk*, 495 F.3d 37, 44-45 (2d Cir. 2007) (informal steps putting officials on "notice" are insufficient to exhaust administrative remedies); *Gizewski v. New York State Dep't of Corr. & Cmty. Supervision*, No. 9:14-CV-124(GTS/DJS), 2016 WL 3661434, at *14 (N.D.N.Y. July 5, 2016) (notice through informal channels is insufficient to properly exhaust administrative remedies).

worked at the grievance place, they work mainly for the COs on his stuff like that, instated of they do for the grievance of the inmates. So other than, that's just he said. I don't know how true it is and stuff like that.

Q: Other than that hearsay you're mentioning, you don't have any personal knowledge whatsoever that Lieutenant Whitmore, Officer Fischer or Officer Bauer were involved in your grievances not getting processed at Marcy [Correctional Facility]; is that fair to say?

A: No, I don't.

Q: Is that fair to say?

A: Yes, it is. I know I filed them, but for some reason something happened to them.

*Id*. at 107-08.

Here, even assuming Plaintiff filed such grievances with the IGRC, and even assuming he received no response from Superintendent Thomas, Plaintiff was required to complete step three of the DOCCS IGP as well – appealing to CORC if the superintendent had adversely disposed of his grievance or failed to timely respond. *See* N.Y. Comp. Codes R. & Regs., tit. 7, §§ 701.5(c)-(d), 701.6(g); *Heyliger v. Bebler*, 624 F. App'x 780, 782 (2d Cir. 2015) (noting that if a decision maker fails to timely respond to a grievance under the DOCCS IGP, the inmate must appeal to the next step in order to properly exhaust); *Warren v. Bealey*, No. 9:12-CV-1318 (TJM/RFT), 2014 WL 4715863, at *9 n.8 (N.D.N.Y. Sept. 22, 2014) ("in the event that the IGRC or superintendent . . . do not respond to an initial grievance within the time prescribed, it remains the prisoner's responsibility to file an appeal with CORC) (collecting cases).

Plaintiff testified, however, that he did not recall filing an appeal to CORC:

Q: Have you ever heard of CORC? Do you know what that is?

A: That name sounds familiar.

Q: All right. Did you ever file anything with CORC involving the May 15, 2014, incident?

A: The name – what did it specifically stand for?

Q: Central office review committee?

A:  Somebody told me about that, but I'm not sure if I ever wrote them.  That's why I said the name sounds familiar.  Somebody told me about that, but I'm not sure if I wrote them or not.
Q:  Okay, but you don't remember doing that for sure?
A:  I don't think so.  I don't think so.

(Dkt. No. 54-3 at 116-17.)

Karen Bellamy, Director of the DOCCS IGP, submitted a declaration in support of Whitmore's motion for summary judgment in which she stated that she conducted a diligent search of CORC's database of records, and found that Plaintiff has never filed a grievance appeal to CORC regarding the alleged May 15, 2014, incident.  (Dkt. No. 54-4 at ¶¶ 1-2)  Attached as Exhibit A to Bellamy's declaration is a computer printout from CORC showing that Plaintiff has never filed a grievance appeal to CORC.  (Dkt. No. 54-5.)  Accordingly, Bellamy declares Plaintiff has not filed a grievance appeal with CORC related to any issue connected to allegedly being assaulted by staff at Marcy Correctional Facility on May 14, 2014.  (Dkt. No. 54-4 at ¶ 4.)

In light of the above, the Court finds Whitmore has "adequately supported the affirmative defense of failure to exhaust."  *See, e.g.*, *Bennett v. Onua*, No. 09-cv-7227 (SAS), 2010 WL 2159199, at *3 (S.D.N.Y. May 26, 2010) (finding that defendants discharged their initial burden on summary judgment by producing affidavits that a search of prison records indicated that no grievances were ever filed).

Accordingly, Plaintiff has failed to exhaust his administrative remedies regarding the alleged May 15, 2014, use of excessive force at Marcy Correctional Facility.  *See Woodford*, (548 U.S. at 90) (holding the PLRA required "proper exhaustion" – "using all steps that the agency holds out, and doing so properly that the agency addressed the issues on the merits").

Plaintiff's failure to exhaust, however, does not end the Court's review because an inmate need only exhaust "available" administrative remedies.  *See Ross*, 136 S. Ct. at 1858.  In this

case, however, Plaintiff has made no claim or offered any evidence that the DOCCS IGP was not "available" to him. (*See* Dkt. Nos. 21 and 57.) In opposition to Whitmore's motion for summary judgment, Plaintiff succinctly summarized his attempt to exhaust his administrative remedies:

> I filed a grievance and wrote [Superintendent] Thomas. Nothing emerged from the grievance or the letter to the superintendent. I was assaulted by the three officers and thrown in the box where I suffered five [grand mal seizures]. Time passed then I filed the lawsuit.

(Dkt. No. 57 at 1.)

However, as discussed above, "in the event that the IGRC or superintendent . . . do not respond to an initial grievance within the period prescribed, it remains the prisoner's responsibility to file an appeal with CORC." *Warren*, 2014 WL 4715863, at *9 n.8. Indeed, "[o]nly upon exhaustion of these three levels may a prisoner seek relief pursuant to § 1983 in federal court." *Id.* at *9 (citations omitted).

Furthermore, there is no evidence in the record showing that the DOCCS IGP operated as a "simple dead end" in this case. Plaintiff has asserted no claim that DOCCS IGP was "so opaque" it was incapable of use, and the record is devoid of evidence that Defendants "thwarted" Plaintiff "from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *See Ross*, 136 S. Ct. at 1860.

Based upon the foregoing, the Court recommends granting Whitmore's motion for summary judgment.

**C.    Dismissal of Action**

Where a claim is dismissed for failure to exhaust administrative remedies, dismissal without prejudice is appropriate if the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik*, 366 F.3d 85, 86-87 (2d Cir. 2004). However, if a prisoner has failed to exhaust available administrative remedies and the time in which to exhaust has expired, it is proper for the court to dismiss the complaint with prejudice because any attempt to exhaust would be futile. *Id.* at 86; *see Hilbert v. Fischer*, No. 12 Civ. 3843(ER), 2013 WL 4774731, at *7 (S.D.N.Y. Sept. 4, 2013) (collecting cases). In this case, the time for Plaintiff to exhaust the alleged May 15, 2014, excessive force claims has long since expired.

Based upon the foregoing, the Court recommends dismissing Plaintiff's May 15, 2014, excessive force claim against Whitmore with prejudice for failure to exhaust available administrative remedies. For the same reasons, the Court also recommends dismissing the May 15, 2014, excessive force claim against unserved Defendants Fischer, Bauer, and John Doe with prejudice. *See, e.g.*, *Brown v. Eagen*, No. 9:08-CV-0009 (TJM/DRH), 2009 WL 815724, at *15 n.11 (N.D.N.Y. Mar. 26, 2009) (dismissing § 1983 action against unserved defendants where all of the plaintiff's claims has been dismissed in their entirety); *Nance v. Hazell*, No. 02-CV-3525 (FB), 2005 WL 859268, at *1 (E.D.N.Y. Apr. 15, 2005) (same).

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendant Whitmore's motion for summary judgment (Dkt. No. 54) be **GRANTED**, and it is further

**RECOMMENDED** that Plaintiff's second amended complaint (Dkt. No. 21) be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: November 4, 2016
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1**  The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*' s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

### B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

[1]  In light of this finding, there is no need to consider the defendant's qualified immunity argument.

### *Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall

have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1033395
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

James Martin WITZENBURG, Plaintiff,

v.

Charles Herman JURGENS, individually and as
Executor of the Estate of Louise Jurgens, Defendant.

No. CV–05–4827 (SJF)(AKT).
|
April 14, 2009.

West KeySummary

**1**  **Executors and Administrators**
 👉 Time for making distribution

In a dispute between relatives, the executor
of the decedent's estate did not breach
his fiduciary duties by failing to distribute
estate assets on the ground that he was not
required to distribute the assets under New
York law until there was a final accounting.
The executor made certain distributions to
beneficiaries of the decedent's will. The
executor had not made any distributions to
himself or taken any fees. It was the conduct
of the cousin bringing the suit, including his
failure to pay the outstanding judgment that
he owed to the estate totally over $750,000,
that prevented the executor from conducting
a final accounting and in turn making the
final distributions under the will. McKinney's
EPTL 11–1.5(c).

Cases that cite this headnote

**Attorneys and Law Firms**

James Martin Witzenburg, Kemah, TX, League City, TX,
pro se.

**OPINION & ORDER**

FEUERSTEIN, District Judge.

**\*1**  Before the Court are objections by plaintiff to a
Report and Recommendation of United States Magistrate
Judge A. Kathleen Tomlinson dated March 16, 2009
("the Report") that recommends: (1) granting defendant's
motion for summary judgment pursuant to Rule 56 of the
Federal Rules of Civil Procedure and dismissing plaintiff's
amended complaint in its entirety; (2) denying plaintiff's
motion to amend the amended complaint to add Patrick
McCarthy, Esq. as a defendant; and (3) denying plaintiff's
motion to compel discovery responses and to impose
sanctions upon defendant. For the reasons stated herein,
the Report of Magistrate Judge Tomlinson is accepted in
its entirety.

I

Rule 72 of the Federal Rules of Civil Procedure
permits magistrate judges to conduct proceedings on
dispositive pretrial matters without the consent of the
parties. Fed.R.Civ.P. 72(b). Any portion of a report and
recommendation on dispositive matters, to which a timely
objection has been made, is reviewed de novo. 28 U.S.C. §
636(b)(1); Fed.R.Civ.P. 72(b). The court, however, is not
required to review the factual findings or legal conclusions
of the magistrate judge as to which no proper objections
are interposed. See, Thomas v. Arn, 474 U.S. 140, 150, 106
S.Ct. 466, 88 L.Ed.2d 435 (1985). To accept the report
and recommendation of a magistrate judge to which no
timely objection has been made, the district judge need
only be satisfied that there is no clear error on the face of
the record. See, Fed.R.Civ.P. 72(b); Baptichon v. Nevada
State Bank, 304 F.Supp.2d 451, 453 (E.D.N.Y.2004),
aff'd, 125 Fed.Appx. 374 (2d Cir.2005); Nelson v. Smith,
618 F.Supp. 1186, 1189 (S.D.N.Y.1985). Whether or not
proper objections have been filed, the district judge may,
after review, accept, reject, or modify any of the magistrate
judge's findings or recommendations. 28 U.S.C. § 636(b)
(1); Fed.R.Civ.P. 72(b).

II

Plaintiff contends that Magistrate Judge Tomlinson erred, *inter alia,* in: (1) not understanding that he is a "double first cousin once removed," to the decedent Louise Jurgens ("decedent"), (Plaintiff's Opposition to Report and Recommendation [Plf. Obj.], ¶ 1); (2) finding that the purported false will was filed in New York Surrogate's Court, as opposed to New York Supreme Court, (Plf Obj., ¶ 2); (3) finding that plaintiff moved to Texas on or about April 17, 2002, when he actually moved on August 22, 2003, (*id.*); (4) failing to recognize that he was willing to be deposed in Texas, or by remote means, but not in New York because he has a "genuine fear for his safety [which] precluded [his] attendance in New York," (Plf.Obj., ¶ 3); (5) assuming that he had access to the records of the Suffolk County Supreme Court and received a copy of the final accounting, (Plf.Obj., ¶¶ 4, 11); (6) failing to recognize that he "moved in Federal court [for relief from the final accounting] as soon as [he] could," (Plf. Obj ., ¶ 5); (7) finding that defendant did not breach his fiduciary obligation to decedent's estate notwithstanding (a) that defendant did not require McCarthy, the guardian of decedent's property, to reconcile his final account with the inventory of assets prepared by defendant, which showed a monetary difference in excess of eight hundred thousand dollars ($800,000.00), and (b) that defendant did not account for and identify "the properties returned to the Estate from Federated Securities," (Plf.Obj., ¶¶ 6–8, 11); (8) finding that defendant "pays for the various law suits and the proceedings in which the estate is involved," (Plf.Obj., ¶ 7); (9) discounting the "Jurgens Conspiracy" theory he asserts in his amended complaint, (Plf.Obj., ¶ 9); (10) finding that because defendant had no authority to oversee or supervise McCarthy, as decedent's property guardian, he had a right to abandon his fiduciary duty to account for and locate assets of the estate, (Plf.Obj., ¶ 10); and (11) "rendering [her] decision on facts which are not proven, not evidence in this case and beyond the power of [the] court to consider under the doctrine of judicial notice but on figments of the Courts [sic] imagination," (Plf.Obj., ¶ 13).

**\*2** Upon *de novo* review of the Report and consideration of plaintiff s objections and defendant's response thereto, plaintiff's objections are overruled and the Report is accepted in its entirety as an order of the Court. [1]

[1] Plaintiff has not objected to the branches of Magistrate Judge Tomlinson's Report as recommended denying his motions to amend

the amended complaint and to compel discovery responses or impose sanctions. Upon review of those branches of the Report, the Court is satisfied that the Report is not facially erroneous. Accordingly, the Court accepts and adopts those branches of the Report.

## II. Conclusion

Upon *de novo* review of the Report, plaintiff's objections are overruled, the Report is accepted in its entirety, defendant's motion for summary judgment is granted and the amended complaint is dismissed in its entirety with prejudice. Plaintiff's motions to amend the amended complaint and to compel discovery responses or to impose sanctions are denied. The Clerk of the Court is directed to enter judgment in favor of defendant and against plaintiff and to close this case.

SO ORDERED.

## *REPORT AND RECOMMENDATION*

A. KATHLEEN TOMLINSON, United States Magistrate Judge.

This action arises out of the role of Defendant Charles Herman Jurgens ("Defendant" or "Jurgens") as Executor of the Estate of Louise Jurgens ("Louise" or "Decedent"). Several motions are presently before the Court. Plaintiff James Martin Witzenburg ("Plaintiff" or "Witzenburg"), a beneficiary of Louise's estate, brought this action against Defendant for, *inter alia,* (1) breach of fiduciary duty, seeking to recover damages in the amount of his inheritance under Louise's Will, (2) alleged mismanagement and/or conversion of funds of Louise's estate, and (3) interest and costs. Defendant moves here for summary judgment seeking dismissal of the remaining claims. By separate motion, Plaintiff moves to add a party defendant, namely, Patrick McCarthy, Esq., who served as a court-appointed property guardian of Louise's property for thirteen months before her death. Finally, Plaintiff moves to compel Defendant to respond to outstanding document requests and interrogatories and for the imposition of sanctions. District Judge Feuerstein has referred these three matters to me for a Report and Recommendations.

## I. BACKGROUND

## A. *Factual Background*

The facts of this case are set forth in substantial detail in Judge Feuerstein's March 1, 2007 Order granting in part and denying in part Defendant's motion to dismiss [DE 73]. Only the facts necessary for the analysis contained in this Report will be recited here.

Plaintiff and Defendant are apparently both cousins, in varying degrees, of the Decedent Louise Jurgens ("Louise" or the "Decedent"). [1] In and around July 1999, Jurgens obtained a "full" power of attorney from Louise. On September 9, 1999, Defendant Jurgens commenced a guardianship proceeding on behalf of Louise in the Supreme Court, Suffolk County, pursuant to Article 81 of the New York Mental Hygiene Law (*Jurgens v. Jurgens,* Index No. 20414–99) (the "Suffolk Supreme Court Action"). (Schmidt Decl. [2] ¶ 4.) On December 28, 1999, the Suffolk Supreme Court appointed non-party attorney Patrick McCarthy ("McCarthy") as guardian of Louise's property and named Jurgens as Louise's personal needs guardian (*id.;* Jurgens Aff. [3] ¶ 3; Def.'s 56.1 Stat. [4] ¶ 2). As Louise's personal guardian, Jurgens attended to her medical and personal needs. (Jurgens Aff. ¶ 3; Def.'s 56.1 Stat. ¶ 5.) However, during the period from December 1999 until Louise's death in January 2001 (the "guardianship period"), Jurgens did not have any control over Louise's finances or property, as those were under the control of Attorney McCarthy as the property guardian. (Jurgens Aff. ¶ 11; Schmidt Decl. ¶ 28; Def.'s 56.1 Stat. ¶ 5.) Moreover, Jurgens had no authority to oversee or supervise McCarthy's conduct as property guardian. (Jurgens Aff. ¶ 10; Schmidt Decl. ¶ 25; Def.'s 56.1 Stat. ¶ 25.)

[1] The record is unclear as to Plaintiff's exact relationship with Louise, as it is variously stated that he is her first cousin once removed (Compl. at 2; Jurgens Aff., Ex. A), her second cousin (Jurgens Aff. ¶ 1), or her nephew (Schmidt Decl. ¶ 4).

[2] Citations to "Schmidt Decl." are to the June 17, 2008 Declaration of Michael C. Schmidt, Esq., in Support of Defendant Jurgens' Motion for Summary Judgment [DE 123].

[3] Citations to "Jurgens Aff." are to the June 10, 2008 Affidavit of Charles Herman Jurgens in support of Motion for Summary Judgment [DE 124].

[4] Citations to "Def.'s 56.1 Stat." are to the Defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 [DE 125].

**\*3** Pursuant to the April 14, 2000 order of the Supreme Court, Suffolk County, McCarthy retained two Smith Barney stockbrokers as independent financial consultants to advise McCarthy with respect to managing Louise's portfolio, among other things [DE 73 at 3]. In general, McCarthy's conduct as property guardian was supervised and reviewed by the Suffolk County Supreme Court. McCarthy accounted for his actions as property guardian in a formal accounting filed with that Court (the "McCarthy Accounting"), in which he was represented by counsel. That Accounting was reviewed by McCarthy's representatives, the attorney for the Estate, the Supreme Court's accounting department, the Supreme Court Examiner, and a bonding company. (Jurgens Aff. ¶ 10; Schmidt Decl. ¶ 26; Def.'s 56.1 Stat. ¶ 26.) Although Jurgens received a copy of McCarthy's Accounting, he had no role in its preparation. (Jurgens Aff. ¶ 10; Schmidt Decl. ¶ 27; Def.'s 56.1 Stat. ¶ 27.)

On January 6, 2001, Louise died and both guardianships ceased. (Jurgens Aff. ¶ 4; Schmidt Decl. ¶ 6; Def.'s 56.1 Stat. ¶ 6.) Jurgens was appointed Preliminary Executor of Louise's estate (the "Estate") on January 30, 2001, and was appointed Permanent Executor on December 30, 2001. (Jurgens Aff. ¶ 4; Def.'s 56.1 Stat. ¶ 9.) Thereafter, Jurgens filed Louise's Last Will and Testament dated October 16, 1995 and Codicil dated July 28, 1998 (together, the "Will") (Jurgens Aff. ¶ 13; Def.'s 56.1 Stat. ¶ 6.) Upon reviewing the Will, Witzenburg executed a Wavier and Consent thereto dated October 22, 2001. (Jurgens Aff. ¶ 13, Ex. A; Def.'s 56.1 Stat. ¶ 8.) The Will was admitted to probate by the Suffolk County Surrogate's Court on December 3, 2001. (Schmidt Decl. ¶ 6; Jurgens Aff. ¶ 13.)

In his capacity as Executor of Louise's Estate, Jurgens took steps to liquidate her assets and sell her house, all of which was accomplished within a few months. Thereafter, Jurgens continued to work to ensure that all bills and taxes, including personal, fiduciary and estate taxes were paid. (Jurgens Aff. ¶ 4; Def.'s 56.1 Stat. ¶ 10.) In the course of performing his duties as Executor, which included locating and accounting for various assets of the Estate, Jurgens discovered that Witzenburg had withheld certain of Louise's money and personal property valued at $789,039.04, which Witzenburg had obtained through specific withdrawals, transfers and check negotiations

between March 1997 and June 2000. (Jurgens Aff. ¶ 5; Schmidt Decl. ¶ 7; Def.'s 56.1 Stat. ¶ 11.)

Following this discovery, on December 5, 2001, Jurgens, in his capacity as Executor, commenced a special proceeding in Suffolk County Surrogate's Court, pursuant to Section 2103 of New York Surrogate's Court Procedure Act, alleging that money and personal property belonging to Louise, valued at $789,039.04, had been withheld by Plaintiff (the "Surrogate's Court Action") (Jurgens Aff ¶ 5; Schmidt Decl. ¶ 7; Def.'s 56.1 Stat. ¶ 12.) On January 14, 2002, Jurgens filed an affirmation with the Surrogate's Court identifying the specific withdrawals, transfers and check negotiations in which Plaintiff had engaged between Marcy 1997 and June 2000. (Schmidt Decl. ¶ 7.)

**\*4** On June 13, 2003, Suffolk County Surrogate, Honorable John M. Czygier, Jr., granted Jurgens' motion (made on behalf of Louise's Estate) for summary judgment on the grounds that no triable issue of fact existed as to whether Witzenburg was in wrongful possession of specific assets belonging to the Estate. (Jurgens Aff ¶ 6; Schmidt Decl. ¶ 10; Def.'s 56.1 Stat. ¶ 17.) By Decree and Judgment entered on August 22, 2003 (the "Judgment"), Witzenburg was ordered to deliver such assets, if in his possession or control, or to pay Jurgens, as the Executor, $789,039.04, representing the total amount of withdrawals and transfers of Louise's assets resulting from the transactions conducted by Plaintiff between March 1997 and June 2000. (Jurgens Aff. ¶ 6; Schmidt Decl. ¶ 10, Ex. A; Def.'s 56.1 Stat. ¶ 17.) Moreover, in the Judgment granting the Estate's motion for summary judgment, Surrogate Czygier stated as follows:

> Sufficient concerns having been raised before this Court to question the nature of the subject transfers it is further ORDERED, ADJUDGED AND DECREED that the Clerk of the Surrogate's Court is directed to serve a copy of the Court's decision upon the Suffolk County District Attorney for further investigation[.]"

(Schmidt Decl. ¶ 11, Ex. A; Def.'s 56.1 Stat. ¶ 18.) The Judgment is a final judgment and was not appealed by Witzenburg. (Schmidt Decl., Ex. A; Def.'s 56.1 Stat. ¶ 20.)

Jurgens alleges, upon information and belief, that Witzenburg left New York shortly after entry of the Judgment on August 22, 2003. (Schmidt Decl. ¶ 12.) To date, Witzenburg has not made any payment to satisfy the Judgment, and it is Jurgens' understanding that Witzenburg has resisted all efforts to enforce the Judgment. (Jurgens Aff. ¶ 6; Def.'s 56.1 Stat. ¶ 19.) However, once the Estate files its final accounting (which it cannot do until after resolution of the instant action), it will ultimately be able to offset the amount of the Judgment against Witzenburg's share. (Jurgens Aff. ¶ 12.; Schmidt Decl. ¶ 12.)

Since his preliminary appointment in January 2001 and continuing through the present date, Jurgens, in his capacity as Executor, avers that he has consistently acted in the interests of the Estate. (Jurgens Aff. ¶¶ 7, 15; Schmidt Decl. ¶¶ 22, 31; Def.'s 56.1 Stat. ¶ 22.) For example, Jurgens maintains the Estate accounts, files and pays fiduciary taxes, and assists and pays for the various lawsuits and proceedings in which the Estate is involved. (Jurgens Aff. ¶ 7; Def.'s 56.1 Stat. ¶ 23.) In addition, Jurgens oversaw certain distributions of Louise's Will to beneficiaries during the period December 2001 through January 2004, pending a final accounting in Surrogate's Court. Jurgens has not made any distribution to himself personally and has not taken any Executor fees. (Jurgens Aff. ¶ 7; Schmidt Decl. ¶¶ 23, 24.)

To date, the Estate remains open, pending the outcome of the instant action. Once this case is resolved, Jurgens intends to render a final accounting of the Estate's property (the proceeds of which are currently held in the Estate accounts at Citibank or Smith Barney) in Surrogate's Court. (Jurgens Aff. ¶ 16; Schmidt Decl. ¶ 16.) As part of the final accounting, Witzenburg's share of the Estate will be determined, against which the Suffolk County Judgment can be applied. Then, according to Jurgens, the Estate can render final distributions of the Estate property and he can close the Estate in Surrogate's Court and complete his duties as Executor. (Jurgens Aff. ¶¶ 8, 12, 16.)

### B. *Procedural Background*

**\*5** The procedural background of this action is also set forth in substantial detail in Judge Feuerstein's March 1, 2007 Order [DE 73] granting in part and denying in part Defendant's motion to dismiss. Only the procedural background germane to this Report will be repeated here.

On December 21, 2004, Plaintiff filed the instant action against Defendant Jurgens, individually and as Executor of the Estate, as well as against Merrill Lynch Pierce Fenner & Smith, Inc. (Merrill Lynch) and Solomon Smith Barney Citigroup ("Smith Barney") in the United States District Court for the Southern District of Texas. On April 27, 2005, Plaintiff filed a First Amended Verified Complaint (the "Amended Complaint"). With respect to Jurgens, Plaintiff alleges that Jurgens and his attorneys were a "corrupt enterprise" and that they depleted Louise's assets, converted assets, committed "frauds" and breached a "fiduciary duty." (Amended Complaint, dated April 27, 2005 ("Am.Compl."), at 4.) On September 15, 2005, Jurgens' motion to transfer venue was granted and the action was transferred to this Court [DE 45].

### 1. *Defendant's Prior Motion To Dismiss*

By motion dated February 3, 2006 [DE 62–65], Defendant Jurgens moved to dismiss the Complaint as against him on the grounds that the Court: (1) lacked subject matter jurisdiction under the *Rooker–Feldman* doctrine and the probate exception to diversity jurisdiction; or in the alternative, (2) should abstain from hearing this dispute because it concerns the administration of an estate; or in the alternative, (3) should dismiss the amended complaint for failure to comply with Rule 8 of the Federal Rules of Civil Procedure.

By Order dated March 1, 2007 [DE 73], Judge Feuerstein held that, "pursuant to the *Rooker–Feldman* doctrine, the Court lacks subject matter jurisdiction over plaintiff's claims relating to the alleged conversion or improper removal of assets from the Merrill Lynch, Federated Securities or First Securities Investors brokerage accounts and those claims are dismissed" [DE 73 at 8]. Moreover, Judge Feuerstein explained that, to the extent Plaintiff seeks damages resulting from a diminished inheritance, he lacks standing because "legatees and beneficiaries thereof have no independent cause of action either in their own right or in the estate to recover estate property." (*Id.* at 21 (citing cases).)

On the other hand, Judge Feuerstein did not dismiss Plaintiff's claims for breach of fiduciary duty and mismanagement of assets, holding that those claims were not directly addressed in the Surrogate's Court proceeding and are not "inextricably intertwined" with the prior state court determination and. thus, are not barred by

the *Rooker–Feldman* doctrine. (*Id.* at 8–9.) In addition, Judge Feuerstein held that the probate exception to diversity jurisdiction does not apply to Plaintiff's breach of fiduciary duty claims. (*Id.* at 12.) In sum, the Court found that to the extent Plaintiff requests damages "to the heirs of the estate of Louise" and for "the depletion of the estate of Louise" based upon causes of action for breach of fiduciary duty, mismanagement of assets and fraud, the probate exception does not deprive this Court of subject matter jurisdiction over those claims. (*Id.* at 12 (citing cases)).

**\*6** Likewise, the Court denied the portion of Jurgens' motion requesting that the federal court abstain from exercising jurisdiction on the grounds that, even if the Court were to assume the existence of parallel proceedings in this Court and Surrogate's Court, the balance of factors nonetheless weighs against abstention. (*Id.* at 14–17.)

The Court also denied the portion of Jurgens' motion seeking dismissal of the Amended Complaint pursuant to Rule 8 of the Federal Rules of Civil Procedure on the grounds that Plaintiff's *pro se* complaint, although "not a model of clarity or brevity," satisfied the requirements of Rule 8(a) by providing fair notice of what plaintiff's claims are and the grounds upon which they rest. (*Id.* at 17–19.)

With regard to Plaintiff's claims against Smith Barney and Citibank, the Court granted Smith Barney's motion and dismissed the Amended Complaint as against it in its entirety, and *sua sponte* dismissed the entirety of the Amended Complaint against Merrill Lynch for lack of subject matter jurisdiction. (*Id.* at 19–22, n .6.)

In sum, the only claim against Jurgens which is before this Court on summary judgment is whether Jurgens, in his capacities as power of attorney and executor, breached his fiduciary duties to Louise's Estate, including whether he mismanaged Louise's or the Estate's funds, thereby causing "the depletion of the estate of Louise" and causing harm "to the heirs of the estate of Louise" [DE 73 at 12].

### 2. *The Preclusion Order Against Plaintiff*

On multiple occasions during the course of the present action, specifically between October 2007 and February 2008, Plaintiff failed to appear for his properly-noticed deposition, despite the Court's denial of his two motions for protective orders [DE 90, 100] and several opportunities to appear. (Schmidt Decl. ¶ 19.) During

this time, the Court explicitly warned Plaintiff as to the consequences of his failure to appear for deposition. By Order dated February 4, 2008 [DE 100], Judge Boyle cautioned Plaintiff that

> [s]hould he fail to be deposed in this action on or before February 27, 200 [8] he faces a preclusion order barring him from filing any affidavit in favor or in opposition to any motion for summary judgment, and further barring him from testifying at trial."

[DE 100.] Between February 4 and February 25, 2008, Defendant made several attempts to schedule Plaintiff's deposition, but Plaintiff nonetheless refused to appear. (DE 106, 107; Schmidt Decl. ¶ 21.) As a result, by Order dated March 4, 2008 (the "Preclusion Order") [DE 109], Judge Boyle held that

> [c]onsistent with the cautionary advice set forth in the order dated February 4, 2008, the *pro se* plaintiff, James Witzenburg, is hereby precluded from offering any affidavit in support of or in opposition to any motion for summary judgment and is also precluded from testifying at trial in this action unless, within ten (10) business days, he submits to a deposition at a mutually agreed date and time at the placed noticed by counsel for the defendants.

**\*7** [DE 109.]

On March 4, Defendant's counsel sent a letter to Plaintiff by fax, e-mail, and regular mail, enclosing a copy of the Court's March 4, 2008 Order, and offering to depose Plaintiff on March 7, 12, 14, 17, or 18, 2008. (Schmidt Decl. ¶ 22.) Plaintiff did not respond to the letter of Defendant's counsel in any traditional or electronic medium. Moreover, Plaintiff did not appear for his deposition by March 18 as directed by Judge Boyle's March 4 Order. (DE 106, 107; Schmidt Decl. ¶ 22; Def.'s 56.1 Stat. ¶ 33.) Accordingly, by operation of the March 4, 2008 Order, Plaintiff is precluded from offering any affidavit in opposition to the current summary judgment

motion and from offering any testimony at trial. Judge Boyle's decision on this issue is now the law of the case.

### C. *Summary Of Plaintiff's Allegations*

In the Amended Complaint, Plaintiff seeks monetary damages as follows: (1) $106,714.43 for funds converted by Jurgens, acting alone or in concert with others, and the Merrill Lynch and Smith Barney brokers, from a brokerage account allegedly owned by Plaintiff; (2) $2,293,225 for which Jurgens is liable "to the heirs of the estate of Louise Jurgens, including Plaintiff," for breach of fiduciary duties to the Estate and/or conversion of Louise's assets; (3) $1,299,175 for which Jurgens is liable because "[b]y placing an unwarranted guardianship on Louise ... Jurgens initiated the frenzy of activity that resulted in ... depletion of the estate of Louise ..." in that amount; (4) $350,000 in inheritance to which Plaintiff is allegedly entitled pursuant to Louise's "true will," including a $300,000 specific bequest and $50,000 which he claims is his share of the residual value of the Estate (his inheritance per stirpes via his mother's inheritance of 40% of the residual value of the Estate); and (5) interests and costs. (Am. Compl. at 33–34). [5]

[5]     The Amended Complaint does not contain separately numbered paragraphs and does not identify specific "causes of action." Accordingly, citations are to page numbers within the Amended Complaint. Moreover, the Court affords the Amended Complaint, filed by *pro se* Plaintiff "as liberal a reading as circumstances permit." *Hardie v. Grenier,* No. 84 Civ. 4710, 1987 U.S. Dist. LEXIS 12664, at \*6 (S.D.N.Y. Jan. 15, 1988); *see also Lerman v. Board of Elections in the City of N.Y.,* 232 F.3d 135, 140 (2d Cir.2000).

As discussed above, in the Order granting in part Defendant's motion to dismiss, Judge Feuerstein found that "pursuant to the *Rooker–Feldman* doctrine, the Court lacks subject matter jurisdiction over plaintiff's claims relating to the conversion or improper removal of assets from the Merrill Lynch, Federated Securities or First Securities Investors brokerage accounts and those claims are dismissed." [DE 73 at 8.] Moreover, Judge Feuerstein explained that to the extent Plaintiff is seeking damages resulting from a diminished inheritance, he has no standing to do so because "legatees and beneficiaries thereof have no independent cause of action either in their own right or in the estate to recover restate property," [DE 73 at 21 (citing cases).] Accordingly,

Plaintiff's claims for $106,714.43 for funds allegedly converted by Jurgens and the Merrill Lynch and Smith Barney brokers (No. (1) listed above) and $1,299,175 for depletion of Louise's assets during the guardianship period (No. (3) listed above) were dismissed pursuant to Judge Feuerstein's Order and need not be considered here. Likewise, Plaintiff's claim for $2,293,225 (No. (2) listed above) was dismissed to the extent it was based on alleged conversion of Louise's assets. The issues remaining before this Court are whether Jurgens breached his fiduciary duties to the Estate and is thus liable to Louise's heirs for $2,293,225 (No. (2) above), and whether Plaintiff is entitled to $350,000, or any portion thereof, in inheritance, pursuant to Louise's "true will" (No. (4) listed above).

**\*8** Insofar as the allegations in the Amended Complaint relate to Defendant Jurgens and are currently before this Court, Plaintiff alleges that Jurgens, in his capacity as executor of Louise's Estate, "committed five separate acts of fraud and many breaches of fiduciary duty." (Am. Compl. at 20). These acts of fraud and breaches of fiduciary duty, as distilled by the Court from the Amended Complaint, are as follows:

- Jurgens knowingly filed a false Last Will and Testament of Louise, which was prepared by Jurgens' counsel in the Surrogate's Court Action, thereby causing the Suffolk Supreme Court Action and/or the Surrogate's Court Action to be "premised upon the filing of a false document which was a fraud on the court," as well as on Louise, her estate, and her beneficiaries, including Plaintiff. (*Id.* at 20–21, Exs. 7, 8.)

- McCarthy was not an independent property guardian and he, together with the Smith Barney experts, "mismanaged" Louise's assets, and filed a false final accounting in the Suffolk Supreme Court Action. (*Id.* at 21–22, Ex. 1.)

- Jurgens' counsel in the Surrogate's Court Action hired a forensic accounting firm to prepare "a report" for which the Estate paid a fee of $53,428.94. However, no such report appears in the files of the Suffolk County Supreme Court or Surrogate's Court Actions. Thus, the $53,428.94 "expense" "is a fraud and unlawful conversion against Louise Jurgens, Plaintiff, and all other heirs of the estate of Louise Jurgens." (*Id.* at 24.)

- Jurgens' counsel in the Surrogate's Court Action caused the final accounting prepared by McCarthy, which was sent by the Court to the forensic accounting firm, to be sent to a non-existent person at the firm so that the firm would not be in the position of having to approve McCarthy's fraudulent final accounting. (*Id.* at 24–25.)

- In arranging the Estate's sale of Louise's residence, Jurgens did not conduct the sale as an "arm's length" transaction; the only appraisal submitted was from a company allegedly "under the exclusive control of Patrick McCarthy, even though McCarthy was no longer actively serving as property manager." (*Id.* at 25.) Moreover, Jurgens submitted an affidavit to the Surrogate's Court affirming that the sale was an "arm's length" transaction. (*Id.*) Jurgens' conduct constituted a breach of his fiduciary duty to Louise's Estate. (*Id.*)

- Jurgens filed a fraudulent bond with the Surrogate's Court and such bond does not actually exist, thereby conferring a fraud on the court and Louise's beneficiaries. (*Id.* at 25–26, Ex. 9.)

In addition, Plaintiff alleges that the difference of $897,115.27 between the listed value of assets contained in Jurgens' Inventory dated October 12, 2001 (filed on November 7, 2001) and McCarthy's Final Accounting (filed in August 2002), both of which pertain to the value of Louise's assets as of the date of her death (January 6, 2001), and Jurgens' alleged failure to address this discrepancy, reveal that Jurgens committed some type of unspecified fraud and that he "continues to act in concert with all parties ... to deplete and convert the assets of" Louise's Estate. (*Id.* at 9.) Finally, Plaintiff claims that Jurgens brought the Suffolk Supreme Court Action against him "to conceal and obfuscate the conversion of the property" of Louise and her Estate during the period in which Jurgens and McCarthy served as Louise's guardians. (*Id.*)

## II. *THE SUMMARY JUDGMENT MOTION*

### A. *Standard of Review*

**\*9** In reviewing a motion for summary judgment, the Court is guided by the tenets set forth in Federal Rule of Civil Procedure 56(c), which provides, in part:

... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law ....

Fed.R.Civ.P. 56; *Globecon Group, LLC v. Hartford Fire Ins. Co .,* 434 F.3d 165, 170 (2d Cir.2006); *Gray v. Lutheran Social Servs. of Metro. New York., Inc.,* No. 04–2843, 2006 WL 1982859, at *3 (E.D.N.Y. Jul.13, 2006). The moving party bears the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In addition, to determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from that inference in the light most favorable to the non-moving party. *Id .* at 157; *Fischl v. Armitage,* 128 F.3d, 50, 55 (2d Cir.1997).

Where the movant shows prima facie entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord,* 467 F.3d 263, 273 (2d Cir.2006). "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id.* See also *McPherson v. N.Y. City Dep't Of Educ.,* 457 F.3d 211, 215 n. 4 (2d Cir.2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Byrnie v. Town of Cromwell, Bd. Of Educ.,* 243 F.3d 93, 101 (2d Cir.2001) ("[e]ven where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor").

"If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Fischl,* 128 F.3d at 56 (citing *Hetchkop v. Woodlawn at Grassmere, Inc.,* 116 F.3d 28, 33 (2d Cir.1997)). On the other hand, Rule 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to material fact and that the movant is

entitled judgment as a matter of law." *Fed .R.Civ.P. 56(e) (2) .* In other words, summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Dobbs v. Dobbs,* No. 06 CV 6104, 2008 WL 3843528, at *5 (S.D.N.Y. Aug. 14, 2008) (the Court's goal should be to "isolate and dispose of factually unsupported claims ...").

**\*10** However, because Plaintiff is proceeding *pro se,* the Court is compelled to "read [*pro se* plaintiff's] supporting papers liberally, and ... interpret them to raise the strongest arguments they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Nevertheless, "the nonmoving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful." *Morris v. Lindau,* 196 F.3d 102, 109 (2d Cir.1999) (quotation omitted).

## B. *Procedural Issues*

On June 17, 2008, Defendant Jurgens served his motion for summary judgment on Plaintiff Witzenburg by e-mail and regular mail [DE 122]. With his summary judgment motion, Defendant also served Plaintiff with a cover letter providing the requisite Notice to *Pro Se* litigant which, in accordance with Local Rule of the Eastern District of New York 56.2, stated:

[y]ou are required to serve any opposition papers on my office *within 10 days of my service of this motion,* without filing any of your opposition papers with the Court .... Accordingly, to the extent you intend to oppose this motion, please send me within the requisite 10 days a service copy of your papers as well as an additional copy of your papers for me to send to the Court.

[DE 126] Plaintiff did not file any opposition papers or attempt any communication with Defendant or the Court by the June 27, 2008 due date. By letters dated July 1 and July 14, 2008, Defendant asked the Court to grant the summary judgment motion without opposition [DE 128, 133].

By Order To Show Cause dated July 15, 2008, the Court gave Plaintiff one final opportunity to demonstrate why Defendant's motion for summary judgment should not be treated as unopposed. The Court directed Defendant (i) to submit a written explanation to the Court no later than August 6, 2008 setting forth good cause why Plaintiff had failed to oppose Defendant's summary judgment motion; and (ii) to file any opposition papers to Defendant's summary judgment motion no later than August 6, 2008 [DE 134].

Plaintiff served his opposition to Defendant's motion for summary judgment on August 5, 2008 [DE 136], but did not submit a written explanation why he had failed to file his opposition by the original due date. (Schmidt Reply Dec. [6] ¶ 2.) Plaintiff's opposition, styled "Plaintiff's Response in Opposition to Defendant Charles Jurgens' Motion for Summary Judgment" (the "Response"), is, in effect, an unsworn affidavit. Unsworn affidavits are not competent summary judgment evidence unless they meet the requirements of *28 U.S.C. § 1746* or, at minimum, "substantially compl[y] with the[ ] statutory requirements [of *28 U.S.C. § 1746*] ...." *LeBoeuf, Lamb, Greene & MacRae, LLP v. Worsham,* 185 F.3d 61, 65 (2d Cir.1999); *see also Nissho–Iwai Amer. Corp. v. Kline,* 845 F.3d 1300, 1306 (5th Cir.1988). Although Plaintiff signed the Response, it is not a sworn affidavit. Likewise, there is no statement that the contents are "true and correct" or made "under penalty of perjury" as required under *28 U.S.C. § 1746* and Second Circuit case law.

[6]   Citations to "Schmidt Reply Decl." are to the August 7, 2008 Reply Declaration of Michael C. Schmidt, Esq., in Further Support of Defendant Jurgens' Motion for Summary Judgment [DE 137].

**\*11** Moreover, Plaintiff is precluded from submitting any affidavits in support of his opposition to Defendant's motion for summary judgment based upon Judge Boyle's March 4, 2008 Order, which the Court finds is law of the case on this issue. Under the "law-of-the-case doctrine, a court has discretion to re-examine an issue in certain circumstances." *Public Employees Retirement Association of New Mexico v. PriceWaterhouseCoopers LLP,* No. 07–3756–cv, 2009 WL 27704, at * 3 (2d Cir. Jan.6, 2009). However, "[c]ourts are understandably reluctant to reopen a ruling once made, especially when one judge or court is asked to consider the ruling of a different judge." *Ali v. Mukasey,* 529 F.3d 478, 490 (2d Cior.2008) A court's

decision whether to apply law-of-the-case is "informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine." *Prisco v. A & D Carting Corp.,* 168 F.3d 593, 607 (2d Cir.1999) (internal quotation marks omitted).

With regard to law-of-the-case doctrine, the Second Circuit has noted that

> [t]he law of the case doctrine ... while not binding, counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.

*ATSI Communications, Inc. v. the Shaar Fund, Ltd.,* 547 F.3d 109, 112 n. 3 (2d Cir.2008) (citing *Ali v. Mukasey,* 529 F.3d at 490). I find that the law-of-the-case doctrine applies in the current circumstances. Plaintiff has provided no argument or rationale here that there has been some "intervening development of law or fact that renders reliance on [Judge Boyle's] earlier ruling inadvisable." *Calabrese v. CSC Holdings, Inc.,* No. 02–CV–5171, 2009 WL 425879, at * 6 (E.D.N.Y. Feb. 19, 2009). Plaintiff has never presented any good faith reason for his failure to show up at his duly noticed deposition, in the face of specific Orders from the court to do so. The law of the case will be disregarded "only when the court has a 'clear conviction of error' with respect to a point of law on which its previous decision was predicated." *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir.1991) (quoting *Zdanok v. Glidden,* 327 F.2d 944, 953 (2d Cir.1964)). Here, Plaintiff presents no new evidence or facts to serve as any reasonable justification for his prior conduct or any basis whatsoever to disturb Judge Boyle's prior rulings.

In addition to the applicability of the law-of-the-case doctrine here, the Court also observes that because Plaintiff's Response constitutes an unsworn declaration, it is inadmissible for purposes of *Rule 56* and cannot be considered by the Court in rendering a decision on the present motion. *Nissho–Iwai Amer. Corp.,* 845 F.3d at 1306; *Hale Propeller LLC v. Ryan Marine Prods. Pty., Ltd.,* 151 F.Supp.2d 183, 200–01 (D.Conn.2001)

(disregarding affidavit where it failed to conform to the standard for unsworn declarations set forth by 28 U.S.C. § 1746); *compare LeBoeuf, Lamb, Greene & MacRae, LLP,* 185 F.3d at 65–66 (defendant's unsworn affidavit could be considered on summary judgment where it stated that "under penalty of perjury I make the statements contained herein" and was signed and dated). Accordingly, Plaintiff's Response cannot be considered on this motion. [7]

[7] Even if Plaintiff's Response were considered, the substance of the Response falls far short of the threshold necessary to support a showing of genuine issue of material fact with regard to the remaining claims. Rather, the Response contains conclusory and unsubstantiated statements, most of which purport to address "the numerous factual inaccuracies and misleading statements" in the Schmidt Declaration [DE 136 at 3], and none of which provide any evidentiary support for Plaintiff's claims.

**\*12** In addition, Plaintiff did not include in the Response a contravention of Defendant's Statement of Undisputed Material Facts [DE 125] or a separate statement of additional material facts for which there exists a genuine dispute, as required under Local Civil Rule 56.1(b). [8] Pursuant to Local Rule 56.1(c), each numbered paragraph in the moving party's statement of material facts "will be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Accordingly, for purposes of this motion, the statements contained in Defendant's Statement of Undisputed Material Facts [DE 125] are hereby deemed admitted as unopposed.

[8] Local Rule 56.1(b) provides: "The papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."

Nevertheless, where, as here, the motion for summary judgment is unopposed, "the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law ." *Vermont Teddy Bear Co. v. Beargram Co.,* 373 F.3d 241, 242 (2d Cir.2004); *Layachi v. Minolta Bus. Sys., Inc.,* 00 Civ. 731, 2001 WL 1098008,

at \*3 (S.D.N.Y. Sept.18, 2001) (where "non-moving *pro se* party has failed to submit papers in opposition, summary judgment should not be granted automatically") (internal citations omitted). The Second Circuit has stated:

> the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment. Instead, the district court must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law.

*Vermont Teddy Bear Co.,* 373 F.3d at 244. Plaintiff's failure to oppose summary judgment in any legally meaningful way allows the Court to accept Defendant's factual assertions as true; however, the court "must be satisfied that the citation to evidence in the record supports the assertion." *Id.*

### C. Breach of Fiduciary Duty Claims

As discussed above, Plaintiff seeks monetary damages against Jurgens in the amount of $2,293,225 on the grounds that, in his role as executor of Louise's Estate, Jurgens breached his fiduciary duties through various acts, including mismanaging the Estate's assets. New York law vests executors of estates with broad powers to dispose of and manage the decedent's interests in real property. Specifically, under the Fiduciaries' Powers Act, "every fiduciary is authorized" *inter alia:*

- with respect to any property ... owned by an estate ... to sell the same at public or private sale, and on such terms as in the opinion of the fiduciary will be most advantageous to those interested therein;

- to employ any bank or trust company incorporated in New York, any national bank located in New York or any private banker duly authorized to engage in business in New York as custodian of any stock or other securities held as a fiduciary, and the cost thereof;

**\*13** • to cause any stock or other securities (together, "securities") held by any bank or trust company to be registered and held in the name of a nominee of such bank or trust company without disclosure of the

fiduciary relationship; and to direct any bank or trust company incorporated in New York, any national bank located in New York or any private banker duly authorized to engage in business in New York to register and hold any securities deposited with such bank, trust company or private banker in the name of a nominee of such bank; and

• to contest, compromise or otherwise settle any claim in favor of the estate, or in favor of third person and against the state.

*See* N.Y. EPTL § 11–1.1(5)(B), (9), (10), (13).

Notwithstanding this broad authority, the Fiduciaries' Powers Act also requires executors to strictly adhere to their fiduciary duties. The following is a brief review of executors' fiduciary duties as relevant to the present case.

Pursuant to the duties of loyalty, care and safekeeping, an executor must collect and preserve the assets of the estate. *In re Estate of Donner,* 82 N.Y.2d 574, 584, 606 N.Y.S.2d 137, 141, 626 N.E.2d 922 (N.Y.1993) (noting that the executors "were fiduciaries who owed a duty of undivided loyalty to the decedent and had a duty to preserve the assets that she entrusted to them") (citing *Meinhard v. Salmon,* 240, N.Y. 458, 464 (N.Y.1928)); *Bender v. City of Rochester,* 765 F.2d 7, 12 (2d Cir.1985) (administrator of an estate has "the legal duty to collect and preserve [decedent's] assets, [and] to pay [decedent's] debts"); *In re Estate of Skelly,* 284 A.D.2d 336, 725 N.Y.S.2d 666, 667 (2d Dep't 2001) (executor "has a duty to preserve the assets of the estate ....") (internal citation omitted). Likewise, an executor is prohibited from commingling estate assets with any other assets. *See* N.Y. EPTL § 11–1.6 ("[e]very fiduciary shall keep property received as fiduciary separate from his individual property"). The Fiduciary Powers Act authorizes an executor to protect the estate's assets by employing "any broker-dealer which is registered with the [SEC] and the department of law in the state of New York ... as a custodian for a fiduciary of any stock or other securities ... [and] to register such securities in the name of such broker." N.Y. EPTL § 11–1.10.

An executor's duty of diligence and prudence requires him to administer and manage the estate assiduously in the interest of the beneficiaries. This includes "employing such diligence and prudence in the care and management of the estate assets and affairs as would a prudent person

of average discretion and intelligence." *In re Robinson,* 282 A.D.2d 607, 724 N.Y.S.2d 424, 426 (2d Dep't 2001) (finding no basis to deny executors' commissions where executors adequately explained reasons for waiting to sell decedent's property and objectant did not present any evidence to refute the explanations) (internal citations omitted); *In re Bello,* 227 A.D.2d 553, 554, 642 N.Y.S.2d 953, 954 (2d Dep't 1996) (concluding that executor met the standard of care under difficult circumstances); *In re Scott,* 234 A.D.2d 551, 651 N.Y.S.2d 592, 593 (2d Dep't 1996 (finding executors' delay in paying tax deficiencies, where resulting accrued interest exceeded amount earned by the estate, constituted breach of duty of diligence and care).

**\*14** The duties of diligence and prudence also relate to the executor's authority to invest the assets of an estate. Under the Prudent Investment Act, [9] the executor must make investment decisions pursuant to the prudent investor standard, which requires the executor to "exercise reasonable care, skill and caution to make and implement investment and management decisions as a prudent investor would for the entire portfolio, taking into account the purposes and terms and provisions of the governing instrument." N.Y. EPTL § 11–2.3(b)(2). The Prudent Investment Act sets out specific requirements for an executor's investment strategy. N.Y. EPTL § 11–2.3(b)(3). For example, executors are required to "pursue an *overall* investment strategy to enable the trustee to make appropriate present and future distributions to or for the benefit of the beneficiaries under the governing instrument, in accordance with risk and return objectives reasonably suited to the *entire* portfolio." *In re Heller,* 6 N.Y.3d 649, 653, 2006 Slip Op 3469, at *3 (N.Y.2006) (emphasis in original) (quoting N.Y. EPTL § 11–2.3(b)(3) (A)). The statute also provides, in relevant part, as follows:

9      The Prudent Investor Act applies to investments "made or held" by a trustee on or after January 1, 1995, and thus applies to the present matter. *See In re Estate of Janes,* 90 N.Y.2d 41, 49, 659 N.Y.S.2d 165, 169, 681 N.E.2d 332 (N.Y.1997) (citing N.Y. EPTL § 11–2.3(b) (3)(C).)

[t]he prudent investor rule requires a standard of conduct, not outcome or performance. Compliance with the prudent investor rule is determined in light of facts and circumstances prevailing at the time of the decision or action of a trustee. A trustee is not liable

to a beneficiary to the extent that the trustee acted in substantial compliance with the prudent investor standard or in reasonable reliance on the express terms and provisions of the governing instrument." N.Y. EPTL § 11–2.3(b)(1). Moreover, an executor is obligated to "diversify assets unless the trustee reasonably determines that it is in the interests of the beneficiaries not to diversify, taking into account the purposes and terms and provisions of the governing instrument." N.Y. EPTL § 11–2.3(b)(3)(C) (quoted in *In re Janes*, 90 N.Y.2d 41, 49, 659 N.Y.S.2d 165, 169, 681 N.E.2d 332 (N.Y.1997).

Also, under New York law, an executor has discretion whether to pay any testamentary disposition or distributive share before the completion of the publication of notice to creditors or, if no such notice is published, before the expiration of seven months from the time letters testamentary or of administration are granted. Thereafter, the executor is required to pay any testamentary disposition or distributive share no more than seven months following the date the letters testamentary are granted. N.Y. EPTL § 11–1.5(a). If the executor fails to make such disposition, an heir may bring a proceeding against the executor. However, for the purpose of computing the time for the heir to commence the proceeding against the executor, the cause of action does not accrue until the executor's account "is judicially settled." N.Y. EPTL § 11–1.5(c).

Typically, the determination of whether the executor's conduct "measures up to the appropriate standards of prudence, vigilance, and care" is an issue of fact to be decided by the court. *Donner*, 82 N.Y.2d at 585, 606 N.Y.S.2d at 142, 626 N.E.2d 922; *Janes*, 90 N.Y.2d at 50, 659 N.Y.S.2d at 169, 681 N.E.2d 332 (internal citations omitted).

### III. *DISCUSSION*

**\*15** The issue to be decided by this Court is whether there exists any genuine issue of material fact which would preclude summary judgment in favor of Defendant on Plaintiff's claims that (1) Defendant, in his role as executor of Louise's estate, breached his fiduciary duties through various acts, including mismanaging the Estate's assets, thereby depleting the Estate's assets and harming Louise's heirs; and (2) Plaintiff is entitled to an inheritance in the amount of $350,000 pursuant to Louise's "true will."

In determining whether there are any genuine issues of material fact, the Court remains mindful of Judge Boyle's Preclusion Order which prohibited Plaintiff from submitting "any affidavit in support of or in opposition to any motion for summary judgment" [DE 109]. The Court is also cognizant that, based upon Plaintiff's failure to oppose Defendant's motion for summary judgment in a substantively meaningful way, including his failure to submit a Local Rule 56.1(b) statement contravening Defendant's statement of undisputed facts, Defendant's factual assertions must be accepted as true. *See* Local Rule 56.1(c).

### A. *Jurgens' Conduct As Executor*

Accepting Jurgens' Rule 56.1 Statement as admitted facts, as the Court must, the record shows that Jurgens fulfilled his fiduciary duties as executor of Louise's estate. Pursuant to the duties of loyalty, care and safekeeping, Jurgens was required to collect and preserve the assets of the estate. *See, e.g. Donner*, 82 N.Y.2d at 584, 606 N.Y.S.2d at 141, 626 N.E.2d 922. Thus, following his appointment as Executor of Louise's Estate, Jurgens took steps to liquidate Louise's assets and sell her house, all of which were accomplished within a few months. Thereafter, Jurgens continued to work to ensure that all bills and taxes, including personal, fiduciary and estate taxes were paid. (Jurgens Aff. ¶ 4; Def.'s 56.1 Stat. ¶ 10.) In addition, since his appointment, Jurgens has continued to maintain the Estate accounts, has filed and paid fiduciary taxes, and has assisted and paid for the various lawsuits and proceedings involving the Estate. (Jurgens Aff. ¶ 7; Def.'s 56.1 Stat. ¶ 23 .)

Although Plaintiff alleges that Jurgens has breached his fiduciary duties by failing to distribute the assets of the Estate, Jurgens is not actually required to do so until there is a final accounting. Jurgens made certain distributions to beneficiaries of Louise's Will between December 2001 and January 2004. (Jurgens Aff. ¶ 7; Def.'s 56.1 Stat. ¶ 24.) Moreover, Jurgens has not made any distributions to himself or taken any Executor fees to date. (*Id.*)

Jurgens will only be required to distribute the Estate's assets when the Estate "is judicially settled." *See* N.Y. EPTL § 11–1 .5(c). In fact, it is Plaintiff's conduct, including the failure to pay the outstanding Surrogate's Court Judgment against him in the amount of $789,039.04, that has prevented Jurgens from conducting a final accounting and in turn making the final

distributions under the Will. (Jurgens Aff. ¶ 8; Def.'s 56.1 Stat. ¶ 24.)

## B. *Breach Of Fiduciary Duty Claims*

### 1. *The Purported False Will*

**\*16** Plaintiff alleges that Jurgens knowingly filed a false Last Will and Testament of Louise, thus committing fraud on the court, Louise, her estate, and her beneficiaries, including Plaintiff. (Am. Compl. at 20–21, Exs. 7, 8.) Furthermore, Plaintiff claims that pursuant to Louise's "true will," he is entitled to an inheritance in the amount of $350,000.

Contrary to Plaintiff's assertions, Defendant Jurgens states that in his role as executor of the Estate, following Louise's death, he duly filed Louise's Last Will and Testament dated October 16, 1995 as well as the Codicil dated July 28, 1998 (together, the "Will") (Jurgens Aff. ¶ 13; Def.'s 56.1 Stat. ¶ 6.) The Will was admitted to probate by the Suffolk County Surrogate's Court on December 3, 2001. (Schmidt Decl. ¶ 6; Jurgens Aff. ¶ 13.)

Moreover, prior to the admission of the Will to probate, Plaintiff reviewed the Will and executed a Wavier and Consent thereto dated October 22, 2001. (Jurgens Aff. ¶ 13, Ex. A; Def.'s 56.1 Stat. ¶ 8.) The Waiver and Consent provides that Plaintiff "consents that the court admit to probate the decedent's Last Will and Testament dated October 16, 1995 (and codicils, if any, dated July 28, 1998), a copy of each which testamentary instrument has been received by me and that Letters Testamentary issue to Charles Jurgens." (Jurgens Aff., Ex. A.) Notably, at no time during the Surrogate's Court proceedings did Plaintiff raise any objection to the Will, despite having had ample opportunity to do so. Plaintiff raised this issue for the first time only upon bringing this action, long after the admission of the Will to probate.

If Plaintiff were seeking to withdraw his Waiver and vacate the decree admitting Louise's Will to probate in order to contest the Will (for which he has not so moved), such motion would have to be made before the Surrogate's Court, where the Waiver was entered. It is well-established that the jurisdiction to administer the probate of wills, including entry of waivers, falls within the ambit of the Surrogate's Court. *See Groman v. Cola,* 07 CV 2635, 2007 WL 3340922, at \*4 (S.D.N.Y. Nov.7, 2007) (noting that federal jurisdiction is barred under the probate exception

if the action requires "the probate or annulment of a will [or] the administration of a decedent's estate") (citing *Marshall v. Marshall,* 547 U.S. 293, 311–12, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006)); *Lefkowitz v. Bank of N. Y.,* 528 F.3d 102,106 (2d Cir.2007) (affirming dismissal of certain tort claims against executor because "[w]ith these claims, Plaintiff seeks to mask in claims for federal relief her complaints about the maladministration of her parent's estates, which have been proceeding in probate courts) (citation omitted); *see also* DE 73 at 10. Here, any request by Plaintiff to set aside his Waiver must properly be made before the Surrogate's Court and such request would be subject to the applicable statute of limitations in that court.

However, even if Plaintiff were to make such a motion, it is unlikely he would succeed based on the record currently before this Court. Under New York law, "[a] party seeking to set aside a probate decree entered upon his consent must show that such consent was obtained by fraud or overreaching, [or] was the product of misrepresentation or misconduct, or that newly-discovered evidence, clerical error or other sufficient cause justifies the reopening of the decree." *Moser v. Pollin,* 294 F.3d 335, 342 (2d Cir.2000) (overruled on other grounds by *Marshall v. Marshall,* 547 U.S. 293, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006)) (quoting *In re Hall,* 185 A.D.2d 322, 322, 586 N.Y.S.2d 285, 286 (2d Dep't 1992)); *In re Coccia,* 2008–0802, 2009 N.Y. Slip Op 1477, 2009 App. Div. LEXIS 1463, at \*1 (citations omitted). In other words, the party challenging the probate decree must establish "sufficient cause ... to justify reopening the decree." *Coccia,* 2009 App. Div. LEXIS 1463, at \*2 ("appellant's unsubstantiated and conclusory allegations that he did not appreciate or understand the significance of the waiver and consent were insufficient to satisfy this standard").

**\*17** Here, not only has Plaintiff not moved to set aside the Waiver, but he has not even addressed the fact that he submitted the Waiver to the Surrogate's Court. Moreover, based on the record now before this Court, no evidence has been introduced which would allow a court to determine that Jurgens had a fraudulent will admitted to probate. Nowhere does Plaintiff submit any evidence showing that he signed the Waiver as a result of fraud, overreaching, misrepresentation or misconduct on the part of any party involved in the Surrogate's Court proceeding. Neither has Plaintiff submitted newly-discovered evidence, or evidence of a clerical error or

other sufficient cause which would justify the reopening of the decree. In fact, the extent of Plaintiff's assertions on this point, other than in the Amended Complaint, is found in his Summary Judgment Response, where he takes issue with Paragraph 6 of the Schmidt Declaration for, among other things, not addressing "the presence of 2 wills" which were annexed to the Amended Complaint. (Pl. Opp'n Summ. J. at 4.)

In sum, there no evidence that Plaintiff's Waiver was fraudulently obtained and should be withdrawn or that Jurgens had a false will admitted to probate. Accordingly, the Court finds that there is no genuine issue of material fact as to whether Defendant breached his fiduciary duty as Executor in regard to the admission of the Will to probate. Likewise, Plaintiff's claim that he is entitled to an inheritance in the amount of $350,000 under a will other than the Will that was admitted to probate in the Surrogate's Court Action is without merit.

### 2. McCarthy's Final Accounting

Plaintiff alleges that Jurgens breached his fiduciary duty because the court-appointed property guardian for Louise, Patrick McCarthy, was not functioning independently and McCarthy, together with the Smith Barney experts, "mismanaged" Louise's assets, ultimately filing a false Final Accounting in the Suffolk Supreme Court Action. (Am. Compl. at 21–22.)

However, Jurgens has stated that he had "absolutely no authority to oversee, let alone supervise, [McCarthy's] actions while he served as Louise's property guardian." (Jurgens Aff. ¶ 10; Def.'s 56.1 Stat. ¶ 25.) Specifically, during the guardianship period, Jurgens did not have any control over Louise's finances or property. (Jurgens Aff. at ¶ 11; Def.'s 56.1 Stat. ¶ 28.) Moreover, at the conclusion of the guardianship period, McCarthy accounted for his actions as Louise's Property Guardian in a formal accounting which was approved by the Suffolk County Supreme Court. (Jurgens Aff. ¶ 10.) Despite having had ample opportunity to do so, Plaintiff at no time objected to McCarthy's Final Accounting and only raises this issue for the first time in the current action, several years after the entry of McCarthy's Final Accounting.

If Plaintiff had been seeking to challenge McCarthy's Final Accounting (for which he has not so moved), he would necessarily have had to bring that information to the attention of the Suffolk County Supreme Court, which previously approved the Final Accounting. *See, e.g., In re Hunter,* 4 N.Y.3d 260, 270, 794 N.Y.S.2d 286, 292, 827 N.E.2d 269 (N.Y.2005) (Explaining that res judicata principles "apply with equal force to judicially settled accounting decrees. As a general rule, an accounting decree is conclusive and binding with respect to all issues raised and as against all persons over whom Surrogate's Court obtained jurisdiction.") (citations omitted).

**\*18** Notwithstanding these purported facts, however, this allegation does not pertain to Jurgens, as he played no role in McCarthy's conduct as guardian. (Jurgens Aff. ¶ 11.) In fact, the conduct at issue here occurred before Louise's death, and thus prior to Jurgens' appointment as executor of Louise's estate and prior to his undertaking the corresponding fiduciary duties which Plaintiff claims were breached. (*Id.*) Moreover, McCarthy is not a party to this action.

Because this allegation relates solely to events that occurred prior to Jurgens' appointment as executor of Louise's Estate, the Court finds that there is no genuine issue of material fact as to whether Defendant breached his fiduciary duties in regard to McCarthy's conduct as Property Guardian and/or McCarthy's Final Accounting.

### 3. The Purported Fraudulent Forensic Accounting Report

Plaintiff contends that, in either the Suffolk Supreme Court Action or the Surrogate's Court Action, Jurgen's attorney hired a forensic accounting firm to prepare "a report" for which Louise's Estate was billed $53,428.94. Plaintiff contends that no such report appears in the files of the Suffolk County Supreme Court or Surrogate's Court Actions and thus, Plaintiff argues, the $53,428.94 "expense" ... "is a fraud and unlawful conversion against Louise Jurgens, Plaintiff, and all other heirs of the estate of Louise Jurgens." (Am. Compl. at 24.)

At first glance, it is unclear whether Plaintiff is alleging that the fraudulent forensic accounting report was prepared during the guardianship period in the course of the Suffolk Supreme Court Action, or following Louise's death in the course of the Surrogate's Court Action. However, based on Plaintiff's assertion that the accountant who was hired to prepare this report informed Plaintiff's attorney (presumably in one of these earlier actions) that he did not know McCarthy, the Court concludes that the conduct alleged here occurred during

the guardianship period, because that is the only time McCarthy was involved with Louise. Specifically, Plaintiff contends that the accountant stated that "he did not know the property manager Patrick McCarthy had never spoken with Patrick McCarthy, and was hired by James Klein." (Am. Compl. at 24.) Plaintiff also adds that the accountant made this statement "after he was paid" for the report. (*Id.*)

Insofar as this allegation pertains to the guardianship period, there is no claim against Jurgens and thus nothing for the Court to consider because this conduct occurred prior to Jurgens' appointment as executor of Louise's estate—and prior to his assuming the corresponding fiduciary duties which Plaintiff claims were breached. (*Id.*)

Even if the Court were to presume that this claim alleges conduct which occurred following Louise's death—and thus while Jurgens was the executor—there is no support, beyond Plaintiff's conclusory and unsubstantiated statements, to show that Jurgens fraudulently billed the Estate for an accounting report that was not received. Thus, the Court finds that there is no genuine issue of material fact whether Defendant caused his counsel to hire a forensic accounting firm to prepare a fraudulent report or to pay an impermissible fee to such firm.

### *4. The Alleged Non–Existent Forensic Accountant*

**\*19** Plaintiff alleges that in the Surrogate's Court Action, Jurgens, through his counsel, caused the Final Accounting prepared by McCarthy to be sent by the Court to a non-existent person at a forensic accounting firm so that the accounting firm would not be in the position of having to approve McCarthy's fraudulent Final Accounting. (Am. Compl. at 24–25.) However, as noted above, Jurgens did not play any role in McCarthy's conduct as the property guardian. Moreover, beyond these conclusory and unsubstantiated allegations, the only evidence offered by Plaintiff is a copy of an envelope addressed to "Ernest Patrick Smith, CPA" at a street address in Melville. Contrary to Plaintiff's proffer, the envelope does not indicate that it is directed to the accounting firm of Callahan Nawrocki. (*Id.* at 25, 794 N.Y.S.2d 286, 827 N.E.2d 269.) Further, the envelope was returned by the post office bearing the stamped notation "Attempted Unknown" (not "addressee unknown" as stated by Plaintiff). (*Id .;* Am. Compl. Ex. 11.)

Because there is no evidence of Jurgens having played any role in this alleged conduct, the Court finds that Plaintiff has failed to raise a genuine issue of material fact to support his contention that Jurgens caused McCarthy's Final Accounting to be sent to a non-existent forensic accountant.

### *5. Sale Of Decedent's Residence As An Arm's Length Transaction*

With regard to the sale of Louise's residence, Plaintiff alleges that Jurgens breached his fiduciary duties as executor because the only appraisal obtained for Louise's house was from a company allegedly "under the exclusive control of Patrick McCarthy, even though McCarthy was no longer actively serving as property manager[,]" and thus the sale was not an "arm's length" transaction. (Am. Compl. at 25.) As noted above, the New York Fiduciary Powers Act provides the executor with broad authority with regard to the sale of decedent's property. The applicable statutory provision authorizes an executor "with respect to any property ... owned by an estate ... to sell the same at public or private sale, and on such terms as in the opinion of the fiduciary will be most advantageous to those interested therein." N.Y. EPTL § 11–1.1(5).

Plaintiff's only support for his claim that Jurgens breached his fiduciary duty in the sale of the residence is his assertion that the appraisal was submitted by a company with whom McCarthy had ties, thereby resulting in a transaction which was not at arm's length. However, Plaintiff does not specify McCarthy's connection to that company or offer any proof to show that any unlawful conduct occurred as a result of this purported connection. Nor does Plaintiff offer any proof to show that Jurgens knew or believed this sale was not "most advantageous" to Louise's beneficiaries, as required under New York law.

Significantly, by Order dated February 21, 2001, the Surrogate's Court granted Jurgens' application for permission to sell Louise's home in accordance with the terms of the contract which Jurgens had provided to the Court (Am.Compl., Ex. 9). In the Order, the Surrogate noted that Jurgens had "proffered a copy of a contract of sale for $270,000.00 and state[d] that the sale of the premises minimizes the estate's obligation to pay taxes and carrying charges on the property during the pendency of the probate proceeding." (*Id.*) The Surrogate found that Jurgens had satisfied his fiduciary duties with regard to the sale of Louise's home, and Plaintiff has not presented

any evidence here to convince this Court otherwise. Accordingly, the Court finds there is no genuine issue of material fact regarding Defendant's conduct in the sale of Louise's home.

### 6. The "Fraudulent Bond" Allegation

**\*20** Plaintiff maintains that Jurgens filed a fraudulent bond with the Surrogate's Court and that no true bond actually exists, thereby resulting in a fraud on the court and Louise's beneficiaries. (Am. Compl. at 25–26, Ex. 9.) In support of this allegation, Plaintiff claims that, pursuant to the order of the Surrogate's Court requiring Jurgens to file a bond on his performance, Jurgens filed "several unbound unexecuted pages purporting to represent an executor's performance bond underwritten by Fidelity and Deposit Company of Maryland" ("F & DC"), and that in 2003, an F & DC representative informed him that "no bond exists or ever existed on the performance of Charles H. Jurgens." (*Id.* at 25–26, 794 N.Y.S.2d 286, 827 N.E.2d 269.)

In his summary judgment motion, Jurgens explains that F & DC insured Louise's Estate for $3,353,000, based on Jurgens' preliminary estimate of the value of the Estate at the time he filed the Preliminary Executor's Bond with the Surrogate's Court. (Jurgens Aff. ¶ 14; Def.'s 56.1 Stat. ¶ 29.) The value of the Estate was ultimately determined to be higher than the face value of the bond. However, by the time that determination was made, the Will had already been admitted to probate and an increase in the bond was not necessary. (Jurgens Aff. ¶ 14; Def.'s 56.1 Stat. ¶ 30.)

In support of his allegation that Jurgens breached his fiduciary duties by filing a false bond, Plaintiff cites to Exhibit 9 annexed to the Amended Complaint. (Am. Compl. at 25–26.) However, Exhibit 9 is neither the purported bond nor any document even suggesting that Jurgens fraudulently obtained the bond. Rather, Exhibit 9 consists of the FD & C's power of attorney dated August 25, 2000, F & DC's statement of financial condition dated May 24, 2000, and FD & C's New York State Insurance Certificate dated April 12, 2001. These documents do not in any way support Plaintiff's contention that Jurgens committed fraud in obtaining the bond, thereby breaching his fiduciary duties.

As a result, Defendant has provided no more than conclusory allegations here regarding the supposed fraudulent nature of the bond, and those allegations are not supported by the irrelevant papers included in Exhibit 9. Accordingly, the Court finds that Plaintiff has failed to carry his burden to establish a genuine issue of material fact regarding the bond filed by Jurgens with the Surrogate's Court.

### 7. Purported Accounting Discrepancies

Plaintiff alleges that the difference of $897,115.27 between the listed value of assets contained in Jurgens' Inventory dated October 12, 2001 (filed on November 7, 2001) and McCarthy's Final Accounting (filed in August 2002), both of which pertain to the value of Louise's assets as of the date of her death (January 6, 2001), and Jurgens' alleged failure to address this discrepancy, reveal that Jurgens committed some type of unspecified fraud and that he "continues to act in concert with all parties ... to deplete and convert the assets of" Louise's Estate. (Am. Compl. at 9.)

**\*21** The conduct alleged here refers to actions taken during the guardianship period. As explained above, during this time, Jurgens had no authority over McCarthy, who was solely in charge of managing Louise's assets. Moreover, Plaintiff had ample opportunity to challenge McCarthy's accounting, including this alleged discrepancy, during the course of the Suffolk Supreme Court Action. Because this allegation relates solely to events that occurred prior to the commencement of Jurgens' role as executor of Louise's Estate, the Court finds that there is no genuine issue of material fact regarding any alleged breach by Jurgens of his fiduciary duties as Executor.

### 8. Jurgens' Purported Improper Motives

Finally, Plaintiff claims that Jurgens brought the Suffolk Surrogate's Court action against Plaintiff "to conceal and obfuscate the conversion of the property" of Louise and her Estate during the period in which Jurgens and McCarthy served as Louise's guardians. (Am. Compl. at 9.) Plaintiff explained that, following his appointment as preliminary executor of Louise's estate in January 2001:

> In the course of performing my duties as executor, I attempted to locate and preliminarily account for various assets of the Estate. In that capacity, I learned that Plaintiff

had withheld certain of Louise's money and personal property valued at $789,039.04, obtained through specific withdrawals, transfers and check negotiations in which Plaintiff engaged during the period prior to Louise's death from March 1997 through the time that Mr. McCarthy was appointed as Louise's property guardian. As a result, I commenced a special proceeding in Suffolk County Surrogate's Court in my capacity as Executor, seeking to discover property withheld by Plaintiff.

(Jurgens Aff. ¶ 5.)

On June 13, 2003, Suffolk County Surrogate, Honorable John M. Czygier, Jr. granted Jurgen's motion for summary judgment (made on behalf of Louise's Estate) on the grounds that no triable issue of fact existed as to whether Witzenburg was in wrongful possession of specific assets belonging to the Estate. (Jurgens Aff ¶ 6; Schmidt Decl. ¶ 10; Def.'s 56.1 Stat. ¶ 17.) By Decree and Judgment entered on August 22, 2003 (the "Judgment"), Witzenburg was ordered to deliver such assets, if in his possession or control, or to pay Jurgens, as the Executor, $789,039.04, representing the total amount of withdrawals and transfers of Louise's assets resulting from the transactions conducted by Plaintiff between March 1997 and June 2000. (Jurgens Aff. ¶ 6; Schmidt Decl. ¶ 10, Ex. A; Def.'s 56.1 Stat. ¶ 17.) Moreover, in the Judgment granting the Estate's motion for summary judgment, Surrogate Czygier stated as follows:

> sufficient concerns having been raised before this Court to question the nature of the subject transfers it is further ORDERED, ADJUDGED AND DECREED that the Clerk of the Surrogates' Court is directed to serve a copy of the Court's decision upon the Suffolk County District Attorney for further investigation[.]"

**\*22** (Schmidt Decl. ¶ 11, Ex. A; Def.'s 56.1 Stat. ¶ 18.) The Judgment is a final judgment and was not appealed by Plaintiff. (Schmidt Decl., Ex. A; Def.'s 56.1 Stat. ¶ 20.)

Jurgens believes that shortly after entry of the Judgment in August 2003, Plaintiff left New York. (Schmidt Decl. ¶ 12.) To date, Plaintiff has not made any payment to satisfy the Judgment, and it is Jurgens' understanding that Plaintiff has resisted all efforts to enforce the Judgment. (Jurgens Aff. ¶ 6; Def.'s 56.1 Stat. ¶ 19.) However, once the Estate files its final accounting (which it cannot do until after resolution of the present action), it will ultimately be able to offset the amount of the Judgment against Plaintiff's share. (Jurgens Aff. ¶ 12.; Schmidt Decl. ¶ 12.)

Notwithstanding that the history of the Surrogate's Court Action strongly suggests that Plaintiff brought the instant case in an effort to further elude the Judgment entered in Surrogate's Court, Jurgens, as Executor, was well within his authority to bring that case against Plaintiff. The New York Fiduciary Powers Act specifically provides that "every fiduciary is authorized ... [t]o contest, compromise or otherwise settle any claim in favor of the estate ...." N.Y. EPTL § 11–1.1(13). Thus, once Jurgens obtained information that Plaintiff had withheld funds which properly belonged to Louise's Estate, he acted properly in brining the Surrogate's Court Action against Plaintiff to recover those funds.

### C. Conclusion

For the foregoing reasons, Plaintiff has not provided any evidentiary basis which would enable this Court to find that Jurgens breached his fiduciary duties in his role as executor of Louise's Estate and that Jurgens' actions caused Witzenburg or any other beneficiary to incur damages. Accepting Jurgens' Rule 56.1 Statement as admitted facts, as the Court must, the record shows that Jurgens' conduct as executor "measures up to the appropriate standards of prudence, vigilance, and care" as required by New York law. *See Donner*, 82 N.Y.2d at 585, 606 N.Y.S.2d at 142, 626 N.E.2d 922.

Having reviewed all of the papers submitted in support of and in opposition to Defendant's Motion for Summary Judgment on the remaining claims in this action, and reviewing the evidence in the light most favorable to Plaintiff as the non-moving party, the Court concludes that Defendant has met his burden of showing that there is no genuine issue of material fact to be tried in this case regarding Plaintiff's claims that Defendant breached his fiduciary duties to the Estate of Louise Jurgens and that he mismanaged the Estate's assets.

Accordingly, I respectfully recommend to Judge Feuerstein that Defendant's motion for summary judgment on the remaining claims be GRANTED and that the Amended Complaint be dismissed in its entirety.

### IV. *PLAINTIFF'S MOTION TO AMEND THE COMPLAINT*

Plaintiff Witzenburg also moves to amend the Amended Complaint pursuant to Fed.R.Civ.P. 15 to add Patrick McCarthy, Esq. as a party defendant. McCarthy served as the court-appointed property guardian of Louise's property for thirteen months before her death. Defendant's motion papers [DE 117] do not include a proposed Second Amended Complaint containing the requested changes. Counsel for Patrick McCarthy filed a letter [DE 119] requesting permission to oppose the motion and to extend the time to submit his opposition. By Order dated June 20, 2008 [DE 120], Judge Boyle granted McCarthy's motion without objection from Plaintiff and extended the deadline for the opposition to July 15, 2008. Defendant Jurgens has not filed papers in opposition to Witzenburg's motion to amend.

**\*23** Plaintiff seeks to amend his pleading for a second time on the grounds that, as guardian of Louise's property, McCarthy "created a false business document identified as 'The Final Accounting,' and filed said false business document with the New York State Supreme Court." [DE 117] Because the deadline to amend the pleadings has expired, [10] the amendment is permissible only if it "relates back" to the original Complaint as defined in Rule 15(c). Under Rule 15(c)(1), an amendment "relates back" to the original pleading when, *inter alia,*

10 Pursuant to the Scheduling Order [DE 22] in this action, the deadline to amend the pleadings was May 6, 2005.

(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Thus, subsection (C) governs the relation back of newly added parties, as opposed to newly added claims and claims and defenses, which is governed by subsection (B) (although under the terms of (C), Plaintiff must also satisfy (B).) *See Sidney v. Wilson,* 228 F.R.D. 517, 520 (S.D.N.Y.2005).

In order for Plaintiff to amend the Amended Complaint to add McCarthy as a party Defendant, he must show that McCarthy originally would have been named as a defendant "but for a mistake concerning the proper party's identity." Under Second Circuit law, a 'mistake' in identifying a defendant occurs for purposes of Rule 15(c) when it is the result of 'misnomer or misidentification' " or when a plaintiff omits the individual defendant altogether in the erroneous belief that suing a government department will suffice. *Messer v. Fahnestock & Co. Inc.,* 03–4989, 2008 WL 4934608, at \*20 (E.D.N.Y. Nov.18, 2008) (internal citation omitted) (quoting *Barrow v. Wethersfield Police Dep't,* 66 F.3d 466, 469–70 (2d Cir .1995)); *Colombo v. S.C. Dep't of Soc. Servs.,* 221 F.R.D. 374, 376 (E.D.N.Y.2004). "However, the relation-back doctrine does not apply where defendants were not originally named merely 'because plaintiff did not know their identities.' " *Colombo,* 221 F.R.D. at 376 (quoting *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999)). Nor does the relation-back doctrine apply where plaintiff does not allege he would have sued the proposed defendant in the original complaint but for a mistake in identity. *See Cornwell v. Robinson,* 23 F.3d 694, 705 (2d Cir.1994) (amendment to add defendants did not relate back where plaintiff knew at the time of her original complaint the "identities of the ... employees who she contended had harassed and discriminated against her;" plaintiff's failure to name defendants thus "must be considered a matter of choice, not mistake"); *see also* Fed.R.Civ.P. 15(c)(3) [11] Advisory Committee's note (1991 Amendment) (this provision was revised to address "the problem of the misnamed defendant").

11 Although numbered differently from the current version of Rule 15(c), the wording is the same.

**\*24** In his motion papers, Plaintiff asserts that the proposed amendment "asserts a claim that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Plaintiff further contends that McCarthy will not be prejudiced because he "knew or should have known that this action would have been brought against him but for a mistake concerning the proper party's identity ...." [DE 117] Other than these conclusory statements, however, Plaintiff gives no explanation as to any mistake on his part concerning McCarthy's identity. There is no evidence that Defendant's failure to name McCarthy as a defendant in the original Complaint was a result of a "misnomer or misidentification," as required under Second Circuit law. *See, e.g., Messer,* 2008 WL 4934608, at \*20, *Colombo,* 221 F.R.D. at 376. In addition, given the history of the related Suffolk Supreme Court and Surrogates' Court Actions that occurred before Plaintiff filed the Complaint in the present case, it is implausible for Plaintiff to assert that he was uncertain of Patrick McCarthy's identity. Rather, Plaintiff chose not to name McCarthy as a defendant in the present action—a mistake which does not allow the proposed amendment to "relate back" to the Complaint. *See Cornwell,* 23 F.3d at 705 (amendment to add defendants did not relate back where plaintiff knew at the time of her original complaint the "identities of the ... employees who she contended had harassed and discriminated against her;" plaintiff's failure to name defendants thus "must be considered a matter of choice, not mistake").

Moreover, even if the Court were to accept Plaintiff's contention that McCarthy "knew or should have known that the action would have been brought against [him], but for a mistake concerning the proper party's identity [,]" Plaintiff must show that McCarthy received timely notice of this action so as to avoid prejudice in defense of the action on the merits. *See* Fed.R.Civ.P. 15(c)(2)(C) (ii); *Colombo,* 221 F.R.D. at 377. To this end, Plaintiff states:

> [a]s Patrick McCarthy was represented by Donald J. Farrinacci when he was the Guardian of Louise Jurgens' Property, as Donald J. Farrinacci had been employed at Cozin O'Conner and is an associate of Michael Schmidt, attorney for Charles H. Jurgens, Patrick McCarthy knew or should have know that this action would

> have been brought against him, but for a mistake concerning the proper party's identity ...."

[DE 117] The Court understands Plaintiff's assertion to mean that McCarthy was on notice of the present action, and therefore will not be prejudiced by being added as a defendant, because, for at least some portion of the time he served as Louise's property guardian (December 1999–January 2001), he was represented by counsel who at one time had worked with Jurgens' current counsel.

Rule 15(c) requires a showing that the defendant who is to be added to the complaint "received such notice of the action that it will not be prejudiced in defending on the merits[.]" Rule 15(c) (2)(C)(ii). Knowledge of the pendency of the action may be imputed to a party to be added as a defendant to that action where there has been "some showing that the proposed defendant's attorney knew that the additional defendant would be added to the existing suit." *Colombo,* 221 F.R.D. at 377 (granting motion to add individual defendants under *Rule 15(c)* where county attorney's office represented the named defendants, including county police department and correctional facility, and was also counsel for the proposed defendants, including individual police and correction officers, the attorneys "should have known that, despite the deficiencies in the original complaint, these individual officers should have been named, and would be added when the mispleading became evident"); *Gleason v. McBride,* 869 F.2d 688, 693 (2d Cir.1989) (holding that notice of a lawsuit cannot be imputed to a proposed defendant based on sharing of counsel with a named defendant; "there must be some showing that the attorney(s) knew that the additional defendants would be added to the existing suit") (citation omitted).

**\*25** Plaintiff's allegation that McCarthy was on notice of the present action because he was, in a prior case, represented by counsel who had at one time worked with Jurgens' current counsel, is insufficient to constitute notice under Rule 15(c)(2)(C)(ii). Plaintiff does not provide the Court with any evidence regarding the relationship between McCarthy's attorney and Jurgens' former attorney. [12] Moreover, Plaintiff has not made any showing that McCarthy or his attorney knew that McCarthy would be added to the existing suit before Plaintiff filed this motion. For the foregoing reasons, Plaintiff has not satisfied the requirements of Rule 15(c)

and therefore should not be permitted to amend his pleading for a second time for this purpose. Accordingly, I respectfully recommend to Judge Feuerstein that Plaintiff's motion to add Patrick McCarthy as a party defendant be DENIED.

12      In addition, the Court notes that, based on preliminary research, Plaintiff's statement appears to be incorrect. No attorney by the name of Donald J. Farrinacci presently works at the law firm of Cozen O'Connor, where Jurgens' attorney, Michael J. Schmidt, currently works. However, Schmidt's biography on the Cozen O'Connor website states that until 2005, Schmidt worked at Fischbein Badillo Wagner Harding, a firm that represented McCarthy for at least some portion of his tenure as guardian. *See* http://www.cozen.com/attorney_detail.asp?d=1 & atid=835.

## V. *PLAINTIFF'S MOTION TO COMPEL*

Plaintiff also moves to compel Defendant to respond to outstanding discovery requests. By motion dated June 26, 2008 [DE 130], Plaintiff requests an order requiring Defendant to respond to outstanding document requests and interrogatories, which Defendant has previously refused to answer on the grounds that the application of the *Rooker–Feldman* doctrine excused them from doing so. The motion is titled "Plaintiff's Motion & Notice of Motion For Sanctions," but nowhere in the body of the motion does Plaintiff request the imposition of sanctions or provide a legal basis for doing so. Accordingly, the Court will treat this request for relief as a motion to compel and to impose sanctions upon Defendant.

By letter dated July 8, 2008 [DE 131], Defendant states that, to the extent the meaning of Plaintiff's motion can be discerned, and to the extent the motion seeks to compel Defendant's further responses to discovery requests, Defendant opposes the motion on the grounds that (1) the Court had already denied an earlier motion to compel by Plaintiff, and (2) there is no basis for an award of sanctions against Defendant.

In a previous motion filed on January 31, 2008 [DE 95–97], Plaintiff moved to compel Defendant "to file adequate responses to Plaintiff's discovery requests." Specifically, Plaintiff objected to Defendant's responses to Interrogatories 4, 6, 13, and 14, and Requests for Admissions ("RFAs") numbered 1, 8, 9, 16, and 17 as being "incomplete," and requested that the Court order

Defendant to respond further to the Interrogatories and to deem as admitted the specified RFAs [DE 96]. In opposition, Defendant filed the Declaration of Michael C. Schmidt, dated February 4, 2008 [DE 99], objecting to Plaintiff's motion to compel. By Order dated February 4, 2008 [DE 100], Judge Boyle ruled that, after reviewing the motion to compel, he found Defendant's response[s] "adequate." The Order also stated that the "plaintiff is advised that he may further pursue those request[s] which do not relate to dismissed parties and causes of action, at the deposition of defendant Jurgens."

***26** Thus, Judge Boyle unequivocally denied Plaintiff's motion to compel on the grounds that Plaintiff's responses were sufficient and any further information could be obtained by deposing Defendant. Plaintiff's current motion to compel is essentially a more vague repetition of his earlier motion. However, Plaintiff does not provide any basis, let alone a legally sufficient one, for reconsidering Judge Boyle's Order denying that motion, and the Court declines to do so. For all of the reasons stated previously in this Report, Judge Boyle's February 4, 2008 Order on this topic is also law-of-the-case and Plaintiff has not met any of the criteria to exempt that Order from such a finding.

To the extent Plaintiff's motion seeks the imposition of sanctions upon Plaintiff, the Court interprets the motion to be requesting sanctions for "Failure to Disclose, to Supplement an Earlier Response, or to Admit," under Rule 37(c). Here, Judge Boyle previously determined that Defendant's responses were adequate. Since that time, Plaintiff has not served any additional discovery requests and Defendant has not incurred any additional obligation to respond to the original discovery requests. Consequently, there is no basis for the Court to impose sanctions on Defendant.

For the foregoing reasons, I respectfully recommend to Judge Feuerstein that Plaintiff's motion to compel and for sanctions be DENIED.

## V. *CONCLUSION*

For the reasons discussed above, I respectfully recommend to Judge Feuerstein that: (1) Defendant's motion for summary judgment on the remaining claims be GRANTED and that Plaintiff's Amended Verified Complaint be dismissed in its entirety; (2) Plaintiff's motion to amend the Amended Complaint to add Patrick

McCarthy, Esq. as a party defendant be DENIED; and (3) Plaintiff's motion to compel discovery responses and to impose sanctions upon Defendant be DENIED.

Pursuant to 28 U.S.C. § 636(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report and Recommendation to file written objections. *See also* Fed.R.Civ.P. 6(a), (e). Such objections shall be filed with the Clerk of the Court via ECF, *except in the case of a party proceeding pro se. Pro Se Plaintiff James Witzenberg must file his objections in writing with the Clerk of the Court within the prescribed time period noted above. A courtesy copy of any objections filed is to be sent to the chambers of the Honorable Sandra J. Feuerstein, and to my chambers as well. Any requests for an extension of time for filing objections must be directed to Judge Feuerstein prior to the expiration of the (10) day period for filing objections. Failure to file objections will result in a waiver of those objections for purposes of appeal.* Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); Beverly v. Walker, 118 F.3d 900, 901 (2d Cir.), *cert. denied,* 522 U.S. 883, 118 S.Ct. 211, 139 L.Ed.2d 147 (1997); Savoie v. Merchants Bank, 84 F.3d 52, 60 (2d Cir.1996).

**\*27** Defendants' counsel is directed to serve a copy of this Report and Recommendation forthwith upon Plaintiff *Pro Se* by overnight mail and first class mail at Plaintiff's last known address. Defendant's counsel is further directed to file proof of service of the same upon ECF.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1033395

---

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 71770
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jeffrey HAMM, Plaintiff,
v.
Richard HATCHER, and City
of New York, Defendants.

No. 05 Civ. 503(ER).
|
Jan. 7, 2013.

**Attorneys and Law Firms**

Jeffery Hamm, East Elmhurst, NY, pro se.

Kimberly D. Conway, Esq., New York City Law Department, Office of the Corporation Counsel, New York, NY, for Defendants.

## *OPINION AND ORDER*

RAMOS, District Judge.

**\*1** *Pro se* Plaintiff Jeffrey Hamm ("Hamm" or "Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 against Defendants Richard Hatcher ("Hatcher")[1] and the City of New York (the "City," and collectively, "Defendants"). Plaintiff alleges that while he was incarcerated in Rikers Island, Defendants violated his rights under the Fourteenth Amendment to the U.S. Constitution when they suspended his antidepressant medications. Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56 as to all of Plaintiff's claims. For the reasons set forth below, Defendants' motion is GRANTED.

[1]  Plaintiff has named "Richard Hatcher" as a Defendant in this action. It appears from Defendants' papers, however, that his correct name is "Richard Fletcher." Because the caption of this case names "Richard Hatcher" as a Defendant, the Court will continue to refer to him by what seems to be an incorrect name.

### I. Background

### A. Undisputed Facts

Plaintiff is a 52 year-old man with a long history of substance addiction and criminal activity.[2] (Conway Decl. Ex. F ("Hamm Dep.") 9:19–23, 31:15–21, 36:24–37:6.) After serving in the military from 1980–1982, (*id.* 10:24–11:2, 35:2–8), Plaintiff and his ex-wife divorced. (*Id.* 35:15–17.) At that time, he became addicted to crack cocaine and remained addicted through 2000, (*id.* 9:20–10:2, 10:24–11:6), when he completed a twenty-day rehabilitation program and enrolled in New York City College of Technology. (*Id.* 10:4–8.) In December of 2001, on his second day of college, Plaintiff was arrested and released. (*Id.* 11:24–12:2, 13:12–14.) He struggled with substance abuse at that time, and continued to relapse into early 2002. (*Id.* 11:7–17.)

[2]  Plaintiff, by his own estimation, has been arrested at least 100 times and has been convicted of a crime at least fifty times. (Hamm Dep. 36:24–37:3.) Most of his arrests have been for the possession or sale of marijuana. (*Id.* 37:4–6.)

Plaintiff was again arrested in March 2002. (*Id.* 13:15–17.) He was immediately taken into custody at the Manhattan Detention Center. (*Id.* 13:18–25.) On March 15, 2002, while incarcerated there, Plaintiff was issued two antidepressant medication prescriptions for fourteen days each—one for forty milligrams daily of Paxil and the other for fifty milligrams daily of Trazodone. (First Unnumbered Exhibit to the Third Amended Complaint ("TAC") at first unnumbered page.) Plaintiff states that he had been taking antidepressant medications before his arrest, as well.[3] (Hamm Dep. 15:22–16:8; Pl.'s Mem. Opp. Mot. Summ. J. ("Pl.'s Mem.") at first unnumbered page.)

[3]  Plaintiff was first diagnosed with depression and anxiety by a psychiatrist in the Department of Corrections, though he does not specify when. (Hamm Dep. 16:8–9.) He believes he suffered from these psychological conditions for many years prior to his diagnosis and that they caused him to begin using narcotics in the first place. (*Id.* 16:10–14.)

In or about June 2002, Plaintiff was transferred to another detention facility,[4] but remained there for less than two months due to an incident involving an assault.[5] (*Id.* 14:11, 21–25 .) After this incident, in or about August 2002, he was transferred to segregated housing in the Central Punitive Segregation Unit of

the Otis Bantum Correctional Center ("OBCC") on Rikers Island. (Conway Decl., Ex. A at 1, 2; Hamm Dep. 14:22–15:2). On August 14, 2002, a mental health clinician, Michele Garden, Ph.D. ("Garden") evaluated Plaintiff, and reported that he presented antisocial behavior, mood changes, persistent anger, and withdrawal symptoms. (Conway Decl., Ex. A at 1.) Garden diagnosed Plaintiff with early onset dysthymic disorder, dependent personality disorder, and polysubstance dependence, and directed that Plaintiff was to undergo biweekly clinician visits. (Id. at 1, 2.) On August 14, 2002, Plaintiff was also seen by a psychiatrist, Roberto Caga–Anan, M.D. ("Caga–Anan") at OBCC, who noted that Plaintiff stated, "I am ok," and observed that he did not present a danger to himself or to others. (Conway Decl, Ex. B at 1.) Caga–Anan prescribed Plaintiff with forty milligrams daily of Paxil and fifty milligrams daily of Atarax. (Id.) Both prescriptions were to last for fourteen days. (Id., Ex. C.)

4    Plaintiff refers to this detention facility as the "Beacon facility." (Hamm Dep. 14:1–4.)

5    The details of this assault are unclear in Plaintiff's deposition testimony, but it appears to have involved corrections officers. (Hamm Dep. 14:11, 24–25.)

**\*2** On August 22, 2012, Garden and Caga–Anan again observed and evaluated Plaintiff. (Conway Decl., Ex. E.) They confirmed their prior observations, and diagnosed him with opioid dependence and adjustment disorder with depressed mood. (Id. at 1.) They again directed that he was to undergo biweekly clinician and psychiatrist visits. (Id. at 2.) On August 28, 2002, Caga–Anan renewed Plaintiff's Paxil prescription and issued him an additional prescription for fifty milligrams of Trazodone daily. (Id., Ex. C.) Caga–Anan discontinued Plaintiff's Atarax prescription. (Id.) Again, both prescriptions were to last Plaintiff for fourteen days-until September 11, 2002.[6] (Id.)

6    Plaintiff states that he was medicated for the entire duration of his detention in segregated housing at OBCC. (Hamm Dep. 15:13–17.)

**B. Facts in Dispute**
In early September 2002, Plaintiff was transferred from segregated housing at OBCC to the George Motchan Detention Center ("GMDC") on Rikers Island. (Hamm Dep. at 15:18–21.) It is at this point where Plaintiff's and Defendants' versions of facts diverge.

**1. Defendant's Version of Facts**
Defendants assert that on September 12, 2002–the day after Plaintiff's prescriptions were due to expire—Vivia Francois, M.D. completed a Consultation Request form on Plaintiff's behalf and referred him to the Mental Health Department at GMDC. (Conway Decl., Ex. G.) There is no evidence in the record, however, that his prescriptions were renewed at that time. On September 13, 2002, Plaintiff was admitted to the Mental Health Department and screened by S. Hernandez ("Hernandez"), a clinical social worker. (Id.) Hernandez completed a mental health intake form for Plaintiff, and noted that he had a history of mental illness and that he was taking medication for depression. (Id., Ex. I.) There is no evidence in the record that Plaintiff's prescriptions were renewed at that time, either.

On September 16, 2002, a clinical supervisor reported that Plaintiff's case had been assigned to Hernandez and that a psychological assessment had been scheduled to determine whether Plaintiff was "on the proper medication with the proper dosage." (Id., Ex. J.) On the same day, Hatcher[7] first evaluated Plaintiff in the Mental Health Clinic at GMDC. (Conway Decl., Ex. K.) Hatcher reported that Plaintiff stated he had not received Paxil for *five* days, that he felt mildly to moderately depressed at times due to his "legal problems and not recently getting his scheduled medications," and that Plaintiff stated, "I know I need the medication because as soon as I stop it I start feeling anxious, irritable and depressed." (Id.) However, Hatcher also noted that Plaintiff stated "I'm doing alright," that he denied experiencing any hallucinations or side effects of his medications, that he denied any suicidal or homicidal ideations, that his mood was calm and stable, that he was eating and sleeping well, and that he did not present any paranoia. (Id.) Hatcher diagnosed Plaintiff with Dysthymic Disorder, and stated that he would "re-start [Plaintiff's] regimen at 'start doses.' " (Id.)

7    Hatcher's position is unclear from the record. According to a Progress Note and a Medication Order Sheet he completed upon treating Plaintiff, it appears Hatcher may be a Nurse Practitioner, as indicated by his signature "Richard Fletcher NP." (Conway Decl., Exs. K, L.) However, during Hamm's deposition, Defendants' attorney repeatedly

referred to Hatcher as "Dr. Fletcher." (*E.g.* Hamm Dep. 17:16.)

**\*3** Hatcher prescribed Plaintiff twenty milligrams daily of Paxil for depression and fifty milligrams daily of Trazodone for sleep. (*Id.*) Hatcher issued prescriptions for one immediate dose of both of medications on September 16, 2002, (*id.,* Ex. L), and an additional prescription for both medications to being immediately thereafter and to last for fourteen days. (*Id.*) Thus, according to the prison medical records submitted by Defendants, Plaintiff was without his prescribed medications from September 11, 2002 through September 15, 2002–a total of five days.

On September 19, 2002, Hernandez evaluated Plaintiff again. (*Id.,* Ex. N.) A Clinical Assessment and Comprehensive Treatment Plan noting Plaintiff's symptoms, diagnosis, and treatment plan was completed and signed by Hernandez, Gerard Derisse, a psychiatrist, and Gilberto Matta, C.S.W., a clinical supervisor. (*Id.*) Plaintiff was thereafter periodically treated for his psychiatric conditions; the last record of his treatment submitted to the Court is dated January 1, 2003. (Third, Fourth, and Fifth Unnumbered Exhibits to TAC.)

### 2. Plaintiff's Version of Facts [8]

[8]     As set forth more fully below, the Court finds that all such disputed facts are not material, and even construing the facts in a light most favorable to Plaintiff, he cannot defeat Defendants' motion.

Plaintiff stated in his deposition testimony that when he was transferred from segregated housing at OBCC to GMDC in September 2002 and was first seen by Hatcher, Hatcher told him that GMDC maintained a policy that newly transferred inmates were required to wait ten days before receiving any medical prescriptions. (*Id.* 17:21–25, 22:2–7.) Hatcher then took Plaintiff off of Paxil and Trazodone for ten days despite Plaintiff's statements to Hatcher that he needed the medication. [9] (*Id.* 17:16–18, 22:2–13.)

[9]     Plaintiff's evidence regarding the time during which he went without his medication is inconsistent. In his memorandum of law in opposition to the instant motion, he states that he "hadn't had [his] medication in 5 days" when he was first transferred to GMDC and met with Hatcher. (Pl.'s Mem. second unnumbered page.) He further states that Hatcher "took it upon himself to lower [his] dosage" after

learning of the five-day delay in receiving treatment. (*Id.*) The Court discusses these inconsistencies below. *See infra* n. 13.

Plaintiff further stated in his deposition testimony that once he stopped taking his medication, he began to experience the "side effects of withdrawal." (Hamm Dep. 23:2–4.) These symptoms included exacerbated depression, nightmares, hopelessness, and suicidal thoughts. (*Id.* 23:5–16.) He avers that he made frequent attempts to alert the mental health staff to the side effects he experienced while not taking his medication [10]-including filing a grievance at GMDC, (*id.* 41:23–42:8, 42:22–43:4; TAC at 4)-but that he remained without his medication for the duration of his first ten days there. (Hamm Dep. 23:17–24:2, 24:10–11.) When the ten days expired, Plaintiff testified that Hatcher prescribed him half of his regular dosage of Paxil and his full dosage of Trazodone. (*Id.* 18:1–3, 28:1–8.) Hatcher later prescribed Risperidone to Plaintiff for impulse control. (*Id.* 29:4–8.)

[10]     Plaintiff's testimony is also inconsistent in this regard. For example, he also stated in his deposition testimony that he did *not* ask to speak to anyone on the mental health staff in his first ten days at GMDC when he was not medicated. (Hamm Dep. 25:25–26:3, 26:22–25, 27:17–19.)

Plaintiff testified in his deposition that he did not tell Hatcher the full extent of the symptoms he was experiencing as a result of going off of his medications. (*Id.* 19:10–14, 21:13–22, 24:8–19.) He believed that because he had recently come out of segregated housing as a result of his involvement in an assault, if he were to explain the nature and degree of his symptoms, he would be placed on suicide watch, be forcibly sedated, or be placed in segregated housing. (*Id.* 21:21–22:1, 24:8–19.)

### 3. The Criminal Prosecution of Plaintiff

**\*4** Pursuant to Plaintiff's guilty plea, he was convicted on February 6, 2003 of attempted criminal sale of a controlled substance in the third degree, and was sentenced to three to six years imprisonment. (First Unnumbered Exhibit to Second Amended Complaint ("SAC")at 12.) Plaintiff later attempted to withdraw his guilty plea, arguing that he was impaired by his state of withdrawal from medication. (SAC ¶ 6.) On February 6, 2003, Judge Ronald A. Zweibel of the Supreme Court of the State of New York, New York County denied Plaintiff's motion to withdraw his plea, and the Supreme Court, Appellate Division, First

Department affirmed the denial of Plaintiff's motion on April 5, 2005. (First Unnumbered Exhibit to SAC at 12–13.) In its Decision and Order, the Appellate Division stated that the record established that Hamm's plea "was knowing, intelligent, and voluntary, and [the record failed] to support his claim that he was incompetent to plead guilty because he had not received his antidepressant medication." (*Id.*) The Appellate Division also noted that the Plaintiff had "freely admitted his guilt, demonstrated his understanding of the terms and consequences of his plea, and specifically denied using any drugs or medication," and that the trial court had "relied on its own recollection of [Hamm's] lucidity at the time of the plea" in rejecting his motion to withdraw his plea. (*Id.*) On June 18, 2005, The Court of Appeals of the State of New York denied Plaintiff's application for leave to appeal. (Second Unnumbered Exhibit to SAC at first unnumbered page.)

## II. Procedural History

Plaintiff filed suit on May 17, 2004 in the Northern District of New York, from where this action was transferred to the Southern District of New York on January 14, 2005. (Doc. 1.) Then–Chief Judge Michael B. Mukasey determined that the Complaint was facially insufficient and ordered Plaintiff to amend, (*id.*), and Plaintiff filed an Amended Complaint on March 28, 2005. (Doc. 2.) The case was subsequently reassigned to the Honorable Colleen McMahon. (Doc. 3.) Plaintiff filed a Second Amended Complaint on July 31, 2006. (Doc. 9.) The case was again reassigned to the Honorable Kenneth M. Karas on August 6, 2007. (Doc. 18.) Plaintiff, who by that time had completed his prison term, moved for default judgment as to Hatcher on December 6, 2007. (Doc. 24.) On September 5, 2008, Defendants filed a motion to dismiss the Second Amended Complaint, (Doc. 22), and on September 8, 2008, Judge Karas denied Plaintiff's motion for default judgment. (Doc. 27.) On May 5, 2009, Judge Karas issued an Opinion and Order granting in part and denying in part Defendants' motion to dismiss, and granting Plaintiff leave to amend the complaint.[11] (Doc. 31.) On August 7, 2009, Plaintiff filed a Third Amended Complaint. (Doc. 33.) On January 23, 2012, this matter was reassigned to the undersigned, and on June 21, 2012, Defendants filed the instant motion. (Docs.61, 63 .)

[11]    In his opinion, Judge Karas dismissed Plaintiff's Fourteenth Amendment claim against Hatcher to

the extent that it was based on allegations that Plaintiff received a lower dose of Paxil than he requested. (Doc. 31 at 21.) Accordingly, this Court only addresses herein the portion of Plaintiff's Fourteenth Amendment claim that has survived the motion to dismiss, i.e., that Defendants violated his constitutional rights by depriving him of antidepressant medication for some period of time.

## III. Applicable Legal Standards

### A. Summary Judgment

**\*5** Summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.,* 812 F.Supp.2d 454, 467 (S.D.N.Y.2011) (citing *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir.2009)). A fact is "material" if it might affect the outcome of the litigation under the relevant law. *Id.*

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.,* 575 F.3d 199, 204 (2d Cir.2009) (citing *Celotex Corp.,* 477 U.S. at 322–23). "In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.,* 706 F.Supp.2d 494, 504 (S.D.N.Y.2010) (internal quotation marks omitted) (quoting *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir.2008)). "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' " *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002) (quoting *Celotex Corp.,* 477 U.S. at 322).

In deciding a motion for summary judgment, the Court must " 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.' " *Brod v. Omya, Inc.,* 653 F.3d 156, 164 (2d Cir.2011) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir.2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). A motion for summary judgment cannot be defeated on the basis of mere denials or unsupported alternative explanations of facts. *Senno,* 812 F.Supp.2d at 467. The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). "[T]he non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor ." *Senno,* 812 F.Supp.2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256–57 (1986)).

**B. Local Rule 56.1 and *Pro Se* Litigants**

**\*6** Under Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1"), a party moving for summary judgment pursuant to Fed.R.Civ.P. 56, must submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local R. 56.1(a). In answering a motion for summary judgment, litigants in this District are required to specifically respond to the assertion of each purported undisputed fact by the movant and, if controverting any such fact, to support its position by citing to admissible evidence in the record. Local Rule 56.1(b), (d); *see also* Fed.R.Civ.P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact). If the moving party seeks summary judgment against a *pro se* litigant, it is also required to notify the *pro se* litigant of the requirements of Federal Rule of Civil Procedure 56 and Local Rule 56.1. Local R. 56.2. Once served with a statement pursuant to Local Rule 56.2, "[*p*]*ro se* litigants are then not excused from meeting the requirements of Local Rule 56. 1." *Wali v. One Source Co.,* 678 F.Supp.2d 170, 178 (S.D.N.Y.2009) (citing *Vt. Teddy Bear Co. v. 1–800–BEARGRAM Co.,* 373 F.3d 241, 246 (2d Cir.2004)). Each factual statement set forth in the moving party's Rule 56.1 statement "will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local R. 56.1(c); *see also T.Y. v. N.Y. City Dep't of Educ.,* 584 F.3d 412, 418 (2d Cir.2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."), *cert. denied,* 130 S.Ct. 3277 (2010).

In the instant case, the Defendants have complied with their obligations by submitting a Local Rule 56.1 Statement and providing Plaintiff with notice, pursuant to Local Rule 56.2, of his obligations. (Docs.63, 66.) Plaintiff has failed to submit an appropriate response. Instead, he filed an unsworn, handwritten memorandum of law in opposition to the instant motion with several exhibits attached. (Doc. 60.) However, as the Second Circuit has made clear, "special solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment," *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988) (quoting *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988)), and "where a *pro se* plaintiff fails to submit a proper [Local] Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." *Wali,* 678 F.Supp.2d at 178 (citing *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001)). Moreover, courts are to read a *pro se* litigant's submissions "liberally and interpret them 'to raise the strongest arguments that they suggest.' " *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

**\*7** Therefore, this Court has endeavored to discern from the record if there is any evidentiary support for the assertions contained in Plaintiff's opposition papers and the documents attached thereto, and to determine if there are any other material issues of fact based on the evidence in the record. *Geldzahler v. N.Y. Med. Coll .,* 746 F.Supp.2d 618, 620 n. 1 (S.D.N.Y.2010). The Court has considered the present motion in light of the entirety of the record to afford Plaintiff the special solicitude to which he is entitled, *Burke v. Royal Ins. Co.,*

39 F.Supp.2d 251, 257 (E.D.N.Y.1999), as well as the unsworn statements in his opposition papers-but only to the extent that they are based on personal knowledge or supported by other admissible evidence in the record—on the assumption that if his allegations were sufficient to raise an issue of fact, Plaintiff would be given an opportunity to submit an affidavit properly attesting to those allegations. *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 603 n. 1 (S.D.N.Y.2004). However, even in light of Plaintiff's *pro se* status, the Court cannot rely on any assertions for which he has failed to offer proper support. *Goenaga,* 51 F.3d at 18.

### IV. Discussion

### A. Plaintiff's Claim Against Hatcher

### 1. Cruel and Unusual Punishment

The Eighth Amendment to the U.S. Constitution guarantees convicted prisoners the right to be free from cruel and unusual punishment. U.S. Const. amend. VIII. A prisoner's Eighth Amendment rights are violated when he is denied adequate medical care due to a prison official's deliberate indifference to a substantial risk of serious harm. *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (quoting *Farmer v. Brennan,* 511 U.S. 825, 828 (1994)). Because the Eighth Amendment only applies where there has been a "formal adjudication of guilt," a pretrial detainee—such as Plaintiff, whose cause of action arose before he was convicted—enjoys a right to adequate medical care pursuant to the Due Process Clause rather than the Eighth Amendment. *City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244 (1983). Nevertheless, the analysis is the same under the Due Process Clause and the Eighth Amendment in this Circuit, because "an unconvicted detainee's rights are at least as great as those of a convicted prisoner." *Weyant,* 101 F.3d at 856; *Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000) (noting that the Second Circuit has "often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment"). Thus, an "official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Weyant,* 101 F.3d at 856.

The standard for a cruel and unusual punishment claim under both the Eighth Amendment and the Due Process Clause includes an objective and a subjective component. *E.g., Mitchell v. Prison Health Services, Inc.,* 07 Civ. 8267(PKC), 2008 WL 5069075, at *3 (S.D.N.Y. Nov. 20, 2008).* First, the objective component requires the alleged deprivation of medical care to be sufficiently serious. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). A deprivation of medical care is sufficiently serious if two prongs are satisfied: (1) the prisoner was actually deprived of adequate medical care; and (2) the inadequacy in medical care was sufficiently serious. *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006). An actual deprivation of adequate medical care occurs only if a prison official denies an inmate reasonable medical care, *Id.* (citing *Farmer,* 511 U.S. at 844–47), and it is sufficiently serious if "a condition of urgency ... that may produce death, degeneration, or extreme pain" is present. *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005) (internal quotation marks and citations omitted). Relevant factors to this inquiry include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks, brackets, and citation omitted).

**\*8** Second, the subjective component requires the defendant to "act with a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66 (citing *Wilson,* 501 U.S. at 298). An official acts with the requisite deliberate indifference when he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. This is the "equivalent to the familiar standard of 'recklessness' as used in criminal law." *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir.2002)).

In the instant case, Plaintiff is unable to satisfy both the subjective and objective components.

### 2. Plaintiff Did Not Sustain a Sufficiently Serious Deprivation of Medical Care.

When a prisoner alleges a complete denial of adequate medical care, courts must evaluate the seriousness of the prisoner's underlying medical condition. *Bellotto v. Cnty. of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (citing *Smith,* 316 F.3d at 184–86 .) Alternatively, when—as in the instant case—a prisoner alleges a temporary delay or interruption in the provision of otherwise adequate medical treatment, the seriousness inquiry is "narrower," *Salahuddin,* 467 F.3d at 280, and focuses on the particular risk of harm that resulted from the delay or interruption in treatment rather than the severity of the prisoner's underlying medical condition. *Id.* (citing *Smith,* 316 F.3d at 185); *see also Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1188–89 (11th Cir.1994) (explaining that the seriousness of a delay in medical treatment may be decided "by reference to the *effect* of delay in treatment .... [considering] the seriousness of the medical need [and] deciding whether the delay worsened the medical condition") (emphasis in original)). In the latter scenario, the court must examine all relevant facts and circumstances when determining whether a delay in treatment is sufficiently serious. *DiChiara v. Wright,* 06 Civ. 6123(KAM)(LB), 2011 WL 1303867, at *7 (E.D.N.Y. Mar. 31, 2011) (quoting *Smith,* 316 F.3d at 187). Accordingly, because Plaintiff's claim against Hatcher is based on a short-term interruption in the treatment that is otherwise unchallenged,[12] the court must focus on the risk of harm from the challenged delay in analyzing whether the alleged deprivation was sufficiently serious.

[12]  To the extent that Plaintiff has argued that Hatcher prescribed him a dosage of Paxil that was too low—and thus inadequate—after the ten-day delay, such a claim has already been addressed and dismissed by Judge Karas. *See supra* n. 11.

"Courts have repeatedly held that treatment of a psychiatric or psychological condition may present a serious medical need." *Cuoco,* 222 F.3d at 106 (internal quotation marks and citation omitted). It is also true that "[f]requently missed doses [of medication] could readily result in adverse medical events." *Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009)). Such a delay or interruption in treatment, however, only gives rise to a violation of a prisoner's constitutional rights if it "reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment."

*Amaker v. Coombe,* No. 96 Civ. 1622, 2002 WL 523388, at *8 (S.D.N.Y. Mar. 29, 2002). Although adverse medical effects are not required to prove a constitutional violation, "the absence of ... physical injury will often be probative," and "in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith,* 316 F.3d at 187, 188.

*9 Plaintiff contends that he was deprived of adequate medical care because his access to his medication was interrupted for ten days when he was transferred from OBCC to GMDC. (TAC at 3; Hamm Dep. 18:20–25.) He further avers that the delay was the result of a policy at GMDC that prevented all newly transferred inmates from taking any medication for their first ten days of detention there.[13] (TAC at 3; Hamm Dep. 17:21–25, 21:13–15, 22:2–7.) Plaintiff relies exclusively on the alleged statement made by Hatcher to establish the existence of the ten-day policy. However, he cannot demonstrate that such a purported policy, as applied to him, caused a sufficiently serious deprivation of adequate medical care.

[13]  As noted above, *see supra* n. 9, Plaintiff's evidence of GMDC's adherence to this policy is inconsistent. First, in his Third Amended Complaint, dated August 7, 2009, and again in his deposition testimony, dated December 30, 2009, Plaintiff stated that due to a GMDC policy, he was unable to receive his medications for the first ten days after being transferred there. In his opposition papers, dated October 17, 2011, however, Plaintiff states that after not receiving his medication for *five* days upon his transfer to GMDC-with no mention of a prison policy-Hatcher lowered his Paxil dosage. While the Court is well aware that on summary judgment, it may not resolve issues of credibility, it is also well settled that "a party cannot attempt to defeat a summary judgment motion by contradicting factual allegations in his complaint" or in prior sworn testimony. *Rojas v. Roman Catholic Diocese of Rochester,* 783 F.Supp.2d 381, 407 (W.D.N.Y.2010) *aff'd,* 660 F.3d 98 (2d Cir.2011) (citing *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,* 757 F.2d 523, 528–529 (2d Cir.1985).

The Court is not required to accept Plaintiff's assertion that he was deprived of the medication for ten days, as opposed to five, given that his statements are both equivocal, *see id.,* and unsupported by admissible evidence, *see Wali,* 678

F.Supp.2d at 178 (citing *Holtz,* 258 F.3d at 73.), and in light of the uncontroverted documentary evidence submitted by Defendants. *See Celotex Corp.,* 477 U.S. at 322. However, because the allegations fail even if the Court accepts Plaintiff's assertion that the delay lasted ten days, the Court will analyze the claim based on that version of the facts.

As a result of the delay in access to his medication, Plaintiff avers that he began to experience the "side effects of withdrawal," including exacerbated depression, nightmares, hopelessness, and suicidal thoughts. (Hamm Dep. 23:1–4, 6–16.) Even assuming that Plaintiff's averments were substantiated by admissible evidence, the psychological consequences he alleges to have suffered are insufficient to show that he was subjected to a significant risk of serious harm. [14] Courts have repeatedly refused to find constitutional violations where the harm alleged as a result of a delay in medical care is similar to that alleged here. *Bellotto,* 248 F. App'x at 237 (plaintiff who alleged missed medication dosages and inadequate monitoring of medications did not sustain a constitutional violation "because the risk of harm [he] faced as a result of the alleged treatment was not substantial," and because the only medical consequence he alleged was an "anxiety attack," which resulted in no physical injuries or acute distress); *Barnard v. Beckstrom,* No. 07–CV–19, 2008 WL 4280007, at *16 (E.D .Ky. Sept. 17, 2008) (doctor's affidavit found no merit in plaintiff's claim that a ten-day delay in making alterations to psychiatric medication rose to the level of a serious medical need as he did not "suffer from any physical injury as the result of any alleged or actual delay in treatment"); *Caldwell v. McEwing,* No. 00–CV–1319, 2006 WL 2796637, at *11 (C.D.Ill. Sept. 28, 2006) (granting summary judgment to defendants where plaintiff saw a doctor for psychiatric assessments, refused to take psychiatric medication, and no physical harm resulted); *cf. Bilal v. White,* 10–4594–PR, 2012 WL 3734376, at *2 (2d Cir. Aug. 30, 2012) (plaintiff who suffered from epilepsy and arthritis—"arguably ... serious underlying conditions"-but failed to demonstrate that his condition worsened due to the delay, was unable to establish a sufficiently serious medical need); *Smith,* 316 F.3d at 181–82 (two separate delays of several days each in provision of medication to inmate with HIV-positive status—an indisputably serious medical condition—did not cause sufficiently serious injury where plaintiff suffered temporary itching, severe headaches, as well as stress due to the missed medication, but his HIV infection and overall health did not worsen).

[14]    Although the Court would have greatly benefitted from an affidavit from Hatcher or other medical professionals employed by the City's Department of Corrections—and is perplexed why Defendants failed to submit one—"summary judgment may not properly be based on an absence of a statement from an expert that the care given was [or was not] grossly negligent when inferences drawn from the record could support such a finding." *Pellum v. Burtt,* 9:05–3339–JFA–GCK, 2008 WL 759084, at *33 (D.S.C. Mar. 20, 2008) (citing *Miltier v. Beorn,* 896 F.2d 848, 852 (4th Cir.1990)).

**\*10** The relevant case law makes clear that a greater showing of harm is required in order to meet the high standard of a constitutional violation within the context of a delay in treatment. *Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (dentist's one-year delay in treating a cavity—a condition tending to cause acute pain if left untreated—precluded summary judgment in defendant's favor because of the severity of the risk of harm involved); *Demata v. N .Y. State Corr. Dept. of Health Servs.,* No. 99–0066, 198 F.3d 233 (Table), 1999 WL 753142, at *2 (2d Cir. Sept. 17, 1999) (a delay in providing necessary medical care may rise to the level of a constitutional violation, but the Second Circuit has reserved such a classification for cases involving deliberate delay of treatment as a form of punishment, disregard for a life-threatening and fast-degenerating condition, and extended delay of a major surgery) (collecting cases); *Hathaway,* 37 F.3d at 67 (plaintiff found to have serious medical need where he suffered from a degenerative hip condition that caused him to have difficulty walking and significant pain over an extended period of time, and corrective surgery was delayed over two years); *Silvera v. Conn. Dept. of Corr.,* 726 F.Supp.2d 183, 191–92 (D.Conn.2010) (plaintiff who suffered from severe mental health issues and was an acute suicide risk, and ultimately committed suicide due to acts and omissions of prison medical staff, was found to have demonstrated a sufficiently serious medical need). The absence of any physical injury to Plaintiff as a result of the ten-day delay underscores the Court's finding. *Smith,* 316 F.3d at 187.

There is no indication in the record that Hatcher's conduct "significantly increased [Plaintiff's] risk for medical injury or similar serious adverse consequences." *Wright v.*

*Genovese,* 694 F.Supp.2d 137, 159 (N.D.N.Y.2010) *aff'd,* 415 F. App'x 313 (2d Cir.2011). Accordingly, Defendants' motion for summary judgment may be granted on this basis alone.

### 3. Hatcher Did Not Act With Deliberate Indifference.

However, even assuming *arguendo* that Plaintiff had been subjected to a "sufficiently serious" deprivation of medical care, his claim for cruel and usual punishment against Hatcher would still fail because he cannot prove that Hatcher acted with deliberate indifference. As discussed above, *see supra* Part IV.A.1, a prison official cannot be found to have acted with deliberate indifference unless a plaintiff can demonstrate that the official "knew of and disregarded the plaintiff's serious medical needs." *Chance,* 143 F.3d at 703 (citing *Farmer,* 511 U.S. at 837). "The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result," but he must be subjectively aware that his conduct creates a substantial risk of harm. *Salahuddin,* 467 F.3d at 280. Mere negligence, however, even if it gives rise to a medical malpractice claim, is insufficient to sustain a constitutional claim. *Salahuddin,* 467 F.3d at 280; *Hathaway,* 37 F.3d at 68. Thus, in order to establish liability, Plaintiff must demonstrate the Hatcher knew of and disregarded an excessive risk to his safety in delaying Plaintiff's access to his medication for ten days.

**\*11** While Plaintiff alleges that he was "severely depressed" when Hatcher first evaluated him, (First Unnumbered Exhibit to TAC, second unnumbered page), by his own testimony he never communicated that to Hatcher. (Hamm Dep. 19:10–15.) Indeed, Plaintiff admits that he *purposely* withheld the full extent of his symptoms from Hatcher in order to avoid being placed in segregated housing, on suicide watch, or being sedated. (Hamm Dep. 21:18–22:1, 24:8–21.) Rather, Plaintiff told Hatcher that he was "doing alright," that he was eating and sleeping well, and that he felt only "mild[ly] to moderately depressed due to his legal problems and not recently getting his scheduled medications." (Conway Decl., Ex K.) Hatcher noted that Plaintiff's mood was "calm and stable" at that time. (*Id.*) Therefore, Plaintiff has set forth no facts tending to prove that Hatcher knew of any risk to Plaintiff's health resulting from the short-term delay in his treatment, much less that he disregarded any

such risk. Accordingly, any potential risk to Plaintiff's health as a result of the delay in receiving antidepressant medication would not be actionable, because Plaintiff did not properly advise Hatcher of his actual psychological condition.

As there is no evidence in the record before the Court that Hatcher acted with deliberate indifference by failing to prescribe Plaintiff his medications for the first ten days of his detention at GMDC, Plaintiff's claim against Hatcher would fail the subjective test, as well.

### B. Plaintiff's Claim Against the City ("*Monell* Claim")

The Court need not reach the merits of Plaintiff's *Monell* claim. As the Second Circuit has stated, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006) (emphasis in original). When a district court concludes that there is "no underlying constitutional violation," it need not address "the municipal defendants' liability under *Monell.*" *Id.* Therefore, the Court GRANTS Defendants summary judgment on Plaintiff's *Monell* claim against the City.

### V. Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal taken from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge V. United States,* 369 U.S. 438, 444–45 (1962). The Clerk of the Court is respectfully directed to teminate this motion (Doc. 63), enter judgment in favor of Defendants, and close this case.

It is SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 71770

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.        9

2012 WL 2401574
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Nicholas ROBLES, Plaintiff,
v.
Warden S. KHAHAIFA, et al., Defendants.

No. 09CV718.
|
June 25, 2012.

**Attorneys and Law Firms**

Nicholas Robles, Albion, NY, pro se.

Kim S. Murphy, NYS Attorney General's Office, Buffalo,
NY, for Defendants.

**Order**

HUGH B. SCOTT, United States Magistrate Judge.

 *1 Before the Court is defendants' motion for summary
judgment dismissing this action (Docket No. 37 [1] ).
Responses to this motion were due by April 3, 2012,
and any reply was due by April 16, 2012 (Docket No.
47). After denying (Docket No. 53) plaintiff's motions
(Docket No. 47) for appointment of counsel and to stay
the defense summary judgment motion (Docket No. 50),
responses were due by May 14, 2012, and replies by May
25, 2012 (*id.*). The parties consented to proceed before
the undersigned as Magistrate Judge on August 15, 2011
(Docket No. 30).

[1]     In support of this motion, defendants submitted
        their Memorandum of Law, Docket No. 38; their
        Statement of Facts, Docket No. 39; the declarations
        of defendants sergeant Darin Austin, Docket No.
        40; inmate grievance resolution program supervisor
        Brian Fitts, Docket No. 41; retired Superintendent
        Sibatu Khuhaifa, Docket No. 42; Dr. Dwight Lewis,
        Docket No. 43; corrections officer Todd Wilson,
        Docket No. 44; and a declaration of their counsel,
        with exhibit (videotape of May 7, 2009), Docket No.
        45; the declaration of Dr. Winston Douglas with
        exhibits, plaintiff's medical record, filed under seal,

        Docket No. 48; their attorney's reply Declaration,
        Docket No. 58.
            In opposition, plaintiff submits his motion to stay
        summary judgment and for appointment of counsel
        and its supporting papers, Docket Nos. 50, 51, 52;
        his letter to Chambers, dated Apr. 11, 2012, Docket
        No. 54; and his "Affidavit of Truth Amendment in
        Opposition to Respondents Summary Judgment,"
        with enclosed Affidavit of Junior Lorenzo Cepeda
        and exhibit of a grievance, Docket No. 55; his
        amendment renewed motion for stay of defense
        motion, Docket No. 57.

Plaintiff filed a renewed motion to stay the defense motion
(Docket No. 57); that motion is **denied.**

**BACKGROUND**

Plaintiff, proceeding *pro se,* commenced this action
alleging that defendants were deliberately indifferent to
his medical condition while he was incarcerated at the
Orleans Correctional Facility ("Orleans") in 2009 (Docket
No. 14, Am. Compl.; Docket No. 39, Defs. Statement
¶¶ 1, 3). The Amended Complaint alleges claims against
Superintendent S. Khuhaifa, Dr. Winston Douglas and
Dr. Dwight Lewis, inmate grievance supervisor Fitts,
Sergeant Austin, and corrections officer Wilson (Docket
No. 14, Am. Compl.). He claims that Drs. Douglas
and Lewis exhibited deliberate indifference to plaintiff's
right shoulder from February 2009 to June 2010 by
failing to treat his shoulder and depriving plaintiff of
pain medication. He alleges that the original injury
arose from a prison assault while he was at Fishkill
Correctional Facility, but he alleges here only claims
arising in this District surrounding the treatment he
received (or did not receive) while at Orleans (*id.* ¶¶ 16–
17). Since plaintiff did not receive what he believed to be
adequate pain medication, he substituted illegal marijuana
to self-medicate his pain and was disciplined for marijuana
possession (*id.* ¶ 20). Plaintiff moved for leave to proceed
*in forma pauperis* (Docket Nos. 2, 5) and leave was granted
(Docket No. 7).

*Defense Motion for Summary Judgment*
According to defendants' Statement of Undisputed
Facts (Docket No. 39), plaintiff alleges that defendants
were deliberately indifferent to the condition of his
right shoulder, alleging that Superintendent Khahaifa
instituted a policy which forbade prescribing narcotics

to inmates (Docket No. 39, Defs. Statement ¶ 3; *see also* Docket No. 14, Am. Compl. ¶ 21). Superintendent Khahaifa states that, because medical decisions are delegated to medical personnel, he disclaims any influence over that decision making and denies that a no antinarcotic policy exists at Orleans (Docket No. 39, Defs. Statement ¶ 4; Docket No. 42, Khahaifa Decl. ¶ 6). Narcotic pain medication is prescribed on a case-by-case basis as needed by an inmate patient (Docket No. 39, Defs. Statement ¶ 5). Khahaifa received five letters and numerous grievances from plaintiff regarding his medical treatment which he forwarded to appropriate office or, with the grievances, he considered the appeal and affirmed denial of relief, with these appealed grievances then appealed to Department of Corrections and Community Supervision ("DOCCS") Albany central office (*id.* ¶ 9; Docket No. 42, Khahaifa Decl. 12).

**\*2** Defendant Fitts was employed as an inmate grievance resolution program supervisor at Orleans (Docket No. 39, Defs. Statement ¶ 11; Docket No. 41, Fitts Decl. ¶ 1). Plaintiff claims that Fitts circumvented the grievance process (Docket No. 39, Defs. Statement ¶ 12), but Fitts claims that all grievances were filed and processed pursuant to DOCCS directives (*id.* ¶ 13).

Defendant Austin was a sergeant at Orleans during this time and plaintiff alleges that he mislead and misinformed unnamed DOCCS officials in Albany by incorrectly telling them that he saw plaintiff lift weights (*id.* ¶¶ 17–18). Austin denies contacting Albany about plaintiff and he disclaims ever seeing plaintiff exercise (*id.* ¶¶ 22, 23).

Defendant Wilson is a corrections officer at Orleans (*id.* ¶ 25) and plaintiff claims that Wilson interfered with plaintiff's medical care by collaborating with nursing staff and Sergeant Austin in misinforming Albany officials about plaintiff's ability to lift weights (*id.* ¶ 26). When Wilson was questioned by medical staff about plaintiff, Wilson told them that he saw plaintiff lift weights daily (*id.* ¶¶ 27–28). A member of medical staff then went to the gym but missed plaintiff because he finished there (*id.* ¶ 29). Wilson never contacted Albany about plaintiff; had such contact been made, it would have been memorialized in a memorandum (*id.* ¶ 31).

Plaintiff alleges that Dr. Douglas, Facility Health Services Director at Orleans, refused to prescribe narcotics to plaintiff and instead chose to treat plaintiff's shoulder

differently (*id.* ¶ 35). Dr. Douglas was plaintiff's primary physician at Orleans (*see* Docket No. 43, Dr. Lewis Decl. ¶ 4). Dr. Douglas explains that plaintiff made repeated demands for Percocet and other narcotics that were not medically necessary and plaintiff was not compliant with medical instructions (Docket No. 39, Defs. Statement ¶ 39; *see id.* ¶¶ 36–38, 40–41; Docket No. 48, Dr. Douglas Decl. ¶¶ 17, 18, 15, 20). Knowing plaintiff's history of drug abuse and his medical condition, Dr. Douglas changed plaintiff's medication (Docket No. 39, Defs. Statement ¶ 40; Docket No. 48, Dr. Douglas Decl. ¶ 20). Plaintiff was prescribed a sling and physical therapy as treatment for his shoulder (Docket No. 39, Defs. Statement ¶ 43), but plaintiff did not regularly wear the sling or attend physical therapy sessions, seeking instead imaging of the shoulder (*id.* ¶¶ 44, 42). Plaintiff also lifted weights (*id.* ¶ 45; Docket No. 48, Dr. Douglas Decl. ¶¶ 12–13), despite being told by medical staff to refrain from lifting weights (Docket No. 48, Dr. Douglas Decl. ¶ 12). On plaintiff's almost daily sick calls, medical staff noted plaintiff's "bulky well defined deltoids and bicep muscles, which are signs indicative of continued exercise" (*id.*). Defendants point to plaintiff's failed November 2008 surgery by outside surgeon Dr. Stegamann at Erie County Medical Center as the cause for plaintiff's rotator cuff damage (Docket No. 39, Defs. Statement ¶ 46; Docket No. 48, Dr. Douglas Decl. ¶ 24, Ex. A, at Bates No. 311).

**\*3** Plaintiff charges that Dr. Lewis, a facility physician at Orleans, was deliberately indifferent (Docket No. 39, Defs. Statement ¶¶ 49–50). Dr. Lewis asserts that plaintiff was given proper medical care for his shoulder while at Orleans, he was prescribed pain and antiinflammatory medicines, physical therapy, and a sling (*id.* ¶ 51; Docket No. 43, Dr. Lewis Decl. ¶ 3), as well as monitoring images of his shoulder and examinations by outside consulting physicians (Docket No. 39, Defs. Statement ¶ 52; Docket No. 43, Dr. Lewis Decl. ¶ 3).

Defendants argue that both the subjective and objective elements of a deliberate indifference claim are not met here. Subjectively, they argue that plaintiff has not proven a culpable state of mind for any of the defendants (Docket No. 38, Defs. Memo. at 8–13). Objectively, defendants contend that plaintiff was scheduled for shoulder surgery in 2007 but was released and that surgery was never performed. Plaintiff was again incarcerated in 2008 and had two surgeries on his shoulder (Docket No. 48, Dr. Douglas Decl. ¶ 6). In 2009, plaintiff was deemed not

to be a candidate for surgery, and was prescribed anti-inflammatory medication instead. Plaintiff, however, was not compliant with medical advice. Plaintiff worked out extensively, with one routine on May 7, 2009, videotaped showing plaintiff lifting weights, punching a heavy bag, and playing basketball, despite medical instruction to avoid such strenuous activity (Docket No. 45, Defs. Atty. Decl. ¶¶ 5–10, Ex. A (videotape) [2] ). Defendants conclude that plaintiff's complaints did not rise to the level of serious medical need to meet the objective prong of the deliberate indifference claim (Docket No. 38, Defs. Memo. at 5–7).

[2]     Plaintiff reviewed the videotape, Docket No. 45, Defs. Atty. Decl., Ex. A, cover letter Feb. 13, 2012 (with written notation "tape reviewed: 2–16–12" and signed by plaintiff).

Defendants each deny conspiring against plaintiff (Docket No. 39, Defs. Statement ¶¶ 10, 16, 24, 33, 48, 54; Docket No. 38, Defs. Memo. at 19–21) and deny any deliberate indifference on their part to plaintiff's condition (*see* Docket No. 39, Defs. Statement ¶ 54). They also argue that plaintiff fails to establish the personal involvement of Superintendent Khahaifa, Austin, Fitts, or Wilson in plaintiff's medical care (Docket No. 38, Defs. Memo. at 13–19). Defendants alternately argue that they are entitled to qualified immunity if a constitutional violation is found here (*id.* at 21–23).

Plaintiff responds that he complains that he continues to suffer pain in that shoulder due to not being prescribed pain medication (Docket No. 54, Pl. letter response dated Apr. 11, 2012, at 1–2), although he has not amended his Complaint to allege continuous liability. He was prescribed Ibuprofen 800 mg., but plaintiff states that he could not tolerate this medicine in his stomach (*id* . at 1). Plaintiff previously argued that there is conflicting testimony (Docket No. 51, Pl. Memo. in support of motion for appointment of counsel and stay of defense motion ¶¶ 2, 5) but does not identify these conflicts. Plaintiff denies that he alleges any conspiracy among the defendants (Docket No. 52, Pl. Aff. in support of appointment motion ¶ 3).

 **\*4**  Plaintiff also complains about an assault that allegedly occurred on April 4, 2012, seeking to have this Court and prison grievance official review videotape of the incident (Docket No. 54, Pl. letter, at 1–2). That incident

and others he raises in his papers (some discussed below), however, are beyond the scope of this pending action [3] .

[3]     Plaintiff also sought production of his medical records from January 2012 to present, Docket No. 54, Pl. Letter at 3. Docket No. 48 is plaintiff's medical record during the relevant period for this action, from February 13, 2009, to June 1, 2010, *see* Docket No. 48, Dr. Douglas Decl. ¶ 4, Ex. A, at first page, cover letter of April 12, 2011; *see generally id.,* Ex. A.

In his "Affidavit of Truth" (Docket No. 55), plaintiff describes the injury to his shoulder that lead to the surgeries and pain he suffers (Docket No. 55, Pl. Aff., FACTS ONE, TWO, FOUR, Ex. B; Docket No. 57, Pl. Amend. ¶¶ 7–8) and complains that physical therapy ended with his transfer to Fishkill Correctional Facility prior to his imprisonment at Orleans (Docket No. 55, Pl. Aff., FACT SIX). He faults Dr. Douglas for relying upon other medical personnel in plaintiff's medical record rather than his own assessment (*id.* FACT TEN), in fact plaintiff claims that Dr. Douglas used a purported assessment of plaintiff from Erie County Medical Center in January or February 2011 which claimed that plaintiff was in the Attica Correctional Facility but plaintiff was not confined there at that time (*id.* FACT NINE). Plaintiff states that due to "the medical malpractice of Winston Douglas," plaintiff had undergone severe and excruciating pain (*id.* FACT ELEVEN). He claims that he was denied proper medical assistance at Orleans (*id.* FACT SEVEN) and that a Jane Doe, a nurse administrator at Orleans but not named as a defendant here, violated HIPAA [4] by having security personnel investigate plaintiff's medical claims (*id.* FACT EIGHT). Plaintiff then alleges that, on April 11, 2012, he was assaulted by prison guards during a cell search (*id.* FACT 14).

[4]     Health Insurance Portability and Accountability Act, Pub.L. No. 104–191, 110 Stat.1936 (1996). As recently held by this Court, any violation of medical privacy under HIPAA is limited to enforcement by the Secretary of Health and Human Services, *Wright v. Szczur,* No. 11 CV 140, 2012 U.S. Dist. LEXIS 10872, at *15,2012 WL 268283 (W.D .N.Y. Jan. 30, 2012) (Skretny, Ch. J.). Thus, even if plaintiff were deemed to allege such a claim, it would have to be denied.

He submits Junior Cepeda's "Affidavit of Truth" about medical staff disregarding plaintiff's complaints on March 28, 2012 (Docket No. 55, Cepeda Aff. of Truth). Cepeda states that he saw unnamed medical personnel "refuse

to listen" to plaintiff on March 28 to his complaints, stating that plaintiff would always "complain about the same right shoulder all the time and everyday" (*id.* FACT 3). Cepeda states that he overhead medical staff talking about plaintiff's medical condition with security personnel at Orleans (*id.* FACT 4). Cepeda also witnessed plaintiff being assaulted by security personnel on April 11, 2012 (*id.* FACT 6).

Because plaintiff was refused pain medication, he claims that he took marijuana and then plead guilty in a disciplinary proceeding to marijuana use when caught (Docket No. 57, Pl. Amend. ¶ 9). He states that he declined what he termed an experimental surgical procedure by Dr. Stegamann in January of 2011 (*id.* [first] ¶ 10). Plaintiff alleges that since his reassignment to Orleans, defendants has been denied appropriate pain medication (*id.* [second] ¶ 10; *see id.* ¶ 11). Plaintiff's condition worsened when he injured his right knee and was then denied pain medication (*id.* ¶ 12).

 **\*5** In their reply, defendants note that plaintiff made "numerous irrelevant references (Docket No. 58, Defs. Atty. Reply Decl. ¶¶ 4, 6) and submitted an unsworn witness statement (*cf.* Docket No. 55, Cepeda Aff. of Truth) that he saw medical personnel walk from plaintiff on March 28, 2012 (Docket No. 58, Defs. Atty. Reply Decl. ¶ 5). Defendants argue that this statement is too vague and conclusory to create a material issue of fact, it does not identify any defendant as the medical personnel involved, and is outside the time period (2009–10) for this action (*id.*). They conclude that plaintiff has failed to raise a material issue of fact to preclude summary judgment (*id.* ¶ 7).

### DISCUSSION

#### I. Summary Judgment Standard

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits or declarations show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003); Fed.R.Civ.P. 56(a), (c)(1) (effective Dec. 2010). The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact

exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. *Ford, supra,* 316 F.3d at 354. "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1535 (2d Cir.) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)), *cert. denied,* 522 U.S. 864 (1997). While the moving party must demonstrate the absence of any genuine factual dispute, *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the party against whom summary judgment is sought, however, "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original removed); *McCarthy v. American Intern. Group, Inc.,* 283 F.3d 121, 124 (2d Cir.2002); *Marvel Characters v. Simon,* 310 F.3d 280, 285–86 (2d Cir.2002). The opponent to summary judgment may argue that he cannot respond to the motion where it shows, by affidavit, "that, for specified reasons, it cannot present facts essential to justify its opposition," Fed.R.Civ.P. 56(d).

The Local Civil Rules of this Court require that movant and opponent each submit "a separate, short, and concise" statement of material facts, and if movant fails to submit such a statement it may be grounds for denying the motion, W.D.N.Y. Loc. Civ. R. 56(a) (1), (2) (effective Jan. 1, 2011). The movant is to submit facts in which there is no genuine issue, *id.* R. 56(a)(1), while the opponent submits an opposing statement of material facts as to which it is contended that there exists a genuine issue to be tried, *id.* R. 56(a)(2). Each numbered paragraph in the movant's statement will be deemed admitted unless specifically controverted by a correspondingly numbered paragraph in the opponent's statement, *id.* Each statement of material fact is to contain citations to admissible evidence to support the factual statements and all cited authority is to be separately submitted as an appendix to that statement, *id.* R. 56(a)(3).

 **\*6** The pleading of a *pro se* plaintiff, however, is to be liberally construed, *see Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam).

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only " 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly,* [550 U.S. 544, 555], 127 S.Ct. 1955, 1964, (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint. *Bell Atlantic Corp., supra,* at [555], 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929, (citing *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974))."

*Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam). In *Erickson,* the Court held that the Tenth Circuit departed from the liberal pleading standards of Rule 8(a)(2) by dismissing a *pro se* inmate's claims.

"The Court of Appeals' departure from the liberal pleading standards set forth by Rule 8(a)(2) is even more pronounced in this particular case because petitioner has been proceeding, from the litigation's outset, without counsel. A document filed *pro se* is 'to be liberally construed,' [*Estelle v. Gamble,* 429 U.S., 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ], and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers,' *ibid.* (internal quotation marks omitted). *Cf.* Fed. Rule Civ. Proc. 8(f) ("All pleadings shall be so construed as to do substantial justice").

551 U.S. at 94; see *Boykin v. KeyCorp,* 521 F.3d 202, 213–14 (2d Cir.2008). Thus, the *pro se* plaintiff's complaint has to be construed "more liberally" than one filed by counsel, *Boykin, supra,* 521 F.3d at 214.

"An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made with personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated," Fed.R.Civ.P. 56(c)(4) (2010) (formerly Rule 56(e)).

## II. Deliberate Indifference Standard

Under the Eighth Amendment, in order to state a claim for inadequate medical treatment, plaintiff must allege that defendants acted with "deliberate indifference to [a] serious medical need," *LaGrange v. Ryan,* 142 F.Supp.2d 287, 293 (N.D.N.Y.2001); *see Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *see also Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (the Eighth Amendment prohibits infliction of "cruel and unusual punishments" which includes punishments that "involve the unnecessary and wanton infliction of pain.") (citations omitted); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied sub nom. Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "To establish an unconstitutional denial of medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Hathaway, supra,* 37 F.3d at 66 (quoting *Estelle, supra,* 429 U.S. at 104). Mere negligent treatment or malpractice upon a suspect, however, does not create an Eighth Amendment violation, *see Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir.1972). This claim has two elements, an objective component, that the deprivation must be sufficiently serious; and a subjective component, that the defendant official must act with sufficiently culpable state of mind. *Hathaway, supra,* 37 F.3d at 66. "Sufficiently serious" for the objective component contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (quoted in *Hathaway, supra,* 37 F.3d at 66). Plaintiff needs to prove that defendants wantonly intended to cause him to suffer. *Wilson v. Seiter, supra,* 501 U.S. at 302.

### III. Application

## A. Procedural Grounds

**\*7** Here, plaintiff did not submit his counterstatement of facts providing a point-by-point refutation or adoption of the defense statement of facts. Instead, plaintiff provides in moving papers an attempt to stay the hearing of this motion and in other documents alleging generally that there were contested issues of fact (Docket Nos. 51, 52) or stating specific facts (contested or not) that he is now asserting in response to the motion (Docket Nos. 55, 57). He lists various facts in the latter instances without clearly indicating which fact is material to this motion. Despite his *pro se* status, the fact plaintiff did not state what facts were contested (even if not in a formal counterstatement) and compels this Court to look exclusively at defendants' statement as the conceded facts in this case. Plaintiff does point to some minor discrepancies in facts (for example, Dr. Douglas relying upon medical findings in 2011 while plaintiff was in another facility, Docket No. 55, Pl. Aff. FACT NINE; *but cf.* Docket No. 48, Dr. Douglas Decl. ¶ 11, Ex. A Bates No. 277 (consultation with Dr. Stegamann occurred in *2010* )) but these are not material to oppose the defense motion.

First, plaintiff submits his own and a witness's "Affidavit of Truth" (Docket No. 55), but both are unsworn and not witnessed statements, *cf.* 10B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2738, at 362–63 (Civil 3d ed.1998) (affidavits submitted for or opposing a summary judgment motion need not be notarized, they may be made under penalty of perjury, but unsworn statements will be rejected). Plaintiff certified and swore "to my unlimited commercial liability that the testimony I give before this court is, to the best of knowledge and understanding, true, correct, and complete, not misleading, the truth, the whole truth, and nothing but the truth, so help me God," and concluded that he declared "under the Laws of the Constitution of the United States of America that the above stated facts are true, correct, and complete to the best of my knowledge and belief. So help me God" (Docket No. 55, Pl. Aff. of Truth at pages 1 of 3 and 3 of 3). Witness Cepeda, a "sovereign American," submits a similar "Affidavit of Truth," declaring that "the facts stated/listed below are true, correct, and complete to the best of my understanding and belief so help me God," concluding that he "declares under the laws of the constitution of the United States of America (1787) as amended (1791) by the Bill of Rights that the above is true, correct, and complete, to the best of my belief

and knowledge. And does declare that notary assistance was not possible upon time and date of submitting this Affidavit of Truth. So help me God" (*id.,* Cepeda Aff. of Truth). The handwriting for both Affidavits is similar as is the verbiage. Neither document is a declaration stating expressly that they were made under penalty of perjury, *cf.* 28 U.S.C. § 1746.

**\*8** Nevertheless, given that plaintiff is an inmate proceeding *pro se* and, as indicated by Cepeda, may have lacked notary assistance with these documents, this Court will consider them as part of the opposition to summary judgment. But even considering these papers, Cepeda's Affidavit of Truth is not admissible for the information it contains since it discusses events in 2012 that are beyond the scope of this action as currently plead, *see* 10B Wright, Miller & Kane, *supra,* § 2738, at 330, 341 (court excludes summary judgment affidavit if its irrelevance is clear). As currently plead, this case involves defendants' deficient treatment of plaintiff in 2009–10; plaintiff has not sought to amend this Complaint again to allege continuing harm. Further, Cepeda's statement accuses an unnamed medical staffer for ignoring plaintiff's pleas for treatment on his shoulder without any connection of that unnamed employee to the named defendants in this case.

Next, this Court addresses the substance of defense arguments.

## B. Deliberate Indifference

As for the objective element of a deliberate indifference Eighth Amendment claim, at worst plaintiff alleges medical malpractice (if that) in not prescribing the medication he desired. He sought narcotic medication while the facility medical staff prescribed Ibuprofen. That allegation is not sufficient to state a constitutional deprivation. Mere negligent treatment or malpractice upon a prisoner does not create an Eighth Amendment violation. *Estelle, supra,* 429 U.S. at 106; *Corby, supra,* 457 F.2d at 254. Plaintiff also exercised his shoulder, engaging in weight lifting and hitting a heavy bag, stressful and strenuous activities on an injured rotator cuff. Defendants' motion for summary judgment on this ground is **granted.**

As for subjective element, plaintiff has not suggested that defendants wantonly wished to cause him to suffer or lay out that defendants had the sufficiently culpable state of mind to establish this element. On this ground, defendants' motion is also **granted.**

### C. Personal Involvement

As alternative ground, defendants motion is **granted** as to certain supervisory defendants because plaintiff fails to establish the personal involvement of supervisory officials retired Superintendent Khahaifa, Austin, Fitts, or Wilson in the denial of the sought medical care. The medical decisions were made by medical staff, in particular defendant Doctors Douglas and Lewis. The administrators named here merely considered grievances raised by plaintiff regarding this care.

To state a § 1983 claim, plaintiff must allege the manner in which defendant was personally involved in depriving plaintiff of his rights, *see Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). There are several ways to allege personal involvement: plaintiff could claim that defendant had direct participation in the event; plaintiff could claim that defendant failed to remedy the violation after it was noticed; defendant created the policy which lead to the violation or allowed the policy to continue; defendant was grossly negligent in managing subordinates which caused the violation to occur; or defendant exhibited gross negligence or deliberate indifference to plaintiff's rights by failing to act on information indicating that unconstitutional acts were taking place, *Wright, supra,* 21 F.3d at 501. An allegation of personal involvement is a prerequisite for damages under a § 1983 claim in this Circuit, *e.g., Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001).

**\*9** Plaintiff here has not alleged any of these bases for personal involvement of the supervisory defendants. Plaintiff merely claims that they failed to intervene or grant his grievance regarding the quality of medical care he received or that the superintendent had a no narcotics policy for the inmates. He does not refute defendants' contention that the supervisory defendants had no role in the medical decision making for plaintiff's treatment or Khahaifa's denial of having a policy regarding prescribing narcotics to inmates. Defendants' motion for summary judgment on this ground is **granted.**

### D. Qualified Immunity

When confronted by a claim of qualified immunity, one of the first questions for the Court to resolve is do the facts, taken in the light most favorable to the party asserting the injury, show the official's conduct violated a constitutional right. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Under *Saucier,* this Court first considers the constitutional question, then considers the qualified immunity question, *id.* But the Supreme Court, in *Pearson v. Callahan,* 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), overruled *Saucier* in mandating the order in which trial courts are to consider qualified immunity claims. In *Pearson,* the Court recognized that district and circuit courts had the discretion to determine the order of the *Saucier* steps they would consider first (either the substance of the constitutional claim or the immunity claim), 555 U.S. at 232.

Government officials performing discretionary functions generally are shielded by qualified immunity from liability in their individual capacities, *see Frank v. Reilin,* 1 F.3d 1317, 1327 (2d Cir.1993), "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "If it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may nevertheless be entitled to qualified immunity." *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 568–69 (2d Cir.1996).

Given that no constitutional violation was found, this Court **need not address** defendants' alternative contention that they deserve qualified immunity for their actions.

### IV. Post Script—2012 Allegations

During the pendency of this action, plaintiff has been transferred, first from Orleans to Attica Correctional Facility then to Groveland Correctional Facility and later back to Orleans. Plaintiff has written two letters to this Court and to the grievance officials complaining about conditions following his last transfer to Orleans (letter of plaintiff to Chambers, Apr. 30, 2012; letter of plaintiff to Chambers, Apr. 30, 2012). In these letters (and in other papers he submitted in response to defendants' motion, Docket No. 54; *see also* Docket No. 57), plaintiff claims that he was harassed and beaten by prison guards when he refused to lift his arms for a frisk due to his shoulder injuries. He also alleges that medical staff at Orleans refused to treat him in 2012. In his responding papers,

he also discusses an April 2012 incident that he seeks the Court to investigate (Docket No. 54; *see also* Docket No. 57).

**\*10** Since these letters and papers allege incidents that occurred in February 23, 2012, and April of that year, well after the incidents alleged in this pending action and unrelated to those in this action, this Court **declines** plaintiff's implied request to amend the Complaint to add these new allegations. Since plaintiff also sent these letters to the grievance authorities, any potential claims may not have been administratively exhausted.

CONCLUSION

For the reasons stated above, defendants' motion for summary judgment (Docket No. 37) is **granted.** Plaintiff's renewed motion to stay consideration of defendants' motion (Docket No. 57) is **denied** and plaintiff's attempted motion for leave to amend the Complaint to assert claims arising from the April 2012 incident is also **denied.**

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a) (3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

The Clerk of Court is instructed to close this case.

So Ordered.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2401574

---

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Arnett v. Shojaie, C.D.Cal., November 8, 2011

2010 WL 1235591
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

James MURRAY, Plaintiff,
v.
R. PALMER; S. Griffin; M. Terry;
F. Englese; Sergeant Edwards; K.
Bump; and K.H. Smith, Defendants.

No. 9:03-CV-1010 (GTS/GHL).
|
March 31, 2010.

**Attorneys and Law Firms**

James Murray, Malone, NY, pro se.

Bosman Law Office, AJ Bosman, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy Mulvey, Esq., James Seaman, Esq., Assistant Attorneys General, of Counsel, Albany, NY, for Defendants.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** The trial in this prisoner civil rights action, filed *pro se* by James Murray ("Plaintiff") pursuant to 42 U.S.C. § 1983, began with an evidentiary hearing before the undersigned on March 1, 2010, regarding the affirmative defense of seven employees of the New York State Department of Correctional Services-R. Palmer, S. Griffin, M. Terry, F. Englese, Sergeant Edwards, K. Bump, and K.H. Smith ("Defendants")-that Plaintiff failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act, before filing this action on August 14, 2003. At the hearing, documentary evidence was admitted, and testimony

was taken of Plaintiff as well as Defendants' witnesses (Darin Williams, Sally Reams, and Jeffery Hale), whom Plaintiff was able to cross-examine through *pro bono* trial counsel. At the conclusion of the hearing, the undersigned indicated that a written decision would follow. This is that written decision. For the reasons stated below, Plaintiff's Second Amended Complaint is dismissed because of his failure to exhaust his available administrative remedies.

**I. RELEVANT LEGAL STANDARD**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle,* 534 U.S. 516, 524-25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo,* 548 U.S. 81, 89, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial review." *Woodford,* 548 U .S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

In accordance with the PLRA, the New York State Department of Correctional Services ("DOCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R.

§§ 701.5, 701.6(g), 701.7. [1] *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence. [2] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

[1]     *See also White v. The State of New York,* 00-CV-3434, 2002 U . S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

[2]     The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

**\*2** Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied. [3] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can-and must-be appealed to the next level, including CORC, to complete the grievance process. [4] There appears to be a conflict in case law regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number. [5] After carefully reviewing this case law, the Court finds that the weight of authority appears to answer this question in the affirmative. [6] The Court notes that, if the plaintiff adequately describes, in his appeal to the superintendent, the substance of his grievance (or if the plaintiff attaches, to his appeal, a copy of his grievance), it would appear that there is something for the superintendent to review.

[3]     *Groves v. Knight,* 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009) (Suddaby, J.).

[4]     7 N .Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g .,* DOCS Directive 4040 dated 8/22/03, ¶ VI.G. ("Absent [a time limit extension granted by the grievant], matters not decided within the time limits may be appealed to the next step.); *Pacheco v. Drown,* 06-CV-0020, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010) (Suddaby, J.) ("It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process."), *accord, Torres v. Caron,* 08-CV-0416, 2009 WL 5216956, at *5 & n. 28 (N.D.N.Y. Dec.30, 2009) (Mordue, C.J.), *Benitez*

*v. Hamm,* 04-CV-1159, 2009 WL 3486379, at *13 & n. 34 (N.D.N.Y. Oct.21, 2009) (Mordue, C.J.), *Ross v. Wood,* 05-CV-1112, 2009 WL 3199539, at *11 & n. 34 (N.D.N.Y. Sept.30, 2009) (Scullin, J.), *Sheils v. Brannen,* 05-CV-0135, 2008 WL 4371776, at *6 & n. 24 (N.D.N.Y. Sept.18, 2008) (Kahn, J.), *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *15 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J.), *McCloud v. Tureglio,* 07-CV-0650, 2008 WL 1772305, at *10 & n. 25 (N.D.N.Y. Apr. 15, 2008) (Mordue, C.J.), *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *14 & n. 114 (N.D.N.Y. Nov.5, 2007) (McAvoy, J.); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *11 & n. 66 (N.D.N.Y. June 22, 2006) (McAvoy, J.) ("[A]n inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Walters v. Carpenter,* 02-CV-0664, 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) ("[M]atters not decided within the prescribed time limits must be appealed to the next level of review."); *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

5    *Compare Johnson v. Tedford,* 04-CV-0632, 616 F.Supp.2d 321, 326 (N.D.N.Y.2007) (Sharpe, J.) ("[W]hen a prisoner asserts a grievance to which there is no response, *and it is not recorded or assigned a grievance number,* administrative remedies may be completely exhausted, as there is nothing on record for the next administrative level to review.") [emphasis in original, and citations omitted] *with Waters v. Schneider,* 01-CV-5217, 2002 WL 727025, at *2 (S.D.N.Y. Apr.23, 2002) (finding that, in order to exhaust his available administrative remedies,

plaintiff had to file an appeal with the superintendent from the IGRC's non-response to his grievance, of which no record existed).

6    *See, e.g., Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *16, 18 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (finding that, in order to exhaust his available administrative remedies with regard to his grievance of August 30, 2000, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to that grievance, which included a failure to acknowledge the receipt of the grievance and assign it a number); *Midalgo v. Bass,* 03-CV-1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept.26, 2006) (Mordue, C.J., adopting Report-Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *Collins v. Cunningham,* 06-CV-0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available to him where his grievance of March 20, 2004, was not assigned a grievance number); *Veloz v. New York,* 339 F.Supp.2d 505, 515-16 (S.D.N.Y.2004) (rejecting inmate's argument that the prison's grievance procedure had been rendered unavailable to him by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* "there was no evidence whatsoever that any of [plaintiff's] grievances were filed with a grievance clerk," and he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *cf. Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

It is also important to note that DOCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

**\*3** "An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Porter,* 534 U.S. at 524). However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004), *accord, Ruggiero,* 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

With regard to this third inquiry, the Court notes that, *under certain circumstances,* an inmate may exhaust his administrative remedies by raising his claim during a related *disciplinary proceeding. Giano v. Goord,* 380 F.3d 670, 678-79 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). [7] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing, [8] *and* (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim. [9] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the DOCS regulations governing the grievability of his claim, [10] (b) the inmate was specifically informed that the claim in question was grievable, [11] (c) the inmate separately pursued the proper grievance process by filing a grievance with the IGRC, [12] (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion, [13] and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC. [14] Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not subsequently investigate that claim, [15] and/or (b) the inmate did not appeal his disciplinary hearing conviction. [16]

[7]   The Court recognizes that the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur through the disciplinary process). Specifically, in *Woodford,* the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Woodford,* 548 U.S. at 93. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* as a prerequisite to bringing suit in federal court. *Id.* at 88-103 (emphasis added). It is unclear whether *Woodford* has overruled

any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano-Testman* line of cases.

8    *Giano,* 380 F.3d at 678 ("[W]hile Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief that DOCS regulations foreclosed such recourse."); *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

9    *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "afford[ing] corrections officials time and opportunity to address complaints internally"); *Chavis v. Goord,* 00-CV-1418, 2007 WL 2903950, at *9 (N.D.N.Y. Oct.1, 2007) (Kahn, J.) ("[T]o be considered proper, exhaustion must occur in both a substantive sense, meaning that prison officials are somehow placed on notice of an inmate's complaint, and procedurally, in that it must be presented within the framework of some established procedure that would permit both investigation and, if appropriate, remediation.") [citation omitted]. The Court joins the above-described two requirements in the conjunctive because the Second Circuit has recognized that mere notice to prison officials through informal channels, without more, does not suffice to satisfy the PLRA procedural exhaustion requirement. *See Macias v. Zenk,* No. 04-6131, 495 F.3d 37, at *43-44 (2d Cir.2007) (recognizing that *Woodford v. Ngo,* 548 U.S. 81 [2006], overruled *Braham v. Casey,* 425 F.3d 177 [2d Cir.2005], to the extent that *Braham* held that "informal complaints" would suffice to exhaust a claim).

10   *See, e.g., Reynoso v. Swezey,* 423 F.Supp.2d 73, 75 (W.D.N.Y.2006), *aff'd,* 238 F. App'x 660 (2d Cir.2007) (unpublished order), *cert. denied,* 552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008); *Holland v. James,* 05-CV-5346, 2009 WL 691946, at *3 (S.D.N.Y. March 6, 2009); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008); *cf. Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *5 & n. 23 (N.D.N.Y. July 11, 2007)

(McAvoy, J.) (reciting this point of law in context of failure to appeal grievance determination to CORC).

11   *See, e.g., Johnson v. Barney,* 04-CV-10204, 2007 WL 2597666, at *2 (S.D.N.Y. Aug.30, 2007); *Reynoso,* 423 F.Supp.2d at 75-76.

12   *See, e.g., Reynoso,* 423 F.Supp.2d at 75 ("There is no evidence that plaintiff was confused or misled about the proper method for raising his claims. In fact, the record shows exactly the opposite: plaintiff did file a grievance about the incident. He simply failed to appeal the denial of that grievance to CORC."); *Tapp v. Kitchen,* 02-CV-6658, 2004 WL 2403827, at *9 (W.D.N.Y. Oct.26, 2004) ("In the instant case, however, plaintiff does not and cannot claim to have believed that his only available remedy was to raise his complaint as part of his disciplinary hearing, since he also filed a grievance with the Inspector General, and also claims to have filed both an inmate grievance and a separate complaint with the facility superintendent."); *cf. Muniz,* 2007 WL 2027912, at *5 & n. 23 ("Plaintiff's Complaint alleges facts indicating that he believed it necessary to file a grievance with the Gouverneur C.F. IGRC and to appeal the denial of that grievance to the Gouverneur C.F. Superintendent. Why would he not also believe it necessary to take the next step in the exhaustion process and appeal the Superintendent's decision to CORC?").

13   *See, e.g., Petrusch v. Oliloushi,* 03-CV-6369, 2005 WL 2420352, at *5 (W.D.N.Y. Sept.30, 2005) ("[A]s to his grievance, which is the subject of this lawsuit, plaintiff does not appear to be contending that he believed the Superintendent's denial constituted exhaustion, since by initially claiming that he did appeal to CORC, albeit without proof, he has demonstrated his knowledge of the correct procedure for exhaustion.").

14   *See, e.g., Benjamin v. Comm'r N.Y. State DOCS,* 02-CV-1703, 2007 WL 2319126, at *14 (S.D.N.Y. Aug.10, 2007) ("Benjamin cannot claim that he believed that appealing his disciplinary proceeding was the only available remedy at his disposal in light of the numerous grievances he has filed during his incarceration at Green Haven [both before and after the incident in question].", *vacated in part on other grounds,* No. 07-3845, 293 F. App'x 69 (2d Cir.2008).

15   *See, e.g., Chavis,* 2007 WL 2903950, at *9 ("The focus of a disciplinary hearing is upon the conduct of the inmate, and not that of prison officials.... While the mention of a constitutional claim during plaintiff's disciplinary hearing could potentially have satisfied

his substantive exhaustion requirement by virtue of his having notified prison officials of the nature of his claims, he did not fulfill his procedural exhaustion requirement [under the circumstances due to his] ... mere utterance of his claims during the course of a disciplinary hearing .... [T]here is nothing in the record to suggest that when the issues of interference with plaintiff's religious free exercise rights or alleged retaliation for having voiced his concerns were in any way investigated by prison officials.") [citations omitted].

16   *See, e.g., Colon v. Furlani,* 07-CV-6022, 2008 WL 5000521, at *2 (W.D.N.Y. Nov.19, 2008) ("Colon was found guilty of harassment based on a letter that he wrote to defendant Bordinaro, concerning some of the events giving rise to his failure-to-protect claim, but it does not appear that he appealed that disposition.... While under some circumstances an inmate may be able to satisfy the exhaustion requirement by appealing from a disciplinary hearing decision ..., plaintiff did not do so here, and this claim is therefore barred under the PLRA.") [citations omitted]; *Cassano v. Powers,* 02-CV-6639, 2005 WL 1926013, at *5 (W.D.N.Y. Aug.10, 2005) ("[E]ven assuming plaintiff believed that his proper recourse was to raise [his] complaint at his disciplinary hearing, rather than using the Inmate Grievance Program, he did not exhaust that process. That is, plaintiff has not provided any evidence that he appealed his Tier III hearing conviction. Since plaintiff did not pursue even the disciplinary appeal process, he can not have made submissions in the disciplinary process that were sufficient, in a substantive sense, to exhaust his remedies under § 1997e(a).") [internal quotation marks and citation omitted].

**\*4** Finally, two points bear mentioning regarding exhaustion. First, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies. *See, e.g., Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *4 (S.D.N.Y. July 25, 2008).* However, once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then "counter" Defendants' assertion by showing exhaustion, unavailability, estoppel, or "special circumstances." [17]

17   *See Hemphill,* 380 F.3d at 686 (describing the three-part inquiry appropriate in cases where a prisoner

plaintiff plausibly seeks to "counter" defendants' contention that the prisoner failed to exhaust his available administrative remedies under the PLRA); *Verley v. Wright,* 02-CV-1182, 2007 WL 2822199, at *8 (S.D.N.Y. Sept.27, 2007) ("[P]laintiff has failed to demonstrate that the administrative remedies were not, in fact, 'actually available to him.' "); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (finding that the plaintiff "failed to meet his burden under *Hemphill* of demonstrating 'special circumstances' "); *see also Ramirez v. Martinez,* 04-CV-1034, 2009 WL 2496647, at *4 (M.D.Pa. Aug.14, 2009) ("In order to effectively oppose defendants' exhaustion argument, the plaintiff has to make a showing in regard to each of his claims."); *Washington v. Proffit,* 04-CV-0671, 2005 WL 1176587, at *1 (W.D.Va. May 17, 2005) ("[I]t is plaintiff's duty, at an evidentiary hearing, "to establish by a preponderance of the evidence that he had exhausted his administrative remedies or that any defendant had hindered or prevented him from doing so within the period fixed by the Jail's procedures for filing a grievance.").

Second, the Court recognizes that there is case law from within the Second Circuit supporting the view that the exhaustion issue is one of fact, which should be determined by a jury, rather than by the Court. [18] However, there is also case law from within the Second Circuit supporting the view that the exhaustion issue is one of law, which should be determined by the Court, rather than by a jury. [19] After carefully reviewing the case law, the Court finds that the latter case law-which includes cases from the Second Circuit and this District-outweighs the former case law. [20] (The Court notes that the latter case law includes cases from the Second Circuit and this District.) [21] More importantly, the Court finds that the latter cases are better reasoned than are the former cases. In particular, the Court relies on the reasons articulated by the Second Circuit in 1999: "Where administrative remedies are created by statute or regulation affecting the governance of prisons, ... the answer depends on the meaning of the relevant statute or regulation." *Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). The Court relies also on the several reasons articulated by Judge Richard A. Posner in a recent Seventh Circuit decision: most notably, the fact that the exhaustion-of-administrative-remedies inquiry does not address the merits of, or deadlines governing, the plaintiff's claim but an issue of "judicial traffic control" (i.e., what forum a dispute is to be resolved in), which is never an issue for a jury but always an issue

for a judge. See *Pavey v. Conley,* 544 F.3d 739, 740-42 (7th Cir.2008) (en banc), *cert. denied, --- U.S. ----,* 129 S.Ct. 1620, 173 L.Ed.2d 995 (2009). The Court notes that the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits appear to agree with the ultimate conclusion of the Second and Seventh Circuits that the exhaustion issue is properly decided by a judge, not a jury. [22]

18    *See, e.g., Lunney v. Brureton,* 04-CV-2438, 2007 WL 1544629, at *10 n. 4 (S.D.N.Y. May 29, 2007) ("There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. As the Supreme Court has recently affirmed, however, exhaustion is an 'affirmative defense,' much like a statute of limitations defense. Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that 'issues of fact as to the application of that defense must be submitted to a jury.' Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court."); *Finch v. Servello,* 06-CV-1448, 2008 WL 4527758, at *8 n. 5 (N.D.N.Y. Sept.29, 2008) (McAvoy, J.) (citing *Lunney* and noting that "it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court").

19    *See, e.g., Harrison v. Goord,* 07-CV-1806, 2009 WL 1605770, at *7 n. 7 (S.D.N.Y. June 9, 2009) (recognizing that "[t]here is authority ... for the position that where questions of fact exist as to whether a plaintiff has exhausted administrative remedies, such fact questions are for the Court, rather than a jury, to decide ...."); *Amador v. Superintend. of Dept. of Corr. Servs.,* 03-CV-0650, 2007 WL 4326747, at *5 n. 7 (S.D.N.Y. Dec.4, 2007) ("It is unclear whether factual disputes regarding the exhaustion defense should ultimately be decided by the court or by a jury.... [T]here is ... case law ... supporting the view that exhaustion should be determined by the court and not a jury."), *appeal pending,* No. 08-2079-pr (2d Cir. argued July 15, 2009).

20    *See, e.g., Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009) (noting that the magistrate judge held an evidentiary hearing "on the issue of exhaustion"); *Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *3 n. 2 (S.D.N.Y. July 25, 2008) (finding that "the better approach is for the judge, and not the jury, to decide any contested issues of fact relating

to the defense of failure to exhaust administrative remedies."); *Amador,* 2007 WL 4326747, at *5 n. 7 ("[T]here is ... case law, which in my view is more persuasive and on point, supporting the view that exhaustion should be determined by the court and not a jury. I find it proper that this issue be decided by the court."); *Enigwe v. Zenk,* 03-CV-0854, 2006 WL 2654985, at *4 (E.D.N.Y. Sept.15, 2006) (finding that, at the summary judgment "stage of the proceedings, a genuine question of fact exists with respect to whether [plaintiff] should be excused from exhausting his administrative remedies with regard to claims relating to his confinement at MDC Brooklyn," and therefore "direct[ing] that a hearing be held" before a judge, to resolve this issue); *Dukes v. S.H.U. C.O. John Doe # 1,* 03-CV-4639, 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering an "evidentiary hearing [before a judge] on the issue of whether prison officials failed to assign grievance numbers to [plaintiff]'s grievances and, if so, whether that rendered further administrative remedies unavailable, estopped the Defendants from asserting non-exhaustion, or justified [plaintiff]'s failure to appeal to the CORC"); *Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) ("The Court could have *sua sponte* dismiss[ed] this action as the record is unmistakeably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA.... In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear."); *Roland v. Murphy,* 289 F.Supp.2d 321, 323 (E.D.N.Y.2003) "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.") [internal quotation marks and citation omitted]; *Evans v. Jonathan,* 253 F.Supp.2d 505, 509 (W.D.N.Y.2003) ( "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.").

21    *See, e.g., Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999) ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They either are, or inevitably contain, questions of law. Where administrative remedies are created by statute or regulation affecting the governance of prisons, the existence of the administrative remedy is purely a question of law.

The answer depends on the meaning of the relevant statute or regulation."), *accord, Mojias v. Johnson,* 351 F.3d 606, 608-11 (2d Cir.2003) (citing relevant language from *Snider v. Melindez,* and later stating that a district court could *sua sponte* dismiss a prisoner's civil rights complaint for failure to exhaust his available administrative remedies if it gave him notice and an opportunity to be heard); *DeBlasio v. Moriarty,* 05-CV-1143, Minute Entry (N.D.N.Y. filed Dec. 9, 2008) (McCurn, J.) (indicating that judge held pre-trial evidentiary hearing on whether plaintiff had exhausted administrative remedies before filing action); *Pierre v. County of Broome,* 05-CV-0332, 2007 WL 625978, at *1 n. 1 (N.D.N.Y. Feb.23, 2007) (McAvoy, J.) (noting that "[t]he court held an evidentiary hearing on October 25, 2006 concerning the issue of whether Plaintiff had exhausted administrative remedies"); *Hill v. Chanalor,* 419 F.Supp.2d 255, 257-59 (N.D.N.Y. March 8, 2006) (Kahn, J.) (*sua sponte* dismissing a prisoner's civil rights complaint, pretrial, for failure to exhaust his available administrative remedies after it gave him notice and an opportunity to be heard); *Raines v. Pickman,* 103 F.Supp.2d 552, 555 (N.D.N.Y.2000) (Mordue, J.) ("[I]n order for the Court to dismiss for failing to exhaust administrative remedies, the Court must be shown that such a remedy exists for an inmate beating in the grievance context. This is an issue of law for the Court to determine.").

22    *See Casanova v. Dubois,* 289 F.3d 142, 147 (1st Cir.2002); *Hill v. Smith,* 186 F. App'x 271, 273-74 (3d Cir.2006); *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir.2003); *Anderson v. XYZ Corr. Health Servs., Inc.,* 407 F.3d 674, 682-83 (4th Cir.2005); *Dillon v. Rogers,* No. 08-30419, 2010 WL 378306, at *7 (5th Cir. Feb.4, 2010); *Taylor v. U.S.,* 161 F. App'x 483, 486 (6th Cir.2005); *Larkins v. Wilkinson,* 172 F.3d 48, at *1 (6th Cir.1998); *Husley v. Belken,* 57 F. App'x 281, 281 (8th Cir.2003); *Ponder v. Wackenhut Corr. Corp.,* 23 F. App'x 631, 631-32 (8th Cir.2002); *Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.2003), *cert. denied,* 540 U.S. 810 (2003); *Freeman v. Watkins,* 479 F.3d 1257, 1260 (10th Cir.2007); *Alloway v. Ward,* 188 F. App'x 663, 666 (6th Cir.2006); *Bryant v. Rich,* 530 F.3d 1368, 1373-76 (11th Cir.), *cert. denied,* ---U.S. ----, 129 S.Ct. 733, 172 L.Ed.2d 734 (2008).

## II. ANALYSIS

As an initial matter, Plaintiff argues that he exhausted his administrative remedies regarding the claims at issue in this action, by filing a grievance regarding those claims,

and then appealing the non-response to that grievance all the way to CORC. Because the Court rejects this argument based on the evidence adduced at the hearing, the Court proceeds to an analysis of the three-step exhaustion inquiry established by the Second Circuit.

### A. Availability of Administrative Remedies

**\*5** New York prison inmates are subject to an Inmate Grievance Program established by DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003), and *Snider v. Melindez,* 199 F.3d 108, 112-13 [2d Cir.1999] ). There are different circumstances under which the grievance procedure is deemed not to have been available to an inmate plaintiff. *Hemphill,* 380 F.3d at 687-88. For example, courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* 04-CV-4587, 2007 WL 389003, at *8 (E.D.N.Y. Jan.31, 2007) (internal citations omitted). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." *Hemphill,* 380F.3d at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at *8.

Here, after carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that administrative remedies were "available" to Plaintiff during the time in question. The Court makes this finding for the following four reasons.

First, in his sworn Complaint (which has the force and effect of an affidavit), Plaintiff stated, "Yes," in response to the question, "Is there a prisoner grievance procedure at this facility ." (Dkt. No. 1, ¶ 4.a.) [23] Second, both Darin Williams (the corrections officer in charge of the special housing unit during the relevant time period) and Sally Reams (the Inmate grievance program supervisor during the relevant time period) testified credibly, at the exhaustion hearing, that there was a working grievance program at Great Meadow Correctional Facility during

the time in question. (Hearing Tr. at 10, 12, 14-21, 40-54.) Third, Plaintiff testified, at the exhaustion hearing that, during this approximate time period (the August to November of 2000), he filed at least three other grievances Great Meadow Correctional Facility, to which he received responses from the inmate grievance clerk, the Superintendent, and CORC. (*Id.* at 154, 157-58, 169-70; *see also* Hearing Exs. D-4, D-5, P-8, P-13, P-14.) [24] Fourth, the Court finds the relevant portions of Plaintiff's hearing testimony regarding the grievance at issue in this action to be incredible due to various omissions and inconsistencies in that testimony, and his demeanor during the hearing. (*Id.* at 127-34.) [25]

[23]    The Court notes that, in his Complaint, Plaintiff also swore that his "grievance was denied." (Dkt. No. 1, ¶ 4.b.ii.) However, during the exhaustion hearing, Plaintiff testified that he never received a response to his grievance from any member of DOCS.

[24]    In addition, the documentary evidence adduced at the hearing establishes that, in actuality, Plaintiff filed ten other grievances during this time period (and several appeals from the denials of those grievances). The first of these grievances (Grievance Number GM-30651-00), filed on August 25, 2000, regarded Plaintiff's request for medications. (Hearing Exs. D-4, D-5.) The second of these grievances (Grievance Number GM-30691-00), filed on September 1, 2000, regarded Plaintiff's request for copies. (Hearing Ex. D-4.) The third of these grievances (Grievance Number GM-30729-00), filed on September 11, 2000, regarded the use of full restraints against Plaintiff. (*Id.; see also* Hearing Ex. P-14.) The fourth of these grievances, filed on October 19, 2000 (Grievance Number GM-30901-00), regarded Plaintiff's request for the repair of his cell sink. (Hearing Exs. D-4, D-5.) The fifth of these grievances (Grievance Number GM-30901-00), also filed on October 19, 2000, regarded Plaintiff's request for the clean up of his cell. (Hearing Ex. D-4.) The sixth of these grievances (Grievance Number GM-31040-00), filed on November 17, 2000, regarded the review of records. (*Id.*) The seventh of these grievances (Grievance Number GM-31041-00), also filed on November 17, 2000, regarded Plaintiff's request for medical attention. (*Id.;* see also Hearing Ex. P-13) The eighth of these grievances (Grievance Number GM-31048-00), filed on November 20, 2000, regarded the rotation of books. (Hearing Ex. D-14) The ninth of these grievances (Grievance Number

GM-31040-00), filed on November 27, 2000, regarded the review of records (and was consolidated with his earlier grievance on the same subject). (*Id.*) The tenth of these grievances (Grievance Number GM-31070-00), filed on November 27, 2000, regarded Plaintiff's eyeglasses. (*Id.*)

[25]    For example, Plaintiff was unable to identify the corrections officers to whom he handed his grievance and appeals for mailing. (*Id.* at 127-34.) Moreover, Plaintiff did not convincingly explain why the grievance and appeals at issue in this action did not make it through the mailing process, while his numerous other grievances and appeals did make it through the mailing process. (*Id.* at 154-171.) In addition, Plaintiff acknowledged that it was his belief, during this time period, that an inmate was not required to exhaust his administrative remedies in matters involving the use of excessive force; yet, according to Plaintiff, he decided to exhaust his administrative remedies on his excessive force claim anyway. (*Id.* at 148-49.)

## B. Estoppel

After carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or by taking actions that inhibited Plaintiff's exhaustion of remedies. For example, Defendants' Answer timely asserted this affirmative defense. (Dkt. No. 35, ¶ 17.) Moreover, Plaintiff failed to offer any credible evidence at the hearing that *Defendant* s in any way interfered with Plaintiff's ability to file grievances during the time in question. (Hearing Tr. at 127-34, 157-58, 169-70.) Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals. [26]

[26]    *See Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (holding that defendants were not estopped from asserting the affirmative defense of non-exhaustion where the conduct plaintiff alleged kept him from filing a grievance-that he was not given the manual on how to grieve-was not attributable to the defendants and plaintiff "point[ed] to no affirmative act by prison officials that would have prevented him from pursuing administrative remedies"); *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008)

(Hurd, J., adopting Report-Recommendation of Lowe, M.J.) ("I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.") [emphasis in original]; *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *16 (N.D.N.Y. Nov.5, 2007) (McAvoy, J. adopting Report-Recommendation of Lowe, M.J.) (finding defendants not estopped from raising Plaintiff's non-exhaustion as a defense based on plaintiff's allegation "that [he] was inhibited (through non-responsiveness) by [ ] unnamed officials at Coxsackie C.F.'s Inmate Grievance Program (or perhaps the Grievance Review Committee), and Coxsackie C.F. Deputy Superintendent of Security Graham" because plaintiff's complaint and "opposition papers ... fail to contain any evidence placing blame on Defendants for the (alleged) failure to address his grievances and complaint letters"); *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *16 (N.D.N.Y. Apr.24, 2006) (Hurd, J. adopting Report-Recommendation of Lowe, M.J.) (finding that defendants are not estopped from relying on the defense of non-exhaustion because "no evidence (or even an argument) exists that any Defendant ... inhibit[ed] Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter."); *cf. Warren v. Purcell,* 03-CV-8736, 2004 WL 1970642, at *6 (S.D.N.Y. Sept.3, 2004) (finding that conflicting statements [offered by a non-party]-that the prisoner needed to refile [his grievance] and that the prisoner should await the results of DOCS's investigation-estopped the defendants from relying on the defense on non-exhaustion, or "[a]lternatively, ... provided ... a 'special circumstance' under which the plaintiff's failure to pursue the appellate procedures specified in the IGP was amply justified."); *Brown v. Koenigsmann,* 01-CV-10013, 2005 WL 1925649, at *1-2 (S.D.N.Y. Aug.10, 2005) ("Plaintiff does not assert that Dr. Koeingsmann personally was responsible for [the failure of anyone from the Inmate Grievance Program to address plaintiff's appeal]. [However,] *Ziemba [v. Wezner,* 366 F.3d 161 (2d Cir.2004) ] does not require a showing that Dr. Koenigsmann is personally responsible for plaintiff's failure to complete exhaustion [in order for Dr. Koenigsmann to be estopped from asserting the affirmative defense of failure to exhaust administrative remedies], as long as someone

employed by DOCS is. If that reading of Ziemba is incorrect, however, ... then the circumstances here must be regarded as special, and as justifying the incompleteness of exhaustion, since a decision by CORC is hardly something plaintiff could have accomplished on his own.").

## C. Special Circumstances

**\*6** There are a variety of special circumstances that may excuse a prisoner's failure to exhaust his available administrative remedies, including (but not limited to) the following:

(1) The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance appeal process unavailable to him." *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendants are estopped from relying on the exhaustion defense, as well as "special circumstances" excusing plaintiff's failure to exhaust");

(2) Other individuals' "threats [to the plaintiff] of physical retaliation and reasonable misinterpretation of the statutory requirements of the appeals process." *Clarke v. Thornton,* 515 F.Supp.2d 435, 439 (S.D.N.Y.2007) (noting also that "[a] correctional facility's failure to make forms or administrative opinions "available" to the prisoner does not relieve the inmate from this burden."); and

(3) When plaintiff tries "to exhaust prison grievance procedures[, and] although each of his efforts, alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance." *Hairston v. LaMarche,* 05-CV-6642, 2006 WL 2309592, at *8 (S.D.N.Y. Aug.10, 2006).

After carefully considering the issue, the Court finds that there exists, in this action, no "special circumstances" justifying Plaintiff's failure to comply with the administrative procedural requirements. Construed with the utmost of special leniency, Plaintiff's hearing testimony, and his counsel's cross-examination of Defendants' witnesses, raise the specter of two excuses for not having exhausted his available administrative remedies before he (allegedly) mailed his Complaint in this action on August 14, 2003:(1) that exhaustion was

not possible because of the administrative procedures that DOCS has implemented regarding inmate grievances; and/or (2) that an unspecified number of unidentified corrections officers (who are not Defendants in this action) somehow interfered with the delivery of his grievance and appeals. For example, Plaintiff testified at the exhaustion hearing that he handed his grievance and appeals to various corrections officers making rounds where he was being housed, and that, if his grievance and/or appeals were never received, it must have been because his letters were not properly delivered. (Hearing Tr. at 126-36.)

With regard to these excuses, the Court finds that, while these excuses could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations, [27] these excuses are not available to Plaintiff in the current action because, as stated in Part II.A. of this Decision and Order, the credible testimony before the Court indicates that Plaintiff did not hand his grievance and appeals to various corrections officers with regard to the claims in question. *See, supra,* Part II.A. of this Decision and Order. [28]

[27]  *See, e.g., Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "refusal to accept or forward plaintiff's appeals ... effectively render[s] the grievance appeal process unavailable to him").

[28]  The Court notes that, even if Plaintiff did (as he testified) hand to a corrections officer for mailing a

letter to the Superintendent on September 13, 2000, appealing from the IGRC's failure to decide his grievance of August 22, 2000, within nine working days (i.e., by September 5, 2000), it appears that such an appeal would have been filed two days too late under DOCS Directive 4040, which requires that appeal to be filed within four working days of the IGRC's failure to decide his grievance (i.e., by September 11, 2000). (*See* Hearing Tr. 127-34; Hearing Ex. P-1, at 5-7 [attaching ¶¶ V.A, V.B. of DOCS Directive 4040, dated 6/8/98].)

**\*7**  For all these reasons, the Court finds that Plaintiff's proffered excuse does not constitute a special circumstance justifying his failure to exhaust his available administrative remedies before filing this action.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 10) is *DISMISSED* **in its entirety without prejudice** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1235591

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 6935254
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Everton BAILEY, Plaintiff,
v.
M. FORTIER, Defendant.

Civ. Action No. 9:09–CV–0742 (GLS/DEP).
|
Oct. 4, 2012.

**Attorneys and Law Firms**

Hancock Estabrook LLP, Michael J. Sciotti, Esq., Robert Thorpe, Esq., of Counsel, Syracuse, NY, for Plaintiff.

Hon. Richard S. Hartunian, United States Attorney, Charles E. Roberts, Esq., Assistant U.S. Attorney, of counsel, Syracuse, NY, for Defendant.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

*1 Plaintiff Everton Bailey, a federal prison inmate, has commenced this *Bivens*[1] action against defendant Michelle Fortier, a corrections officer stationed at the prison facility in which Bailey was confined at the relevant times, alleging deprivation of his civil rights. Bailey's claims are based upon Fortier's alleged failure to protect him from an assault by a cellmate, despite having registered prior complaints expressing fear for his safety.

[1]  *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

Currently at the forefront of the action is the threshold question of whether Bailey, who admits that he did not file a grievance following the procedures in place at Bureau of Prisons ("BOP") facilities, should be excused from the requirement of exhausting administrative remedies before commencing suit due to the alleged refusal of prison officials to provide him with the forms necessary to file a grievance. Because I find, based upon an evidentiary hearing conducted, that Bailey was not prevented by the actions of prison officials from filing a grievance regarding his claim against Fortier, and that he has offered no special circumstances providing a basis to excuse his failure to exhaust administrative remedies, I recommend that his complaint be dismissed on this procedural basis, without addressing its merits.

*I. BACKGROUND*

Bailey is a federal prison inmate currently being held in the custody of the BOP as a result of a 2007 criminal conviction entered in the United States District Court for the Eastern District of Pennsylvania. *See generally* Complaint (Dkt. No. 1); *see also* VanWeelden Decl. (Dkt. No. 10–4) ¶ 5; June 20, 2012 Hearing Transcript (Dkt. No. 44) at p. 84.[2] While he is presently housed in another BOP facility, at times relevant to this litigation Bailey was designated by the BOP to the Ray Brook Federal Correctional Institution ("FCI Ray Brook"), located in Ray Brook, New York. *Id.*

[2]  The June 20, 2012 Hearing Transcript (Dkt. No. 44) will hereinafter be cited as "Tr. ____".

On the morning of February 23, 2009, while housed in a six-person cell in the Mohawk Housing Unit at FCI Ray Brook, Bailey was confronted and physically assaulted by one of his cellmates after being accused of stealing that inmate's prayer oil. Complaint (Dkt. No. 1) ¶¶ 8–9; *see also* VanWeelden Decl. (Dkt. No. 10–4) Exh. D. Bailey reported the incident to Fortier, and requested that he be moved to another cell. Complaint (Dkt. No. 1) ¶ 10. That request was denied, and Bailey was directed by Fortier to return to his cell in light of an impending inmate count. *Id.* at ¶ 11.

Following the inmate count, Bailey again was accosted by the same inmate, who on this occasion threw hot oil from a ceramic mug onto his face.[3] Complaint (Dkt. No. 1) ¶ 13; VanWeelden Decl. (Dkt. No. 10–4) Exh. D; Tr. 100, 145. Bailey suffered second degree burns to his face resulting in his being hospitalized at an outside medical facility for a period of fourteen days. Complaint (Dkt. No. 1) ¶¶ 13–14; Tr. 32, 84–85. Upon his return to FCI Ray Brook, Bailey was placed in a special housing unit ("SHU") cell, where he remained until he was transferred to another BOP facility. Tr. 59–60, 85.

3    According to Bailey, there were no corrections officers present in his cell unit at the time of the assault. Complaint (Dkt. No. 1) ¶ 13.

**\*2** The BOP has established an Administrative Remedy Program ("ARP"), comprised of a four-step administrative process through which inmates can seek formal internal review of any complaint regarding any aspect of their imprisonment. Tr. 10; 28 C.F.R. § 542.10 et seq.; see also Macias v. Zenk, 495 F.3d 37, 42 (2d Cir.2007). In accordance with the established ARP protocol, an inmate must first attempt informal resolution of his or her complaint by presenting the issue informally to staff, and staff must attempt to resolve the issue. 28 C.F.R. § 542.13(a); see also Johnson v. Testman, 380 F.3d 691, 693 (2d Cir.2004). This informal, initial procedure typically begins with the filing of a "cop-out," which can be submitted either on a BP–8 form available to inmates through several sources, including their assigned counselors, or on paper of any other description. Tr. 10, 22, 27, 66–67, 129, 142.

If the complaint cannot be resolved informally, the inmate may next submit a formal written Administrative Remedy Request ("ARR") to the warden of the facility, utilizing a BP–9 form, within twenty calendar days of the event that generated the inmate's complaint. 4 Tr. 22, 32, 44; 28 C.F.R. § 542.14(a); see also Johnson, 380 F.3d at 693. That twenty-day period, however, can be extended in appropriate circumstances. 5 Tr. 33, 54, 144. If that formal request is denied, the inmate may next appeal the matter to the appropriate BOP Regional Director, utilizing a BP–10 form, within twenty calendar days of the date the grievance is denied by the facility warden. Tr. 22; 28 C.F.R. § 542.15(a); see also Johnson, 380 F.3d at 693. An unfavorable decision from the Regional Director can then be appealed to the General Counsel's office, utilizing a BP–11 form, within twenty calendar days of the date of the Regional Director's response. Tr. 22; 28 C.F.R. § 542.15(a).

4    Plaintiff was aware of the twenty-day limitation for filing a BP–9 form to initiate the formal grievance process. Tr. 103.

5    Here, the record demonstrates that in light of his circumstances, including the fourteen-day period of hospitalization following the incident, Bailey almost certainly would have been granted relief from that requirement had such a request been made. See Tr.

43, 144. I note, parenthetically, that the handbook provided to inmates at FCI Ray Brook does not address the possibility of requesting an extension of the twenty-day time limit for filing a BP–9. See Tr. 34, 43.

Despite the existence of the ARP, Bailey did not avail himself of that process by filing a grievance regarding the assault or the defendant's alleged failure to protect him from it. Tr. 101–02, 106. Bailey claims that he requested the appropriate forms for commencing the grievance process from several prison workers, including Hawley Snyder, Barbara Darrah, and the warden at FCI Ray Brook. Tr. 86–88, 91, 93–95, 107–09. Employees at FCI Ray Brook, however, uniformly testified that Bailey never requested the appropriate grievance forms from them. See Tr. 72, 131, 146–47, 153, 155, 168; see also Tr. 49 (Robin Van Weelden); 161 (Jean Marie Diehl); 166 (Michelle Gonyea). I credit the testimony of defendant's witnesses and find that Bailey failed to ask his corrections counselor, or any other BOP employee at FCI Ray Brook, for the necessary forms to commence the grievance process.

The record also reflects that Bailey had abundant opportunity to secure the necessary grievance forms. In February and March of 2009, he was assigned a unit team that included Barbara Darrah, his unit manager; Michelle Gonyea, a case worker; Hawley Snyder, his assigned corrections counselor; and one other corrections counselor. 6 Tr. 46, 86, 140–41. Members of Bailey's unit team, particularly his corrections counselor, were in frequent contact with him. See, e.g., Tr. 126, 129–30, 140–41, 165.

6    Jean Marie Diehl took over as plaintiff's correction counselor in or about September 2009, shortly before Snyder's retirement from the BOP. Tr. 140, 163.

**\*3** Various other BOP officials were also in regular contact with Bailey, making periodic rounds of the FCI Ray Brook SHU. Tr. 35. For example, at the times relevant to this litigation, the facility's warden typically visited the SHU every Wednesday morning, normally accompanied by Robin Van Weelden, who in February 2009 served as a legal assistant, as well as one or two associate wardens, a corrections captain, and unit team members. Tr. 35, 55. When making those rounds the group would proceed from cell to cell, knocking on doors and asking whether an inmate in a particular cell wished to voice any needs. Tr. 57. In addition, Barbara Darrah, as a unit manager, was required to visit inmates in the

SHU twice weekly, although she testified that she was in that portion of the facility "pretty much daily." Tr. 126. When visiting the SHU, Darrah generally carried with her a folder of various forms, including BP–8, BP–9, BP–10, BP–11 and cop-out forms, earning her the nickname "the form lady." Tr. 70–71, 120, 124–27, 131. Like the warden and the warden's group, when visiting the SHU facility Darrah normally would proceed from cell-to-cell. Tr. 128. Similarly Michelle Gonyea, as plaintiff's case manager during February and March of 2009, was required to visit the SHU at least once weekly. Tr. 165.

Despite all of those visits and requests as to whether he needed anything, Bailey did not ask any of those individuals for the forms necessary to grieve Fortier's alleged failure to protect him from harm. Tr. 161–62, 166, 49–50, 72, 132, 144, 154–55, 161, 166.

As previously indicated, plaintiff was absent from FCI Ray Brook receiving outside treatment for his injuries during the fourteen-day period immediately following the inmate assault. In accordance with FCI Ray Brook policy requiring visits by prison officials to any inmate hospitalized for more than five days, Darrah, as plaintiff's unit manager, visited him in or about March of 2009, while he was a patient at the Adirondack Medical Center in Saranac Lake, in order to insure that his needs were being met. Tr. 133. When asked on that occasion whether he needed anything, Bailey replied, "No." [7] *Id.*

[7]    During the hearing Bailey testified that he did not recall Darrah visiting him. *See* Tr. 114. Once again, I credit the testimony of Darrah over that of the Bailey with respect to this issue.

## II. *PROCEDURAL HISTORY*

Bailey commenced this action on June 29, 2009. Dkt. No. 1. His complaint identifies Corrections Officer M. Fortier as the sole named defendant, and alleges that she violated his constitutional rights by failing to protect him from foreseeable harm. *Id.*

On January 8, 2010, prior to answering, Fortier moved to dismiss Bailey's complaint for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, alternatively, for summary judgment pursuant to Rule 56. Dkt. No. 10. The sole basis for Fortier's motion was her contention that Bailey's complaint is subject to dismissal based upon his

failure to exhaust available administrative remedies before commencing suit, as required under 42 U.S.C. § 1997e(a). That motion resulted in my issuance of a report on August 30, 2010, recommending that the motion be denied, based upon the existence of genuine disputes of material fact to be resolved before addressing whether a proper basis for excusing the governing exhaustion requirement had been demonstrated. Dkt. No. 19. That recommendation was adopted by Chief District Judge Gary L. Sharpe on October 12, 2010. Dkt. No. 21.

**\*4** Following the issuance and acceptance of my report and recommendation, the parties were afforded the opportunity to engage in discovery, and a scheduling order was entered requiring, *inter alia,* that any additional dispositive motions be filed on or before October 3, 2011. *See* Dkt. No. 23. All deadlines under that scheduling order have passed, without the filing of any additional motions, and the case is now trial-ready. In light of the existence of a threshold procedural issue regarding exhaustion, the matter was referred to me for the purpose of conducting an evidentiary hearing, pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011), in order to develop the record concerning Bailey's efforts to satisfy his exhaustion requirement. *See* Text Entry 11/02/11. That hearing was conducted on June 20, 2012, *see* Text Entry 6/20/12, and, following the close of the hearing, decision was reserved pending briefing by the parties. [8], [9]

[8]    The hearing was conducted by video conference, with Bailey participating and testifying from the Kentucky federal correctional facility in which he is currently being held, pursuant to Rule 43(a) of the Federal Rules of Civil Procedure. *See Rivera v. Santirocco,* 814 F.2d 859, 862 (2d Cir.1987). At the outset of the hearing I placed upon the record the factors which I considered in declining to exercise my discretion to require that Bailey be produced in person for the evidentiary hearing. *See* Tr. 3.

[9]    Attorney Michael J. Sciotti, Esq., of the firm of Hancock & Estabrook, LLP, was appointed in January 2012 to represent the plaintiff in this action, *pro bono,* at the hearing. The court wishes to express its thanks to Attorney Sciotti and his co-counsel, Robert Thorpe, Esq., for their energetic and diligent efforts on behalf of the plaintiff.

## III. *DISCUSSION*

A. *Governing Legal Principles*

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at *5–6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002). An inmate plaintiff's complaint is subject to dismissal if the evidence establishes that he or she failed to properly exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias,* 495 F.3d at 43 (citing *Woodford* ). Complete exhaustion has not occurred, for purposes of the PLRA, until all of the steps of that available process have been taken. *Macias,* 495 F.3d at 44; *see also Johnson v. Rowley,* 569 F.3d 40, 45 (2d Cir.2009); *Strong v. Lapin,* No. 90–CV–3522, 2010 WL 276206, at *4 (E.D.N.Y. Jan.15, 2010) ("Until the BOP'S Central Office considers the appeal, no administrative remedy is considered to be fully exhausted.").

**\*5** In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted in the event of a failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed rubric, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendant should be deemed to have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through the defendant's own actions preventing the plaintiff from exhausting otherwise available remedies, he or she should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the proffered defense survives these first two levels of scrutiny, the court must determine whether the plaintiff has established the existence of special circumstances sufficient "to justify the failure to comply with applicable administrative procedural requirements.[10],[11] *Id.*

[10]     In *Macias,* which, like this action, involved an Eighth Amendment claim under *Bivens,* as well as claims under the Federal Court Claims Act, 28 U.S.C. § 2671 *et seq.,* defendants asserted that plaintiff's complaint was subject to dismissal under the PLRA based upon his failure to exhaust available administrative remedies. *Macias,* 495 F.3d at 40. Reiterating the importance of exhaustion in both a substantive and a procedural sense, the Second Circuit concluded that, while a prisoner may have substantively exhausted remedies by making informal complaints regarding the conditions at issue, the PLRA, as illuminated by *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368, requires proper procedural exhaustion through the available grievance channels. *Id.* at 41. The court left open, however, the possibility that, notwithstanding the Supreme Court's decision in *Woodford,* a defendant could be precluded from asserting failure to exhaust available administrative remedies in the event of a finding that threats by prison officials may have deterred compliance with the PLRA exhaustion requirements, including under *Hemphill. Id.* at 44–45. The court in *Macias* also noted that the plaintiff in that case did not assert that the available internal remedial scheme was so confusing as to excuse his failure to avail himself of that process, thereby obviating the need for the court to determine what effect, if any, *Woodford* would have upon the *Hemphill* holding to the effect that a reasonable misinterpretation of the available scheme could justify an inmate's failure to follow the procedural rules. *See Amador v. Superintendents of Dep't of Correctional Serv.,* No. 03 CIV. 0650 (KTD/CWG), 2007 WL 4326747, at *6 (S.D.N.Y. Dec.4, 2007). It therefore appears that the teachings

of *Hemphill* remain intact, at least with regard to the first two points of inquiry. *Id.* at *7.

11    In practicality, these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap. *See Hargrove,* 2007 WL 389003, at *8 n. 14; *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

### B. *Burden of Proof*

Before applying the foregoing legal principles, I must first consider who bears the burden of proof, and whether that burden shifts throughout the analysis prescribed under *Hemphill.*

As an affirmative defense, *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), exhaustion is a claim upon which the party asserting it typically bears the ultimate burden of proving its essential elements by a preponderance of the evidence. *Soria v. Girdich,* No. 9:04–CV–727, 2007 WL 4790807, at *2 (N.D.N.Y. Dec. 2007) (DiBianco, M.J.) (citing *McCoy v. Goord,* 255 F.Supp.2d 233, 247 (S.D.N.Y.2003)); *McEachin v. Selsky,* No. 9:04–CV–83(FJS/RFT), 2005 WL 2128851, at *4 (N.D.N.Y. Aug.30, 2005) (Scullin, C.J.) (citing *Howard v. Goord,* No. 98–CV–7471, 1999 WL 1288679, *3 (E.D.N.Y. Dec. 28, 1999)), *aff'd in part, vacated in part,* 225 F. App'x 36 (2d Cir.2007). The issue is somewhat complicated, however, by consideration of the three-part analysis mandated by *Hemphill* and related cases because that line of cases incorporates concepts—such as estoppel, for example—that typically require the party asserting them to bear the ultimate burden of proof. *See e.g., Abbas v. Dixon,* 480 F.3d 636, 642 (2d Cir.2007) ("The plaintiff bears the burden of showing that the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling or equitable estoppel ...."); *In re Heflin,* 464 B.R. 545, 554 (D.Conn.2011) ("The burden of providing every element of an estoppel is upon the party seeking to set up the estoppel.") (citing *Comm'r v. Union Pac. R.R. Co.,* 86 F.2d 637, 640 (2d Cir.1936)).

*6 Also complicating matters is the fact that several courts have held that once a defendant satisfies the burden of demonstrating that an inmate has failed to exhaust administrative remedies, it then becomes incumbent upon the plaintiff to counter with a showing of unavailability, estoppel, or special circumstances. *See, e.g., Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at * 4 and n. 17 (N.D.N.Y. Mar.31, 2010)

(Suddaby, J.); *see also Calloway v. Grimshaw,* No. 9:09–CV–1354, 2011 WL 4345299, at *5 and n. 5 (N.D.N.Y. Aug.10, 2011) (Lowe, M.J.) (citing cases); *report and recommendation adopted,* 2011 WL 4345296 (N.D.N.Y. Sep.15, 2011) (McAvoy, S.J.); *Cohn v. KeySpan Corp.,* 713 F.Supp.2d 143, 155 (E.D.N.Y.2010) (finding that, in the employment discrimination context, defendants bear the burden of establishing the affirmative defense of failure to timely exhaust his administrative remedies, but once defendants have done so, the plaintiff must plead and prove facts supporting equitable avoidance of the defense.). Those decisions, while referencing the burden of proof on an affirmative defense, seem to primarily address an inmate's burden of *production,* or of going forward, to show facts that would form the basis for finding of unavailability, estoppel, or a finding of special circumstances, rather than speaking to the ultimate burden of *persuasion.*

I have been unable to uncover any cases squarely holding that the defendant bears the ultimate burden of proof with regard to all elements of a *Hemphill* analysis. In the final analysis, however, *Hemphill* addresses all of the elements a court is required to consider when analyzing an exhaustion defense. *See Macias,* 495 F.3d at 41 ("In *Hemphill* we "read together" [a series of cases] and formulated a three-part *test* ....") (emphasis added). Therefore, I recommend a finding that, while the burden of production may shift to the plaintiff when a court undertakes a *Hemphill* analysis, the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant. *See Soria,* 2007 WL 4790807, at *2 ("[A]s with other affirmative defenses, the defendant has the burden of proof to show that plaintiff failed to exhaust his administrative remedies.").

### C. *Application of Governing Legal Principles*

#### 1. *Availability of Administrative Remedy*

In this instance, the question of whether the ARP was available to Bailey is at the heart of the exhaustion analysis. The hearing testimony confirmed, and Bailey admitted, that at all times relevant to this litigation, there was an inmate grievance procedure in place at FCI Ray Brook. This, however, does not necessarily mean that it was "available" to the plaintiff.

Bailey contends that the grievance process was not available to him in light of the alleged refusal of prison

officials to provide him with the forms necessary to file an ARR and pursue the grievance to culmination. Having considered the competing testimony, however, I conclude that Fortier has established, by a preponderance of the evidence, that the forms necessary to pursue a grievance in accordance with the ARP in place at FCI Ray Brook were available to Bailey through several sources, but were not requested. As such, Fortier has satisfied the first *Hemphill* factor.

### 2. *Presentation of Defense/Estoppel*

**\*7** The focus of the second prong of the *Hemphill* analysis is upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted). In her answer, Fortier raised exhaustion as a defense in a timely fashion. *See* Answer (Dkt. No. 22) Second Defense ("Plaintiff clearly failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a)."). Bailey argues, however, that his failure to follow the prescribed grievance process was a direct result of the refusal of prison officials to cooperate in his efforts to grieve the matter.

" 'Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals.' " *Atkins v. Menard,* No. 9:11–CV–9366, 2012 WL 4026840, at \*3 (N.D.N.Y. Sept.12, 2012) (Suddaby, J.) (citing *Murray,* 2010 WL 1235591, at \*5 and n. 26 (collecting cases)). Put differently, a plaintiff must allege that a defendant named in the lawsuit acted to interfere with his ability to exhaust in order to establish a basis to estop that defendant from invoking the exhaustion defense. *Calloway,* 2011 WL 4345299, at \*4 (citing *Bennett v. James,* 737 F.Supp.2d 219, 226 (S.D.N.Y.2010), *aff'd,* 441 F. App'x 816 (2d Cir.2011)) (other citations omitted).

The question of whether, in this instance, prison officials should be estopped from asserting failure to exhaust as an affirmative defense as a result of their conduct is inextricably intertwined with the question of availability of the remedy. Assuming, however, that this presents a distinct inquiry, the court must examine whether, through her conduct, Fortier has provided a basis to estop her from asserting an exhaustion defense.

In this instance, Bailey does not allege that Fortier engaged in a campaign to preclude him from filing a grievance regarding her actions. Instead, his focus is upon the alleged refusal of other officials at FCI Ray Brook to provide him with necessary forms and cooperate in his efforts to present his grievance against Fortier. Accordingly, Bailey has failed to present any evidence that would support an estoppel against the defendant from raising the issue of exhaustion. *Atkins,* 2012 WL 4026840, at \* 3. Therefore, I conclude that Fortier has proven, by a preponderance of the evidence, that she did not, through her own actions, preclude Bailey from taking advantage of the ARP and therefore should not be estopped from asserting the defense.

### 3. *Special Circumstances*

The third, catchall factor that must be considered under the Second Circuit's prescribed exhaustion rubric centers upon whether special circumstances sufficient to justify excusing the plaintiff's failure to exhaust administrative remedies have been demonstrated. *Hemphill,* 380 F.3d at 689; *see also Giano,* 380 F.3d at 676–77; *Hargrove,* 2007 WL 389003, at \*10. Among the circumstances potentially qualifying as "special" under this prong of the test is where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77; *see also Hargrove,* 2007 WL 389003, at \*10 (quoting and citing *Giano* ). Special circumstances may also exist when a facility's "[f]ailure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance process unavailable to him." *Murray,* 2010 WL 1235591, at \*6 (quoting *Sandlin v. Poole,* 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendant's are estopped from relying on exhaustion defense as 'special circumstances' excusing plaintiff's failure to exhaust")).

**\*8** During the evidentiary hearing, Bailey testified to his awareness of the existence of the ARP at FCI Ray Brook. *See, e.g.,* Tr. 102. Bailey's testimony regarding his alleged efforts to secure the forms necessary to pursue the grievance plainly evidences his knowledge of the requirement that he exhaust available administrative

remedies, and negates a finding of any reasonable belief on his part that the dispute in issue was not grievable and could not have been presented through the BOP's internal grievance process. Accordingly, again allocating the ultimate burden of proof on the issue of special circumstances to the defendant, I nonetheless conclude that she has demonstrated, by a preponderance of the evidence, the absence of any special circumstances that would serve to excuse plaintiff's failure to exhaust administrative remedies.

## IV. *SUMMARY AND RECOMMENDATION*

The credible testimony and evidence adduced at the recent hearing, held to address the merits of defendant's exhaustion defense, establishes that (1) Bailey failed to avail himself of the BOP grievance process, which was available to him, before commencing this action; (2) Fortier did not, through her actions, preclude Bailey from filing a grievance regarding the claims set forth in his complaint, or otherwise engage in conduct for which she should be estopped from asserting failure to exhaust as an affirmative defense; and (3) Bailey has offered no special circumstances warranting that he be excused from the PLRA's exhaustion requirement. Accordingly, it is therefore hereby respectfully

RECOMMENDED, that plaintiff's complaint in this action be DISMISSED, based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a).

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6935254

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.          7

2014 WL 4715863
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Garry WARREN, Plaintiff,

v.

Sgt. BEALEY, Sergeant, Greene Correctional
Facility, Damiano, Correction Officer, Greene
Correctional Facility, Lampoutus, Correction
Officers, Greene Correctional Facility, Hayes,
Correction Officer, Greene Correctional Facility,
John Doe, Correction Officer, Mid–State
Correctional Facility, John Doe(s), Correction
Officers, Greene Correctional Facility, Defendants.

No. 9:12–CV–1318.
|
Signed Sept. 22, 2014.

**Attorneys and Law Firms**

Garry Warren, Brooklyn, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the
State of New York, Michael G. McCartin, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

**\*1** This *pro se* action brought pursuant to 42 U.S.C.
§ 1983 was referred to the Hon. Randolph F. Treece,
United States Magistrate Judge, for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c). No objections to the Report–
Recommendation and Order dated July 28, 2014 have
been filed, and the time to do so has expired.

The Docket indicates that the underlying motion for
summary judgment, upon which Magistrate Judge Treece
issued his Report–Recommendation and Order, was
filed on January 17, 2014. Despite being granted three
extension of time in which to file opposition, Plaintiff
failed to do so. As indicated, Magistrate Judge Treece

issued his Report–Recommendation and Order on July
28, 2014. On August 8, 2014, Plaintiff filed a request
to withdrawal this action without prejudice until he
can acquire legal representation. Defendants opposed
the request. On August 11, 2014, the Court denied
Plaintiff's request and granted him an extension until
September 15, 2014 to either file objections to Magistrate
Judge Treece's Report-recommendation or to have an
attorney electronically file a notice of appearance and
to file any objections to the report-recommendation on
Plaintiff's behalf. On September 2, 2014, the Report–
Recommendation and Order, mailed to Plaintiff's last
reported address, was returned as "undeliverable."

Every litigant is required to keep the Court advised of his
or her address so that documents and decisions may be
served upon them by mail. *See* Local Rules of the United
States District Court for the Northern District of New
York, 10.1(b), 41.(2) & (b). Failure to do so can greatly
delay proceedings and, therefore, can be construed as
an abandonment of the action. Under the circumstances,
including Plaintiff's failure to respond to the motion for
summary judgment despite three extension and his request
to withdraw his action *after* Defendants filed their motion
for summary judgment, the Court deems that Plaintiff
has intentionally failed to file any objections and has
abandoned this action.

Furthermore, after examining the record, this Court has
determined that the Report–Recommendation and Order
is not subject to attack for plain error or manifest injustice.

**II. CONCLUSION**

Accordingly, the Court **ADOPTS** the Report–
Recommendation and Order (Dkt. No. 33) for the reasons
stated therein. Therefore, it is hereby

**ORDERED** that Defendants' Motion for Summary
Judgment (Dkt. No. 24) is **GRANTED,** and all claims in
this action are **DISMISSED.** The Clerk of the Court may
enter judgment for the Defendants and mark this case as
closed.

**IT IS SO ORDERED.**

*REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Garry Warren brings this action, pursuant to 42 U.S.C. § 1983. Plaintiff's surviving claims [1] are that: (1) on September 12, 2011, Defendant Damiano issued a false misbehavior report against him in retaliation for a grievance he filed against her co-workers; (2) on October 16, 2011, Defendant Hayes used excessive force while pat-frisking Plaintiff; and (3) Defendants Hayes, Lampoutus, Begley, [2] and John Doe(s) used excessive force when they assaulted him on November 6, 2011. *See generally* Dkt. No. 9, Dec. & Order, dated Feb. 5, 2013; *see also* Dkt. No. 1, Compl. Defendants now move for Summary Judgment on the grounds that Plaintiff failed to exhaust any of his claims, and has failed to state a retaliation claim against Defendant Damiano or an excessive force claim against Defendant Hayes regarding the October 16 pat-frisk incident. *See generally* Dkt. No. 24–15, Defs.' Mem. of Law. Plaintiff has not opposed the Motion. For the reasons that follow, we recommend that Defendants' Motion be **GRANTED.**

[1] On February 5, 2013, The Honorable Thomas J. McAvoy, Senior United States District Judge, severed and transferred, to the Western District of New York, Plaintiff's claims regarding alleged incidents which occurred at at Attica Correctional Facility, as well as dismissed multiple claims and Defendants from this action. *See* Dkt. No. 9, Dec. & Order, dated Feb. 5, 2013.

[2] Plaintiff mistakenly refers to Defendant Begley as "Bealey." *See* Dkt. No. 24–15, Defs.' Mem. of Law, at p. 3 n. 1.

### I. STANDARD OF REVIEW

**\*2** Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [ Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ( "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

**\*3** "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Even in the absence of a response, Defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002).

In the instant case, we note that on January 17, 2014, Defendants filed and served upon Plaintiff, a Motion for Summary Judgment and the Court's NOTIFICATION OF THE CONSEQUENCES OF FAILING TO RESPOND TO A SUMMARY JUDGMENT MOTION. Dkt. Nos. 24, 24–1, & 26. That same day, a second copy of the Court's Notice to *pro se* litigants was sent to Plaintiff by the Clerk of the Court. Dkt. No. 25, Notice to Pl., dated Jan. 17, 2014. On February 28, 2014, Plaintiff's initial deadline to respond to Defendants' Motion terminated without response. On March 3, 2014, pursuant to a request from Plaintiff, the Court extended the response deadline to March 26, 2014, and once again sent Plaintiff a copy of the Court's Notice to *pro se* litigants outlining the consequences of failing to respond to a motion for summary judgment. Dkt. Nos. 27, Lt.-Mot., dated Feb. 25, 2014, & 28, Text Order, dated Mar. 3, 2014. On April 2, 2014, the Court received an additional request from Plaintiff for an extension of the response deadline. Dkt. No. 29, Lt.-Mot., dated Mar. 27, 2014. Although the Court granted Plaintiff's request and extended the response deadline until May 14, we noted that "[n]o further extensions w[ould] be granted absent a showing of good cause." Dkt. No. 30, Text Order, dated April 3, 2014. On May 11, 2014, Plaintiff requested an additional extension of the response deadline. Dkt. No. 31, Lt.-Mot., dated May 11, 2014. On May 15, the Court denied Plaintiff's request on the ground that Plaintiff failed to establish good cause in support of his Motion. Dkt. No. 32, Text Order, dated May 15, 2014.

Accordingly, because Plaintiff failed to comply with Local Rule 7 .1(a)(3), the Court accepts, as true, the factual assertions contained in Defendants' submissions. *See Lopez v. Reynolds,* 998 F.Supp. 252, 256 (W.D.N.Y.1997) (citing *Champion v. Artuz,* 76 F.3d at 486, for the

proposition that "where the movant's papers give the opposing party 'easily comprehensible notice' of the possible consequences of not replying to the motion, and the party does not provide a response to the motion, the court may consider as undisputed the facts set forth in the moving party's affidavits, and may enter judgment in favor of the movant.").

## II. DISCUSSION

### A. Facts

**\*4** Plaintiff was incarcerated at Greene Correctional Facility ("Greene") from February 16 to November 25, 2011, when he was transferred to Mid–State Correctional Facility ("Mid–State"). [3] Plaintiff remained at Mid–State until March 29, 2012, when he was transferred to Attica Correctional Facility. *See* Compl. at pp. 12, 39, & 45.

[3] The precise sequence of events which occurred during this period are unclear from the parties' papers. However, according to Plaintiff, on November 17, 2011, at a disciplinary hearing, he was sentenced to serve a year in the Solitary Housing Unit ("SITU") (this sentence was later commuted to six months). Compl. at p. 38. Following the hearing, he was placed in Greene's SITU until he was transferred to the SITU at Mid–State on November 25, 2011. *Id.* at pp. 34 & 54.

On September 12, 2011, Defendant Damiano issued a misbehavior report against Plaintiff for two rule violations, "Lying and Being Out of Place." Dkt. Nos. 24–11 through 24–13, Stefanie Damiano Decl., dated Jan. 13, 2014, at ¶ 2 & Ex. A. At a subsequent Tier II disciplinary hearing, Plaintiff was convicted of being out of place and received two days loss of programming and twenty days loss of recreation, receipt of packages, commissary buys, and the use of the telephone. *Id.* at ¶ 3 & Ex. B.

At his Deposition, and in response to questions asked regarding the alleged October 16 patfrisk incident involving Defendant Hayes, Plaintiff testified that the amount of force used by Defendant Hayes would not have been painful for any other person; indeed, it was only painful for Plaintiff because he had suffered multiple gun shot wounds to one of the areas of his body that Defendant Hayes touched during the pat-frisk. Dkt. No. Dkt. Nos.

24–2 & 24–3, Michael G. McCartin Decl., dated Jan. 17, 2014, at Ex. A, Gary Warren Dep., dated Oct. 8, 2013 (hereinafter "Warren Dep."), at pp. 15–16.

Although Plaintiff filed at least two grievances while at Greene, neither grievance was related to Plaintiff's surviving claims. Rather, on September 13, 2011, the day after he was allegedly retaliated against by Defendant Damiano, Plaintiff filed, and ultimately appealed to the Central Office Review Committee ("CORC"), a grievance regarding medical care which had nothing to do with Defendant Damiano's alleged act of retaliation on the previous day. Additionally, on October 27, Plaintiff filed, and ultimately appealed to the CORC, a grievance entitled "unprofessional" regarding staff conduct unrelated to his claim against Defendant Hayes regarding the October 16 pat-frisk. Dkt. No. 24–4, Anthony Black Decl., dated Jan. 14, 2014, at ¶¶ 2–3; Dkt. Nos. 24–7 through 24–10, Karen Bellamy Decl., dated Jan. 16, 2014, at ¶¶ 2–6 & Exs. A–C.

On November 26, 2011, after his transfer to Mid–State, Plaintiff wrote a grievance with regard to his excessive force claim against Defendants Begley, Hayes, Lampoutus and John Doe(s). Dkt. Nos. 24–5 & 24–7, Christopher Tapia Decl., dated Jan. 14, 2014, at Ex. A, Grievance, dated November 26, 2011. However, that grievance was not filed until December 13, 2011. *Id.* at ¶¶ 1–2 & Ex. A. That grievance was returned to Plaintiff unfiled, with a note explaining that the grievance was untimely and that Plaintiff could apply to the Inmate Grievance Program supervisor for an extension of time to re-file his grievance based on mitigating circumstances; but that in no case would an extension be granted more than forty-five days after the alleged occurrence. *Id.* at ¶ 4 & Ex. A, dated Dec. 14, 2011. Plaintiff failed to provide an explanation of mitigating circumstances, either before or after the forty-five day period expired. *Id.* at ¶ 4. [4]

---

[4]  In his Complaint, Plaintiff alleges that his late grievance was returned to him, within the forty-five day period during which an extension could be granted, "stating that he should write to the I.G.P. (Inmate Grievance Program) Supervisor, but because the Plaintiff had no idea who he was, he just wrote back to the I.G.P. Representative C. Tapia asking him for the extension, which he never responded to." Compl. at p. 39.

**\*5**  Additionally, Plaintiff never appealed any grievance related to the three incidents relevant to the instant Complaint, nor regarding a request for an extension of time to re-file his belated December 13 grievance, to the CORC. Bellamy Decl. at ¶¶ 1–3 & Ex. A.

## B. Failure to State a Claim

Defendants argue that Plaintiff failed to exhaust any of his surviving claims, and that he failed to state a retaliation claim against Defendant Damiano or an excessive force claim against Defendant Hayes regarding the pat-frisk incident. Defs.' Mem. of Law at pp. 11–15. Because we agree that Plaintiff's pat-frisk and retaliation claims are plainly meritless, we need not consider whether they were properly exhausted. *See Woodford v. Ngo,* 548 U.S. 81, 101 (2006) (citing 42 U.S.C. § 1997e(c)(2), for the proposition that "the PLRA exhaustion requirement is not jurisdictional, and thus ... a district court [may] dismiss plainly meritless claims without first addressing what may be a much more complex question, namely, whether the prisoner did in fact properly exhaust available administrative remedies.").

### 1. Pat–Frisk Incident

According to Plaintiff, on October 16, 2011, Defendant Hayes "placed the Plaintiff in a frisk position ... which there was no reason for .... [and] began to man handle him to the point that he was causing the Plaintiff undue and unnecessary pain." Compl. at pp. 33–34. At his Deposition, Plaintiff testified that "the point of the matter wasn't that he frisked me, it's the way he frisked me and knowing of my disability and the pain that my leg carries by touching. It's sensitive. It's like, you can't really touch it. I can't even touch it." Warren Dep. at p. 15. Plaintiff also admitted at his Deposition that no other individual would have felt pain from the amount of force used by Defendant Hayes during the frisk. *Id.* at p. 16.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment and is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Robinson v. California,* 370 U.S. 660, 666–67 (cited in *Tramell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003)). In *Hudson v. McMillian,* 503 U.S. 1 (1992), the Supreme Court clarified the standards for determining

whether an Eighth Amendment violation occurred in the context of excessive force. Specifically, the Court stated that, "whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley [v. Albers,* 475 U.S. 312 (1986) ]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 503 U.S. at 6–7 (quoted in *Davidson v. Flynn,* 32 F.3d 27, 29 (2d Cir.1994)). To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must prove two components: (1) objectively, that the defendant's actions violated "contemporary standards of decency," and (2) subjectively, that the defendant acted wantonly and in bad faith. *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks and citations omitted).

**\*6** Regarding the objective element, we note initially that "a *de minimis* use of force will rarely suffice to state a constitutional claim[.]" *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993). In that respect, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973) (quoted in *Hudson v. McMillian,* 503 U.S. at 10). However, the malicious use of force to cause harm constitutes an Eighth Amendment violation *per se* because in such instances "contemporary standards of decency always are violated." *Blyden v. Mancusi,* 186 F.3d at 263 (citing *Hudson v. McMillian,* 503 U.S. at 9). For example, "when a prison guard applies force against a prisoner that poses no reasonable threat simply because the guard loses his or her temper and wishes to wantonly inflict pain on the prisoner, a per se violation of the Eighth Amendment occurs." *Beckford v. Portuondo,* 151 F.Supp.2d 204, 216 (N.D.N.Y.2001) (citation omitted).

In assessing the objective component, the court should consider the seriousness of the injury, however, "the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury;" thus, "the seriousness of the injury is relevant to the Eight Amendment inquiry, but does not end it." *Davidson v. Flynn,* 32 F.3d 27, 29–30 n. 1 (2d Cir.1994) (alterations in original) (quoting *Hudson v. McMillian,* 503 U.S. at 4).

With regard to the subjective component, a court should consider whether the defendant had a wanton state of mind when engaging in the alleged misconduct. To determine whether a defendant acted wantonly or maliciously, several factors should be examined, including:

> the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by defendants to temper the severity of a forceful response.

*Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted); *see also Hudson v. McMillian,* 503 U.S. at 7).

Plaintiff's excessive force claim against Defendant Hayes is plainly meritless. To begin with, according to Plaintiff's own testimony, the amount of force used was clearly *de minimis, i.e.,* Plaintiff admitted that no other person would have considered the force Defendant used during the pat-frisk to be excessive, and that other than temporary discomfort, Plaintiff sustained no injury from the incident. Crucially, there is no evidence that Defendant Hayes had any intent to harm Plaintiff. Indeed, by Plaintiff's own admission "up until this point [he] didn't think of Defendant Officer Hayes [as] such a bad individual, since he had been the Officer who ... had sent [another inmate] to help [him] with his package after becoming stuck in the yard." Compl. at p. 34. Moreover, although the alleged impetus for the pat-frisk, that Plaintiff was to meet with an investigator, related to a grievance he filed, the grievance had nothing to do with Defendant Hayes. *See id.* at pp. 20–21 & 33–34. Thus, nothing in the record would permit a reasonable juror to conclude that Defendant Hayes possessed the requisite subjective state of mind for purposes of an excessive force claim.

**\*7** Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's excessive force/pat-frisk claim against Defendant Hayes.

*2. Retaliation Claim*

The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to retaliation for the exercise of a constitutional right, such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679–80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589–90 (2d Cir.1988). Claims of retaliation, like those asserted by Plaintiff, find their roots in the First Amendment. Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *Gill v. Pidlypchak,* 389 F.3d 379, 381–83 (2d Cir.2004).

Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d at 872 (citation omitted); *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002) ("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." (citation omitted)); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d at 492); *see also Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002).

The plaintiff bears the initial burden in showing that the defendant's actions were improperly motivated. To satisfy the second prong, a prisoner must present evidence inferring that a defendant acted with an improper motive. Such evidence includes: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) plaintiff's prior good disciplinary record; (3) plaintiff's vindication at his disciplinary hearing; and (4) defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin,* 58 F.3d 865, 872–73 (2d Cir.1995). A plaintiff may meet this burden by presenting circumstantial evidence of a retaliatory motive, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d 133, 139 (2d Cir.2003) (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d at 493). Otherwise, the retaliatory act is "*de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker,* 239 F.3d at 493. Furthermore, in satisfying the causal connection requirement, also known as temporal proximity, the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." *Id.* at 492 (internal quotation marks and citations omitted) (cited in *Davis,* 320 F.3d at 353).

**\*8** In situations where the defendant's actions are the result of both retaliatory and legitimate reasons, the burden shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citing, *inter alia, Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287 (1977)); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (cited in *Carpio v. Walker,* 1997 WL 642543, at \*6 (N.D.N.Y. Oct. 15, 1997)); *see also Gayle v. Gonyea,* 313 F.3d at 682 (defendant may successfully meet this burden of justification with regard to a particular punishment by demonstrating that "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report" (internal quotation marks and citations omitted)).

On September 12, 2011, Defendant Damiano issued a misbehavior report against Plaintiff, charging him with lying and being out of place; Plaintiff was subsequently convicted of being out of place at a Tier II disciplinary hearing. Damiano Decl. at ¶¶ 2–3 & Exs. A–B. Plaintiff maintains that the misbehavior report was fabricated by Defendant Damiano in retaliation for a grievance he filed against her and two other officers at Greene on August 6, 2011; and that as a result he was confined to his dorm at mid-state for thirteen days [5] without any privileges. Compl. at p. 31; Warren Dep. at pp. 39–52.

5    Plaintiff testified at his Deposition that, as a result of his disciplinary conviction, in addition to losing all of his privileges, he was confined to his cube (keeplocked) for thirteen days. Warren Dep. at pp. 46–49.

Plaintiff's August 6, 2011, grievance against Defendant Damiano and other officers at Greene, *see* Compl. at pp. 26–27 & 31, [6] was clearly a protected exercise, *Jones v. Coughlin,* 45 F.3d at 679–80. However, even if we assume, *arguendo,* that Defendant Damiano's disciplinary report constituted an adverse action, Plaintiff's retaliation claim would still fail because it is uncontested that Defendant Damiano also had a legitimate non-retaliatory reason for filing the misbehavior report on September 12, 2011; namely, that Plaintiff was "out of place." *See* Damiano Decl. at ¶ 2 & Ex. A. Thus, even if Defendant Damiano was partially motivated by retaliatory animus, the fact that she also had a legitimate non-retaliatory reason for writing the misbehavior report nullifies Plaintiff's claim. *See Graham v. Henderson,* 89 F.3d at 79.

6    Nothing in Defendants' submissions controvert Plaintiff's claim that he filed a grievance against Defendant Damiano and others on August 6, 2011. *Cf.* Black Decl. at ¶ 3 (referring only to the grievances Plaintiff filed at Greene "after the date of September 11, 2011").

Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's retaliation claim against Defendant Damiano.

### C. Exhaustion

Defendants argue that Plaintiff's claim that he was assaulted by Defendants Hayes, Begley, Lampoutus, and John Doe(s) on November 6, 2011, should be dismissed because he failed to exhaust his administrative remedies before filing the instant action. Defs.' Mem. of Law at pp. 4–10.

Pursuant to the Prison Litigation Reform Act ("PLRA") "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e(a). The Supreme Court has held that "the

PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002) (citations omitted). Exhaustion is similarly required even if the prisoner asserts futility as an excuse. *See Booth v. Churner,* 531 U.S. 731, 741 n. 6 (2001) (refusing to "read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise.") (cited in *Marvin v. Goord,* 255 F.3d 40, 43 (2d Cir.2001)). Accordingly, the exhaustion requirements apply even where the grievance process does not permit an award of money damages and the prisoner seeks only money damages, provided the grievance tribunal has the authority to take some responsive action. *See Thomas v. Wright,* 2002 WL 31309190, at *5 (N.D.N.Y. Oct. 11, 2002) (citing *Booth v. Churner,* 531 U.S. 731 (2001)).

**\*9** In determining whether a prisoner has failed to exhaust all available administrative remedies, the Second Circuit has instructed district courts to ask: "(1) whether administrative remedies were actually available, (2) whether the defendants forfeited their right to raise the affirmative defense or by their own actions precluded the plaintiff from using administrative grievance procedures, and (3) whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements." *Singh v. Goord,* 520 F.Supp.2d 487, 495–96 (S.D.N.Y.2007) (quoting *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

In New York State, the administrative remedies ordinarily consist of a three-step review process. First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. [7] N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). The IGRC reviews and investigates the formal complaints and then issues a written determination. *Id.* Second, if the IGRC decision is appealed, the superintendent of the facility reviews the IGRCs determination and issues a decision. *Id.* at § 701.5(c). Finally, if the superintendent's decision is appealed, the CORC makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to § 1983 in federal court. *Bridgeforth v. Bartlett,* 686 F.Supp.2d 238, 239 (W.D.N.Y.2010) (citing, *inter alia, Porter v. Nussle,* 534 U.S. 516, 524 (2002)); *see also Neal v.*

*Goord,* 267 F.3d 116, 121 (2d Cir.2001), *overruled on other grounds by* *Porter v. Nussle,* 534 U.S. 516.

[7] The IGRC is a five-member body consisting of two voting inmates, two voting staff members, and a nonvoting chair (who may be an inmate, staff member of volunteer). N.Y. COMP.CODES R. & REGS tit.7, § 701.4.

Additionally, there is an expedited procedure for the review of grievances alleging harassment. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.8. Once it is determined that the grievance presents a "bona fide harassment issue" the Superintendent is required to initiate an in-house investigation, and within twenty-five (25) calender days of receipt of the grievance, the superintendent must render a decision. *Id.* at § 701.8(d) & (f). If the superintendent fails to respond within the required twenty-five (25) day time limit, the grievant may appeal directly to CORC by filing a Notice of Decision to Appeal (Form # 2133) with the inmate grievance clerk. *Id.* at § 701.8(g). CORC then has thirty (30) calender days from the time the appeal was received to render a decision. *Id.* at § 701.5(d)(3).

It is uncontested that Plaintiff failed to file any grievances with regard to the November 6 assault while at Greene. Black Decl. at ¶ 2.[8] Furthermore, on December 13, 2011, Plaintiff attempted to file a grievance regarding the November 6 issue at Mid–State. Tapia Decl. at ¶ 3 & Ex. A. That grievance was denied as untimely, and Plaintiff was instructed that he could request an extension of time to file the grievance, based on extenuating circumstances, but that in no event would such an extension be granted more than forty-five days after the alleged event; nonetheless, Plaintiff failed to provide extenuating circumstances within the proscribed forty-five day period (or thereafter). *Id.* at ¶ 4 & Ex. A. Additionally, Plaintiff never appealed any grievance related to the November 6, 2011 alleged use of excessive force or a request for an extension to re-file his belated grievance to the CORC. Bellamy Decl. at ¶¶ 2–6 & Ex. A.

[8] Plaintiff claims in his Deposition that he filed a grievance with regard to the November 6 incident on November 8, but never received a response. Warren Dep. at p. 61. However, he provides no evidence, beyond his vague and unsupported statements to support this proposition. Such a statement, standing on its own, is insufficient as a matter of law to raise

a triable issue of fact in light of Defendants' properly supported Motion for Summary Judgment. *See Carey v. Crescenzi,* 923 F.2d at 21. Moreover, even if we accept this allegation as true, the fact that Plaintiff did not receive a response did not alleviate his duty to continue to pursue the administrative remedies that were available to him. Indeed, in the event that the IGRC or superintendent (in cases involving the expedited grievance procedure), do not respond to an initial grievance within the period prescribed, it remains the prisoner's responsibility to file an appeal with the CORC. *See Charles v. Gordon,* 2013 WL 6667632, at *4 (S.D.N.Y. Dec. 17, 2013) (citing *Williams v. City of New York,* 2005 WL 2862007, at *10 (S.D.N.Y. Nov. 1, 2005), for the proposition that "[c]ourts in this circuit require an inmate to pursue all levels of appeal even if the inmate does not receive a response to his initial grievance"); *Torres v. Carry,* 672 F.Supp.2d 338, 343 (S.D.N.Y.2009) (superintendent's failure to respond within twenty-five days did not alleviate prisoner's duty to file an appeal with the CORC in order to exhaust administrative remedies).

**\*10** Accordingly, Defendants have established that no issues of material fact exist with regard to whether Plaintiff exhausted his November 6 excessive force claim. However, such a conclusion does not render our exhaustion inquiry complete. Notwithstanding his failure to respond to Defendants' Motion, given the special solicitude and liberality afforded to *pro se* plaintiffs in the Second Circuit, we must still look to the allegations of the Plaintiff's Complaint and his Deposition testimony to determine whether Plaintiff has met his burden of production with regard to the issues of availability, estoppel, and/or special circumstances.

### *1. Availability*

The availability inquiry is a two part test, first courts must ask whether the prison had a grievance procedure in place that inmates could avail themselves of, and second, "whether threats rendered 'all administrative remedies unavailable' or 'some procedures that would ordinarily be available ... effectively unavailable.' " *Snyder v. Whittier,* 428 F. App'x 89, 91 (2d Cir.2011) (citing *Hemphill v. New York,* 380 F.3d at 686–87). "Unavailability of administrative remedies ... is an objective [test]: that is, would a similarly situated individual of ordinary firmness have deemed them unavailable." *Puga v. Choto,* 2014 WL 675824, at *4 (N.D.N.Y. Feb. 21, 2014) (quoting *Kasiem*

*v. Switz,* 756 F.Supp.2d 570, 576–77 (S.D.N.Y.2010)) (alterations in original). In the instant case it is clear, from the fact that Plaintiff availed himself of the grievance procedures at both Greene and Mid–State, that such procedures did in fact exist. Black Decl. at ¶ 3; Bellamy Decl. at ¶¶ 4–5 & Exs. A–C; Tapia Decl. at ¶ 3 & Ex. A.

In his Complaint, Plaintiff alleges that on multiple occasions grievances which he submitted at Greene were either discarded or never filed, that on or about September 14, 2011, Inmate Grievance Procedure ("IGP") Supervisor M. Meyers and IGP Officer Snide summoned him to their office, where he was told not to "submit anymore grievances or else he was gonna [sic] have problems the next time he came to the grievance office[,]" and that he was threatened and intimidated by Defendants and others while at Greene in retaliation for having filed grievances and complaints about them and other officers. *See, e.g.,* Compl. at pp. 21–22, 27–28, 31–32, 35, & 38; *see also* Warren Dep. at pp. 52–53. It is certainly possible that such behavior rendered all or part of the grievance procedure unavailable to Plaintiff while he was at Greene. *See* Hemphill v. New York, 380 F.3d at 688 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance.") (citation omitted).

Crucially, however, these threats did not foreclose all of the administrative remedies available to Plaintiff. To begin with, although the threats and intimidation Plaintiff alleges he suffered at Greene may have caused the ordinary grievance procedures to be unavailable to him, such threats did not necessarily preclude him "from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." *Id.* Plaintiff has failed to allege any facts from which a reasonable juror could conclude that Plaintiff was precluded from utilizing the expedited grievance procedure available to him for claims of employee harassment while at Greene.

**\*11** Moreover, Plaintiff was transferred to Mid–State on November 25, 2011, with two days remaining in the twenty-one day limitations period to timely file a grievance regarding the November 6, 2011 incident. And, Plaintiff acknowledges that he filed several grievances after arriving at Mid–State. Compl. at pp. 31 & 34. The only explanation Plaintiff offers for his failure to timely

file a grievance on November 25, 26, or 27 is that between approximately November 17, 2011 and November 26, 2011 he did not have adequate access to pen and paper with which to file grievances. Warren Dep. at pp. 54, 61–62, & 64. Yet, this claim is plainly belied by Plaintiff's own allegations that, while at Greene, he wrote letters on November 21 and 23, 2011, Compl. at pp. 38–39, and while at Mid–State on November 26, 2011, he wrote a four-page grievance which he belatedly filed on December 13, 2011, Tapia Decl. at Ex. A, Greivance, dated Nov. 26, 2011; *see also* Warren Dep. at pp. 63–64 (Plaintiff acknowledges that after about a month he "finally g[o]t somewhere ... stationary" and "the box [was] working pretty good at Midstate [sic] where [he] could get some paper and a pencil to resubmit that grievance."). Thus, it is also possible that Plaintiff could have filed a timely grievance when he first arrived at Mid–State. *See* Rambert v. Mulkins, 2014 WL 2440747, at *11 (S.D.N.Y. May 30, 2014) (concluding that grievance procedure was available to prisoner where "by his own admission, Plaintiff had the ability and opportunity to grieve the [alleged] incident within the relevant time period").

Finally, as noted above, after his belated December 13 grievance regarding the November 6 incident was rejected as untimely, Plaintiff was given explicit instructions on how to apply for an extension of time to re-file within the forty-five day limitations period for such requests; nonetheless, he failed to follow those instructions. Tapia Decl. at ¶ 4 & Ex. A, Lt., dated Dec. 14, 2011. Plaintiff admitted as much at his deposition. Warren Dep. at p. 64. Yet, Plaintiff failed to do so.[9] Thus, administrative remedies were available to Plaintiff well after his November 25 arrival. *See* Lopez v. Goodman, 2013 WL 3105550, at *3 (W.D.N.Y. June 18, 2013);[10] Woodford v. Ngo, 548 U.S. at 115 n. 10 ("If a prison regulation explicitly grants prison officials discretion to consider untimely or otherwise procedurally defective grievances, of course prison grievance remedies would still be "available," and thus unexhausted, if a prisoner had not even tried to file a grievance simply because it was untimely or otherwise procedurally defective.") (J. Breyer, concurring); *cf.* Tomony v. Cnty. of Suffolk, 2013 WL 55821, at *4 (E.D.N.Y. Jan. 3, 2013) (quoting Harper v. Jenkin, 179 F.3d 1311, 1312 (11th Cir.1999), for the proposition that " '[s]ince appellant has not sought leave to file an out-of-time grievance, he cannot be considered to have exhausted his administrative remedies.' ").

9    Plaintiff's claim that he was unable to file such a request properly because he did not know who the IGP supervisor was, is dealt with *infra* at Part II.C.3.

10    In *Lopez v. Goodman,* the court stated:

> The grievance procedure is not unavailable to an inmate simply because he missed an initial deadline for filing a grievance. If an inmate misses the deadline for filing, the IGP contains provisions for requesting an extension of time to file in cases of mitigating circumstances. 7 N.Y.C.R.R. § 701.6(g)(1)(i)(a). Moreover, a denial of an extension of time to file a grievance is itself a grievable complaint that may be pursued via the IGP. 7 N.Y.C.R.R. § 701.6(g)(1)(ii). Plaintiff fails to assert in his Reply why he has apparently not attempted to avail himself of the IGP, or that he has attempted to file for an extension of time to file a grievance but has been denied. Therefore, Plaintiff has not exhausted all of his administrative remedies.

> *Lopez v. Goodman,* 2013 WL 3105550, at *3; *compare with Mandell v. Goord,* 2009 WL 3123029, at *11 (N.D.N.Y. Sept. 29, 2009) (finding issue of fact with regard to exhaustion where "plaintiff's grievance provided an explanation for his delay, that grievance was tersely rejected as untimely, and the defendants did not advise the plaintiff at that time that he should request an exception to the time limit from the IGP supervisor based on mitigating circumstances, or that additional information regarding his delay in filing the grievance was needed. It was not until the letter of October 6, 2006 from the Commissioner's office, responding to the plaintiff's attempted appeal of the denial of his grievance as untimely, that the plaintiff was instructed to file for an exception under section 701.6(g); by that time, one hundred and seventeen days had passed since the alleged occurrence, and the time limit for seeking extensions—forty-five days from the alleged occurrence—had long since expired.").

### *2. Estoppel*

 **\*12**  The Second Circuit has stated that "verbal and physical threats of retaliation, physical assault, denial of grievance forms or writing implements, and transfers" can constitute cause to estop a defendant from raising the affirmative defense of exhaustion. *Amador v. Andrews,* 655 F.3d 89, 103 (2d Cir.2011).

At the same time, "a defendant in a prisoner civil rights action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies (for purposes of the second part of the three-part inquiry established by the Second Circuit) based on the actions or inactions of *other* individuals." *Smith v. Kelly,* 2013 WL 6154366, at *6 & n. 17 (N . D.N.Y. Oct. 30, 2013) (emphasis in original) (collecting cases). Thus, to the extent that Plaintiff's Complaint can be interpreted as asserting that estoppel is warranted due to the alleged interference/destruction of his grievances by non-party Officers Snide and Myers, the difficulties he experienced while in SHU or the Box at Greene or Midstate, or the actions or threats of anyone other than Defendants Hayes, Lampoutus, Begley, or John Doe(s), such claims are unavailing.

Moreover, to the extent that any of the Defendants personally interfered with Plaintiff's ability to file grievances while he was at Greene, as noted above, *supra* Part II.C.2, Plaintiff had ample opportunity to avail himself of the grievance procedure while he was at Mid–State, away from the influence of Defendants. Accordingly, estoppel is not warranted in the instant case. *See Harvey v. Corr. Officers 1–6,* 2014 WL 2779252, at *10 (N.D.N.Y. Mar. 18, 2014) (no estoppel where "Plaintiff ... was transferred to a different facility while he still had over two weeks to file a grievance .... [and][t]here [wa]s no testimony in the record that suggests the Plaintiff's concerns about staff at Clinton became a concern at Downstate for any reason, nor that he would have had any difficulty in filing a timely grievance at Downstate due to any actions of the named Defendants."); *Goodson v. Silver,* 2012 WL 4449937, at *8 (N.D.N.Y. Sept. 25, 2012) (reaching a similar conclusion).

### *3. Special Circumstances*

Plaintiffs allegations that he was unable to seek an extension because "[he] didn't know anything about the grievance process at that time," Warren Dep. at p. 53, or, "because [he] had no idea who [the supervisor] was," Compl. at p. 39, do not evince special circumstances. Plaintiff's tacit admission of ignorance is a far cry from the type of mistake that ordinarily constitutes special circumstances, such as where a prisoner attempting to navigate the grievance procedure reasonably misinterprets a confusing or ambiguous procedural regulation. *See*

*Harrison v. Goord,* 2009 WL 1605770, at *6 (S.D.N.Y. June 9, 2009) (quoting *Giano v. Goord,* 380 f.3d at 678, for the proposition that "[t]he existence of such special circumstances 'must be determined by looking at circumstances which might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way.' "). Moreover, we have reviewed Plaintiff's other arguments, and we can find no evidence that special circumstances warrant reprieving Plaintiff of the PLRA's exhaustion requirement.

**\*13** Accordingly, having found no indication that the grievance process was unavailable, that Defendants should be estopped from asserting the defense of exhaustion, or that special circumstances warrant a reprieve from the PLRA's exhaustion requirement, we recommend that Defendants' Motion be **GRANTED** as to Plaintiff's November 6, 2011, excessive force claim.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 24), be **GRANTED,** and this action be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

Date: July 28, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4715863

---

**End of Document**                © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 2159199
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
S.D. New York.

Donald Mack BENNETT, Plaintiff,
v.
Edith ONUA, Edwin Oduro, and
June Yazzo Liason, Defendants.

No. 09 Civ. 7227(SAS).
|
May 26, 2010.

**Attorneys and Law Firms**

Donald Mack Bennett, Valhalla, NY, pro se.

[Robert F. Meehan](), Westchester County Attorney, Fay Angela Jones, Senior Assistant Westchester County Attorney, White Plains, NY, for Defendants.

***OPINION AND ORDER***

[SHIRA A. SCHEINDLIN](), District Judge.

### I. INTRODUCTION

*\*1* Donald Mack Bennett, presently incarcerated and proceeding pro se, brings this action against Edith Onua, Edwin Oduro, and June Yazzo Liason [1] pursuant to [section 1983 of Title 42 of the United States Code](). Bennett seeks monetary damages in the amount of $5,000,000 for alleged emotional distress, negligence, deliberate indifference, and medical malpractice. Defendants now move to dismiss pursuant to [Federal Rule of Civil Procedure 12(c)]() for failure to exhaust administrative remedies under 42 U.S.C. § 1197e(a) and failure to state a claim under [42 U.S.C. § 1983](). For the reasons stated below, the motion to dismiss is granted.

[1]    Hereinafter, "Defendants."

### II. BACKGROUND [2]

[2]    The facts recited here are drawn from the Complaint ("Compl."), attached as Ex. A to the Declaration of Fay Angela Jones ("Fay Decl."), Senior Assistant County Attorney.

Bennett was incarcerated at the Westchester County Jail ("WCJ") from February 20, 2009, through February 27, 2009. [3] On February 20, 2009, Bennett was examined by Edwin Odoro, a physician's assistant ("P.A."). [4] At the time of the examination, Bennett had in his possession a hospital discharge paper with all his prescribed medications. [5] During the week of February 20, 2009 until Bennett's court date (on February 27, 2009), he allegedly submitted five "sick-call slips" but was not contacted until Edith Onua, also a P.A., called to tell him she could not prescribe his "life sustaining medication." [6]

[3]    *See* Compl. Section II–D.

[4]    *See id.*

[5]    *See id.*

[6]    *Id.*

On February 27, 2009, Bennett was taken to court without being given his medication. [7] Bennett subsequently became ill and was taken to Sound Shore Medical Center, where he was treated and released. [8] Bennett claims defendant June Yazzo Liason, also a P.A., purposely informed the WCJ staff that nothing was wrong with him because she is racially biased against him. [9] Bennett further claims that Yazzo denies any grievance he files on the same racially-motivated grounds. [10]

[7]    *See id.*

[8]    *See id.* Bennett alleges he had a "massive heart attack, grand mal seizure, and almost had a stroke" and that he "ran blood pressure 196 over 145, heart rate running over 230 beats." *Id.* Defendants include WCJ documentation of Bennett's lengthy medical problems. *See* Ex. C to Fay Decl.

[9]    *See* Compl. Section II–D.

[10]    *See id.*

### III. APPLICABLE LAW

#### A. [Rule 12(c)]()

Under Rule 12(c), after the pleadings close but before the trial begins, a party may move for judgment on the pleadings provided that the motion is made early enough so as not to delay the trial.[11] Judgment on the pleadings should be granted if it is clear that the moving party is entitled to judgment as a matter of law.[12] In evaluating a motion for judgment on the pleadings, the court applies the same standard as that applicable to Rule 12(b)(6) motions to dismiss for failure to state a claim.[13] As in the context of a motion to dismiss, the court "must accept as true all of the factual allegations contained in the complaint"[14] and "draw all reasonable inferences in the plaintiff's favor."[15] Even so, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations ... a presumption of truthfulness."[16] In deciding a motion for judgment on the pleadings, a court may consider

[11]  See Fed.R.Civ.P. 12(c).

[12]  See Burns Int'l Sec. Servs. v. International Union, 47 F.3d 14, 16 (2d Cir.1995).

[13]  See Patel v. Contemporary Classics, 259 F.3d 123, 126 (2d Cir.2001).

[14]  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 572 (2007). Accord Rescuecom Corp. v. Google Inc., 562 F.3d 123, 127 (2d Cir.2009).

[15]  Ofori–Tenkorang v. American Int'l. Group, Inc., 460 F.3d 296, 298 (2d Cir.2006).

[16]  In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir.2007) (quotation omitted).

the pleadings and exhibits attached thereto, statements or documents incorporated by reference in the pleadings, matters subject to judicial notice, and documents submitted by the moving party, so long as such documents either are in the possession of the party opposing the motion or were relied upon by that party in its pleadings.[17]

[17]  Prentice v. Apfel, 11 F.Supp.2d 420, 424 (S.D.N.Y.1998) (citing Brass v. American Film Techs., Inc., 987 F.2d 142, 150 (2d Cir.1993)).

**B. Prison Litigation Reform Act**

**\*2**  The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions.[18] The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."[19] "[A]s long as other forms of relief are obtainable through administrative channels, the provision is applicable even to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings."[20]

[18]  See 42 U.S.C. § 1997e(a) (providing that "no action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted."). See also Porter v. Nussle, 534 U.S. 516, 516 (2002).

[19]  Porter, 534 U.S. at 532.

[20]  Booth v. Churner, 532 U.S. 731, 741 (2001) (requiring an inmate to complete the prison administrative process before suing over prison conditions even where the inmate sought only money damages, which could not be recovered through the administrative process).

Failure to exhaust is an absolute bar to an inmate's action in federal court as "[section] 1997e(a) requires exhaustion of available administrative remedies before inmate-plaintiffs may bring their federal claims to court at all."[21] Failure to exhaust is an affirmative defense, however.[22] As such, plaintiff need not plead exhaustion in the complaint.[23]

[21]  Neal v. Goord, 267 F.3d 116, 122 (2d Cir.2001), rev'd. on other grounds (quotation marks and citation omitted) (emphasis in original).

[22]  See Jenkins v. Haubert, 179 F.3d 19, 28–29 (2d Cir.1999).

[23]  See Jones v. Bock, 549 U.S. 199, 216 (2007) ("We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints.").

While the Second Circuit has recognized that the PLRA's exhaustion requirement is mandatory, it has also recognized three exceptions to the exhaustion requirement:

when (1) administrative remedies are not available [24] to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement. [25]

[24]  To be available, an administrative remedy must "afford the possibility of some relief for the action complained of." *Booth,* 532 U.S. at 738. In some circumstances, the behavior of the defendant may render administrative remedies unavailable. *See, e.g., Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) (remanding case to the district court to determine whether some seemingly available remedies were rendered unavailable by threats made by correction officers).

[25]  *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

When any of the above are present, the affirmative defense of non-exhaustion fails. [26] Where (1) administrative remedies were available to the plaintiff, (2) defendants are not estopped and have not forfeited their non-exhaustion defense, and yet (3) plaintiff did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged to justify "the prisoner's failure to comply with administrative procedural requirements." [27]

[26]  *See Hemphill,* 380 F.3d at 686.

[27]  *Giano v. Goord,* 380 F.3d 670, 676 (2d Cir.2004).

The Second Circuit has held that " '[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought' ... does not constitute proper exhaustion." [28] "[N]otice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given fair opportunity to consider the grievance' and '[t]he ... system will not have such an opportunity unless the grievance complies with the system's critical procedural rules.' " [29]

[28]  *Macias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (quoting *Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005)) (noting that Braham cannot survive *Woodford v. Ngo,* 548 U.S. 81, 94–95 (2006), which states that plaintiff "cannot satisfy the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to [prison] staff.").

[29]  *Id.* (quoting *Woodford,* 548 U.S. at 95).

## C. Westchester County Department of Corrections Inmate Grievance Program

The Westchester County Department of Corrections ("WCDOC"), Jail Division, has an established Inmate Grievance Program ("IGP") approved by the New York State Commission on Correction ("NYSCOC") . [30] A "grievance" is defined as "any inmate/detainee complaint relating to any facility policies, procedures, rules, practices, programs or the action or inaction of any person within the facility ." [31] In 2009, the IGP allowed inmates to make informal complaints to the Block Officer, who would log such complaint and attempt to resolve them. [32] Grievances that could not be resolved in this manner entered a formal process affording two levels of subsequent appeal. [33]

[30]  *See* Affidavit of Anthony Amicucci ("Amicucci Aff."), Warden of the Westchester County Department of Correction, ¶ 5; *see also* Ex. 1 to Amicucci Aff. (copy of the WCDOC grievance procedures).

[31]  Amicucci Aff. ¶ 8.

[32]  *See id.* ¶ 9.

[33]  *See id.* ¶¶ 11–13. *See also* Westchester County Department of Correction Policy and Procedure, Ex. 1 to Amicucci Aff. at 4 (attached as Ex. E to Fay Deck) (chart showing time schedule for grievance filing and appeal).

## IV. DISCUSSION

### A. Defendants Have Adequately Demonstrated Bennett's Failure to Exhaust Administrative Remedies

**\*3** Despite Bennett's claim that he filed a grievance at WCJ that was denied, [34] a search of the grievance

log records maintained by WCDOC between February 20 and February 27, 2009 did not reveal any record of a grievance by Bennett concerning his medical care. [35] Bennett claims he informed Warden Amicucci of his grievance. [36] Warden Amicucci states in his sworn affidavit that Bennett never contacted him about any claims. [37] Regardless, notice to a prison official is insufficient. [38] As such, Defendants have adequately supported the affirmative defense of failure to exhaust.

[34]     *See* Compl. Section IV–F.

[35]     *See* Amicucci Aff. ¶ 17. Although Bennett completed Complaint Section IV–F, which asks the inmate to describe the grievance claim if one had been made, he also completed Section IV–G, which states, "If you did *not* file a grievance, did you inform any officials of your claim(s)?" Also, in describing "all efforts to appeal [the instant claim] to the highest level of the grievance process," Bennett simply writes that he has "always appeal [sic] and never sign agreeing." Compl. Section IV–F(3). Bennett cannot have appealed if he never filed an initial grievance.

[36]     *See* Compl. Section IV–G

[37]     *See* Amicucci Aff. ¶ 18.

[38]     *See Macias,* 495 F.3d at 44.

### B. Bennett Has Not Sufficiently Alleged Facts Supporting an Exemption From the Exhaustion Requirement

In light of Defendants' affirmative defense of non-exhaustion, the instant motion now presents three issues: (1) whether administrative remedies were available to Bennett, (2) whether Defendants are estopped from asserting exhaustion as a defense, and (3) whether special circumstances excuse Bennett's failure to exhaust administrative remedies. Bennett has not alleged any facts to support an exemption from the exhaustion requirement.

*First,* Bennett does not allege that all available administrative remedies were procedurally unavailable at WCJ. When first processed into WCJ, inmates receive a packet called "The Inmate Rules and Regulations." [39] The Inmate Rules and Regulations advise inmates that grievance forms are available from the correction staff and from the Law Library. [40] Bennett does not allege that these forms were not available to him or that they did not "afford the possibility of some relief for the action complained of." [41]

[39]     *See* Amicucci Aff. ¶ 6; *see also* Ex. 2 to Amicucci Aff. (copy of the Inmate Rules and Regulations packet).

[40]     *See* Amicucci Aff. ¶ 6.

[41]     *Booth,* 532 U.S. at 738. Bennett was allegedly familiar with the WCJ grievance process, having filed an unrelated grievance about two years prior to commencing this action. *See* Amicucci Aff ¶ 19; *see also* Ex. 3 to Amicucci Aff. (photocopy of WCJ's log of Bennett's unrelated May 2007 grievance).

*Second,* Bennett does not allege that all available administrative remedies were rendered unavailable by any action of any defendant. *Third,* Bennett does not allege that any defendant ever acted in any way that would estop Defendants from asserting non-exhaustion as a defense, or that any special circumstances exist to justify Bennett's failure to exhaust all possible remedies.

### V. CONCLUSION

Because Defendants have adequately supported the affirmative defense of failure to exhaust and because Bennett has not presented any facts on which this Court could base an exception, his Complaint is dismissed without prejudice. Bennett may file a new action once he has exhausted all remedies, as required by PLRA section 1997e(a). Accordingly, Defendants' motion to dismiss is granted. The Clerk of the Court is directed to close this motion [Docket No. 17] and this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 2159199

2013 WL 4774731
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Stanley HILBERT, Plaintiff,
v.
Brian FISCHER, et al., Defendants.

No. 12 Civ. 3843(ER).
|
Sept. 5, 2013.

**OPINION AND ORDER**

[EDGARDO RAMOS](), District Judge.

**\*1** Plaintiff Stanley Hilbert ("Plaintiff"), proceeding *pro se,* brings this action pursuant to [42 U.S.C. § 1983](), the Americans With Disabilities Act and the Rehabilitation Act against Brian Fischer, Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS"); Green Haven Correctional Facility ("Green Haven") Superintendent William Lee; and various Green Haven "contractors and employees" (collectively, the "Defendants").[1] Presently before the Court is Defendants' motion to partially dismiss Plaintiff's Amended Complaint.[2] Doc. 65. Specifically, Defendants seek dismissal of Plaintiff's claim of deliberate medical indifference for failure to exhaust administrative remedies. Defendants Fischer and Lee move in the alternative to dismiss Plaintiff's deliberate indifference claim because Plaintiff has failed to demonstrate that they were personally involved in the alleged Constitutional violation. For the reasons discussed below, Defendants' motion for partial dismissal of the Amended Complaint is GRANTED.

[1] On June 5, 2012, the Court dismissed DOCCS as a Defendant in this action. Doc. 6.

[2] Plaintiff filed a Notice of Motion along with his opposition papers for an "Order pursuant to [Rule 7(b) of the Federal Rule[s] of Civil Procedure]() granting a trial concerning the complaint." Doc. 77. As the motion is procedurally improper, the Court assumes that Plaintiff filed the Notice of Motion in further

support of his opposition to Defendants' motion to dismiss, and will consider it accordingly.

**I. Factual Background**
The Court accepts the factual allegations in the Amended Complaint as true for purposes of Defendants' motion. *[Famous Horse Inc. v. 5th Ave. Photo Inc.,]() [624 F.3d 106, 108 (2d Cir.2010)]().*

In September 2011, Plaintiff was incarcerated at Marcy Correctional Facility's ("Marcy") Residential Mental Health Unit ("RMHU"). Amended Complaint ("Am.Compl.") ¶ 42. Plaintiff sought mental health treatment at that facility; however, due to the unavailability of observational cells, he was transferred to Green Haven.[3] *Id.* ¶¶ 42–43. On September 27, 2011, at approximately 10:40 am, while still at Green Haven, Plaintiff complained of chest pains and was escorted to the facility infirmary. *Id.* ¶ 45. After Plaintiff had been examined, Defendants Kowalchuk, Rodriguez and Surprenant escorted him back to his cell. *Id.* ¶ 47. On the way back to the cell, Surprenant told Plaintiff that he was "full of shit," that he was "bullshitting and wasting my time," and that "this ain't Marcy [and] we have another way to treat mental illness and you're going to find out soon enough." *Id.* ¶¶ 48–50. Upon hearing this, Plaintiff requested that Surprenant allow him to see a mental health therapist. *Id.* ¶ 51. Defendant Rodriguez then interjected and said that "we got some therapy for you" and that "your [sic] going to need a physical therapist to teach you how to walk again." *Id.* ¶ 52.

[3] The exact date on which Plaintiff was transferred to Green Haven is not clear from the face of the Amended Complaint.

Upon returning to his cell, Plaintiff was ordered to face the wall, which he did. *Id.* ¶ 53. Surprenant then instructed Plaintiff, who was still in restraints, to turn around and face him. *Id.* ¶ 54. After Plaintiff complied, Surprenant "got nose to nose" with him and stated, "you played games and wasted my time. I told you we have another way to treat mental illness." *Id.* ¶ 55. At that point, Rodriguez "[s]uddenly" punched Plaintiff in the left eye. *Id.* ¶ 56. Defendants Kowalchuk, Rodriguez and Surprenant then began beating Plaintiff "mercilessly with their hands and feet," and "punched and kicked [him] repeatedly about the body, face and head." *Id.* ¶¶ 57–58. Plaintiff alleges that upon information and belief, Defendant Rodriguez then "stepped on [his] lower back

while Defendants Surprenant, Tillotson, Kowalchuk, Keran [sic], and Brothers held [him] down and removed the restraints." *Id.* ¶ 59. Defendants then left the cell and locked it behind them. *Id.* ¶ 61.

**\*2** Plaintiff alleges that he then informed Defendant Kowalchuk that he was in "excruciating pain and need[ed] medical attention," *id.* ¶ 60; however, Kowalchuk refused Plaintiff's request. *Id.* ¶ 62. Approximately one hour later, Defendant Miller, a nurse, arrived at Plaintiff's cell with a corrections officer to take photographs. *Id.* ¶ 63. At that point, Plaintiff's nose was bleeding profusely, he was bleeding out of his left eye, and he could barely stand up. *Id.* ¶ 64. Plaintiff informed Miller that he was in excruciating pain, but she did not "even [perform] a cursory examination ... [and] told Plaintiff that there was nothing wrong." *Id.* ¶ 64–65. Plaintiff alleges that Miller told him to "stop whining" and that crying is what babies do. *Id.* ¶ 66. She then exited the cell with the corrections officer. *Id.* ¶ 67.

Over the next two days, from September 27 to 29, 2011, Plaintiff alleges that he requested medical assistance for his injuries from Defendants Morlas, Patil, Panuto, Zwillinger, O'Conner, Brandow, Hannd, Sposato, Santoro, Edwards, Kutz, Kowalchuk, Lamay, and Gotsch, and that these Defendants all denied his requests. *Id.* ¶¶ 68–81. On the morning of September 29, 2011, a doctor came to Plaintiff's cell and, after examining him, determined that he was seriously injured and in need of immediate medical attention. *Id.* ¶ 82. Plaintiff was then transferred to an outside hospital, Westchester County Medical Center, where he was treated and later released. *Id.* ¶ 83. Plaintiff claims that he suffers from frequent migraines, "extreme debilitating back pain," loss of vision and a broken nose. *Id.* ¶ 84.

### II. Plaintiff has not Exhausted Administrative Remedies with Respect to his Eighth Amendment Deliberate Medical Indifference Claim

Plaintiff claims that Defendants violated his Eighth Amendment rights by using unnecessary and excessive force against him and by acting with "deliberate indifference or reckless disregard toward [his] serious medical needs by failing to take the steps necessary to ensure that [he] received treatment for his injuries." Am. Compl. ¶ 87. Defendants argue that Plaintiff's deliberate medical indifference claim should be dismissed because he failed to exhaust the administrative remedies

available under DOCCS' three-tiered Inmate Grievance Program ("IGP"). Specifically, Defendants argue that Plaintiff's grievance only alleged that he was assaulted by several officers at Green Haven, and did not include any allegations that Defendants were deliberately indifferent to his medical needs.

#### a. Prison Litigation Reform Act

The Prison Litigation Reform Act ("PLRA") "requires prisoners to exhaust prison grievance procedures before filing suit." *Jones v. Bock,* 549 U.S. 199, 202 (2007) (citations omitted). The PLRA's exhaustion requirement is "mandatory," *Porter v. Nussle,* 534 U .S. 516, 524 (2002), and " 'applies to all inmate suits about prison life.' " *Johnson v. Killian,* 680 F.3d 234, 238 (2d Cir.2012) (quoting *Porter,* 534 U.S. at 532). The Supreme Court has held that "the PLRA exhaustion requirement requires proper exhaustion." *Id.* (quoting *Woodford v. Ngo,* 548 U.S. 81, 93 (2007)) (internal quotation marks omitted). That is, "prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself." *Id.* (quoting *Jones,* 549 U.S. at 218).

**\*3** In New York, prisoners must exhaust each level of the three-tiered IGP. *Kasiem v. Switz,* 756 F.Supp.2d 570, 575 (S.D .N.Y.2010). Under the IGP, an inmate must: (i) file a complaint with the grievance clerk; (ii) appeal an adverse decision by the Inmate Grievance Resolution Committee ("IGRC") to the superintendent of the facility; and (iii) appeal an adverse decision by the superintendent to the Central Officer Review Committee ("CORC"). N.Y. Comp.Codes R. & Regs. ("NYCRR") tit. 7, § 701.5. The IGP regulations provide that an inmate must submit a complaint on an inmate grievance complaint form, or on plain paper if the form is not readily available. 7 NYCRR § 701.5(a)(1). The regulations further require that "the grievance ... contain a concise, specific description of the problem and the action requested." 7 NYCRR § 701.5(a) (2).

Although failure to exhaust is "an absolute bar to an inmate's action in federal court," *George v. Morrison–Warden,* No. 06 Civ. 3188(SAS), 2007 WL 1686321, at \*2 (S.D.N.Y. June 11, 2007), the Second Circuit has recognized three grounds for exceptions to the exhaustion requirement. *See Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). First, a court must ask "whether

administrative remedies were in fact 'available' to the prisoner." *Id.* (citation omitted). Second, a court must determine whether the defendant forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendant's own actions estop him from raising the affirmative defense of non-exhaustion. *Id.* Finally, if the court finds that administrative remedies were available to the plaintiff, and that the defendant is not estopped and has not forfeited his non-exhaustion defense, a court should consider whether any " 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Id.* (quoting *Giano v. Goord,* 380 F.3d 670, 676 (2d Cir.2004)).

### b. The Court May Consider Extrinsic Material Because Plaintiff was on Notice that Defendants' Motion to Dismiss Might be Converted to One for Summary Judgment and had the Opportunity to Submit Evidence Relevant to the Issue of Exhaustion

Defendants move to dismiss Plaintiff's deliberate indifference claim pursuant to Fed.R.Civ.P. 12(b)(6). Along with their moving papers, Defendants submit the declaration of Jeffery Hale, as well as a copy of the grievance Plaintiff filed at Marcy, numbered MCY–15928–12. *See* Doc. 68. On a Rule 12(b)(6) motion, a district court generally must confine itself to the four corners of the complaint and look only to the allegations contained therein. *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007). Accordingly, courts in this district have held that where non-exhaustion is clear from the face of a complaint, a court should dismiss the complaint under Rule 12(b)(6). *See Mateo v. Bristow,* No. 12 Civ. 5052(RJS), 2013 WL 3863865, at *3 (S.D.N.Y. July 16, 2013) (citing *Kasiem,* 756 F.Supp.2d at 575; *McCoy v.. Goord,* 255 F.Supp.2d 233, 251 (S.D.N.Y.2003)). However, where non-exhaustion is not clear from the face of the complaint, courts should convert a Rule 12(b) motion into a Rule 56 motion for summary judgment "limited to the narrow issue of exhaustion and the relatively straightforward questions about ... whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused." *Id.* (quoting *McCoy,* 255 F.Supp.2d at 251). Before converting a Rule 12(b)(6) motion into a Rule 56 motion, courts must notify the parties and "afford [them] the opportunity to present supporting material." *Id.* (quoting *Friedl v. City of New York,* 210 F.3d 79, 83 (2d Cir.2000)). Such notice and

opportunity are "especially important when a plaintiff is *pro se.*" *Id.* (quoting *McCoy,* 255 F.Supp.2d at 251).

**\*4** Here, non-exhaustion is not clear from the face of Plaintiff's complaint. Accordingly, the Court must convert the current motion to one for summary judgment and look to extrinsic evidence. Before converting the motion, however, the Court must determine whether Plaintiff has been given "unequivocal notice" of his obligation to submit evidentiary materials and an opportunity to do so. *See McCoy,* 255 F.Supp.2d at 255.

The Court finds that Plaintiff has been given both notice and opportunity. First, Defendants moved to dismiss specifically on the ground of failure to exhaust and notified Plaintiff that the Court might choose to treat the motion to dismiss as one for summary judgment, and that to oppose it, he would need to submit evidence, such as affidavits. Doc. 67 (Notice to Pro Se Litigant); *see Kasiem,* 756 F.Supp.2d at 575 (holding that formal notice of conversion was not necessary where defendants attached as exhibits to their motion the records they had of plaintiff's grievances and appeals and notified plaintiff that the court might treat the motion to dismiss as one for summary judgment and that plaintiff must therefore submit evidence to oppose the motion); *see also McCoy,* 255 F.Supp.2d at 255–56 (holding that formal notice was not necessary where defendants moved to dismiss specifically on the ground of exhaustion and where plaintiff directly addressed exhaustion in his opposition papers and referred the court to documentary evidence). Additionally, in his opposition papers, Plaintiff directly addresses the issue of exhaustion and refers the Court to documentary evidence, including a copy of Plaintiff's hospital records and "Special Watch Log Book # S1533," attached to his brief as exhibits. *See* Doc. 80. Accordingly, the Court finds that Plaintiff had "unequivocal notice" that the Court might convert Defendants' motion to dismiss to one for summary judgment and that Plaintiff had the opportunity to submit extrinsic materials pertinent to that issue.

### c. Plaintiff did not Exhaust Administrative Remedies with Respect to his Claim of Deliberate Indifference to his Medical Needs

Defendants argue that Plaintiff has not exhausted administrative remedies with respect to his claim of deliberate medical indifference because his grievance does not contain any allegations regarding Plaintiff's medical

care; rather, Plaintiff's grievance only alleges that he was subjected to excessive force by several of the Defendants. Accordingly, Defendants argue that Plaintiff's grievance failed to " 'alert[ ] the prison to the nature of the wrong for which redress is sought,' " thereby failing to afford it "time and opportunity to address [his] complaints internally before allowing the initiation of a federal case." *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004) (quoting *Porter,* 534 U.S. at 524–25; *Strong v. David,* 297 F.3d 646, 650 (7th Cir.2002)).

The Second Circuit has held that "a claim may be exhausted when it is closely associated with, but not explicitly mentioned in, an exhausted grievance, as long as the claim was specifically addressed in the prison's denial of the grievance and, hence, was properly investigated." *Percinthe v. Julien,* No. 08 Civ. 893(SAS), 2009 WL 2223070, at *4, *4 n. 9 (S.D.N.Y. July 24, 2009) (citing *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir.2009) (holding that the plaintiff's claim for denial of medical care was exhausted by a grievance alleging excessive force and retaliation, explaining, "while Espinal's grievance ... does not explicitly discuss the misconduct by medical personnel which is alleged in the complaint, it is clear that the State considered these allegations when reviewing Espinal's grievance," because denial of medical care was addressed in the grievance's denial)). Ultimately, the question for the Court is "whether [the] plaintiff's grievance sufficiently alerted prison officials that he was alleging some wrongdoing beyond" that alleged against the individual or individuals specifically named in the grievance. *Id.*

*5 Here, Plaintiff's grievance merely alleges that he was subjected to excessive force by Defendants Surprenant, Rodriguez, Tillotson, Brothers, Krein, and Kowalchuk;[4] it does not allege that Defendants were deliberately indifferent to Plaintiff's medical needs. *See* Hale Decl., Ex. A. Indeed, the *only* reference in the grievance to Plaintiff's medical care is his allegation that on September 29, 2011, he was taken to Westchester Medical Center "for a cat scan for [his] left eye and a broken nose." *Id.* The Court also notes that Plaintiff's subsequent communications with prison officials regarding his grievance failed to mention any allegations of deliberate indifference to Plaintiff's medical needs. For example, in a December 26, 2011 letter to DOCCS' employee Teri Thomas, Plaintiff refers to his grievance as a "grievance of assault." *Id.* Similarly, in a January 14,

2012 letter to Karen Bellamy, Director of the IGP, regarding the status of his grievance, Plaintiff states that he "was assaulted in Green Haven Facility on 9/27/11" and makes no mention of Defendants' alleged denials of his requests for medical care. *Id.* Moreover, the Court's review of Plaintiff's grievance file indicates that the State did not investigate Plaintiff's allegation of deliberate indifference.[5] Indeed, the grievance file contains memoranda specifically regarding the alleged use of force by only those Defendants actually named in Plaintiff's grievance. Accordingly, the Court finds that Plaintiff's grievance did not "sufficiently alert[ ] prison officials that [Plaintiff] was alleging some wrongdoing beyond" the allegation that he was subjected to excessive force by Defendants Surprenant, Kowalchuk, Brothers, Krein, Tillotson, and Rodriguez.

4       The grievance mistakenly refers to Defendants Krein, Kowalchuk and Surprenant as "Keran," "Wallchuck" and "Suprintnay," respectively.

5       As Defendants mention in their motion papers, a September 27, 2011 memorandum from Defendant Surprenant to Defendant Lee regarding the incident states that "RN Miller reported to PSU to conduct the medical exam of inmate Hilbert in the cell. Swelling to his left eye and a small abrasion on the right arm was reported on the medical exam. All injuries were deemed minor in nature and the inmate remained in MH–OB–004 on the 1 to 1 watch." Hale Decl., Ex. A. Defendant Surprenant's reference to Plaintiff's medical examination and status immediately following the alleged excessive use of force does not suggest that the State investigated Plaintiff's claim of deliberate indifference. Moreover, Defendant Surprenant's description of Plaintiff's medical exam by Defendant Miller would not put the State on notice of any potential allegations regarding Defendants' alleged refusal of Plaintiff's requests for medical care. Additionally, Plaintiff's grievance file includes the medical report by Defendant Miller, dated September 27, 2011, describing the nature of Plaintiff's injuries. That report, however, also does not suggest that the State investigated or considered Plaintiff's claim of deliberate indifference; nor would the report have put the State on notice of such a claim.

Moreover, the Court finds that none of the three exceptions to the exhaustion requirement articulated by the Second Circuit in *Hemphill,* 380 F.3d at 686, are applicable to Plaintiff's case. First, administrative remedies were clearly "available" to Plaintiff, as he filed

a grievance at Marcy on December 8, 2011, which was subsequently investigated by the Inspector General's Office. Hale Decl., Ex. A. Second, Defendants have not forfeited the affirmative defense of non-exhaustion, nor are they estopped from asserting it. Estoppel is found where "an inmate reasonably understands that pursuing a grievance through the administrative process will be futile or impossible." *Winston v. Woodward,* No. 05 Civ. 3385(RJS), 2008 WL 2263191, at *9 (S.D.N.Y. May 30, 2008) (citations omitted). As such, the Second Circuit has held that a plaintiff's non-exhaustion may be excused on the grounds of estoppel where the plaintiff was misled, threatened or otherwise deterred from fulfilling the requisite procedures. *Id.* (citing *Hemphill,* 380 F.3d at 688–89; *Ziemba v. Wezner,* 366 F.3d 161, 163–64 (2d Cir.2004)). Here, Plaintiff does not allege that Defendants improperly deterred him from filing a grievance regarding the alleged deliberate indifference, and the record does not evidence the existence of any such threats or misconduct on the part of Defendants.

**\*6** With respect to the third exception, the Second Circuit has held that "there are certain 'special circumstances,' " such as a reasonable misunderstanding of grievance procedures, "in which, though administrative remedies may have been available and though the government may not have been estopped from asserting the affirmative defense of non-exhaustion, the prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified." *Hemphill,* 380 F.3d at 689 (citations omitted). While Plaintiff does not specifically allege any "special circumstances" justifying his failure to exhaust administrative remedies, he states in his opposition papers that he "was told that his grievance was untimely" when he attempted to file it at Marcy, and that he believed he had "taken all the proper steps" by filing a complaint "with risk management at CNYPC [Central New York Psychiatric Center] for the excessive force claim and medical negligence." Pl.'s Affirmation in Support of Motion (Doc. 78); *see also* Pl.'s Mem. L. Opp. 6 (stating that Plaintiff filed a complaint concerning his "medical issues" with the risk management office at CNYPC on October 14, 2011). In light of its obligation to interpret Plaintiff's submissions as raising the strongest arguments that they suggest, *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006), the Court will treat Plaintiff's argument regarding his failure to exhaust administrative remedies as a request to excuse his non-exhaustion under the third *Hemphill* exception.

A review of the grievance file indicates that Plaintiff remained at Green Haven until October 13, 2011, where he was in a psychiatric observation cell in the Mental Health Unit and did not have access to any writing tools. Hale Deck, Ex. A. Plaintiff was then transferred to CNYPC, where he claims to have filed a complaint with "risk management." *Id.* After Plaintiff returned to Marcy on December 8, 2011, his grievance regarding the September 27, 2011 assault was rejected as untimely. *Id.* However, after prison officials confirmed that Plaintiff did not have access to the grievance process while at Green Haven and determined that he had shown "mitigating circumstances," Plaintiff's grievance was filed at Marcy on January 27, 2012. *Id.* Accordingly, the record indicates that despite initially being informed that his grievance was untimely, Plaintiff was ultimately permitted to file his grievance upon his return to Marcy.

Moreover, to the extent that Plaintiff argues that his attempt to file a complaint while at CNYPC constitutes a "special circumstance" justifying his failure to exhaust administrative remedies, the Court disagrees. First, Plaintiff failed to provide the Court with a copy of the complaint that he allegedly filed at CNYPC, and the declaration of Jeffery Hale, Assistant Director of the IGP for DOCCS, states that after conducting a "diligent search for grievances and appeals filed by [Plaintiff] based on grievances filed at the facility level," Mr. Hale determined that Plaintiff "did not file a grievance alleging that defendants were deliberately indifferent to his medical needs while at Green Haven in September 2011." Hale Decl. ¶ 10. Plaintiff's unsupported allegation that he filed a grievance at CNYPC is insufficient to withstand a motion for summary judgment. *See Santiago v. Murphy,* No. 08 Civ.1961(SLT), 2010 WL 2680018, at *2–*3 (E.D.N.Y. June 30, 2010) (dismissing complaint where declarations submitted by defendant stated that there was "no record of any grievance" for the alleged incident and holding that plaintiff's unsupported allegation that he filed a grievance is insufficient to withstand a motion for summary judgment). Second, even assuming that Plaintiff did file a complaint with the risk management office at CNYPC, that complaint was clearly not exhausted. The IGP requires that inmates file grievances "with an IGP clerk." 7 NYCRR § 701.2(a); *see also id.* §§ 701.4(g), 701.5. Accordingly, Plaintiff's complaint to the risk management office was not properly filed. Additionally, Plaintiff does not assert that he appealed from the

denial of that grievance, nor is there any record of such appeal. *Santiago,* 2010 WL 2680018, at *3. Finally, even if at the time of allegedly filing his complaint at CNYPC Plaintiff misunderstood the grievance procedure, his failure to exhaust administrative remedies would still not be justified. Upon his return to Marcy, Plaintiff clearly had an understanding of the grievance procedure sufficient enough to allow him to properly file a grievance regarding the excessive force allegation in accordance with the IGP. Plaintiff has provided the Court with no explanation to justify his failure to include in that grievance the allegation regarding Defendants' alleged deliberate indifference to his medical needs. Accordingly, as the record establishes that Plaintiff is aware of and has shown that he is capable of following the correct grievance procedure, the Court finds that he has failed to demonstrate the existence of "special circumstances" sufficient to excuse his non-exhaustion.[6] *See Kasiem,* 756 F.Supp.2d at 577–78 (holding that the plaintiff failed to demonstrate the existence of "special circumstances" justifying his non-exhaustion where he had previously shown that he was capable of following the correct grievance procedure).

[6]     The Court notes that the exhibits attached to Plaintiffs' opposition papers, which include a copy of Plaintiff's hospital records and "Special Watch Log Book # S1533," do not compel a different outcome, as they do not go to the issue of exhaustion.

**\*7** The Court therefore finds that Plaintiff has failed to exhaust administrative remedies with respect to his deliberate medical indifference claim and that none of the three exceptions to the exhaustion requirement apply. Where a claim is dismissed for failure to exhaust administrative remedies, dismissal without prejudice is appropriate if the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Prisoners have 21 days from the date of the alleged occurrence to initiate the first formal step of the IGP, subject to exceptions "based on mitigating circumstances." 7 NYCRR §§ 701.5(a)(1), 701.6(g)(1)(i)(a). However, an exception to the time limit may not be granted if the request is made more than 45 days after the alleged occurrence. 7 NYCRR § 701.6(g) (1) (i)(a). Accordingly, because the time to both file a grievance and request an exception to the time limit has long expired, and because Plaintiff has not offered any reason for his delay in filing a grievance with respect to his deliberate indifference claim, the claim is dismissed

with prejudice.[7] *See Santiago,* 2010 WL 2680018, at *3 (dismissing complaint with prejudice because "[a]ny grievance or appeal would now be untimely under 7 NYCRR § 701.5, and the time limit for seeking an exception to the time limitations under 7 NYCRR § 701.6 has also passed"); *see also Bridgeforth v. Bartlett,* 686 F.Supp.2d 238, 240 (W.D.N.Y.2010) (dismissing complaint with prejudice where the time limits for plaintiff to file an administrative appeal had long since passed and plaintiff did not allege "any facts excusing his failure to exhaust").

[7]     The Supreme Court has held that the PLRA does not require dismissal of an entire complaint when a prisoner has failed to exhaust some, but not all, of the claims included in the complaint. *Jones,* 549 U.S. at 223–24. Accordingly, although the Court finds that Plaintiff's deliberate indifference claim should be dismissed for non-exhaustion, his remaining exhausted claims may proceed.

#### d. Fischer and Lee are Dismissed as Defendants

Defendants move in the alternative to dismiss the Amended Complaint against Defendants Fischer and Lee. Plaintiff's sole allegation with respect to these Defendants relates exclusively to his deliberate medical indifference claim. *See* Am. Compl. ¶ 5. Accordingly, because the Court finds that Plaintiff has failed to exhaust administrative remedies with respect to his deliberate indifference claim, Defendants' motion to dismiss with respect to Defendants Fischer and Lee is granted.

Moreover, to the extent that Plaintiff seeks to hold Defendants Fischer and Lee liable for his excessive force claim, that claim is also dismissed against them. Case law is clear that supervisors may not be held vicariously liable for their subordinates' violations. *See Rahman v. Fisher,* 607 F.Supp.2d 580, 584–85 (S.D.N.Y.2009). It is therefore "well settled" that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Id.* at 585 (citation omitted). Neither the factual allegations contained in the Amended Complaint nor the grievance file submitted by Defendants indicate that Defendants Fischer or Lee were "personally involved" in the alleged violation, either by directly participating in it or by failing to stop it. Although a review of Plaintiff's grievance file indicates that Defendant Lee received a memorandum from Defendant Surprenant regarding the

alleged excessive use of force, case law is clear that "[a]fter the fact notice of a violation of an inmate's rights is insufficient to establish a supervisor's liability for the violation." *Id.*

### III. Conclusion

**\*8** For the reasons set forth above, Defendants' partial motion to dismiss is GRANTED. Accordingly, Plaintiff's First Cause of Action for Deliberate Indifference to an Inmate's Medical Needs in Violation of the Eighth and Fourteenth Amendments is DISMISSED with prejudice. [8] The only remaining claims are those for unnecessary and excessive use of force in violation of the Eighth Amendment; violations of the Americans with Disabilities Act; and violations of the Rehabilitation Act. The only remaining Defendants in this action are Surprenant, Tillitson, Brothers, Krein, Kowalchuk, and Rodriguez.

[8]  Although Defendants Santoro, Krein and Rodriguez did not join in Defendants' partial motion to dismiss, because the Court finds that Plaintiff failed to exhaust administrative remedies with respect to his deliberate medical indifference claim, that claim is dismissed as to those Defendants as well.

The Clerk of the Court is respectfully directed to terminate the motions. Docs. 65, 77. The parties are directed to appear for a status conference on October 2, 2013 at 9:30 am.

It is SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 4774731

---

End of Document                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 815724
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Frank BROWN, Plaintiff,
v.
Thomas G. EAGEN, et al., Defendants.

No. 9:08–CV–0009 (TJM/DRH).
|
March 26, 2009.

West KeySummary

1    **Civil Rights**

       🔑 Prisons and Jails;Probation and Parole

       An inmate's § 1983 claims of deliberate
       indifference to his serious medical needs
       were so fantastic or incredible that they
       were dismissed as factually frivolous. The
       inmate alleged that prison officials gave him
       a "medical resource drink" that contained
       blood and feces, intentionally infected him
       with Hepatitis A and H. Pylori and denied
       testing and treatment. The inmate also alleged
       that the prison officials were working with
       Spanish inmates to contaminate his food
       tray with blood, urine, semen, and chemicals.
       Further, the inmate failed to allege a tangible
       connection between the acts of any of the
       prison officials and any injuries he suffered. 42
       U.S.C.A. § 1983.

       Cases that cite this headnote

**Attorneys and Law Firms**

Frank Brown, pro se.

Hon. Andrew M. Cuomo, New York State Attorney
General, Richard Lombardo, Esq., Assistant Attorney
General, of Counsel, for Represented Defendants.

**MEMORANDUM–DECISION and ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. Introduction**

 **\*1** Plaintiff Frank Brown commenced this action *pro se*
pursuant to 42 U.S.C. § 1983 ("Section 1983") alleging
that Defendants violated his rights under the United
States Constitution. Dkt. No. 1 (Comp.). Plaintiff seeks
substantial monetary relief.

Reading Plaintiff's Complaint liberally, Plaintiff claims
that Defendants conspired and retaliated against him
for filing grievances; denied him access to the courts
by interfering with his legal mail; were deliberately
indifferent to his serious medical needs; failed to protect
him from known harm; subjected him to excessive force;
conspired against Plaintiff; and denied him due process,
all in violation of his rights under the First, Fifth,
Eighth, and Fourteenth Amendments to the United States
Constitution.

Presently before the Court is Defendants' Motion to
Dismiss the Complaint pursuant to FED. R. CIV. P.
12(b)(1) and (6). Dkt. No. 50. Plaintiff has responded in
opposition to the Motion. Dkt. No. 65. For the following
reasons, Defendants' Motion to Dismiss is granted.

**II. Standard of Review**

A motion to dismiss pursuant to Rule 12(b)(6) may not be
granted so long as plaintiff's complaint includes "enough
facts to state a claim to relief that is plausible on its
face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544,550
U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007);[1]
cf. *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007)
(recognizing that the Supreme Court "is not requiring
a universal standard of heightened fact pleading, but is
instead requiring a flexible 'plausibility standard,' which
obliges a pleader to amplify a claim with some factual
allegations in those contexts where such amplification is
needed to render the claim *plausible."* ). The pleading of
specific facts is not required; rather a complaint need only
give the defendant "fair notice of what the ... claim is
and the grounds upon which it rests." *Erickson v. Pardus,*
551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081
(2007). The court must accept the material facts alleged
in the complaint as true. *Cooper v. Pate,* 378 U.S. 546, 84

S.Ct. 1733, 12 L.Ed.2d 1030 (1964) (per curiam)); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005). In determining whether a complaint states a cause of action, great liberality is afforded to pro se litigants. *Platsky v. Central Intelligence Agency,* 953 F.2d 26, 28 (2d Cir.1991) (citation omitted).

1    The Supreme Court, in *Bell Atlantic Corp.,* rejected the standard of review previously applied-namely, that "it appears beyond a doubt that plaintiff can prove no set of facts in support of his claim that would entitle him to relief"—and replaced the "no set of facts" language with the requirement that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." *Id.* at 1974.

For purposes of a Rule 12(b)(6) motion, the "complaint" includes any written instrument attached to the complaint and any statements or documents incorporated into it by reference. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002); *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 674 (2d Cir.1995) (citations omitted). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers,* 282 F.3d at 153 (citation omitted). The Court may also consider "matters of which judicial notice may be taken." *Kowalyshyn v. Sobieski,* 3:07–CV–687, 2008 WL 1924973, at *1 (D.Conn. Apr.30, 2008).

### III. Facts

**\*2**  The facts are related as alleged by Plaintiff in his complaint. Dkt. No. 1 (Comp.).

### A. First Cause of Action

On November 4, 2004, Defendants Burge and Bellnier failed to protect Plaintiff when they did "nothing to stop" Spanish inmates from contaminating Plaintiff's food tray "by putting ketchup that was sealed and called LA–BINE–YA, which is sealed ketchup with blood inside" and by "paying black porters with drugs and money to let them violate [Plaintiff's] food trays with sperm and blood and chemicals." Comp. at 11. Plaintiff's mail was constantly tampered with at Auburn Correctional Facility by the spanish inmates and, as a result, his grievances and complaints, including a letter to the FBI which included a sample of the ketchup, were never delivered. Comp. at 11–12. Plaintiff's mail was tampered with "to prevent

[Plaintiff] from contacting anyone [to] let them know that all the murders of [his] whole family was done by spanish inmates at Great Meadow from Oct, 2006, until Nov, 2007." Comp. at 12. Defendants Burge and Bellnier are "responsible for massive corruption at Auburn from 9/17/2004 until 3/8/2005, so they are responsible for all corrupt acts committed" against Plaintiff. Comp. at 13, 33.

### B. Second Cause of Action

On December 29, 2004, spanish officers gave out Plaintiff's personal information to "their spanish people." Comp. at 13. The sharing of Plaintiff's personal information began in 1999 when he was at Southport, and since then "all spanish inmates have been able to get all information at will." Comp. at 13. John Burge, Glenn Goord, and Lucien J. LeClaire were made aware of all of these "criminal acts by many spanish inmates and officers" but did nothing to protect Plaintiff's federal rights. Comp. at 13, 33–34.

### C. Third Cause of Action

On January 1, 2005 Defendants Nurse Smith [2] and Sergeant Nipper retaliated against Plaintiff because of the many grievances Plaintiff had filed against "medical and officers." Comp. at 13–14. Nurse Smith and Sergeant Nipper gave Plaintiff "an infected medical resource drink with feces and blood inside of it." Comp. at 14. Nurse Smith was very nervous when she came to Plaintiff's cell on that day "[b]ecause some one put her up to this ... [and it] was done in retaliation for the many grievances and complaints" that Plaintiff was writing. Comp. at 14, 34.

2    Nurse Smith has not been served and has not appeared in this action.

### D. Fourth Cause of Action

Nurse Smith and Sergeant Nipper gave Plaintiff an "infected medical resource drink with feces and blood inside of it." Comp. at 14. Defendants were deliberately indifferent to Plaintiff's serious medical needs and to his safety in violation of the Eighth Amendment. Comp. at 14, 35.

### E. Fifth Cause of Action

On January 6, 2005, Defendant Burge was involved in a "massive conspiracy" with Southport Superintendent Michael McGinnis, who is **not a defendant** in this action,

to keep Plaintiff "on mental health level one" and medicated so as to prevent Plaintiff from pursuing his legal actions in Federal Court and exposing the massive conspiracy. Comp. at 15. Burge and McGinnis knew each other because they had previously worked together at Southport. Comp. at 15. Plaintiff was put on mental health level one and transferred to Auburn "to be silenced at all costs." Comp. at 15. Plaintiff has "no mental health problems or issues at all." Comp. at 15. Burge's actions violated Plaintiff's right to due process in violation of the Fourteenth Amendment. Comp. at 35.

### F. Sixth Cause of Action

**\*3** On January 12, 2005, Defendants Robinson, Laux, Wright, LeClaire, Goord, Burge, Bellnier, Meyers, Nurse Smith, Officer Smith, and Sergeant Nipper violated Plaintiff's "constitutional rights to be free from infections." [3] Comp. at 15. Plaintiff was infected with the hepatitis A virus and then denied medical treatment. Comp. at 16. All of the staff prevented Plaintiff from being tested for hepatitis to prevent the ongoing conspiracy from being exposed. Comp. at 16. Plaintiff advised "all staff at Central Office" of this problem but they did nothing at all. Comp. at 16. Defendants were deliberately indifferent to Plaintiff's serious medical needs and to his safety in violation of the Eighth Amendment. Comp. at 36.

[3]    Defendants Robinson and Correctional Officer Smith have not been served and have not appeared in this action.

### G. Seventh Cause of Action

On January 18, 2005, Defendants Eagan, Bellamy, and Burge denied Plaintiff "access to the open tank cells." Comp. at 16. All Defendants are to blame for this discrimination because they "all had the opportunity to correct this policy that discriminated against [Plaintiff]." Comp. at 16. Defendants' actions were retaliatory in violation of Plaintiff's First Amendment rights. Comp. at 37.

### H. Eighth Cause of Action

On January 23, 2005, Defendants Meyers and Toomey denied Plaintiff his right to "medical help" by destroying a paper instructing Plaintiff not to eat any food in preparation for a blood test. Comp. at 17. LeClaire, Goord, Eagen, and Bellamy "are all responsible also

because they did nothing and knew of all crimes being done to [Plaintiff] many times." Comp. at 17. Defendant Wright is also responsible because it was "his duty to stop crimes against [Plaintiff] for massive infections." Comp. at 17. Defendants were deliberately indifferent to Plaintiff's serious medical needs and safety in violation of the Eighth Amendment. Comp. 38.

### I. Ninth Cause of Action

On January 26, 2006, Defendant Nurse Vega, who is spanish, destroyed the test results from Plaintiff's stool sample to cover up the conspiracy by spanish inmates and corrupt officers. Comp. at 18. Defendant was deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment. Comp. at 38.

### J. Tenth Cause of Action

On January 27, 2005, in retaliation for Plaintiff's filing grievances, Defendant Rizzo gave Plaintiff tuna fish with "sperm in it." Comp. at 18–19. Plaintiff wrote many grievances against Defendant Rizzo. Comp. at 19. Defendant retaliated against Plaintiff in violation of his First Amendment rights. Comp. at 39.

### K. Eleventh Cause of Action

On January 30, 2005, Defendant Meyers denied Plaintiff access to the courts "by destroying [Plaintiff's] free legal postage mail," including his Article 78 motions. Comp. at 19–20. Defendant Meyers also destroyed many of Plaintiff's grievances. Comp. at 20. Meyers is the officer "who almost always picks up the mail." Comp. at 20. Defendant Meyers denied Plaintiff access to the Courts in violation of his First Amendment rights. Comp. at 39.

### L. Thirteenth Cause of Action [4]

[4]    Plaintiff's Complaint does not include a Twelfth Cause of Action. *See* Comp. at 39–40.

**\*4** On February 1, 2005, Defendants Rizzo, Correctional Officer Smith, Portney, Nurse Smith, Sergeant Nipper, and D. Meyers infected Plaintiff with "a life time virus called Hepatitis A" because Plaintiff filed many grievances against them and other correctional staff. Comp. at 21. Defendants subjected Plaintiff to cruel and unusual punishment and were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Comp. at 40.

### M. Fourteenth Cause of Action

On February 2, 2005, Plaintiff was infected with H. Pylori from the drinking water. Comp. at 21. Defendant Burge, "being the chief person at Auburn in 2004 and 2005 is responsible for [Plaintiff's] well-being." Comp. at 22. Defendant Laux refused to have Plaintiff's blood tested. Comp. at 22. Both Defendants Burge and Laux knew that Plaintiff was "bleeding inside from the drinking water" but did nothing. Comp. at 22. Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Comp. at 40–41.

### N. Fifteenth Cause of Action

On February 10, 2005, Defendants Eagen, Bellamy, and Burge denied Plaintiff the right to petition the government without retaliation or reprisals "because the grievance program is not fair and effective." Comp. at 22. Plaintiff has been "infected in every prison ... most likely by chemicals, sperm, blood by officers, sergeants, medical staff and spanish inmate agents. [He] has been given three (3) life time viruses of Hepatitis A, Herpes and H pyloria. Plus massive infections in [his] stomach, throat and head for only using the grievance programs." Comp. at 23. "The whole corrupt Great Meadow murdered [Plaintiff's] whole family for only using the grievance program." Comp. at 24. Plaintiff was denied due process under the Fourteenth Amendment. Comp. at 42.

### O. Sixteenth Cause of Action

On February 23, 2005, Defendants Burge, Bellnier, Nurse Smith, Officer Smith, Portney, Rizzo, Putman, Toomey, LeClaire, Wright, Eagen, Bellany, Laux, Robinson, Vega, Nipper, Meyers, and Goord all conspired with each other to infect Plaintiff with chemicals and to retaliate against him. Comp. at 25. Goord, Wright, LeClaire, Eagen, and Bellamy were all from the Central Office and therefore "in a position to stop all crimes being committed against [Plaintiff] but did nothing." Comp. at 25. Plaintiff claims that no white prisoners would be treated like this, only black prisoners, because there is "class-based discriminatory animus behind this massive conspiracy." Comp. at 25. Plaintiff states that

> [t]his massive conspiracy is from prison to prison with massive criminal acts of

food tampering, mail tampering, property destruction, assaults, conspiracy to murder, attempted murders, massive infections, retaliation and murders of [Plaintiff's] whole family also. This is the biggest conspiracy in the history of United States. Plus using mental health to help [them] cover-up massive federal crimes.

**\*5** Comp. at 26. Plaintiff claims that Defendants conspired against him in violation of 42 U.S.C. § 1985(3).

### P. Seventeenth and Eighteenth Causes of Action

On February 27, 2005, Defendants Portney and Correctional Officer Smith assaulted Plaintiff "by putting the black strap on [him] at sick call because nurse Androsko told the officers" to get Plaintiff out of there. Comp. at 27. When Plaintiff returned to his cell, Plaintiff put his hands out of the food slot and "all officers which [he] didn't put on this lawsuit because [he] is extremely indigent ... pulled [Plaintiff's] hands and arms very hard trying to break them and [Plaintiff's] wrists also plus [his] back was in extreme pain." Comp. at 27–28. Plaintiff alleges that he was subjected to excessive force in violation of the Eighth Amendment. Comp. at 44–46.

### Q. Nineteenth Cause of Action

On February 28, 2005, Defendant Putnam told Plaintiff that he will remember Plaintiff till the day Plaintiff died and then threatened to give Plaintiff food and water infected with feces, urine, and sperm. Comp. at 28–29. Putnam's actions were in retaliation for Plaintiff filing grievances in violation of the First Amendment. Comp. at 29, 47.

### R. Twentieth Cause of Action

On February 28, 2005, Officer Toomey tampered with Plaintiff's food tray by pouring some sort of liquid all over everything. Comp. at 29–30. Toomey planned this with Defendant Putnam. Comp. at 30. Plaintiff alleges that Defendants actions were retaliatory in violation of the First Amendment. Comp. at 48–49.

### S. Twenty-first Cause of Action

On March 1, 2005, Defendant Rizzo contaminated Plaintiff's water with chemicals "that put pain in [Plaintiff's] side." Comp. at 30. Many times Defendant Officer Smith put feces and sperm in Plaintiff's hot water. Comp. at 31.

### T. Twenty-second Cause of Action

Plaintiff was in the Auburn Special Housing Unit (SHU) from October 30, 2004 until March 7, 2005 under conditions that were an "atypical and significant hardship [and] a deprivation of a liberty interest." Comp. at 31. During this period of SHU incarceration, he was infected with two or maybe three "life time viruses." [5] Comp. at 31. Plaintiff alleges that he "was entitled to be free from all infections, crimes against [him] in SHU at Auburn." Comp. at 50. Plaintiff claims that he was deprived of due process. Comp. at 50.

[5]     Plaintiff was placed in SHU after he "stabbed spanish inmate Rodriguez on October 30, 2005. Comp. at 32. Plaintiff says that he stabbed Rodriguez because Defendants had failed to stop the "corruption and breaches of security" that Plaintiff had been subjected to. Comp. at 32.

### IV. Defendants' motion to dismiss

Defendants argue that Plaintiff's Complaint should be dismissed because: (1) the Complaint fails to state a claim pursuant to 42 U.S.C. § 1983; (2) Defendants are entitled to qualified immunity; and (3) the First, Second, Third and Fourth causes of action are barred by the applicable statute of limitations. Dkt. No. 50.

### V. Discussion

#### A. Statute of limitations

The applicable statute of limitations for Section 1983 actions arising in New York requires claims to be brought within three years. Pinaud v. County of Suffolk, 52 F.3d 1139, 1156 (2d Cir.1995) (citing Owens v. Okure, 488 U.S. 235, 250–51, 109 S.Ct. 573, 582, 102 L.Ed.2d 594 (1989); Eagleston v. Guido, 41 F.3d 865, 871 (2d Cir.1994)).

**\*6** Defendants assert that Plaintiff's action was filed with the Court on January 4, 2008, and that therefore Plaintiff's first, second, third, and fourth causes of action should be dismissed as time-barred. Dkt. No. 50–2, Memorandum of Law at 26. However, because Plaintiff is an inmate, his

pleading is deemed "filed" when it is delivered to prison officials. Dory v. Ryan, 999 F.2d 679, 682 (2d Cir.1993); Pritchard v. Kelly, 9:98–CV–0349, 2000 WL 33743378, at \*2 n. 2 (N.D.N.Y. Oct.3, 2000) (Sharpe, M.J.). The date the plaintiff signed the complaint is presumed to be the date the plaintiff gave the complaint to prison officials to be mailed. Mingues v. Nelson, 96–CV–5397, 2004 WL 324898, at \*3 (S.D.N.Y. Feb.20, 2004). In this case, Plaintiff signed his Complaint on December 25, 2007. Comp. at 52. Accordingly Plaintiff may not prevail on any claims asserted in his Complaint which occurred prior to December 25, 2004.

Plaintiff's first cause of action asserts allegations against Defendants Burge and Bellnier concerning wrongdoing that occurred on November 4, 2004, **but also alleges** that Burge and Bellnier were "responsible for massive corruption at Auburn from September 17, 2004 continuing **until March 8, 2005.** Comp. at 11–13. The alleged wrongdoing in Plaintiff's second, third, and fourth causes of action occurred, if at all, on December 29, 2004 and January 4, 2008. Accepting Plaintiff's allegations as true, the Court cannot conclude at this juncture that the allegations set forth in the first through fourth causes of action are time-barred. [6] Defendants' Motion to Dismiss portions of Plaintiff's Complaint as untimely is denied **without prejudice.**

[6]     The sufficiency of Plaintiff's allegations will be discussed below.

#### B. Personal Involvement

To state a viable claim under Section 1983, a plaintiff must allege that the defendant, while acting under color of state law, deprived him of a right, privilege or immunity secured by the Constitution or by the laws of the United States. See 42 U.S.C. § 1983. The personal involvement of a defendant is a prerequisite for the assessment of damages in a Section 1983 action, McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977), and the doctrine of respondeat superior is inapplicable to Section 1983 claims. Polk County v. Dodson, 454 U.S. 312, 325, 102 S.Ct. 445, 453, 70 L.Ed.2d 509 (1981); Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.1973). "Further, a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " Austin v. Pappas, No. 04–CV7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar.31, 2008) (citing Bass v. Jackson, 790 F.2d 260, 263 (2d Cir.1986) (other citation omitted). Any complaint that fails to allege

personal involvement is "fatally defective on its face." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987) (internal quotations and citations omitted).

A defendant is "personally involved" if he or she "directly participated in the infraction." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Also, a defendant in a supervisory capacity may be "personally involved" within the meaning of Section 1983 if the state actor (1) failed to remedy the wrong after learning of the violation through a report or appeal; (2) created or continued a custom or policy under which unconstitutional practices ensued; or (3) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

**\*7** Plaintiff has named supervisory personnel as Defendants and attempts to hold them liable for alleged violations of his rights by Department of Corrections employees. Plaintiff alleges, among other things, that Burge and Bellnier failed to stop "breaches of security" including spanish inmates from giving Plaintiff ketchup contaminated with blood (Comp. at 11–12); Burge, Goord, and LeClaire did nothing to stop "the spanish population" from tampering with Plaintiff's food and mail and disseminating Plaintiff's personal information (Comp. at 13); Burge was involved in a "massive conspiracy" to keep Plaintiff on mental health status and medicated (Comp. at 15); Wright, LeClaire, Goord, Burge, and Bellnier and "all staff at Central Office were made aware of all infections and did nothing at all" (Comp. at 15–16); LeClaire, Goord, Eagan, Bellamy, and Wright are responsible for Plaintiff's injuries because "they did nothing and knew of all crimes being done to [Plaintiff]" and did not stop the crimes or the "massive infections" (Comp. at 17). Plaintiff's vague allegations that he let the supervisory Defendants and all Central Office staff know about the conspiracy and crimes against him is insufficient to provide the type of notice that would have required these Defendants to act. Moreover, none of these Defendants can be held personally liable merely because they were in a high position of authority. *See Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) ("[P]laintiff's claim for monetary damages against [the Commissioner] requires a showing of more than linkage in the prison chain of command.").

The Court has reviewed the Complaint in its entirety and afforded it great liberality but is unable to find any allegations to suggest that any of the supervisory Defendants—Burge, Goord, LeClaire, Bellnier, Wright, Eagan, or Bellamy—were personally involved or directly participated in any violation of Plaintiff's civil or constitutional rights. *See Johnson,* 481 F.2d at 1034 (when monetary damages are sought under Section 1983, the general doctrine of respondeat superior does not suffice and a showing of personal responsibility is required). Defendants Burge, Goord, LeClaire, Bellnier, Wright, Eagan, and Bellamy are **dismissed without prejudice.** [7]

[7]     As discussed below, even if Plaintiff could sufficiently allege personal involvement by these Defendants, Plaintiff has failed to state any claim which would entitle him to relief under Section 1983.

### C. Failure to State a Claim

A court may dismiss an *in forma pauperis* complaint if it determines that the complaint is frivolous. *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 1833, 104 L.Ed.2d 338 (1989). "An action is frivolous when either: (1) the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir.1998) (internal quotations omitted) (citing *Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990) (per curiam) (quoting *Neitzke,* 490 U.S. at 327, 109 S.Ct. at 1833)).

**\*8** A complaint is factually frivolous if the facts alleged are clearly baseless, a category that includes allegations that are fanciful, fantastic, and delusional. *Denton v. Hernandez,* 504 U.S. 25, 32–33, 112 S.Ct. 1728, 1733, 118 L.Ed.2d 340 (1992) (citing *Neitzke,* 490 U .S. at 325–28, 109 S.Ct. at 1833). "[A] finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them." *Denton,* 504 U.S. at 33, 112 S.Ct. at 1733. A complaint is based on an "indisputably meritless" legal theory when either the claim lacks an arguable basis in law, *Benitez v. Wolff,* 907 F.2d 1293, 1295 (2d Cir.1990) (per curiam), or a dispositive defense clearly exists on the face of the complaint. *See Pino v. Ryan,* 49 F.3d 51, 53 (2d Cir.1995). Although the Court must accept the truth of Plaintiff's allegations on a motion to dismiss, the federal *in forma pauperis* statute grants the Court "the unusual power to pierce the veil of the complaint's

factual allegations and dismiss those claims whose factual allegations are clearly baseless." *Neitzke,* 490 U.S. at 327, 109 S.Ct. at 1833.

Moreover, the law in this Circuit clearly provides that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Hunt v. Budd,* 895 F.Supp. 35, 38 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) (other citations omitted)); *Pourzandvakil v. Humphry,* 94–CV–1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.) (citation omitted).

### 1. Eighth Amendment
The Eighth Amendment prohibits cruel and unusual punishment which encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290– 91, 50 L.Ed.2d 251 (1976) (citations and quotations omitted). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement—the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (quoting *Wilson v. Seiter,* 501 U.S. 294, 297–98, 111 S.Ct. 2321, 2323–24, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.). Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979.

*9 Plaintiff alleges multiple violations of his Eighth Amendment rights. Plaintiff claims that Defendants were deliberately indifferent to his health and safety because they purposely infected him with and then denied him treatment for three "life-time" viruses, served him contaminated food, and subjected him to excessive force.

#### a. Medical claims
Generally, to prevail on a claim of inadequate medical care under the Eighth Amendment, a plaintiff must show two things: (1) that the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 290–91. Mere disagreement with prison officials about what constitutes appropriate medical care does not state a cognizable claim under the Eighth Amendment. *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.1992). Prison officials have broad discretion in determining the nature and the character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Id.* at 45 (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986); *Jackson v. Fair,* 846 F.2d 811, 817–18 (1st Cir.1988)). "Further, a delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Thomas v. Nassau County Correctional Center,* 288 F.Supp.2d 333, 339 (E.D.N.Y.2003) (citation omitted). "The Second Circuit has 'reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years.' " *Thomas,* 288 F.Supp.2d at 339 (citing *Espinal v. Coughlin,* 98 Civ. 2579, 2002 WL 10450, at *3 (S.D.N.Y. Jan.3, 2002)). Even if a prisoner is able to establish delay, in order to establish deliberate indifference, he must also show that his condition became worse or deteriorated as a result of the delay. *Thomas,* 288 F.Supp.2d at 339.

Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs when they gave him a "medical resource drink" containing blood and feces (fourth cause of action); intentionally infected him with Hepatitis A and then denied testing and medical treatment for the disease (sixth and thirteenth causes of action); infected him with H. Pylori (fourteenth cause of action); and served Plaintiff water intentionally contaminated with

chemicals (twenty-first cause of action). Plaintiff also alleges that the supervisory Defendants allowed spanish inmates and corrupt correctional officers to contaminate his food tray with blood, semen, urine, and chemicals. These allegations are so fantastic or incredible as to be factually frivolous. Moreover, with respect to the sixth, thirteenth, and fourteenth causes of action, Plaintiff has failed to allege a tangible connection between the acts of any of the Defendants named in those causes of action and the injuries suffered by Plaintiff. Accordingly, Plaintiff's fourth, sixth, thirteenth, fourteenth, and twenty-first causes of action are dismissed **without prejudice.**

**\*10** Plaintiff also alleges that he was unable to have his blood tested on January 23, 2005 because Defendants Meyers and Toomey destroyed the paper instructing Plaintiff to fast before the test (eighth cause of action). Finally, Plaintiff alleges that on January 26, 2005, Defendant Vega destroyed the results from Plaintiff's stool sample to cover up the conspiracy by spanish inmates and officers (ninth cause of action). Plaintiff does not, however allege that any of these actions resulted in a delay in treatment which was life-threatening or that Plaintiff was ultimately denied medical treatment because of these acts. *See, e.g. Amaker v. Coombe,* No. 96 Civ. 1622, 2002 WL 523388, at \*8 (S.D.N.Y. Mar. 29, 2002) ("delay in treatment does not automatically indicate a violation of a prisoner's Eighth Amendment rights, 'unless the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.' "). Moreover, Plaintiff's claims against Defendants Meyers, Toomey, and Vega when read in their entirety are, as all of Plaintiff's claims in this Complaint, factually frivolous. Plaintiff alleges that the actions of these Defendants were part of the massive conspiracy to deliberately infect Plaintiff with viruses and then deny him proof that he had such viruses or treatment for the viruses. Plaintiff's eighth and ninth causes of action are also **dismissed without prejudice.**

### b. Food contamination

In the context of Eighth Amendment protections, prisoners are to be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (citation

omitted); *see also Lunney v. Brureton,* No. 04 Civ. 2438, 2005 WL 121720, at \*6 (S.D.N.Y. Jan.21, 2005). Consequently, "[d]epriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment." *Moncrieffe v. Witbeck,* No. 97–CV–253, 2000 WL 949457, at \*6 (N.D.N.Y. June 29, 2000) (citing *Robles v. Coughlin,* 725 F.2d at 15). However, as with most of his medical claims, Plaintiff's allegations that his food was contaminated with blood (sealed in packaged ketchup); feces; urine; semen; and chemicals are so conclusory and fantastic as to rise to the level of factually frivolous. Accordingly, these allegations are dismissed **without prejudice.**

### c. Excessive force

While the Eighth Amendment protects a prisoner against the excessive use of force, it "excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind ." *Branham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (other quotations omitted)). A truly *de minimis* use of force will rarely suffice to state a constitutional claim. *Hudson,* 503 U.S. at 9–10, 112 S.Ct. at 1000 ("[N]ot every malevolent touch by a prison guard gives rise to a federal cause of action."); *Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

**\*11** Plaintiff alleges that Defendants Portnoy and Correctional Officer Smith "put the black strap" on Plaintiff's hands when transporting him from sick call to his cell. Comp. at 27. The restraining of Plaintiff's hands with a black strap on one occasion during transport from sick call to his cell is a *diminimis* use of force at best and does not allege conduct which is "repugnant to the conscience of mankind." Plaintiff's excessive force claims against Portnoy and Correctional Officer Smith are **dismissed without prejudice.** [8]

8    To the extent that Plaintiff claims to have suffered emotional and mental harm for the alleged use of force by Defendants Portnoy and Smith, Plaintiff fails to state a claim upon which relief may be granted. *See* 42 U.S.C. § 1997e(e) (No Federal civil action may be brought by a prisoner confined in a jail,

prison or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury).

Plaintiff also alleges that once back at his cell, he held his hands out through the food slot to have the black strap removed and "all officers which [Plaintiff] didn't name in this law suit started pulling his hands and arms really hard trying to break them and [his] wrists also." Comp. at 27–28. Since Plaintiff has not named any of the officers responsible for this incident, this claim is also dismissed **without prejudice.**

Defendants' Motion to Dismiss Plaintiff's excessive force claims is granted and those claims (seventeenth and eighteenth causes of action) are dismissed **without prejudice.**

### 2. Retaliation

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). Courts must approach claims of retaliation " 'with skepticism and particular care' because 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.' " *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (quoting *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds by *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

In order to survive a motion to dismiss a complaint, a plaintiff asserting a First Amendment retaliation claim must advance "non-conclusory" allegations establishing:

> (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action.

*Davis,* 320 F.3d at 352 (quoting *Dawes,* 239 F.3d at 492). "[A] complaint which alleges retaliation in wholly

conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

Plaintiff alleges that he was retaliated against for filing grievances and complaints (third, seventh, tenth, nineteenth, and twentieth causes of action). Since the filing of prison grievances is a constitutionally protected activity, Plaintiff meets the first prong of the retaliation test. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996); *Franco,* 854 F.2d at 590.

**\*12** Plaintiff has not proffered non-conclusory allegations showing a causal connection between any of the alleged retaliatory conduct with any of Plaintiff's grievances. More importantly, the retaliatory conduct alleged—which includes intentionally infecting Plaintiff with viruses; contaminating his food with blood, urine, semen, and chemicals; and murdering his whole family —are so outrageous and unbelievable as be factually frivolous. Plaintiff's retaliation claims are **dismissed without prejudice** in their entirety.

### 3. Denial of access to the courts

Inmates have a First Amendment right to "petition the Government for a redress of grievances." This right, which is more informally referred to as a "right of access to the courts," requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), *modified on other grounds, Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *see also Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004) (citations omitted). "However, this right is not 'an abstract, freestanding right to a law library or legal assistance' and cannot ground a Section 1983 claim without a showing of 'actual injury.' " *Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis,* 518 U.S. at 351). As a result, to state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. *Lewis,* 518 U.S. at 353; *Renelique v. Duncan,* 03–CV1256, 2007 WL 1110913, at \*9 (N.D.N.Y. Apr.12, 2007) (Strom, J.) (same) (citing *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994)).

Plaintiff alleges that Defendant Meyers denied Plaintiff access to the courts by destroying Plaintiffs' free legal postage mail, including Plaintiff's Article 78 motions (eleventh cause of action). Comp. at 19–20. Plaintiff does not allege any actual injury as a result of Defendant's alleged conduct. Plaintiff fails to state a claim for denial of access to the Courts, and therefore his eleventh cause of action is dismissed **without prejudice.** *See Lewis,* 518 U.S. at 351, 116 S.Ct. at 2180 (to state a constitutional claim for denial of access to the courts, a plaintiff must make a showing that he has suffered, or will imminently suffer, actual harm; that is, that he was "hindered [in] his efforts to pursue a legal claim"); *accord Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987).

### 4. Conspiracy claims under Sections 1983 and 1985

To survive a motion to dismiss, a conspiracy claim under § 42 U.S .C.1983 must allege that: (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff and (2) an overt act was committed in furtherance of that goal. *Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002); *see also Concepcion v. City of New York,* No. 05 Civ. 8501, 2008 WL 2020363, at *5 (affirming the continued viability of the *Ciambriello* standards when analyzing a conspiracy claim *vis a vis* a motion to dismiss).[9] Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed. *Ciambriello,* 292 F.3d at 325; *see also Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss."); *Brown v. City of Oneonta,* 106 F.3d 1125, 1133 (2d Cir.1997) (complaints containing only conclusory, vague and general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief). Moreover, a Section 1983 conspiracy claim must not only allege a conspiracy, but also the "actual deprivation of constitutional rights." *Romer v. Morgenthau,* 119 F.Supp.2d 346, 363–64 (S.D.N.Y.2000) (citing *Malsh v. Austin,* 901 F.Supp. 757, 765 (S.D.N.Y.1995). "Thus, if a plaintiff cannot sufficiently allege a violation of his rights, it follows that he cannot sustain a claim of conspiracy to violate those rights." *See id.*

[9]     The *Concepcion* Court stated that "in accord with Supreme Court precedent as well as the overwhelming

weight of authority in this Circuit, this Court applies the *Ciambrello* standard in evaluating the sufficiency of the conspiracy claim ... under the Rule 12(b)(6) standard. In this regard ... the Court notes that it does not construe the decision in *Ciambrello* as imposing a 'heightened pleading requirement [ ]' for civil rights conspiracy claims ... nor a requirement that plaintiff must plead 'specific facts' to support his claim.... Rather, it reads *Ciambrello* as informing this Court's understanding of the type of factual allegations that are minimally sufficient to state a 'plausible' conspiracy claim under § 1983." *Concepcion,* 2008 WL 2020363, at * 5.

**\*13** Plaintiff alleges in conclusory fashion that all of the Defendants were involved in a massive conspiracy against Plaintiff. Plaintiff does not assert any facts giving rise to a conspiracy, but instead makes vague and shocking statements about a massive conspiracy involving Defendants, spanish inmates, and corrupt officers. Plaintiff has not alleged, except in conclusory fashion, that any meeting of the minds occurred between any of the Defendants. The Complaint does not contain any allegations to support a "plausible" conspiracy claim involving any of the Defendants. "[A]lthough a plaintiff does not need to provide detailed factual allegations, the allegations in the complaint must be 'enough to raise a right to relief above the speculative level.' " *Flores v. Levy,* No. 07–CV–3753, 2008 WL 4394681, at *9 (E.D.N.Y. Sep. 23, 2008) (citing *Bell Atlantic Corp.,* 127 S.Ct. at 1965).

Plaintiff also asserts conspiracy claims under 42 U.S.C. § 1985(3). To state a claim under 42 U.S.C.1985(3) a plaintiff must allege:

> " '(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of the citizens of the United States.' " *Fox v. City of New York,* No. 03 Civ. 2268, 2004 WL 856299, at *9 (S.D.N.Y. Apr. 20, 2004) (quoting *Mian [v. Donaldson, Lufkin & Jenrette Sec. Corp.],* 7 F.3d [1085,] 1087–88 [ (2d Cir.1993) ] ).

*Mione v. McGrath,* 435 F.Supp.2d 266, 271–72 (S.D.N.Y.2006). Under § 1985(3), the language requiring intent to deprive of equal protection of the laws "means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirator's action." *Segreto v. Kirschner,* 977 F.Supp. 553, 565 (D.Conn.1997) (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971)).

However, "[a]s the Second Circuit has noted repeatedly, conspiracy claims are to be viewed with skepticism and must be supported by more than mere conclusory allegations." *Webb,* 340 F.3d at 110 ("In order to maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.") (internal quotation marks omitted). Plaintiff's conclusory allegations of a conspiracy against him fail to provide any factual basis to plausibly support a meeting of the minds between the Defendants or that Defendants entered into an agreement to violate Plaintiff's rights.

Finally, even if Plaintiff's allegations of conspiracy were found to be more than merely conclusory, Plaintiff's conspiracy claims are barred by the "intra-corpo rate conspiracy" doctrine, also sometimes referred to as the intraenterprise conspiracy doctrine. The "intracorporate conspiracy" doctrine provides that a corporation or public entity "generally cannot conspire with its employees or agents as all are considered a single entity." *Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 76 (E.D.N.Y.2002) (citation omitted); *see also Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (holding that the conspiracy claim failed because the alleged co-conspirators were all DOCS officials and employees acting within the scope of their employment) (internal citations and quotations omitted), vacated and remanded on other grounds by *Orafan v. Rashid,* 249 Fed. Appx. 217, 2007 WL 2875968 (2d Cir.2007). An exception exists if the individuals are motivated by personal interests, separate and apart from the entity. *Orafan,* 411 F.Supp.2d at 165. To allege facts plausibly suggesting that defendants were pursuing personal interests, more is required than merely alleging defendants were motivated by personal bias. *See Peters v. City of New York,* 04–CV–9333, 2005 WL 387141, at *3 (S.D.N.Y. Feb.16, 2005) ("[P]ersonal bias is not the sort of individual interest that takes a defendant out of the intraenterprise conspiracy doctrine") (internal quotation marks and citation omitted); *accord, Johnson v. City of New York,* 01–CV–1860, 2004 WL 502929, at *5 (E.D.N.Y. Jan.12, 2004).

**\*14** In this case, all of the Defendants were DOCS employees during the period set forth in the Complaint and all were acting within the scope of their employment. Therefore, the intra-corporate conspiracy doctrine applies. Additionally, Plaintiff has not alleged facts to plausibly suggest that the exception to the intra-corporate conspiracy doctrine applies.

For all of the foregoing reasons, Plaintiff's conspiracy claims (the fifth and sixteenth causes of action) are **dismissed** in their entirety **without prejudice**.

### 5. Due process

To state a claim for violation of procedural due process, Plaintiff must allege first that he had a protected liberty interest and, second, if he had such an interest, that he was deprived of that interest without being afforded due process of law. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *see generally Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

Plaintiff alleges that Defendant Burge violated Plaintiff right to due process because he was involved in "massive conspiracy" to keep Plaintiff on mental health status and medicated in order to silence Plaintiff (fifth cause of action). Comp. at 15. This claim is dismissed as conclusory and for failure to state any sort of claim for denial of due process.

Plaintiff also alleges that Defendants Eagen, Bellamy, and Burge denied Plaintiff due process by having in place a "grievance program [that is] not fair and effective." (fifteenth cause of action). Comp. at 22–23. Inmates do not have a constitutional right to have grievances processed or to ensure that grievances are processed properly. *See e.g. Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003) (prison grievance procedures do not confer any constitutionally protected right on an inmate). A violation of the inmate grievance procedures does ***not*** give rise to a claim under Section 1983. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001). Thus, Plaintiff's claims regarding the unfairness of the grievance process are dismissed.

Finally, Plaintiff alleges that he was subjected to an "atypical and significant hardship" during his SHU incarceration at Auburn in violation of his due process rights (twenty-second cause of action). Comp. at 31. Plaintiff has not however alleged that he received insufficient process prior to being confined in SHU nor does he indicate what Defendants, if any, were personally involved in the alleged denial of due process. Plaintiff fails to allege a plausible claim for denial of due process.

### 6. Qualified Immunity

Defendants raise the affirmative defense of qualified immunity. Dkt. No. 50–2, Memorandum of Law at 24–25. "Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Stephenson v. Doe,* 332 F.3d 68, 76 (2d Cir.2003) (quoting *McCardle v. Haddad,* 131 F.3d 43, 50 (2d Cir.1997) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

**\*15** In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001), modified by *Pearson v. Callahan,* ––– U.S. ––––, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (holding that although "the sequence set forth [in *Saucier* ] is often appropriate, it should no longer be regarded as mandatory"). If the plaintiff establishes that the violation of a constitutional right occurred, the court can examine "whether the right was clearly established ... in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. 194 at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201, 121 S.Ct. at 2156. Because Plaintiff has not sufficiently alleged that any of the Defendants have violated his constitutional rights, "there is no necessity for further inquiries concerning qualified immunity."

### VI. Conclusion

Plaintiff's recounting of the facts is conclusory at best and wholly fantastic. Plaintiff claims that he is the target of a "massive conspiracy" to infect him with three "life-time" viruses; contaminate his food; and destroy his mail. Plaintiff claims that spanish inmates have been putting "LA–BINE–YA" on Plaintiff's food tray, which he describes as "sealed ketchup with blood inside." Plaintiff also claims that spanish officers are giving out Plaintiff's personal information; Plaintiff is being kept at "mental health level one" and medicated to prevent him from litigating his actions in the courts; he has been deliberately infected with Hepatitis A, H. pylori, and herpes; and his food has been contaminated with feces, sperm, blood, urine, and chemicals. Additionally, Plaintiff alleges that as part of this conspiracy, his whole family has been murdered. Plaintiff claims that "[t]his is the biggest conspiracy in the history of the United States." Comp. at 26.

Even reading Plaintiff's Complaint in the most generous manner, the Court finds Plaintiff's allegations as a whole to be unbelievable. Moreover, Plaintiff's history of mental illness, as documented in the psychiatric evaluations attached as exhibits to Plaintiff's Complaint (*see* Comp., Exhibits at 8–15), further supports a finding that his allegations are the product of delusion. The Court finds that the Complaint is factually frivolous under the standards delineated in *Denton, Neitzke,* and *Livingston* (*see* Section V.C., *supra* ) and therefore dismisses the Complaint in its entirety. [10]

[10]    Since the Complaint has been found to be factually frivolous, it "is exactly the sort of case that the PLRA now requires that a district court dismiss 'before docketing, if feasible' ... [since a]llowing these frivolous suits to proceed would subject the prospective defendants to the type of inconvenience and expense that concerned the Supreme Court in *Neitzke....*"*Jones v. City of New York,* Nos. Civ.A. 99–8281 and Civ.A. CV–00–370, 2000 WL 516889, at \*3 (E.D.N.Y. Mar.15, 2000). Moreover, because the problem with Plaintiff's complaint is substantive, such that a better pleading will not cure it, leave to re-plead is denied as futile. See *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000).

WHEREFORE, based on the findings above, it is hereby

ORDERED, that Defendants' Motion to Dismiss (Dkt. No. 50) is **GRANTED** and Plaintiff's claims and

all Defendants are **dismissed in their entirety without prejudice;** [11] and it is further

[11] While Defendants Correctional Officer Smith, W. Robinson, and Nurse Smith have not been served or appeared, because all of Plaintiff's claims have been dismissed in their entirety, this action is dismissed as to the unserved Defendants as well.

**\*16** ORDERED that the Clerk shall serve a copy of this Memorandum–Decision and Order upon the parties in accordance with the Local Rules.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 815724

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 859268
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Harold NANCE, Plaintiff,

v.

Lieut. J.W. HAZELL, No. 11; Jefferson, No. 24;
Hannike, No. 31; Britt, No. 30; Dr. Reznike;
and Long Island College Hospital, Defendants.

No. 02-CV-3525 (FB).
|
April 15, 2005.

**Attorneys and Law Firms**

Harold Nance, Brooklyn, NY, pro se.

Patrick J. Brennan, Esq., Wilson, Elser, Moskowitz,
Edelman & Dicker, LLP, New York, NY, for the
Defendants.

*MEMORANDUM AND ORDER*

BLOCK, District Judge.

**\*1** Plaintiff, Harold Nance ("Nance"), proceeding *pro
se* and *in forma pauperis,* brings this action pursuant to
28 U.S.C. § 1983; his amended complaint alleges that,
while seeking treatment and medication at defendant
Long Island College Hospital ("LICH"), he was "grabbed
forcefully" by "Hospital Security Police" and thrown out.
Am. Compl. at 3. Nance has sued LICH, an LICH doctor
and four LICH security officers; service has been perfected
as to all defendants except "Jefferson, No. 24" and "Britt,
No. 30."

The served defendants move for summary judgment on
the grounds that, because they are not state actors, they
are not liable under § 1983; the Court agrees and grants
the motion. For the same reason, the Court dismisses the
claims against the unserved defendants.

DISCUSSION

*A. Summary Judgment*

Summary judgment is appropriate when there is no
genuine issue of material fact and the moving party is
entitled to judgment as a matter of law. *See* Fed.R.Civ.P.
56(c); *Powell v. Nat'l Bd. of Med. Examiners,* 364 F.3d 79,
84 (2d Cir.2004). In making this determination, a court
must view the facts in the light most favorable to the non-
moving party and must resolve all ambiguities and draw
all reasonable inferences against the movant. *See Baisch v.
Gallina,* 346 F.3d 366, 372 (2d Cir.2003). [1]

[1]     Pursuant to Local Rule 56.2, Nance was given notice
        of the motion for summary judgment, his right to
        submit affidavits and other material opposing the
        motion, and the consequences of failing to do so.

Here, the affidavits submitted in support of the motion
for summary judgment establish (1) that LICH is a private
hospital, and (2) that its security officers are not police
officers or otherwise affiliated with any governmental law-
enforcement agency. The material submitted by Nance in
opposition to the motion in no way contradicts those facts.
There is, therefore, no genuine issue that the defendants
are private parties.

A claim under § 1983, however, requires a plaintiff to show
that the defendant was acting under color of state law
(also known as "state action"). *See Tancredi v. Metro. Life
Ins. Co.,* 316 F.3d 308, 312 (2d Cir.2003); *United States
v. Int'l Brotherhood of Teamsters,* 941 F.2d 1292, 1295
(2d Cir.1991) ("Because the United States Constitution
regulates only the Government, not private parties, a
litigant claiming that his constitutional rights have been
violated must first establish that the challenged conduct
constitutes 'state action.' "). With certain exceptions not
relevant here, the conduct of a private entity or individual
is not "state action." *See Tancredi,* 316 F.3d at 312-14
(citing *Brentwood Acad. v. Tenn. Secondary Sch. Athletic
Ass'n,* 531 U.S. 288 (2001)).

*B. Dismissal for Failure to State a Claim*

Because Nance is proceeding *in forma pauperis,* the Court
must dismiss the case *sua sponte* if it determines that
the amended complaint fails to state a claim upon which
relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).
Dismissal on those grounds is usually accompanied by
leave to amend the complaint; however, leave to amend
need not be granted when it would be futile. *See Cuoco v.
Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000).

**\*2** As previously explained, a § 1983 claim requires a plaintiff to show state action. Nance's amended complaint makes no such allegation with respect to either the served defendants or the unserved defendants; therefore, the amended complaint fails to state a valid § 1983 claim against any defendant. Because it is undisputed that the defendants are not, in fact, state actors, leave to amend the complaint would be futile. *Accord Washington v. Lenihan,* 1996 WL 345950, at \*3 (S.D.N.Y.1996) ("[E]ven if Plaintiff was granted leave to refile his claim against [an unserved defendant], it would be dismissed on the grounds [for dismissing the defendants moving for summary judgment].").

CONCLUSION

In sum, it is undisputed that the defendants are not state actors. As a result, the served defendants are entitled to summary judgment on Nance's § 1983 claims against them. For the same reason, Nance cannot state valid § 1983 claims against the unserved defendants. The case is, therefore, dismissed as to all defendants.[2] Pursuant to 28 U.S.C. § 1915(a)(3), the Court certifies that any appeal from this order would not be taken in good faith; therefore, *in forma pauperis* status is denied for purposes of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444-45 (1962).

[2]    Although brought pursuant to § 1983, Nance's amended complaint makes reference to torts such as assault and malpractice, as well as to "hazing in the first degree," Am. Compl. at 3(a)(2), which is apparently a crime under New York law. Under 28 U.S.C. § 1367, the Court has supplemental jurisdiction over such state-law claims; however, where, as here, all federal claims have been eliminated before trial, concerns of judicial economy, convenience, fairness and comity usually "point toward declining to exercise jurisdiction over the remaining state-law claims." *Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 305 (2d Cir.2003) (citing 28 U.S.C. § 1367(c)). The Court finds that to be the case here; any state-law claims raised in the amended complaint are, therefore, dismissed without prejudice.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 859268

---

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification

Appeal Filed by GIZEWSKI v. NEW YORK STATE DEPARTMENT OF C, 2nd Cir., August 24, 2016

2016 WL 3661434
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Mark Gizewski, Plaintiff,

v.

New York State Department of Corrections and
Community Supervision; Michael Sheahan,
Superintendent at Five Points Correctional Facility,
in his official and individual capacity; John Doe
1, Plaintiff's Treating Physician at Five Points
Correctional Facility, in his official and individual
capacity; and John Doe 2, Corrections Officer
at Five Points Correctional Facility, Defendants.

9:14-CV-0124(GTS/DJS)
|
Signed 07/05/2016

**Attorneys and Law Firms**

LEVINE & BLIT, PLLC, 350 Fifth Avenue, Suite
6902,OF COUNSEL: LEWIS G. SPICER, ESQ.,
MATTHEW J. BLIT, ESQ., JUSTIN S. CLARK, ESQ.,
New York, New York 10118, Counsel for Plaintiff.

ERIC T. SCHNEIDERMAN, Attorney General for the
State of New York, The Capitol, CHRISTOPHER W.
HALL, ESQ., Assistant Attorney General, Albany, New
York 12224, Counsel for Defendants.

## DECISION and ORDER

GLENN T. SUDDABY, Chief United States District
Judge

**\*1** Currently before the Court, in this prisoner civil
rights action filed by Mark Gizewski ("Plaintiff") against
the New York State Department of Corrections and
Community Supervision ("DOCCS"), is three of its
employees (collectively "Defendants"), is Defendants'
motion for summary judgment (Dkt. No. 37) and
Plaintiff's cross-motion to join Kristin Salotti as a
defendant (Dkt. No. 42). For the reasons set forth below,

Defendants' motion is granted and Plaintiff's cross-motion
is denied.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Complaint

Plaintiff's Complaint asserts the following four claims:
(1) a claim that DOCCS discriminated against Plaintiff
based upon his disabilities in violation of Title II of
the Americans with Disabilities Act ("ADA"), 42 U.S.C.
§ 12132; (2) a claim that DOCCS failed to reasonably
accommodate Plaintiff's disabilities in violation of Title II
of the ADA; (3) a claim that Defendants Sheahan, John
Doe 1, and John Doe 2 violated the Eighth Amendment
and 42 U.S.C. § 1983 by acting with deliberate indifference
to Plaintiff's serious medical needs; and (4) a claim
that DOCCS unlawfully retaliated against Plaintiff for
engaging in protected activity in violation of Title II of the
ADA. (Dkt. No. 1, ¶¶ 86-109 [Pl.'s Compl.].) Familiarity
with the factual allegations supporting these claims in
Plaintiff's Complaint is assumed in this Decision and
Order, which is intended primarily for the review of the
parties.

### B. Statement of Undisputed Material Facts

The undisputed material facts are as follows. Plaintiff was
incarcerated at Five Points Correctional Facility ("C.F."),
located in Romulus, New York, from May 25, 2012, until
January 14, 2014. (Dkt. No. 37, Attach. 1, ¶ 2 [Defs.' Rule
7.1 Statement].) [1]

1    Unless otherwise indicated, the cited factual
     assertions of Defendants were either expressly
     admitted by Plaintiff or denied without a supporting
     record citation by Plaintiff.

Requests for Accommodation

On February 7, 2013, Plaintiff made a formal request
for a cassette tape player so he could listen to books on
tape, which was approved the next day. (Id., ¶ 49.) The
bottom of the "request for reasonable accommodation"
form advised the inmate that he could file a grievance
regarding the request. (Id., ¶ 50.) On March 4, 2013,
Plaintiff requested that a stool in his cell be moved and
to be provided with a new shower hose and handle.
(Id., ¶ 51.) This request was partially granted in that

the stool in Plaintiff's cell was moved, and the shower hose was repaired (rather than replaced), but Plaintiff was not given a new handle. (*Id.*, ¶ 52.) On April 3, 2013, Plaintiff requested a Roho cushion. (*Id.*, ¶ 53.) The following day, Matthew Thoms, Deputy Superintendent for Administration at Five Points C.F., referred Plaintiff's request to Nurse Administrator Bannister, which was subsequently approved. (*Id.*, ¶¶ 53-54.) On May 15, 2013, Plaintiff wrote to Nurse Administrator Bannister to inquire about the status of the delivery of his Roho cushion, which he received on July 2, 2013. (*Compare* Dkt. No. 37, Attach. 1, ¶ 55 [Defs.' Rule 7.1 Statement, asserting that Plaintiff mistakenly stated in his letter that he had made the request for the cushion three months prior but it was only one month before] *with* Dkt. No. 41, Attach. 1, ¶ 55 [Pl.'s Rule 7.1 Response, citing a DOCCS' Ambulatory Health Record Progress Note, dated January 23, 2013, in which Plaintiff requested a "w/c cushion please"].) On September 11, 2013, Plaintiff requested a second Roho cushion and received it on October 16, 2013. (*Id.*, ¶ 57.)

**\*2** On August 30, 2013, Mr. Thoms received the letter from Plaintiff's attorney, dated August 23, 2013, which was attached to his grievance, FPT 27997-13, that made a number of requests for accommodation described previously. (*Id.*, ¶ 58.) In response, Nurse Administrator Bannister investigated whether these requests should be granted and wrote a memo dated September 9, 2013, with her findings. (*Id.*, ¶ 60.) Mr. Thoms incorporated Nurse Administrator Bannister's findings into his letter response, dated September 12, 2013, to Plaintiff's attorney. (*Id.*, ¶ 65.) On September 18, 2013, Plaintiff submitted another formal request for reasonable accommodations asking for a grabber tool, grab bars, soft bristle shower brushes, a wheelchair pusher and a cell assistant. (*Id.*, ¶ 66.) All of these requests were granted. (*Compare* Dkt. No. 37, Attach. 1, ¶ 67 [Defs.' Rule 7.1 Statement, asserting above-stated fact and citing record evidence that establishes fact] *with* Dkt. No. 41, Attach. 1, ¶ 67 [Pl.'s Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].) On November 1, 2013, Mr. Thoms sent a letter to Plaintiff's attorney to advise him that Plaintiff had received a new Roho cushion on October 16, 2013, as well as two soft bristle brushes and a grabber tool on October 18, 2013. (*Id.*, ¶¶ 70-71.) Mr. Thoms further advised Plaintiff's attorney that Plaintiff was housed in a handicap cell with grab bars. (*Id.*, ¶ 71.)

On November 22, 2013, Plaintiff submitted another formal request for accommodation, asking for vertical shower bars to be installed in his cell. (*Id.*, ¶ 72.) This request was received on November 29, 2013, by the Deputy Superintendent for Programs, Laurine Jones. (*Id.*, ¶ 73.) Plaintiff's request was reviewed by DOCCS' medical personnel and subsequently approved on December 6, 2013. (*Id.*, ¶ 74.) On December 22, 2013, Plaintiff submitted his last formal request for formal accommodation at Five Points C.F., asking for a cell assistant to help make his bed and put on his socks. (*Id.*, ¶ 75.) Plaintiff's request was received by Mr. Thoms on December 30, 2013. (*Id.*, ¶ 76.) In resolving this request, Mr. Thoms decided that, because of Plaintiff's "current disciplinary [and] physical status, he is being housed in [the] infirmary in lieu of SHU, to accommodate [his] needs." (*Id.*, ¶ 77.) Plaintiff checked the box at the bottom of the request for reasonable accommodation form indicating he agreed with this decision. (*Id.*)

### Plaintiff's Grievances

While incarcerated at Five Points C.F., Plaintiff filed two grievances that were formally processed. (*Compare* Dkt. No. 37, Attach. 1, ¶ 3 [Defs.' Rule 7.1 Statement, asserting that Plaintiff filed only two grievances while incarcerated] *with* Dkt. No. 41, Attach. 1, ¶ 3 [Pl.'s Rule 7.1 Response, asserting that Plaintiff made numerous grievance but only two were processed].) One of these grievances was assigned file number FPT-27869 and was received on August 27, 2013. (Dkt. No. 37, Attach. 1, ¶ 4 [Defs.' Rule 7.1 Statement].) In that grievance, Plaintiff complained about his COMPAS risk assessment, which apparently affected his parole eligibility but has nothing to do with the causes of action asserted in his Complaint. (*Id.*, ¶¶ 5-6.)

The other grievance was assigned file number FPT-27997-13 and was received on October 1, 2013. (*Id.*, ¶ 7.) In that grievance, Plaintiff complained generally that "reasonable accommodations are not being provided. Adequate medical care is not being provided." (*Id.*, ¶ 8.) In addition, Plaintiff attached a letter, dated August 23, 2013, from his attorney, who raised the following specific complaints on Plaintiff's behalf: (1) objecting to the requirement that Plaintiff be placed in the infirmary before he could receive pain medication; (2) requesting a transfer to Fishkill C.F. where Plaintiff could receive better care;

(3) requesting an access ramp be built in compliance with the ADA so Plaintiff could access the yard area in order to join other participants in the horticulture program; (4) requesting a motorized wheelchair because Plaintiff has deformed hands and had difficulty using his current chair; (5) requesting a shower brush for hygienic purposes; (6) requesting a four-inch Roho air cushion for Plaintiff's wheelchair; (7) requesting a grabber tool to allow Plaintiff easier access to the food items in his locker; (8) requesting an appointment with a pain specialist; (9) requesting a cell assistant; and (10) requesting that grab-bars be installed on the outside of Plaintiff's shower. (*Id.*, ¶ 9.)

### IGRC's Decision and Plaintiff's Appeal

**\*3** In response, the Inmate Grievance Resolution Committee ("IGRC") granted Plaintiff's request for a Roho cushion, two shower brushes, and a grabber tool, and submitted a work order to have bars installed on the inside and outside of Plaintiff's shower. (*Id.*, ¶¶ 11-12.) The IGRC also found Plaintiff's request for a cell assistant to be an "appropriate request." (*Id.*, ¶ 14.) The IGRC denied Plaintiff's request for a new wheelchair, however, because Plaintiff "navigate[d] very well with his legs and has a pusher available at all times." (*Id.*, ¶¶ 13, 61.) On November 1, 2013, Plaintiff appealed the IGRC determination to Defendant Sheahan, who denied Plaintiff's appeal, noting that he had received a Roho cushion on October 16, 2013, and a grabber tool as well as soft bristle shower brushes on October 18, 2013. (*Id.*, ¶ 15.) Defendant Sheahan also noted that Plaintiff was "housed in a handicap cell that has grab bars installed for his needs." (*Id.*, ¶ 16.) On November 14, 2013, Plaintiff appealed Defendant Sheahan's decision to the Central Office Review Committee ("CORC"). (*Id.*, ¶ 17.) Due to a clerical error, however, the Five Points C.F.'s grievance office failed to forward Plaintiff's appeal to CORC until five months later on April 30, 2014. (*Id.*, ¶ 18.)

### Plaintiff's Transfer to Walsh

On January 14, 2014, Plaintiff was transferred from Five Points C.F. to Walsh Regional Medical Unit ("Walsh"). (*Id.*, ¶ 25.) Walsh is a DOCCS' regional medical facility that adjoins, and is part of, Mohawk C.F. in Rome, New York. (*Id.*, ¶ 26.) Inmates at Walsh file their grievances with the Mohawk C.F.'s grievance office. (*Id.*,

¶ 27.) Joseph Cieslak, the Inmate Grievance Program Supervisor at Mohawk C.F., was unable to locate any grievances filed by Plaintiff related to a use of force at Five Points C.F. in January 2014, improper medical treatment at Five Points C.F. and Walsh, or denial of pain medication by Walsh medical staff from January 2014 through February 2014. (*Id.*, ¶ 28.) However, on May 28, 2014, Plaintiff filed a grievance regarding the denial of pain medication for the first 10 days that he was at Walsh but did not name a defendant with respect to this claim. (*Id.*, ¶¶ 29-31, 40, 47-48.) Jeffrey Hale, the Assistant Director of the DOCCS' Inmate Grievance Program and records custodian for CORC, conducted a search for grievance appeals filed by Plaintiff with CORC in 2013 and 2014 when he resided at Five Points C.F. and Walsh. (*Id.*, ¶¶ 32-33.) Mr. Hale found that Plaintiff had appealed one grievance from Five Points C.F. (FPT-27997-13) and one grievance from Walsh (MHK-12578-14). (*Id.*, ¶ 34.)

### C. Parties' Briefing on Their Respective Motions

#### 1. Defendants' Motion for Summary Judgment

##### a. Defendants' Memorandum of Law

Generally, in their memorandum of law, Defendants assert five arguments with regard to Plaintiff's claims against them. (Dkt. No. 37, Attach. 6 [Defs.' Mem. of Law].)

First, Defendants argue that Plaintiff failed to exhaust his administrative remedies before commencing the present action and note that Plaintiff filed only two grievances (FPT 27869-13 and FPT 27997-13) while incarcerated at Five Points C.F., the first of which (FPT 27869-13) is not relevant to the claims in this action. (*Id.* at 2-9.) With respect to the second grievance, Defendants argue that, although the grievance office failed (due to a clerical error) to forward the appeal to CORC until five months after Plaintiff filed it, he was obligated to either file a direct appeal to CORC or file a new grievance regarding the delay. (*Id.* at 5.) Alternatively, Defendants argue that, in his appeal, Plaintiff raised only four of the eleven issues he previously grieved. (*Id.* at 6-7.) [2] Therefore, Defendants argue that the other seven issues were not administratively exhausted because they had been abandoned by Plaintiff. (*Id.* at 7.) [3]

2     According to Defendants, these four issues consist of the following: (1) Plaintiff's request for a grabber tool; (2) his request for a Roho cushion; (3) his request for shower brushes; and (4) his complaint that the shower bars that had been installed were inadequate because "they're not where I need them to be and therefore are dangerous." (Dkt. No. 37, Attach. 6, at 6 [Defs.' Mem. of Law].)

3     These seven issues consist of the following: (1) Plaintiff being able to receive pain medication only when he is in the infirmary; (2) Plaintiff's request to be transferred to Fishkill C.F.; (3) the installation of an access ramp to the yard area; (4) a new wheelchair; (5) an appointment with a pain specialist; (6) a cell assistant; and (7) better medical care. (*Id.* at 7.)

**\*4** With respect to the other grievances that Plaintiff alleges he filed, but that were never formally processed, Defendants argue that Plaintiff did file one grievance (MHK-12578-14) while at Walsh on May 28, 2014, seeking certain reasonable accommodations. (*Id.*) However, Defendants argue that this claim for such reasonable accommodations is unrelated to Plaintiff's legal claim against Walsh in the present action, which alleges that Plaintiff was denied pain medication. (*Id.*) In any event, Defendants argue that Plaintiff failed to administratively exhaust any claims he had while at Walsh. (*Id.* at 7-8.) Finally, Defendants argue that Plaintiff failed to grieve the substance of his three ADA claims (the first, second, and fourth causes of action in his Complaint) and his § 1983 claims (the third cause of action in his Complaint) at either Five Points C.F. or Walsh. (*Id.* at 8-9.)

Second, Defendants argue that Plaintiff's ADA retaliation claim in his fourth cause of action is barred by the Eleventh Amendment because, although Plaintiff asserted a retaliation claim in violation of Title II of the ADA in his fourth cause of action, retaliation claims are brought pursuant to Title V and New York State has not abrogated its sovereign immunity with respect to Title V retaliation claims. (*Id.* at 9-10.)

Third, Defendants argue that Plaintiff's § 1983 claims in his third cause of action fail to state a claim because he has failed to allege facts plausibly suggesting that Defendant Sheahan had any personal involvement in the allegations serving as the basis for Plaintiff's medical indifference and excessive force claims at Five Points C.F. (*Id.* at

10-11.) More specifically, Defendants argue that Plaintiff fails to allege Defendant Sheahan's personal involvement for the following three reasons: (a) with respect to Plaintiff's medical indifference claim, the Complaint alleges that an unknown "Treating Physician" (i.e., John Doe 1) was the one who failed to properly address Plaintiff's medical concerns and, although it is alleged that Defendant Sheahan knew that Plaintiff endured severe and chronic pain for six months, it was appropriate for Defendant Sheahan to defer to prison medical staff regarding Plaintiff's treatment; (b) with respect to Plaintiff's excessive force claim, the Complaint alleges that a corrections officer (i.e., John Doe 2) injured Plaintiff after using excessive force but fails to allege that Defendant Sheahan had any involvement in the incident; and (c) with respect to Plaintiff's claim that he was improperly denied pain medication while at Walsh, the Complaint fails to identify either a named or unnamed defendant as being responsible for or having any personal involvement in Plaintiff's medical care at Walsh. (*Id.* at 11-13.)

Fourth, Defendants argue that Plaintiff's ADA claims in his first and second causes of action fail to state a claim because, of the many requests Plaintiff made for reasonable accommodations, only his request for a new wheelchair was denied on the ground that his needs were already being met. (*Id.* at 13-17.)

Fifth, and finally, Defendants argue that Plaintiff's ADA retaliation claim in his fourth cause of action fails to state a claim for the following two reasons: (a) of the numerous requests Plaintiff made for reasonable accommodations, only his request for a new wheelchair was denied because his needs were already being met and, therefore, there is no evidence of retaliatory intent; and (b) to the extent that Plaintiff argues this denial was retaliatory, Defendants would have made the same decision regardless of retaliatory motive because there were legitimate, nonretaliatory reasons for denying the request. (*Id.* at 17.)

### b. Plaintiff's Opposition Memorandum of Law

Generally, Plaintiff asserts six arguments in opposition to Defendants' motion. (Dkt. No. 42 [Pl.'s Opp'n Mem. of Law].)

**\*5** First, Plaintiff argues that he administratively exhausted his remedies with respect to his grievances that the grabber tool, shower brushes, and the positioning of his shower bars were inadequate for the following four reasons: (a) Plaintiff filed formal grievances and timely appealed those grievances to each successive level; (b) it was the grievance office's fault for not timely transmitting his appeal to CORC; (c) Defendants cannot side-step this failure by claiming that it would have taken four months to decide his appeal even if it were timely transmitted because 7 N.Y.C.R.R. § 701.5(d)(3)(ii) requires the CORC to render a decision within 30 days from the time the appeal was received; and (d) although 7 N.Y.C.R.R. § 701.6(g) states that "matters not decided within the time limits may be appealed to the next step," Plaintiff argues that there was no next step after CORC. (*Id.* at 9.)

With respect to Plaintiff's remaining grievances that were not formally processed, he relies on the Second Circuit's three-part inquiry appropriate for cases involving a failure-to-exhaust defense. (*Id.* at 10.) More specifically, Plaintiff argues that he fully exhausted his administrative remedies through informal channels when he informally grieved for Ultram to treat his pain, to have grab bars installed on the outside of his shower, and to be provided with a new wheelchair and two long handled brushes, all of which were resolved in his favor. (*Id.* at 10-11.) Under this special circumstance, Plaintiff argues that he fully exhausted his remedies under an exception recognized by this Court in *Goodson v. Silver*, 09-CV-0494, 2012 WL 4449937, at \*9 n.20 (N.D.N.Y. Sept. 25, 2012) (Suddaby, J.). (*Id.* at 10-11.)

In the alternative, Plaintiff argues that the formal grievance procedure was unavailable to him because he made reasonable attempts to exhaust his administrative remedies by submitting grievances, writing letters to Defendant Sheahan and other officials at Five Points C.F., making verbal requests to Ms. Salotti, and retaining an attorney to contact Five Points C.F. and DOCCS concerning his ongoing issues. (*Id.* at 11-12.) Plaintiff further argues that his attorney submitted a Notice of Intention to File a Claim to the Office of the Attorney General of the State of New York concerning the denial of reasonable accommodations, pain medication, and medical devices. (*Id.* 12.) Therefore, Plaintiff argues that, at a minimum, there is a genuine dispute of material fact regarding whether the formal grievance procedures were available to him at Five Points C.F. (*Id.*)

With respect to another special-circumstances exception to the exhaustion rule, Plaintiff argues that his attempts to exhaust his available administrative remedies comported with the applicable procedural rules and reflected a reasonable interpretation of those regulations for the following three reasons: (a) there was no policy at Five Points C.F. that mandated or informed inmates that a document must be marked as a "grievance" for it to be treated as such; (b) there was no way for Plaintiff to know that, if he submitted a letter grieving his conditions to the administration, it would not be considered a grievance; and (c) Directive #2614 instructs inmates to make requests for medical treatment and items for daily living through the facility's medical unit (which Plaintiff complied with by making verbal complaints to Ms. Salotti), but there is no indication from the Directive that grieving was an alternative. (*Id.* at 13.)

Second, Plaintiff argues that a genuine dispute of material fact exists regarding the personal involvement of Defendant Sheahan in the allegations serving as the basis for his § 1983 claims for the following three reasons: (a) Defendant Sheahan acted with deliberate indifference to Plaintiff's medical condition because he received numerous letters from both Plaintiff and his attorney regarding Plaintiff's condition but never confirmed with anyone that Plaintiff's needs were being met; (b) Defendant Sheahan failed to take immediate and/or complete corrective action after visiting Plaintiff in the infirmary on two occasions in which Plaintiff complained to him that he had not received the medical devices he needed to maintain his cleanliness; and (c) in the alternative, Defendant Sheahan was grossly negligent in supervising the subordinates who were deliberately indifferent to Plaintiff's medical needs. (*Id.* at 15-16.)

**\*6** In addition, Plaintiff argues that Ms. Salotti was personally involved and deliberately indifferent to his medical needs for the following three reasons: (a) Ms. Salotti was aware that Plaintiff was being denied medically necessary shower brushes in the SHU but did not provide him with any shower brushes; (b) Ms. Salotti was aware that Plaintiff was in chronic pain and had opined that he should be treated with Ultram but gave Plaintiff over-the-counter pain relievers instead; (c) Ms. Salotti had opined that, if Plaintiff's use of Ultram was ever discontinued, he should be weaned off of it, rather than discontinued without weaning, but on two occasions, Ultram was

discontinued without weaning, causing Plaintiff to suffer from withdrawal; and (d) Ms. Salotti was the only medical provider at Five Points C.F. who treated him and, therefore, was directly and personally involved in the constitutional deprivations he suffered. (*Id.* at 16-17.)

Third, Plaintiff argues that his ADA retaliation claim (which he concedes should have been brought under Title V and not Title II) is not barred by the Eleventh Amendment because his underlying claim is predicated on an alleged violation of Title II of the ADA and the Title II abrogation of sovereign immunity should be extended to his Title V retaliation claim. (*Id.* at 17-18.)

Fourth, Plaintiff argues that he has alleged facts plausibly suggesting a cause of action for discrimination and failure to provide reasonable accommodations in violation of Title II of the ADA for the following two reasons: (a) the Complaint alleges that Plaintiff's requests for a new wheelchair, two long-handled shower brushes, and shower handles were denied and/or the items provided to him were inadequate; and (b) Plaintiff was denied these accommodations because of his disabilities. (*Id.* at 19.)

Fifth, Plaintiff argues that he has alleged facts plausibly suggesting a claim for retaliation in violation of Title II of the ADA because he has alleged that, after making his requests for reasonable accommodations, he was retaliated against by being placed in solitary confinement without his tools and medical devices that were necessary for him to maintain his cleanliness. (*Id.* at 19-20.)

Sixth, and finally, in the alternative, Plaintiff argues that, should the Court dismiss one or all of his ADA claims for failure to state a claim, he should be granted leave to amend his Complaint pursuant to Fed. R. Civ. P. 15(a)(2). (*Id.* at 20.)

### c. Defendants' Reply Memorandum of Law

In reply to Plaintiff's opposition memorandum of law, Defendants assert three arguments. (Dkt. No. 43 [Defs.' Reply Mem. of Law].)

First, Defendants argue that Plaintiff has failed to exhaust his administrative remedies. As an initial matter, Defendants argue that, in opposing their motion, Plaintiff acknowledged that he failed to file any formal grievances

at Five Points C.F. or Walsh regarding deliberate indifference to his medical care, an alleged excessive force incident at Five Points C.F. in January 2014, unsanitary conditions and lack of reasonable accommodations during his confinement in the SHU in December 2013 at Five Points C.F., and retaliation under the ADA. (*Id.* at 1.)

Furthermore, with respect to Plaintiff's remaining claims, Defendants argue that, under *Woodford v. NGO*, 548 U.S. 81 (2006), and *Macias v. Zenk*, 495 F.3d 37 (2d Cir. 2007), Plaintiff cannot procedurally exhaust his administrative remedies through informal channels. (*Id.* at 1-4.) In any event, Defendants argue that Plaintiff did not receive a favorable result regarding his request for Ultram at Five Points C.F. because he did not receive this medication until *after* he was transferred to Walsh. (*Id.* at 4.)

With respect to Plaintiff's argument that the grievance procedure was unavailable to him because only two of his grievances were processed, Defendants argue that Plaintiff failed to file proper grievances. (*Id.* at 4-5.) More specifically, Defendants argue that Plaintiff's letters and complaints to various DOCCS' officials were not submitted to the inmate grievance office as required by 7 N.Y.C.R.R. § 701, *et seq.*, and, therefore, do not meet the definition of a grievance under 7 N.Y.C.R.R. § 701.2(a) (stating that "[a] letter addressed to facility or central office staff is not a grievance"). (*Id.*) In addition, Defendants argue that it was Plaintiff's choice to write letters, rather than file a formal grievance, and that he knew how to file a proper grievance from past experience because he filed two grievances in 2011 while incarcerated at Orleans C.F. as well as two grievances in 2013 at Five Points C.F. (FPT 27869-13 and 27997-13). (*Id.* at 5-6.)

**\*7** With respect to Plaintiff's argument that special circumstances excuse his failure to exhaust his administrative remedies, Defendants argue that this should be disregarded for the following four reasons: (a) Plaintiff retained counsel four months before being transferred to Walsh and two months before filing his second grievance at Five Points C.F. and, therefore, should have known how to file a proper grievance; (b) Plaintiff's prior experience filing proper grievances belies his assertion that he did not know that sending a letter grieving his conditions would not be considered a grievance; (c) contrary to Plaintiff's assertion, page three of Directive 2614 states, in bold

capital letters, "**GRIEVANCE PROCEDURE**," which specifically instructs inmates that they can file a grievance, and page four states "**HOW TO MAKE COMPLAINTS**" with sample forms inmates can fill out to make requests for reasonable accommodations; and (d) Plaintiff filled out and signed a draft request for reasonable accommodations that contains the language "I understand my right to file a grievance in accordance with Directive #4040" above the inmate signature line. (*Id.* at 6-8.)

Second, Defendants argue that, because they never received certain deposition transcripts from Plaintiff, the Court should not consider excerpts from deposition testimony by Defendant Sheahan, Ms. Salotti, and Patrick O'Neill, which were submitted by Plaintiff in support of his opposition to Defendants' motion. (*Id.* at 10.)

Third, Defendants argue that, because Plaintiff was placed in solitary confinement after he received a second misbehavior report for using marijuana and not in retaliation for making requests for reasonable accommodation, Plaintiff's ADA retaliation claim in his fourth cause of action should be dismissed. (*Id.* at 10-11.)

### 2. Plaintiff's Cross-Motion to Join Kristin Salotti as a Defendant

#### a. Plaintiff's Memorandum of Law

In support of his cross-motion, Plaintiff argues that, under Fed. R. Civ. P. 16(b)(4), good cause exists to join Kristin Salotti, a nurse practitioner at Five Points C.F., as a defendant in this action. (Dkt. No. 42, at 6-8 [Pl.'s Opp'n Mem. of Law].) More specifically, Plaintiff acknowledges that this Court's Pretrial Scheduling Order required that any application to join additional parties was to be made on or before September 5, 2014. (*Id.* at 7; Dkt. No. 14, ¶ 4 [Uniform Pretrial Scheduling Order].) However, Plaintiff argues that he was unable to file an application to join Ms. Salotti as a defendant before this deadline expired for the following four reasons: (1) due to his incarceration, Plaintiff's counsel lacked access to Plaintiff and the ability to determine all of the relevant information; (2) it was not until September of 2014 that Plaintiff's counsel was able to ascertain any information regarding Plaintiff's treating providers and, even then, Plaintiff's counsel believed that the treating provider was a medical doctor and not a nurse practitioner; (3) despite their diligence throughout this

action, it was not until March of 2015 when Plaintiff's counsel was able to irrefutably determine that Ms. Salotti was Plaintiff's only treating provider; and (4) Plaintiff did not receive Defendants' discovery responses until more than ten days after September 5, 2014. (Dkt. No. 42, at 7 [Pl.'s Opp'n Mem. of Law].)

Finally, Plaintiff argues that Ms. Salotti would not be prejudiced by being joined to this action because she has already been deposed with her counsel present and was well aware that she was Plaintiff's only treating provider with respect to the issues relevant in this matter. (*Id.* at 7-8.)

#### b. Defendants' Opposition to Plaintiff's Cross-Motion

Generally, Defendants assert two arguments in opposition to Plaintiff's cross-motion. (Dkt. No. 43, at 9-10 [Defs.' Reply Mem. of Law].) First, Defendants argue that Plaintiff's reliance on Fed. R. Civ. P. 16 is misplaced because that rule concerns only the scheduling and conduct of pretrial conferences and has nothing to do with joining a party to a lawsuit. (*Id.*) Second, Defendants argue that, apart from proceeding under the wrong rule, Plaintiff failed to address the correct legal standards and comply with the Local Rules of Practice for this Court for joining a party to a pending action. (*Id.* at 10.)

### II. RELEVANT LEGAL STANDARDS

#### A. Standard Governing a Motion for Summary Judgment

**\*8** Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). [4] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

---

4      As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d

Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. *Fed. R. Civ. P. 56(a)*,(c),(e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute. [5] Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

[5]     *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement. [6]

[6]     Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's

Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3). [7] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein ...."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

[7]     *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31, 1999 WL 325378 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

## B. Standard Governing Exhaustion of Administrative Remedies

**\*9** The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

42 U.S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle,* 534 U.S. 516, 524-25 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is hailed into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo,* 548 U.S. 81, 89 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Woodford,* 548 U.S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

In accordance with the PLRA, DOCCS has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7.[8] First, an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence.[9] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. Second, a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. Third, a grievant may appeal to CORC within a certain number of days of receipt of the superintendent's written decision. CORC is

to render a written decision within a certain number of days of receipt of the appeal.

[8]   *See also Murray v. Palmer,* 03-CV-1010, 2010 WL 1235591, at *1 & n.1 (N.D.N.Y. March 31, 2010) [citation omitted].

[9]   The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied.[10] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can–and must–be appealed to the next level, including CORC, to complete the grievance process.[11]

[10]   *See Murray v. Palmer,* 03-CV-1010, 2010 WL 1235591, at *2 & n.3 (N.D.N.Y. March 31, 2010) (citing *Groves v. Knight,* 05-CV-0183, Decision and Order at 3 [N.D.N.Y. filed Aug. 4, 2009], an appeal from which was subsequently dismissed as frivolous, *see Groves v. Knight,* No. 09-3641, Mandate [2d Cir. filed Jan. 15, 2010].)

[11]   7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *see also Murray,* 2010 WL 1235591, at *2 & n.4 [collecting cases].

**\*10** Despite the plain language of 7 N.Y.C.R.R. § 701.6(g), there appears to be some confusion regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number.[12] After carefully reviewing the case law, the Court finds that the weight of authority (and the better-reasoned authority) answers this question in the affirmative. This point of law has implicitly been recognized by the Second Circuit,[13] and

has explicitly been recognized by district courts in the Northern District, [14] Southern District, [15] and Western District. [16] The Court notes that, if the plaintiff attaches to his appeal a copy of his grievance (or even if he adequately describes, in his appeal to the superintendent, the substance of that grievance), there is something for the superintendent to review. [17]

[12] *Murray,* 2010 WL 1235591, at *2 & n.5 [citing cases].

[13] See *Collins v. Doe,* 597 Fed.Appx. 34, 34 (2d Cir. 2015) ("[T]he district court properly dismissed the complaint for failure to exhaust administrative remedies."), aff'g, Collins v. Caron, 10-CV-1527, 2014 WL 296859, at *2-3, 6-8 (N.D.N.Y. Jan. 27, 2014) (Suddaby, J.) (finding lack of special circumstances where inmate failed to properly appeal from the "non-processing" of a grievance through lack of assignment of number); cf. *Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n.3 (2d Cir. 2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

[14] *See, e.g., Kelly v. Smith,* 985 F. Supp.2d 275, 291 (N.D.N.Y. 2013) (Suddaby, J.) ("Plaintiff did not complete the exhaustion process with regard to either of those documents. The (alleged) non-processing of the first document was never appealed (in a timely fashion or otherwise) to the Superintendent and then CORC."); *Sidney v. Caron,* 09-CV-1326, 2012 WL 4380392, at *5 (N.D.N.Y. Sept. 25, 2012) (Suddaby, J) ("[E]ven if Plaintiff did submit a second grievance that was subsequently not filed, he had the ability–and the duty–to file an appeal regarding the non-processing of that grievance."); *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *15, 18 & n.46 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) ("[E]ven if Great Meadow C.F. did not ... have a functioning grievance-recording process (thus, resulting in Plaintiff's alleged grievance never being responded to), Plaintiff still had the duty to appeal that non-response to the next level."); *Midalgo v. Bass,* 03-CV-1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept. 26, 2006) (Mordue, C.J., adopting Report-Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number).

[15] See, e.g., Hernandez v. Coffey, 99-CV-11615, 2003 WL 22241431, at *4 (S.D.N.Y. Sept. 29, 2003) (rejecting plaintiff's argument that he could not have exhausted because he never received a grievance number, finding he could nonetheless have appealed any such non-response to the next level).

[16] See, e.g., *Collins v. Cunningham,* 06-CV-0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available where his grievance of March 20, 2004, was not assigned a grievance number).

[17] See Collins v. Caron, 10-CV-1527, 2014 WL 296859, at *3 (N.D.N.Y. Jan. 27, 2014) (Suddaby, J.) ("The Court notes that, if the plaintiff attaches to his appeal a copy of his grievance (or even if he adequately describes, in his appeal to the superintendent, the substance of that grievance), there is something for the superintendent to review."), aff'd, *Collins v. Doe,* 597 Fed.Appx. 34, 34 (2d Cir. 2015) ("[T]he district court properly dismissed the complaint for failure to exhaust administrative remedies.").

**\*11** Generally, if a prisoner has failed to properly follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies, and his claims are subject to dismissal. *Woodford,* 548 U.S. at 93; *Porter,* 534 U.S. at 524; *Ruggiero v. Cty. of Orange,* 467 F.3d 170, 175 (2d Cir. 2006). However, a plaintiff's failure to exhaust does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir. 2004), accord, *Ruggiero,* 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations

omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

### III. ANALYSIS

### A. Whether Plaintiff Failed to Exhaust His Administrative Remedies

For the reasons stated in Defendants' memorandum of law and reply memorandum of law, the Court answers this question in the affirmative. (Dkt. No. 37, Attach. 6, at 2-9 [Defs.' Mem. of Law]; Dkt. No. 43, at 1-8 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

#### 1. Availability of the Formal Grievance Procedure

After carefully considering the matter, the Court finds that the formal grievance procedure was available to Plaintiff. Examples of when courts have found unavailability include " 'where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies.' " *Murray*, 2010 WL 1235591, at *5 (quoting *Hargrove v. Riley*, 04-CV-4587, 2007 WL 389003, at *8 [E.D.N.Y. Jan. 31, 2007]). Here, the Court finds that the grievance procedure was available to Plaintiff because (a) before and/or after the time in question Plaintiff filed and appealed grievances at Orleans C.F. and Five Points C.F., (b) he had retained counsel who could have advised him regarding the grievance procedure, and (c) he knew how to file a proper grievance from his prior experience as an inmate at Orleans C.F. in 2011 as well as when he was at Five Points C.F.

In addition to these reasons, the Court finds that there is a lack of admissible record evidence demonstrating that Plaintiff unsuccessfully filed other grievances during the time in question. As discussed in Part I.C.1.b. of this Decision and Order, Plaintiff argues that the grievance procedure at Five Points C.F. was unavailable to him because he filed numerous grievances but only two were processed. (Dkt. No. 42, at 12 [Pl.'s Opp'n Mem. of Law].) As an initial matter, the admissible record evidence

demonstrates that many of Plaintiff's complaints were made in the form of letters and verbal complaints to prison officials but were not properly filed as formal grievances. For example, Plaintiff's counsel has attached numerous letters written by either Plaintiff or Plaintiff's former attorney to various prison officials at Five Points C.F. regarding his complaints. (Dkt. No. 41, ¶¶ 3-7, 9-10, 12-15, 17-19.) However, for the reasons discussed below in Part III.A.3. of this Decision and Order, informal complaints and letters written to prison officials are not considered formal grievances under 7 N.Y.C.R.R. § 701.2(a) and/or for purposes of the Inmate Grievance Program.

Similarly, Plaintiff's deposition testimony is inconsistent with respect to how many grievances he filed while an inmate at Five Points C.F. For example, Plaintiff testified as follows:

Q: Did you ever file a request for reasonable accommodation about the problem you were having getting around in the horticulture program?

**\*12** A: Yes.

Q: Do you know how many you filed?

A: *A couple.*

....

Q: Did you ever get back a form that said your request for help in getting around horticulture was denied?

A: No.

Q: Did you file a grievance about it?

A: Yes.

Q: Did you file more than one grievance?

A: I – I must have filed *thousands* of grievances since I've been incarcerated.

Q: But I'm just referring to Five Points.

A: At least *hundreds* of them in there.

Q: And – okay. So you filed hundreds of grievances at Five Points?

A: *Many of them.*

(Dkt. No. 41, at 118, 54:5-55:16 [Gizewski Dep.] ) (emphasis added). Plaintiff's internally inconsistent testimony, coupled with the lack of external record evidence supporting his argument that he filed numerous grievances while an inmate at Five Points C.F., is insufficient to create a genuine dispute of material fact regarding the availability of the formal grievance procedure. *See Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (explaining that district court could resolve issues of credibility on motion for summary judgment in narrow circumstances where [1] the testimony of non-movant is largely unsubstantiated by any other direct evidence, and [2] that testimony is so incomplete and/or replete with inconsistencies and improbabilities that, even after drawing all inferences in the light most favorable to the non-movant, no reasonable jury could find for the non-movant).

## 2. Estoppel [18]

[18]     The Court notes that Plaintiff did not argue in his opposition memorandum of law that estoppel applies as a ground for holding that exhaustion does not apply. Nonetheless, the Court will consider the issue for the sake of thoroughness.

After carefully considering the matter, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or by taking actions that inhibited Plaintiff's exhaustion of remedies. Defendants' Answer timely asserted this affirmative defense. (Dkt. No. 10, ¶ 16 [Defs.' Answer].) Moreover, Plaintiff has failed to adduce any admissible record evidence that it was Defendants who in any way interfered with Plaintiff's ability to file grievances during the time in question. Therefore, estoppel does not excuse Plaintiff's failure to exhaust his administrative remedies.

It is important to note that a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of *other* individuals. This point of law is clear from Second Circuit cases. [19] Furthermore, this point of law has been relied on by district courts in the Northern District, [20] Southern District, [21] Eastern District, [22] and Western District. [23]

[19]     *See Amador v. Andrews*, 655 F.3d 89, 102 (2d Cir. 2011) ("The second part considers whether defendants forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether defendants' *own* actions inhibiting the inmate's exhaustion of remedies estops one or more of the defendants from raising the exhaustion defense.") (emphasis added); *Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir. 2006) ("In our prior cases recognizing that *defendants' actions* may estop them from raising non-exhaustion as a defense .... Ruggiero does not allege beatings or threats of retaliation for filing a grievance or that he made any attempt to file a grievance and was denied that opportunity *by Defendants-Appellants.*") (emphasis added); *Hemphill v. New York*, 380 F.3d 680, 689 (2d Cir. 2004) (explaining that, where several defendants played different roles in the acts giving rise to estoppel, "it is possible that some individual defendants may be estopped, *while other may be*") (emphasis added).

[20]     *See, e.g., Belile v. Griffin*, 11-CV-0092, 2013 WL 1776086, at *9 (N.D.N.Y. Feb. 12, 2013) (Peebles, M.J.), *adopted by* 2013 WL 1291720 (N.D.N.Y. March 27, 2013) (McAvoy, J.); *Bailey v. Fortier,* 09-CV-0742, 2013 WL 310306, at *2 (N.D.N.Y. Jan. 25, 2013) (Sharpe, C.J.); *Thompson v. Bellevue Hosp.*, 09-CV-1038, 2011 WL 4369132, at *12 (N.D.N.Y. Aug. 29, 2011) (Lowe, M.J.), *adopted by* 2011 WL 4369132 (N.D.N.Y. Aug. 29, 2011) (Mordue, C.J.); *Calloway v. Grimshaw*, 09-CV-1354, 2011 WL 4345299, at *4 (N.D.N.Y. Aug. 10, 2011) (Lowe, M.J.), *adopted by* 2011 WL 4345296 (N.D.N.Y. Sep. 15, 2011) (McAvoy, J.); *Murray v. Palmer*, 03-CV-1010, 2010 WL 1235591, at *5 & n.26 (N.D.N.Y. March 31, 2010) (Suddaby, J.); *Snyder v. Whittier*, 05-CV-1284, 2009 WL 691940, at *9 (N.D.N.Y. March 12, 2009) (Report-Recommendation of Peebles, M.J., adopted by McAvoy, J.); *Murray v. Palmer*, 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008) (Report-Recommendation of Lowe, M.J., adopted by Hurd, J.); *McCloud v. Tureglio*, 07-CV-0650, 2008 WL 1772305, at *12 (N.D.N.Y. Apr. 15, 2008) (Report-Recommendation of Lowe, M.J., adopted by Mordue, C.J.); *Shaheen v. McIntyre*, 05-CV-0173, 2007 WL 3274835, at *16 (N.D.N.Y. Nov. 5, 2007) (Report-Recommendation of Lowe, M.J., adopted by McAvoy, J.); *Gill v. Frawley*, 02-CV-1380, 2006 WL 1742378, at *12 (N.D.N.Y. June 22, 2006) (Report-Recommendation of Lowe, M.J., adopted by McAvoy, J.); *Smith v. Woods*, 03-CV-0480, 2006 WL 1133247, at *16 (N.D.N.Y. Apr. 24, 2006)

(Report-Recommendation of Lowe, M.J., adopted by Hurd, J.).

21    *See, e.g., Collins v. Goord*, 438 F. Supp.2d 399, 415, n.16 (S.D.N.Y. 2006).

22    *See, e.g., McCullough v. Burroughs*, 04-CV-3216, 2005 WL 3164248, at *4 (E.D.N.Y. Nov. 29, 2005).

23    *See, e.g., Barad v. Comstock*, 03-CV-0736, 2005 WL 1579794, at *6 (W.D.N.Y. June 30, 2005).

**\*13** The Court notes that a contrary interpretation of the second part of the Second Circuit's three-part exhaustion inquiry would turn the ancient doctrine of estoppel on its head, transforming it–in Orwellian fashion–into one of "vicarious estoppel." *See Black's Law Dictionary* at 629 (9th ed) (defining "estoppel" as "[a] bar that prevents one from asserting a claim or right that contradicts what one has said or done before ...."). Moreover, such an invention would be wholly unnecessary: the vicarious conduct sought to be protected against is already protected against by the "special circumstances" inquiry established by the Second Circuit.

Finally, while it may be argued that such an interpretation of the doctrine of estoppel would nonetheless be appropriate because the purpose of the PLRA is to enable the institution to resolve disputes efficiently rather than protect the individual, prisoner civil rights suits are suits against prison officials in their individual capacities rather than suits against them in their official capacities (which would effectively be suits against the State and thus be barred by the Eleventh Amendment). As a result, the crux of the second part of the Second Circuit's three-part exhaustion inquiry is whether the officials may avail themselves of that defense, not whether the institution may avail itself of the defense.

For all of these reasons, to the extent that Plaintiff alleges that the conduct of a non-defendant correctional employee (such as employees working in the inmate grievance office who failed to forward his appeal to CORC) inhibited him from exhausting his administrative remedies, those allegations cannot estop Defendants from asserting failure-to-exhaust as a defense.

### 3. Special Circumstances Justifying Plaintiff's Failure to Exhaust

After carefully considering the matter, the Court finds that special circumstances did not exist to justify a failure to exhaust. [24] The Court notes that, contrary to Plaintiff's assertion, Directive No. 2614 makes clear that inmates may file a formal grievance. (Dkt. No. 41, at 94 [Ex. X to Blit Decl.].) Indeed, as discussed above in Part I.C.1.c. of this Decision and Order, the Directive states in conspicuous lettering "**GRIEVANCE PROCEDURE**," "**HOW TO MAKE COMPLAINTS**," and even provides a sample form for inmates to make requests for reasonable accommodation. (*Id.* at 94-96.)

24    Because the Court finds that evidence of special circumstances does not exist on the current record, it need not, and does not, reach the issue of the impact of the U.S. Supreme Court's recent decision in *Ross v. Blake*, No. 15-339, 2016 WL 3128839 (S. Ct. June 6, 2016), on the Second Circuit's special circumstances exception.

Furthermore, with respect to Grievance No. FPT-27997-13, it is apparent that Plaintiff received a determination from CORC on October 1, 2014, which is approximately eight months after Plaintiff commenced this action on February 4, 2014. (Dkt. No. 37, Attach. 3, ¶ 12 [Hale Decl.] [stating that, due to an administrative error, Plaintiff's appeal was mailed to CORC on April 30, 2013, and was then decided by CORC on October 1, 2014].) [25] It is well established that "[r]eceiving a decision from CORC *after* filing a federal lawsuit does not satisfy the PLRA's requirement that administrative remedies be exhausted *before* filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice." *Fofana v. Moss*, 15-CV-0188, 2016 WL 1237796, at *3 (N.D.N.Y. Mar. 4, 2016) (Dancks, M.J.); *accord, Burgos v. Craig*, 307 Fed.Appx. 469, 470 (2d Cir. 2008); *Neal v. Goord*, 267 F.3d 116, 121-22 (2d Cir. 2001), *abrogated in part on other grounds by Porter v. Nussle*, 534 U.S. 516 (2002). Although the Court is sympathetic to the fact that it was the inmate grievance office that failed to transmit Plaintiff's appeal to CORC until five months after he had filed it, Plaintiff is also at fault for not taking any further action during this time period. More specifically, 7 N.Y.C.R.R § 701.5(d)(3)(i) states that "[i]f a grievant does not receive a copy of the written notice of receipt [by CORC] within 45 days of filing an appeal, *the grievant should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC.*" (Emphasis added.) Nor is the delay in rendering a decision on Plaintiff's appeal a defense

to the exhaustion requirement. *See Casey v. Brockley*, 13-CV-1271, 2015 WL 8008728, at *6 (N.D.N.Y. Nov. 9, 2015) (Dancks, M.J.) (stating that "CORC's failure to act within the time frame set out in the regulations does not constitute a special circumstance justifying the failure to exhaust") (collecting cases); *Guillory v. Haywood*, 13-CV-1564, 2015 WL 268933, at *12 (N.D.N.Y. Jan. 21, 2015) (D'Agostino, J.) (stating that, "although regulations require CORC to respond within thirty days, its failure to do so is not a 'special circumstance' which might defeat an exhaustion defense").

25    With respect to the other grievance formally processed at Five Points C.F. (Grievance No. FPT-27869-13), because the parties agree that it is not relevant to the present matter, the Court will not address it in this Decision and Order. (Dkt. No. 37, Attach. 1, ¶¶ 5-6 [Defs.' Rule 7.1 Statement].)

**\*14** Finally, the Court finds that Plaintiff has failed to administratively exhaust the complaints he made through informal channels. "Contrary to [plaintiff's] suggestion, *Marvin [v. Goord*, 255 F.3d 40 (2d Cir. 2001)] does not imply that a prisoner has exhausted his administrative remedies every time he receives his desired relief through informal channels." *Ruggiero*, 467 F.3d at 177-78. Furthermore, "[m]erely [a]lert[ing] ... prison officials as to the nature of the wrong for which redress is sought does not constitute proper exhaustion." *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007) (internal citations and quotation marks omitted); *see also Perez v. City of New York*, 14-CV-7502, 2015 WL 3652511, at *4 (S.D.N.Y. June 11, 2015) (explaining that the "[p]laintiff's allegation that he advised others of his grievance does not excuse his failure to exhaust the administrative process specified in the IGRP"). "Regardless of whether ... informal complaints put the prison officials on notice of his grievance 'in a substantive sense,' ... to satisfy the PLRA, a prisoner must also procedurally exhaust his available remedies." *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 [2d Cir. 2004]). Substantive notice alone is insufficient because "[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance," and "[t]he prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules." *Woodford*, 548 U.S. at 95.

Accordingly, "[c]ourts have repeatedly held that complaint letters to the ... facility [s]uperintendent do not satisfy the PLRA's exhaustion requirement." *Nelson v. Rodas*, 01-CV-7887, 2002 WL 31075804, at *3 (S.D.N.Y. Sept. 17, 2002) (collecting cases); *see also Lopez*, 2015 5732076, at * 8 (holding that letter sent to superintendent from plaintiff's attorney did not excuse exhaustion); *accord*, *Dabney v. Pegano*, 604 Fed.Appx. 1, 5 (2d Cir. 2015). Moreover, writing to the superintendent does not "preclude submission of a formal grievance," *Amador*, 655 F.3d at 97, nor does it preclude the requirement that an inmate must go through the appeal process if the superintendent fails to act. *See McNair v. Sgt. Jones*, 01-CV-3253, 2002 WL 31082948, at *8 (S.D.N.Y. Sept. 18, 2002) (noting that the failure to follow the appeal process alone "means that [a plaintiff] has not exhausted his administrative remedies"); *accord*, 7 N.Y.C.R.R. §§ 701.5(a), 701.8(g).

Here, it is apparent that Plaintiff made various complaints to both Ms. Salotti and Defendant Sheahan, both verbally and in writing, through informal channels. However, these informal complaints do not constitute grievances for purposes of the Inmate Grievance Program, nor are they a substitute for filing a proper grievance.[26]

26    7 N.Y.C.R.R. § 701.2(a) states that a grievance is a complaint, filed with an IGP clerk, about the substance of application of any written or unwritten policy, regulation, procedure or rule of the [DOCCS] or any of its program units, or the lack of a policy, regulation, procedure or rule. *A letter addressed to facility or central office staff is not a grievance.* 7 N.Y.C.R.R. § 701.2(a) (emphasis added).

For all of these reasons, Plaintiff has failed to create a genuine dispute of material fact regarding a special circumstance justifying his failure to exhaust his administrative remedies.

### 4. Dismissal With or Without Prejudice

"Ordinarily, the proper remedy where a prisoner has failed to satisfy the exhaustion requirement is to dismiss the complaint without prejudice, to give the inmate a chance to exhaust his administrative remedies and then refile his complaint." *Brown v. Napoli*, 687 F. Supp. 2d 295, 298 (W.D.N.Y. 2009); *see also Morales v. Mackalm*, 278

F.3d 126, 128 (2d Cir. 2002) (dismissal for failure to exhaust should be without prejudice to refiling following exhaustion). "This is so even when the issue is decided on a motion for summary judgment." *Mateo v. Corebine*, 09-CV-4811, 2010 WL 3629515, at *7 (S.D.N.Y. Sept. 17, 2010) (collecting cases). Where a plaintiff has fully exhausted his administrative remedies after filing suit, the complaint should still be dismissed without prejudice. *See Mendez v. Artuz*, 01-CV-4157, 2002 WL 313796, at *2 (S.D.N.Y. Feb. 27, 2002) (stating that "the greater good forbids allowing a case to proceed where administrative remedies have been exhausted while the complaint is pending, and requires in such a case dismissal of the complaint, to be re-filed, if the plaintiff wishes, with the addition of paragraphs explaining how administrative remedies have been exhausted"). Accordingly, the Court finds that, at the very least, the entirety of Plaintiff's Complaint should be dismissed without prejudice.[27] However, for the reasons discussed below, the Court finds that Plaintiff's first, second, and fourth causes of action against DOCCS should be dismissed with prejudice. Furthermore, Plaintiff's third cause of action against Defendant Sheahan and John Doe 1 should also be dismissed with prejudice.

[27]   The Court is not at liberty to stay Plaintiff's action. *See McCoy v. Goord*, 255 F. Supp. 2d 233, 254 (S.D.N.Y. 2003) ("In the context of § 1983 and the PLRA ... courts have squarely held that the district court may not stay the action pending exhaustion, as Congress eliminated the authority to do so by enacting the PLRA .... Pre-suit exhaustion is thus required."). Therefore, if Plaintiff's claims are at risk of becoming time-barred, the parties will have to address that issue at the appropriate time.

### B. Whether Plaintiff's ADA Retaliation Claim Is Barred by the Eleventh Amendment

**\*15** After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Plaintiff's opposition memorandum of law. (Dkt. No. 42, at 17-18 [Pl.'s Opp'n Mem. of Law].) *See also Maioriello v. N.Y.S. Office for People with Dev. Disabilities*, 14-CV-0214, 2015 WL 5749879, at *12 (N.D.N.Y. Sept. 30, 2015) (Suddaby, J.) (holding that the Eleventh Amendment did not bar plaintiff's ADA Title V retaliation claim where it was predicated on Title II) (citing cases); *accord, Bylsma v. Hawaii Pub. Hous. Auth.*, 951 F. Supp. 2d 1116, 1121 (D. Haw. 2013) (citing cases).

### C. Whether Plaintiff's § 1983 Claims Should Be Dismissed for Lack of Personal Involvement

#### 1. Superintendent Sheahan

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendants' memorandum of law. (Dkt. No. 37, Attach. 6, at 11-13 [Defs.' Mem. of Law].) To those reasons, the Court adds only that the fact that Plaintiff wrote letters to Defendant Sheahan and spoke with him directly regarding his complaints on one or two occasions (Dkt. No. 42, at 15-16 [Pl.'s Opp'n Mem. of Law] ) are not, in and of themselves, sufficient to raise a genuine dispute of material fact regarding his personal involvement. *See Funderburke v. Canfield*, 13-CV-6128, 2016 WL 831974, at *9 (W.D.N.Y. Feb. 29, 2016) (holding that plaintiff failed to create a genuine dispute of material fact regarding superintendent's personal involvement where plaintiff wrote to the superintendent on several occasions but received no response and where plaintiff spoke directly to superintendent regarding his complaints but superintendent did nothing); *Jones v. Tompkins*, 12-CV-0057, 2014 WL 860334, at *5 (W.D.N.Y. Mar. 5, 2014) ("The fact that the plaintiff spoke with the supervisory officials, may not be sufficient personal involvement for the maintenance of a § 1983 claim"); *accord, Rosales v. Kikendall*, 677 F. Supp. 2d 643, 650-51 (W.D.N.Y. 2010). Accordingly, Plaintiff's third cause of action against Defendant Sheahan is dismissed with prejudice.

#### 2. Kristen Salotti

Because the Court is denying Plaintiff's cross-motion to join Ms. Salotti as a defendant for the reasons discussed below in Part III.E. of this Decision and Order, the Court need not, and does not, consider Plaintiff's § 1983 claim against Ms. Salotti.

### D. Whether Plaintiff's ADA Claims Should Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendants' memorandum of law. (Dkt. No. 37, Attach.

6, at 8-9, 13-17 [Defs.' Mem. of Law].) To those reasons, the Court adds the following three points.

First, Plaintiff incorrectly analyzes Defendants' arguments regarding his ADA claims under the standard governing a motion to dismiss under Fed. R. Civ. P. 12(b)(6) based upon Defendants having entitled their arguments "The ADA Claims Fail to State a Cause of Action." (*Id.*) Although Defendants used this heading, Defendants filed a motion for summary judgment and relied on admissible record evidence outside of the pleadings in support of their arguments. (Dkt. No. 37, Attach. 6, at 13-17 [Defs.' Mem. of Law].) Therefore, the Court may not consider Defendants' arguments merely under the legal standard appropriate for a motion to dismiss.[28] Simply stated, Plaintiff's strategic choice to proceed without analyzing Defendants' arguments in the alternative under the summary judgment standard was at his own risk.

[28]     Of course, in a motion for summary judgment under Fed. R. Civ. P. 56, a defendant may assert an argument that the plaintiff has failed to state a claim under Fed. R. Civ. P. 12(b)(6). *See Schwartz v. Compagnise Gen. Transatlantique*, 405 F.2d 270, 273-74 (2d Cir. 1968) ("Where appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment."). In such a circumstance, the Court need not give prior notice to the party whose pleading is being analyzed. *See Katz v. Molic*, 128 F.R.D. 35, 37-38 (S.D.N.Y. 1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

*16 Second, Plaintiff has failed to adduce admissible record evidence sufficient to create a genuine dispute of material fact regarding whether he fully exhausted his administrative remedies with respect to these claims. Although Defendants argue that Plaintiff failed to grieve the substance of these three claims (Dkt. No. 37, Attach. 6, at 8-9 [Defs.' Mem. of Law] ), Plaintiff fails to respond to this argument in his opposition memorandum of law. As discussed above, in Part II.A. of this Decision and Order, in this District, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. The Court

finds that Defendants have met this modest burden, in part, for the reasons stated in their memorandum of law. (*Id.*) In addition, the Court has carefully reviewed the admissible record evidence submitted by Plaintiff in opposition to Defendants' motion and finds that, during his incarceration, Plaintiff's attorney sent letters to Superintendent Sheahan regarding the substance of Plaintiff's ADA claims. (Dkt. No. 41, at 51-56 [Exs. "P" & "Q" to Blit Decl.].) However, as discussed above in Part III.A.3. of this Decision and Order, letters sent to a facility's superintendent do not satisfy the PLRA's exhaustion requirement. Furthermore, an inmate must go through the appeal process if the superintendent fails to act. Here, although one of the letters requests that it be attached to a grievance form and filed as an official grievance,[29] Plaintiff has failed to submit admissible record evidence demonstrating whether he received a response and/or whether he appealed the grievance to the next level. (Dkt. No. 41, at 55 [Ex. "Q" to Blit Decl.].)

[29]     For the sake of brevity, the Court will not linger on the fact that this unusual attempt to submit a grievance failed to specifically identify the individual(s) alleged to have committed wrongdoing and the date(s) on which that alleged wrongdoing was committed.

Third, with respect to Plaintiff's retaliation claim, it is apparent that Defendants' basis for dismissal of this claim is raised for the first time in Point IV of their reply memorandum of law. More specifically, Defendants argue in their memorandum of law that they have a legitimate, nonretaliatory reason for denying Plaintiff's request for a new wheelchair and that this denial was not in retaliation for Plaintiff having made a request for a reasonable accommodation. (Dkt. No. 37, Attach. 6, at 17 [Defs.' Mem. of Law].) After reviewing Plaintiff's opposition memorandum of law, however, Defendants argue in their reply memorandum of law that they had "interpreted the claim to mean that plaintiff had one reasonable accommodation request for a new wheelchair denied because of retaliation.... Instead, plaintiff contends that [he] was transferred to the [SHU] 'in retaliation for his reasonable accommodation requests.' " (Dkt. No. 43, at 10-11 [Defs.' Reply Mem. of Law].) Defendants then argue that Plaintiff's retaliation claim should still be dismissed because they had a legitimate, nonretaliatory reason for placing Plaintiff in the SHU. (*Id.* at 11.) Specifically, Defendants argue that Plaintiff testified at his deposition that, on December 16, 2013, he received a

second misbehavior report at Five Points C.F. for using marijuana. (*Id.*) As a result, Plaintiff went to a tier hearing and pled guilty to the charge and was sentenced to a year in SHU by a hearing officer. (*Id.*)

Because this argument was raised for the first time in Defendants' reply memorandum of law, it would not ordinarily be considered. *See Knipe v. Skinner*, 999 F.2d 708, 710-11 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief."); *Playboy Enter., Inc. v. Dumas*, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) ("Arguments made for the first time in a reply brief need not be considered by a court."). However, in a Text Order dated May 31, 2016, the Court *sua sponte* granted Plaintiff seven days to file a sur-reply to address the arguments raised in Point IV of Defendants' reply memorandum of law. (Dkt. No. 46 [Text Order dated May 31, 2016].) Plaintiff declined the Court's invitation to respond to this issue, neglecting to file a sur-reply. Accordingly, the Court finds that Defendants' arguments regarding this issue are unopposed and that they have met their modest burden demonstrating that they had a legitimate, nonretaliatory reason for placing Plaintiff in the SHU for the reasons stated in their reply memorandum of law. (Dkt. No. 43, at 10-11 [Defs.' Reply Mem. of Law].) Even if the Court were to subject this legal argument to the more heightened scrutiny appropriate for a contested legal argument, it would find that legal argument to have merit, for the reasons stated by Defendants.

**\*17** Accordingly, for all of the foregoing reasons, Plaintiff's first and second causes of action are dismissed for failure to exhaust his administrative remedies. As discussed above in Part III.A.4. of this Decision and Order, these claims would ordinarily be dismissed without prejudice to give Plaintiff an opportunity to exhaust his administrative remedies. However, because administrative remedies have become unavailable (due to Plaintiff's release from incarceration), he had ample opportunity to use them while he was incarcerated, and no special circumstances justified his failure to exhaust, these claims are dismissed with prejudice. *See Prescott v. Annetts*, 09-CV-4435, 2010 WL 3020023, at *8 (S.D.N.Y. July 22, 2010) (dismissing plaintiff's claims with prejudice because he had ample opportunity to exhaust his administrative remedies while incarcerated, they are no longer available to him because he has been released, and no special circumstances justified his failure to exhaust); *accord*, *Fowler v. Fischer*, 13-CV-6262,

2014 WL 4058218, at *1 (S.D.N.Y. Aug. 14, 2014); *Finger v. Superintendent McFinnis*, 99-CV-9870, 2004 WL 1367506, at *5 (S.D.N.Y. June 16, 2004). Plaintiff's fourth cause of action is likewise dismissed with prejudice for the additional reason that Defendants' had a legitimate, nonretaliatory reason for placing Plaintiff in the SHU.

### E. Whether Kristin Salotti
### Should Be Joined as a Defendant
After carefully considering the matter, the Court answers this question in the negative for the reasons set forth below.

Generally, a motion such as this one is brought under Fed. R. Civ. P. 15(a). [30] However, courts also apply Fed. R. Civ. P. 16(b)(4) when a party has moved to join or add a party after the expiration of a scheduling order deadline. *See, e.g.*, *Gullo v. City of New York*, 540 Fed.Appx. 45, 47 (2d Cir. 2013); *Charles v. City of New York*, 11-CV-2783, 2015 WL 756886, at *2 (S.D.N.Y. Feb. 20, 2015); *Gallo v. Wonderly Co., Inc.*, 12-CV-1868, 2014 WL 36628, at *2-5 (N.D.N.Y. Jan. 6, 2014) (Treece, M.J.); *Steuben Foods, Inc. v. Shibuya Hoppmann Corp.*, 10-CV-0781, 2012 WL 3204040, at *2-3 (W.D.N.Y. Aug. 3, 2012). [31] "[A] finding of 'good cause' depends on the diligence of the moving party." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000); *accord*, *Kassner v. 2ⁿᵈ Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007). Furthermore, "[g]ood cause should not be subject to either the subjective needs or caprice of the litigants but, rather, should be based upon an objective standard." *Gallo*, 2014 WL 36628, at *2. "The burden of demonstrating good cause rests with the movant.... The burden of demonstrating prejudice rests with the non-movant." *Scott v. Chipotle Mexican Grill, Inc.*, 300 F.R.D. 193, 198 (S.D.N.Y. 2014).

30      Despite the fact that Plaintiff has requested leave to "join" a female nurse as a defendant in place of male doctor Defendant John Doe 1, the Court finds that the request is appropriately analyzed as a motion to amend under Fed. R. Civ. P. 15 rather than a motion to join a defendant under Fed. R. Civ. P. 20(a)(2) due to the explanation for that request (e.g., that Plaintiff had named "John Doe 1, Plaintiff's Treating Physician" based on his presumption that he had been treated by a male doctor and that he had later learned that his only treatment provider was a female

nurse). *Cf. Llody v. Yankey*, 12-CV-5913, [2013 WL 6086074, at *1-2 (W.D. Wash. Nov. 19, 2013)](#) ("After Defendants filed their motion for summary judgment, Plaintiff was granted leave to amend his complaint to correctly name 'John Doe' as Nurse Practitioner P. McClan ... who failed to splint his finger or to refer him for x-rays or follow-up to a doctor, even though his finger was twisted and bent when *she* examined his hand.") (emphasis added); *Washington v. Reed*, 07-CV-4231, [2008 WL 2230704, at *3 (W.D. Mo. May 29, 2008)](#) ("[P]laintiff filed a motion to amend his complaint to provide the name of the defendant nurse [Annette R. Bruemmer] previously identified only as a John Doe.... Plaintiff will be granted leave to substitute the name of Bruemmer for the John Doe defendant....").

31    Similarly, this Court's Local Rules state the following:

> Deadlines that the Court institutes in any case management order shall be strictly enforced and shall not be modified by the Court, even upon stipulation of the parties, except upon a showing of good cause.

N.D.N.Y. L.R. 16.1(f).

**\*18** As discussed above in Part I.C.2.b. of this Decision and Order, Defendants argue only that [Fed. R. Civ. P. 16](#) is inapplicable to Plaintiff's cross-motion to join Ms. Salotti. Notwithstanding Defendants failure to identify the correct standard (or even apply the incorrect standard), the Court finds that Plaintiff has failed to demonstrate good cause to join or add Ms. Salotti as a defendant at this stage in the litigation. More specifically, the Uniform Pretrial Scheduling Order required that any application to join or add parties to be made on or before September 5, 2014. (Dkt. No. 14, at 1 [Uniform Pretrial Scheduling Order].) On December 2, 2014, the parties attempted to extend this deadline by stipulating that Plaintiff would have until December 8, 2014, to join or add parties. (Dkt. No. 33.) However, Magistrate Judge Treece denied the parties' request to extend the deadline, noting that the initial deadline had already expired, resulting in Plaintiff having to show good cause before the deadline would be extended. (Dkt. No. 34 [Text Order dated December 4, 2014].) Plaintiff attempts to make that showing now, arguing, in part, that "it was not until the middle of March, 2015, [that] plaintiff's counsel was able to irrefutably determine that Ms. Salotti was plaintiff's only treating provider." (Dkt. No. 42, at 7 [Pl.'s Opp'n Mem. of Law].) Conspicuously absent from Plaintiff's papers, however, is an explanation as to why he waited until August 14, 2015, to move to join Ms.

Salotti when he was able to "irrefutably determine" her identity in March 2015. Accordingly, Plaintiff has failed to demonstrate the due diligence necessary to establish good cause by failing to take any action during the five months that elapsed between mid-March and mid-August 2015. *See Gullo*, [540 Fed.Appx. at 47](#) ("The district court acted well within its discretion in concluding that plaintiffs' three-month failure to move for amendment after learning the officers' names failed to demonstrate the diligence necessary to satisfy [Rule 16](#).") Moreover, such a delay, especially in a relatively old case such as a this one, prejudice Defendants by affecting witnesses' memories, the ability to locate witnesses (who might retire from, or be transferred within, DOCCS), and the preservation of evidence. *See [Georgiadis v. First Boston Corp.](#)*, [167 F.R.D. 24, 25 (S.D.N.Y. 1996)](#) ("The passage of time always threatens difficulty as memories fade. Given the age of this case, that problem probably is severe already. The additional delay that plaintiff has caused here [which was four months in length] can only make matters worse.").

In any event, even if Plaintiff had shown good cause for the five-month delay, he has failed to meet the underlying standard for a motion to amend under [Fed. R. Civ. P. 15(a)](#). *See [Foman v. Davis](#)*, [371 U.S. 178, 1782 (1962)](#) (explaining that permissible grounds upon which to base the denial of a motion for leave to file an amended complaint include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance the amendment, futility of amendment, etc."). Finally, even if the underlying standard were one under [Fed. R. Civ. P. 20(a)(2)](#), Plaintiff has failed to meet that standard, which is similar to the standard under [Fed. R. Civ. P. 15(a)](#). *See Midlantic Commercial. Co. v. Prime Sportswear Corp.*, 95-CV-10192, [1996 WL 361539, at *5 (S.D.N.Y. June 27, 1996)](#) ("In deciding whether permissive joined is warranted, a court should determine whether the requirements of [Rule 20](#) are satisfied, and then weigh any considerations relevant to efficient adjudication such as the potential for delay and unfair prejudice.").

For all of the foregoing reasons, Plaintiff's cross-motion is denied. Moreover, because Plaintiff has made clear that Ms. Salotti is actually the John Doe 1 Defendant against whom he intended to assert an Eighth Amendment claim (*see*, *supra*, Part I.C.2.a of this Decision and Order), Plaintiff's third cause of action is dismissed against

Defendant John Doe 1. The Court notes that it would reach this conclusion even if it were to analyze this issue under the standard governing dismissals for failure to prosecute under Fed. R. Civ. P. 41(b). More specifically, the Court finds that (1) the duration of the Plaintiff's failure to name Defendant John Doe 1 is some twenty-one months (having begun on the deadline for motions to amend on September 5, 2014), (2) Plaintiff received adequate notice that a delay would result in the dismissal of this claim (given that he is represented by counsel who is familiar with both the Federal Rules of Civil Procedure and Local Rules of Practice for this Court), (3) Defendants are likely to be prejudiced by a further delay (for the reasons discussed above in *Geordiadis*, 167 F.R.D. at 25), (4) Plaintiff's right to due process and a fair chance to be heard on this claim is outweighed by the need to alleviate congestion on the Court's docket, and (5) lesser sanctions would not be effective under the circumstances. *See Hevner v. Vill. E. Towers, Inc.*, No. 07-5608, 2008 WL 4280070, at *1-2 (2d Cir. Sept. 18, 2008).

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 37) is **GRANTED**; and it is further

**ORDERED** that the following portions of Plaintiff's Complaint (Dkt. No. 1) are **DISMISSED**:

> (1) Plaintiff's First, Second, and Fourth Causes of Action against DOCCS, which are **DISMISSED with prejudice**; and

> **\*19** (2) Plaintiff's Third Cause of Action against Defendant Sheahan and "John Doe 1," which is **DISMISSED with prejudice**; and it is further

**ORDERED** that Plaintiff's cross-motion to join Kristin Salotti as a defendant (Dkt. No. 42) is **DENIED**; and it is further

**ORDERED** that the sole remaining claim in this action– i.e., Plaintiff's Third Cause of Action against Defendant "John Doe 2"–shall be **DISMISSED with prejudice** for failure to prosecute under Fed. R. Civ. P. 41(b) **UNLESS**, within **THIRTY (30) DAYS** of the date of this Decision and Order, Plaintiff files a motion for leave to file an Amended Complaint identifying that Defendant.

**All Citations**

Slip Copy, 2016 WL 3661434

---

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.